ORIGINAL



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------X
ROBERT JEFFREY JOHNSON, JR.

Plaintiff,

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JOHN STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOE 1-9 SERVANTS AND REPRESENTATIVES OF NASSAU,

Defendants.

---------------------------------------------X

Videoconference

August 22, 2023
2:00 p.m.

EXAMINATION BEFORE TRIAL OF DONNA HENIG, a Nonparty Witness herein, taken by the Plaintiff, pursuant to Federal Rules of Testimony, held Virtually, before Christina Schmidt, Notary Public of the State of New York.

A P P E A R A N C E S:

GUERCIO & GUERCIO
Attorneys for the Plaintiff
77 Conklin Street
Farmingdale, New York 11735
BY: JOHN BRADLEY, ESQ.

COUNTY ATTORNEY'S OFFICE COUNTY OF NASSAU
Attorneys for the Defendants
1 West Street
Mineola, New York 11501
BY: BRIAN MCLAUGHLIN, ESQ.

MILBER MAKRIS PLOUSADIS & SEIDEN, LLP
Attorneys for the Defendant
County of Nassau
1000 Woodbury Road, Suite 402
Woodbury, New York 11797
BY: PETER TAMIGI, ESQ.

LAW OFFICES OF EDWARD J. TROY
Attorneys for the Witness
Dr. Donna Henig
44 Broadway
Greenlawn, New York 11740
BY: ALEXANDER SANSONE, ESQ.

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any notary public with the same force and effect as if signed and sworn to before the court.

* * *

D O N N A H E N I G, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: State your name for the record, please.

THE WITNESS: It's Donna Henig.

THE COURT REPORTER: State your address, please.

THE WITNESS: 100 Carmen Avenue, East Meadow, New York 11544.

EXAMINATION BY

MR. BRADLEY:

MR. BRADLEY: Mr. Sansone, do you have a copy of a policy regarding medical records that was requested in the subpoena?

MR. SANSONE: That's part of the problem. Policy regarding medical records with respect to what? I thought you sent over a policy that you were using.

MR. BRADLEY: In the subpoena, it says, for the treatment of

patient-inmates at the medical facility.

MR. SANSONE: What specific policy are you looking for because there are a whole bunch of policies that deal with patient treatment?

MR. BRADLEY: Well, I know that you have the policy. I know that it discusses the requirements for patient treatment. I think the information that I provided in the subpoena is sufficient enough for you to give me that.

I'm requesting all records, all policies regarding the keeping of medical records at this facility.

MR. SANSONE: All right. So you're asking for a policy regarding keeping medical records?

MR. BRADLEY: Yes, the requirement for doing so.

MR. SANSONE: Do we have such a policy?

THE WITNESS: I don't know,

probably.

MR. SANSONE: I think that's what he's asking for.

MR. BRADLEY: Yes. I asked for it in the subpoena. I asked that it be provided today.

MR. SANSONE: Sure.

MR. BRADLEY: While we are doing that, since you only have two hours, I would like to proceed. Obviously, if we have to go further than two, I need you to come back but I would have liked this record before we proceeded.

MR. SANSONE: I would suggest that you try to move your examination along, number one. Number two, give her a chance to find out -- get someone to get the policy. So you can start questioning as soon as she's made that contact.

MR. BRADLEY: I'm just waiting for her to get off the phone.

MR. SANSONE: Did you ask somebody for the policy?

THE WITNESS: No. They are not answering.

MR. SANSONE: Okay. So we'll take a break at some point and look for the policy.

THE WITNESS: I just want to make sure it's clear.

What policy exactly are you looking for?

MR. SANSONE: Medical records.

THE WITNESS: The keeping of medical records?

MR. SANSONE: That's what he's asking.

MR. BRADLEY: Right.

MR. SANSONE: Like a record retention policy.

THE WITNESS: Okay.

MR. BRADLEY: All right.

Ms. Henig, could you please state your name for the record?

THE WITNESS: Dr. Donna Henig.

MR. BRADLEY: Okay, Doctor. My name is John Bradley. I represent the plaintiff, Robert Jeffrey Johnson, in this matter.

I am going to ask you some questions with respect to an incident that occurred on October 12, 2021 at the Nassau County Correctional Center.

Before we begin, I'm going to ask you to agree to some ground rules for the deposition.

First thing, I'm going to ask that you keep all your responses to my questions verbal, okay?

THE WITNESS: Yes.

MR. BRADLEY: Please keep your voice up and speak clearly so that the court reporter can transcribe this accurately; will you agree to that?

THE WITNESS: Yes.

MR. BRADLEY: If there is a question you don't understand, let

me know and I'll repeat the question or rephrase it; will you agree to that?

THE WITNESS: Yes.

MR. BRADLEY: Unless you tell me otherwise, I will assume you've understood and heard my question, okay?

THE WITNESS: Okay.

MR. BRADLEY: If you do not know the answer to a question, please do not guess. Tell me that you don't know. I don't want you to guess on anything. I'm not here to trick you, okay?

THE WITNESS: Okay.

MR. BRADLEY: Please wait for me to finish my question. You may anticipate the answer to my question while I'm asking it. I just ask that you wait until I'm finished so the court reporter can cleanly take down the question, okay?

THE WITNESS: Okay.

MR. BRADLEY: Do you understand that you have taken an oath to tell the truth today?

THE WITNESS: Yes.

MR. BRADLEY: Do you understand that it's the same oath that you would take in the courtroom if this case were to go to trial?

THE WITNESS: Yes.

MR. BRADLEY: Okay. If you realize at any time during this deposition that an earlier answer you gave was inaccurate or incomplete, please let me know and I'll give you a chance to make a correction, okay?

THE WITNESS: Okay.

MR. BRADLEY: You'll have an opportunity to review a transcript of today's examination. After you reviewed it, you may correct any errors you find in the transcript, okay?

THE WITNESS: Okay.

MR. BRADLEY: If you need to take a break at any point, please let me know. But before you take a break, you need to answer the question that's pending before you, okay?

THE WITNESS: Okay.

MR. BRADLEY: Are we in agreement on these rules?

THE WITNESS: Yes.

Q Is there any reason at all that you cannot testify truthfully and accurately today?

A No.

Q Are you represented by an attorney?

A Yes.

Q Did you meet with your attorney to prepare for this examination, whether in person, by phone or by other means?

A Yes.

Q When was that?

A Today.

Q How long was that?

A About a half an hour.

Q All right. Did you review any documents in preparation for this examination?

A Yes.

Q What documents did you review?

A What you sent over by lockbox.

Q Okay. Injury to inmate report. There was a logbook. There was sick call requests. Those documents?

A Correct.

Q There was a picture of an individual named Robert Johnson.

A Yes.

Q Were you ever contacted by anyone from the county attorney with respect to the matter at all?

A No.

Q Okay. Can you please describe your educational background?

A I went to college, graduated from Barnard. I went to New York College Medical School. I trained at Montefiore as my internship. I completed my residency in

medicine at Hartford, in Hartford, Connecticut.

Q Okay. And where did you proceed after your residency?

A I worked in an internal medicine office for a number of years up in Connecticut. I eventually moved back to New York where I initially worked as a hospitalist at Winthrop, followed by a private practice. In addition to the private practice, I started working in a wound care center. I got double-boarded in hyperbaric and wound care. I worked there for approximately ten years. And then, I switched over to correctional medicine.

Q Okay. What year did you switch over to correctional medicine?

A In 2017.

Q Did you have to receive any training to make the switch to correctional medicine?

A No, I did not.

Q Where do you currently work?

A At the Nassau County

Correctional Facility in East Meadow.

Q When did you first begin working there?

A January, 2017.

Q When you first began employment, what was your job title?

A I was a physician and within two weeks, I moved up to medical director.

Q Okay. With respect to getting moved up to medical director, was there some process to do that?

A There was a medical director that was currently working here that left.

MR. SANSONE: Should be noted, that was for a different company.

THE WITNESS: That's correct.

I was with Armor Correctional Facilities first from January, 2017 through August of 2017. Then Nassau University Medical Center took me on as a vendor and hired me to continue as medical director.

Q Okay. So your career as a medical doctor, do you have any

certifications?

A Like I said, I'm board certified in internal medicine. I'm also board certified in hyperbaric wound care back in 2010-2020, a certified correctional health professional for CCHP. I also have addiction training and like I said, wound care and internal medicine training. I'm board certified.

Q You said CCHP?

A Yes, Certified Correctional Health Professional.

Q Do you have any publications?

A In medical school, I published under dermatology on protoporphyria.

Q And as a medical director, do you have to receive training or continuing training for that role?

A CMEs are always necessary. After every two years, you have to have at least 50 CMEs. In correctional medicine, you have to have at least 15. I have both and more.

Q Okay. So you work at the

medical unit at Nassau County Correctional Center?

A Yes.

Q And that's where you're the medical director?

A Yes.

Q What is the relationship between Nassau University Medical Center and the jail?

A I work for Nassau University Medical Center. We are the vendor. We work in this jail for corrections to take care of the patients.

Q Where is the medical unit located at the jail?

A We have two buildings. There's a core building and a satellite building. There are two separate medical units in each building. Administration tends to be in the core but we do have administration people in the satellites. It's separated by maybe about a quarter of a mile.

Q Where's the core building located?

A It's in East Meadow.

Q So there's multiple buildings at the jail, right?

A Yes.

Q Which building is the core located in?

A I don't know how to describe it.

MR. SANSONE: I think he's looking for a designation for the building.

Are you aware whether it's A, B, C, D or E?

THE WITNESS: I'm not exactly sure.

A I know it's -- We house, you know, what we house in this building in the core. I know what we house in the satellite. It's called the 832 building is the satellite building. The core building, we just call it the core building.

Q Did you work in the core building?

A Most of the time, yes.

Q All right. Is there a policy handbook of the medical unit at the jail?

A Yes. It's also online and a book.

Q Is it available to the public?

A I'm not sure. It's available to staff.

Q Okay. And you're required to make that available to staff, right?

A Yes.

Q What staff makes up the medical unit? What types of nurses? Who makes up the medical unit?

A We have approximately 13 healthcare providers that include physician assistants, nurse practitioners and M.D.s, medical doctors. We call them healthcare providers. We then have a number of subspecialists which include OBGYN, pediatrist, orthopedist. We have a radiology program here. We have dentists. We have mental health, physical therapists. We also have -- As part of the mental health program, we have social workers. We have

discharge planners. We have psychologists, forensic psychologists. And we have psychiatrists. These people all are supervised more or less by myself.

As far as the nurses, we have a director of nursing here who supervises RNs and LPNs.

Q So you would agree that there's not really much of a difference between the medical unit and a normal hospital, right?

MR. SANSONE: Objection.

You can answer.

A I'm not sure what you're trying to ask.

Q Okay. I think we have enough information for that question.

Are you familiar with the National Commission on Correction Healthcare?

A Yes, I am.

Q What is that?

A It's sort of a -- It's an organization that sets a standard of care for incarcerated individuals and for

managing medical units.

Q And you're certified by this entity, correct?

A Yes.

Q And this entity offers accreditation to medical units at jails, right?

A Yes.

Q Is the medical unit at the jail accredited?

A No.

Q Why not?

MR. SANSONE: Objection.

You can answer.

A There's a lot of details based on -- that are required. We don't have electronic medical records right now. It's difficult to acquire all the specific information that is required to sort of attain that level of accreditation. It doesn't mean that the care here is not far superior even though we're not accredited. It really has to do with logistics.

It would be nice if the County

wants to build us one building so that we could manage all the patients in one building. It sets a lot of obstacles and difficulty to get that accreditation. That just means we are accredited. It doesn't necessarily mean we are not qualified.

Q So based on your certification, are you familiar with the standards set forth by the National Commission on Correctional Healthcare?

A I am.

Q And that's considered the gold standard in the industry, right?

A Yes.

Q Are you familiar with a publication called Standards for Health Services in Jails published by the National Commission on Correctional Health Care?

A I would have to see what you're referring to. I'm not really sure. I think you're talking about the green book.

Q Yes.

A That's what you're talking about.

Q And you're required to be familiar with the content of the standards contained within that book to be certified, correct?
A Yes.
Q Do you have a copy of that book?
A Yes.
Q Okay. Do you keep it at your desk?
A Yes.
Q All right. And some of the standards in that book include protocols about how to treat inmates.
A Yes.
Q Creating and maintaining health records with respect to health encounters with patient-inmates.
A Correct.
Q Protocols regarding responding to emergencies.
A Yes.
Q Sick calls.
A Yes.

Q Protocols for providing treatment to patients in a private settings where possible.

A Yes.

Q Treating victims of sexual assault.

A Yes.

Q Responding to complaints of sexual assault by an inmate.

A Yes.

Q Continuity and coordination of care during incarceration.

A Yes.

Q Inmate transfer screenings.

A Yes.

Q Written nursing assessment protocols.

A Yes.

Q Other than yourself, is there any other member of your staff that is certified by the National Commission on Correctional Healthcare?

A Yes.

Q Who?

A We had a number of people take tests a couple of years ago. I can't tell you the specific number. I can get back to you if you want to know how many people are certified but we do have a number of certified healthcare professionals.

Q Do you require a particular staff to be certified?

A No.

Q Are nurses certified?

A They can be, yes.

Q Okay. Do you offer any incentive for your staff to get certified?

A We ask them to get trained if they're interested, sure. We always offer that.

Q Is anyone required to be certified?

A No.

Q Okay. Do you know what a responsible health authority is?

A Yes.

Q What is that?

A It's a person who can make the

ultimate decision when someone needs guidance.

Q Are you that person at the medical unit?

A In general.

Q Okay. And what is a health services administrator?

A That's the person that does the operations of the jail. They coordinate things with corrections and medical, make sure that the medicine can take place in a timely fashion and that things run smoothly.

Q Do you have a health services administrator at the medical unit?

A Yes.

Q Who is that person?

A Todd Haiken, H-A-I-K-E-N.

Q All right. Is it the policy of the medical unit that the responsible health authority and teleservices administrator ensure that healthcare policies and procedures are developed, documented and ready and available to healthcare staff?

A Yes.

Q All right.
THE WITNESS: Can I just call him and see if he's available to get that policy that you're looking for?
MR. BRADLEY: Sure.
THE WITNESS: You may continue.
Q Are the policies and procedures that are developed by the medical unit at the jail address each applicable standard outlined in the National Commission on Correctional Healthcare Standards for health services in jails?
A Yes.
Q Is it the policy of the medical unit at the jail to ensure that patients and inmates have access to care to meet their serious medical, dental and mental health needs?
A Yes.
Q Is it the policy of the medical unit at the jail that physicians, dentists, nurses have the freedom to practice their profession without the interference from nonmedical personnel such as correction

officers?

A Yes.

Q Clinical decisions regarding healthcare provided to patients are the sole responsibility of qualified healthcare professionals at the medical unit, correct?

A Correct.

Q Okay. Are you familiar with standard A-08 health records by the National Commission on Correctional Healthcare?

A I mean, obviously, I am but I want to see what you're referring to because it's not fair to ask this is the book on the standards. I'm not sure which one you're talking about but I'll look. Which one?

Q So I just want to ask before you go in there -- I won't ask you specifically on this but I just want to know based on the medical unit's policy.

A Okay.

Q Is it the medical unit's policy to create a health record every time its staff has a health encounter with a patient-inmate?

A Yes.
Q All right. And one of those health encounters could include treating an inmate who has complained of chest pain or shortness of breath.
A Yes.
Q In that situation, a health record would be created?
A Yes.
Q In that situation, staff would typically record the vital signs of the patient, correct?
A Yes.
Q And when staff would record the vital signs of the patient, they would put that information in a health record regarding the inmate-patient, correct?
A Correct.
Q And those records would be maintained in the patient healthcare record or file at the jail, right?
A Yes.
Q Or the medical unit?
A Uh-huh.

Q Yes?
A Yes.
Q When we talk about vital signs, that would include testing for blood pressure or an inmate's oxygen level?
A Heart rate, respiratory rate, sometimes as a finger stick, blood glucose and a pulse oximetry on the vital signs.
Q Do you know the particular record that that would be called where the healthcare professional would record that information?
A (No verbal response.)
MR. SANSONE: Objection.
You can answer.
Q In other words, is it called a progress note?
A Well, it's actually -- We have a specific form called a sick call. And we now document if a patient in the jail has a complaint, they write a request to medical and we answer on that sick call page. So it's actually on the sick call page. If we want to extend it, we can write in the

progress note section but we now specifically have a sick call sheet.

Q Okay. I understand the medical unit's sick call policy.

Would you agree with me that not every instance would a sick call be created if an inmate requires medical treatment, correct?

A Correct.

Q There are some instances where correctional staff will call the medical unit in an emergency situation.

A Correct.

Q And an emergency situation could be considered or is considered a complaint by an inmate of chest pains or shortness of breath?

MR. SANSONE: Objection. I think the form of the question is wrong. You might want to just redo the question.

Q An emergency situation could be considered shortness of breath or chest pain, correct?

A That would be considered an emergency, yes.

Q If a correctional staff member called the medical unit stating that an inmate was complaining of shortness of breath or chest pain, a sick call request may not be created in that instance.

A That's correct.

Q But nevertheless, staff from the medical unit would come and treat that inmate, correct?

A Correct.

Q They would check vital signs.

A Yes.

Q And other tests that you mentioned, correct?

A Yes.

Q And they would take that information and they would put it in a medical record, correct?

A Correct.

Q And they are required to put that information in the record, correct?

A Correct.

Q Pursuant to medical unit's policy?

A Correct.

Q And in accordance with standard A-08 health records of the National Commission on Correctional Healthcare, correct?

A Correct.

Q All right. So even in a situation where a patient was found to have normal blood pressure and oxygen levels, that disposition, the results of that testing, would be indicated in a written medical record in the patient's medical record, correct?

A Yes.

Q So I know that you stated that the medical unit does not maintain electronic medical records.

A That's correct.

Q So when maintaining or creating medical records to the extent that they're handwritten, it is the policy of the medical unit that those notes and those records

remain legible?

A Correct.

Q It is the policy of the medical unit that when creating a health record that it is maintained and created contemporaneously with the treatment provided.

A Correct.

Q Documenting health encounters with the patient-inmate demonstrates continuity of healthcare.

MR. SANSONE: Is that a statement or a question?

Q Does documenting health encounters with the patient-inmate demonstrate continuity of healthcare?

A It creates a story that's very helpful for the healthcare and continuity.

Q So yes?

A Yes.

Q Does the medical unit have a policy on the continuity, coordination and quality of healthcare during incarceration?

MR. SANSONE: Objection.

You can answer.

A I'm not sure what you're asking. I think that's built into just the general practice of medicine.

Q Are you familiar with standard E-09 of the National Commission on Correctional Healthcare policy regarding continuity, coordination and quality of care during incarceration?

A That's the practice of medicine. Yes, I am.

Q Does the medical unit have a policy on responding to complaints of sexual abuse by an inmate?

A Yes.

MR. BRADLEY: I'm going to make a request for that policy.

To the extent that there is a continuity, coordination and quality of care during incarceration, I'm going to request that.

MR. SANSONE: I would just ask to make sure I get all of these. At some point, just send me something

in writing, please.

MR. BRADLEY: Sure.

Q My next question, Doctor, is do you have a policy or does the medical unit have a policy regarding nursing and assessment protocols?

A Yes.

Q What are they?

A Well, RNs are the only ones that can assess. LPNs are not the assessors. They actually have to bring a patient down to have a healthcare provider see the patient because they cannot assess. Only an RN can assess.

Q What is an LPN?

A License Practicing Nurse.

Q And what are the duties of an LPN at the jail?

A I think you'd be best asking the director of nursing but I can tell you that they do treatments. They can administer medication. They can assist nursing but they always answer to the RN and then to the nurse managers and the nursing

supervisors.

Q Okay. Does the nursing assessment protocols guide nurses with respect to documentation of treatment in health records?

A Yes.

Q Do the nursing assessment protocols include documenting medical treatments such as first-aid procedures and care of ailments that are provided to an inmate?

A Always.

Q Okay. And that would also include documenting more emergent symptoms by an inmate which would include chest pain or shortness of breath?

A Yes.

Q Does the nursing protocols also state that each professional encounter between a patient-inmate and a nurse shall be documented in the patient health record?

A Yes.

Q Does the nursing protocols guide the nurse and require him or her when

creating a health record that they include the date and time of occurrence, printed name and signature on the health record?

A Yes.

Q Not only do they have to include their signature but they are also required to complete or state the type of nurse's license that they have?

A Yes.

Q Are you familiar with the SOAP method of documentation?

A Yes.

Q What does SOAP stand for?

A Subjective, Objective, Assessment and Plan.

Q Okay. Does the nursing protocols include a requirement that they engage in the SOAP method of documentation?

A I'm not sure.

Q All right. Does the medical unit take complaints by an inmate of chest pain or shortness of breath seriously?

A Always.

Q Why?

A Because we want to make sure we take care of patients and this is a serious complaint.

Q And among other things, why you may take it so seriously is that chest pains could mean signs of a stroke, right?

MR. SANSONE: Objection.

You may answer.

A Well, I mean, working in the jail is different from other outside private sectors in the sense that every -- A lot of the complaints that come through tend to be a little more, not necessarily exaggerated but maybe a little bit more elaborate. "I'm dying. I'm struggling." And we always have to figure out what's real and not real here a little more often than not but these are not complaints you should ever take lightly.

You can have a chest pain complaint and you go to the cell and it can be a hip problem. Chest pain doesn't necessarily always mean chest pain. It could mean something else. They just misinterpret what they are feeling

sometimes. That's what a nurse RN would do or a healthcare provider would assess.

Q In a typical situation, how would the medical unit respond to a complaint by an inmate of chest pain or shortness of breath?

A Typically, corrections will call the medical unit and say there's a complaint of chest pain on a certain dorm. At that point, three people have to run to the emergency, an LPN who grabs the chart. We have to know exactly who we're treating. They also grab a wheelchair, a jump bag and an RN accompanies them as well as a healthcare provider to every emergency you just referred to.

Q Okay. And the medical unit considers the complaint of chest pain, shortness of breath to be an emergency?

A Yes. If it's called down by corrections.

Q And you mentioned a jump bag. What is that?

A Basically, it's an emergency

bag, you know. It has medications in it. It has bandages in it. It has a defibrillator if we need a defibrillator. Any kind of emergency equipment comes with us to the emergency.

Q And you said that an RN is accompanied by a healthcare provider. What is that?

A A healthcare provider is either a MD, a PA or an NP. There's an RN and an LPN that goes to emergencies.

Q Okay. So what happens next?

A They go to the emergency. If it's something that can be -- If a person is completely unconscious, the emergency takes place right there. And then, they call for an ambulance. If the patient is movable, we move the patient via wheelchair to the trauma room in the medical core or the satellite to be assessed a little more thoroughly which would include an EKG, a finger stick, putting them on oxygen, you know, an emergency situation sort of like an ER to try to stabilize the patient.

Q So if an inmate was responsive, would you ever provide treatment to them in their cell?
A Yes.
Q Okay. So why wouldn't you take them to the trauma room but treat them in their cell? What situation would call for that?
A It would depend on whether the patient was being disingenuous or being genuous. If the patient says, I'm short of breath and you put a pulse on and it's a 100 percent oxygenation, the patient looks stable, the vital signs are stable and you assess that there's no need to bring them down to medical, then you don't bring them down to medical. If it's more urgent, more concerning, they're always brought down to medical.
Q Are you saying that when you respond to the emergency, the medical unit would test blood pressure and oxygen level right away?
A Yes.

Q Okay. Are you familiar with the lockbox area in the jails?

A Yes.

Q Typically, doesn't the medical unit have a policy that treatment of inmates should be provided in a clinical setting?

A Yes.

Q All right. So treating an inmate in their jail cell is not considered a clinical setting, correct?

MR. SANSONE: Objection.

You can answer.

A That's not necessarily so. Sometimes patients will tell you they have chest pain. You get up there and it's for a little anxiety attack so there's no reason to bring them down. We can contact mental health and tell them they have to see this patient and the patient can be addressed at the cell side.

We have an infirmary where I go cell side every single day and see patients. That, to me, is a qualified medical setting because this is -- It's a medical unit.

Q Okay. So if the medical unit was responding to an emergency based on a complaint of shortness of breath or chest pain, would they test the inmate's vital signs in the cell or bring them out of their cell and test somewhere else?

A Test them right there.

Q Would they open up the cell door?

A I'm sorry?

Q Would they open the cell door?

A Yeah, of course.

MR. SANSONE: Note my objection.

Obviously, you wouldn't open the cell door.

THE WITNESS: No. The corrections opens the door. The doors open and we are in there seeing the patient in their cell or right outside their cell.

Q Would vital signs ever be tested in the lockbox area?

A I'm not sure what you -- What

do you mean by lockbox? That's not a typical phrase that we use. Lockbox, to me, means a medication that needs to go under a lockbox.

Q I'll show you a picture. That may be helpful.

A Okay.

MR. BRADLEY: I'm going to mark this as Plaintiff's Exhibit 1. It's Nassau County bates number 000659 through 671.

(Whereupon, Plaintiff's Exhibit 1 was marked for identification.)

(Whereupon, screen share was enabled for all parties to view Plaintiff's Exhibit 1.)

Q Doctor, do you see this picture?

A Yes.

Q Okay. When I refer to the lockbox area, I'm referring to this area beyond the bars. Do you now know now what I mean by that?

A I guess so, yeah. I never

heard that before.

Q So that's obviously with the doors open.

Do you see those boxes to the right and left?

A Yes.

Q It's my understanding that that's referred to as the lockbox.

A Oh, okay. That's corrections.

Q So you notice that there's a chair there and a desk?

A Yes.

Q All right. So my question is, when the medical unit responds to an emergency complaint of shortness of breath or chest pain, are vital signs ever checked in this lockbox area, to your knowledge?

A I don't think so. It's usually in the cell area itself near the patient's cell or they're brought down to medical. It's seldom in that area.

Q But it does occur, you're saying sometimes?

A Possibly. I can't be 100

percent. I've never done it there.

Q Okay. So would it surprise you if a Corporal or Sergeant McCaffrey testified that an inmate was taken out of the lockbox area and his vitals were tested there?

MR. SANSONE: Objection.

You can answer.

A It wouldn't surprise me. I think it's a possibility because I've spoken to patients before. So if I can speak to a patient in that area, it's somewhat private. It's outside the other incarcerated individual area. If they did vitals there, they could have done that there. It's possible.

Q So this normal procedure when responding to an emergency complaint of chest pains by an inmate, is there like a little cart that's wheeled down by medical?

A There is a wheelchair, a jump box. That would include the vital signs capability and the staff.

MR. SANSONE: Did you ask her

if there was a cart?
MR. BRADLEY: Yes, a cart.
MR. SANSONE: I think that was his question.
A No.
Q Is a computer brought with them?
A No.
Q All right. Do you know if there's any specific written policies and procedures by the medical unit with respect to the responding of complaints of chest pain by an inmate?
A It's under the category of urgent care.
Q Okay.
MR. BRADLEY: I am going to request a copy of that policy. I'll follow up in writing.
Q All right. I want to talk about schedules, okay?
Where are nurses typically assigned each day at the jail?
A Into each separate medical

unit.

Q Would there be a written record of where a nurse would be assigned on a typical day?

A I believe so.

Q And what would that record be called? Do you know?

A Nurse's schedule.

Q The nursing schedule, does it also have their shift on it?

A Again, this an area that I do not do. This is the director of nursing handles the scheduling of her nurses. I would assume it does. I can't say for sure. I mean, I know -- I leave that up to her.

MR. SANSONE: If you don't know, you don't know.

A I don't know.

Q Can you tell me what a triage nurse is?

A Someone that reviews the requests for sick call on patients and determines the gravity of the sick call. And then, triage is the appropriate day or

person because some of the sick calls come in requesting a toothache. That goes to dental. Some people come in requesting the changing of their medication for mental health. That goes to mental health. Triage is not only the complaint but the department that it needs to go to.

Q Okay. And what about a charge nurse?

A What about a charge nurse?

Q What are they?

A They are the ones who stay in the medical unit. Typically, they are the ones that go to the emergencies, are available to assist in any kind of care of patients that come down to the medical unit.

Q All right. What about a nurse practitioner? Does he ever go or she ever go on the floor typically?

A Yes, they can.

These are my healthcare providers, the nurse practitioners, the PAs and the MDs. So if there's an emergency and there's a nurse practitioner unit, they can

go to the emergency and that's on the floor.

Q But you would agree with me that triage and charge nurses, they're typically on the floor more frequently?

MR. SANSONE: Objection.

A Yes, I would say so.

Q All right. And we mentioned LPNs. They hand out the medication there, right?

A Yes.

Q Medication is handed out twice a day?

A Could be three or four times a day.

Q Okay.

MR. BRADLEY: I'm going to request a copy of the nursing schedule from October 12, 2021 to October 13, 2021.

MR. SANSONE: For a particular area?

MR. BRADLEY: B2 floor and E2 floor.

THE WITNESS: E2. What dorm?

MR. BRADLEY: B.
THE WITNESS: E2B.
MR. BRADLEY: E2B and B2D.
THE WITNESS: D as in dog?
MR. BRADLEY: D as in dog.
I'm going to mark this as Plaintiff's Exhibit 2. It's the sick call policy.
(Whereupon, Plaintiff's Exhibit 2 was marked for identification.)
(Whereupon, screen share was enabled for all parties to view Plaintiff's Exhibit 2.)
Q Doctor, you reviewed this document, right?
A (No verbal response.)
Q Sick call policy.
A Yes.
Q Okay. Do you see there it says approved? That's your name?
A Yes, that's me.
Q What is the quality and policy advisory counsel?
A It's our administrative staff,

including the health service administrator, the director of nursing, the director of pharmacy, the director of forensic psychiatry, and medical records.

Q Okay. Are you responsible for approving all policies and procedures in the medical unit?

A Yes.

Q Okay. And do you play any role in preparing these policies?

A I play a role, yes.

Q Okay. And it says, cross reference NCHCC. That's a typo, right?

A No. It's NCCHC, National Commission on Correctional Healthcare Services.

Q Got it, okay.

And it says, standards for health services in jail, 2018. That's the green book, right?

A Yes.

Q So if you look down at 2.5, it says, all written requests will be collected daily from a locked sick call collection

box.

Do you actually use sick call collection boxes?

A We do. And we also allow the incarcerated individual to hand it to the nurse when they're doing rounds for incarcerations.

Q How would an inmate put their sick call request in a sick call collection box?

A They just put it in the box that's on the floor.

Q Where is the box typically located?

A It depends on the dorm.

Q Okay. Could there be a situation where an inmate hands a sick call request to a correction officer to be placed in the collection box?

MR. SANSONE: Is it possible?

MR. BRADLEY: Or can they do that?

MR. SANSONE: Objection.

A No. They don't -- I don't

believe the corrections are allowed to do that. It goes directly to medical, medical staff only. They can hand them a blank request but they don't take the requests back.

Q Okay. Do you know why they're not allowed to collect the requests?

A It's health privacy information. They are not supposed to be privy to any of that.

Q So how often is the sick collection box emptied for review?

A Daily.

Q Daily?

A Daily.

Q How many times a day?

A It's daily. But like I said, they could be handed sick call requests any time the nurse is doing a med pass which could be four times a day.

Q Okay. Are the sick call requests then immediately reviewed after they are taken out of the box?

A By the -- Well, when they're

collected, they're brought to the triage nurse who does review them, yes.

Q Is it the triage nurse's responsibility to determine whether or not the request is emergent or non-emergent?

A Yes.

Q Because if it's not emergent, the inmate is not required to be seen right away, right?

A That's correct.

Q All right. We touched on this but I just have to ask a couple more questions.

The medical unit maintains a medical record file for each inmate, right?

A Yes.

Q And that's kept separate from the jail, right?

A Yes.

MR. SANSONE: Objection.

You can answer.

A (No verbal response.)

Q Can the staff of Nassau County Correctional Center easily access the

medical records?

MR. SANSONE: No. That wasn't what the answer was.

A The medical records are kept in the medical area in both buildings. Only medical staff have access to the medical records.

Q Thank you.

Where are those records stored?

A Old records you mean?

Q All records.

A All records. They're in the medical unit in both buildings. There's a medical records room.

Q All right. And you store records of past inmates there?

A We store that in a separate area that's designated for the medical department downstairs.

Q I want to switch gears for a second and I want to talk to you about October, 2021.

Are you familiar with whether or not the jail had any COVID-19 protocols

at that time?

A Let me think. 2021, yes.

Q Okay. And when I say COVID-19 protocols, what are you understanding that to be?

A Well, I think that -- Let's see. I'm trying to backtrack a little.

It was a very difficult time but I know that -- I think it started rearing its head in March of 2020 and protocols were pretty strict for at least two years. We had isolation protocols at the beginning. At that time, I think we had relaxed some of the isolation protocols. However, we're still testing everyone that comes into the facility. Anybody that gets sick, we're isolating to the best of our ability and quarantining. I think those were probably still in effect in 2021 of October.

Q Okay.

A There might have been a second resurgence, actually, I think.

Q Were these protocols ever

transcribed in writing?

A Yes.

Q Were those protocols that were in writing given to staff at a Nassau County Correctional Center?

MR. SANSONE: Objection.

You can answer.

A It's available to staff, yes.

Q Were those protocols meant to guide staff at Nassau County Correctional Center on how to address COVID-19 in the jails?

A Yes.

Q Okay.

MR. BRADLEY: I'm going to demand and request a copy of all COVID-19 protocols that were transcribed into writing.

MR. SANSONE: Do you have a timeframe on this?

THE WITNESS: It's one policy. There's only one policy.

Do you know how many deaths we had?

MR. BRADLEY: Hold on. You can ask me all the questions you want after I'm done.

My request is unrestricted in time.

Q So let's say an inmate on a tier had tested positive for COVID-19 in October, 2021. What would the procedure be at that time?

A It's typically the removal of patients from that dorm, place them in an isolation dorm and the actual tier would be locked down for -- I am trying to think for back then -- at least five to seven days where the nursing would go there daily and check vital signs to see if anybody else was appearing sick and should be tested.

Q So you're saying that if an inmate tested positive, that the other inmates would be forced to stay in that tier for approximately five to seven days?

A Correct.

Q Would the medical unit have any record other than the personal medical

record of the inmate that an inmate had tested positive on that tier?

A I'm sorry. Could you repeat that?

Q If an inmate tested positive on a tier, would the medical unit create a record other than the inmate's personal record indicating that he tested positive?

MR. SANSONE: Objection.

You can answer.

A Yes. At the time, we were keeping -- We had a running log of everybody who tested positive.

Q Okay.

MR. BRADLEY: I am going to request a copy of the log, to the extent that it exists, inmates that tested positive for COVID-19 in October, 2021 at B2D tier.

MR. SANSONE: You want to give that back to me.

MR. BRADLEY: I'm going to request a running log that documents any inmate that had COVID-19 from

the B2D tier in October, 2021.

MR. SANSONE: I immediately see the problem with this being that I don't think that we could give you a list of people who tested positive.

MR. BRADLEY: With redactions.

MR. SANSONE: You want a list of anyone that tested positive on B2D in October of '21 with redactions?

MR. BRADLEY: With redactions, yes. You take the PII out, redacted.

Q Would you agree with this statement that medical personnel on a day-to-day basis was providing guidance to correctional staff about how to deal with COVID-19?

MR. SANSONE: Objection.

A We communicated daily.

MR. SANSONE: He's asking you if you provided guidance.

A We went by the guidelines of the Department of Health, the County's

recommendation, the hospital's recommendation and our own good medical judgment based on the situation that we weren't familiar with.

Q Okay. I'm going to just ask you if you know any of these individuals.

Do you know who a Patrick McCaffrey is?

A The name sounds familiar.

Q What about Sergeant or Corporal Patrick McCaffrey? Do you know who that is?

A I don't think so.

Q Do you know who a Correction Officer Hussey is?

A No.

Q Do you know who Correction Officer James Staib is?

MR. SANSONE: James, who?

MR. BRADLEY: Staib, S-T-A-I-B.

A No.

Q Do you know who Correction Officer Thomas Benson is?

A No.

Q Do you know who Nurse Jiovani

Ferrere is?

A Yes.

Q Okay. Do you know what Ferrere looks like?

A I'm not 100 percent sure.

Q Male or female?

A Male.

Q Approximately how old?

A I'm not sure.

Q Is he an LPN, RN, nurse practitioner?

A I don't know, not a nurse practitioner. He's on the nursing staff.

Q Do you know who Nurse Abuzo is?

A I do. I believe he's not with us any longer.

Q You said it was a male?

A Yes.

Q Do you know of any nurse that fits the following description: Tan, Asian, middle-aged woman, nurse?

A I think so.

Q Who do you think that is?

A I don't think she's Asian. I

think she's Hawaiian.

Q That's close.

What's her name?

A Amy.

Q Amy what?

A I don't know the last name. I would ask my director of nursing. I don't know the nursing people specifically.

Q All right.

MR. BRADLEY: I'm going to ask that you provide me with the name, full name, of Amy. I'll follow up in writing for that.

Q Do you know who Robert Jefferey Johnson, Jr. is?

A He's the person I'm being subpoenaed for.

Q Do you have an independent recollection of who that is?

A I don't believe I ever met him.

MR. BRADLEY: I'm going to pull up as Plaintiff's Exhibit 3 a picture of Robert Johnson.

(Whereupon, Plaintiff's Exhibit

3 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 3.)

Q Doctor, I'm showing you what's Plaintiff's Exhibit 3. It's bates number Nassau County 268. It's a picture of Robert Johnson.

Do you recognize this person?

A No.

Q Doctor, based on your training and experience as a medical director in 2017 in the medical unit of the Nassau County jail medical unit, have you ever heard of a complaint by an inmate that a correction officer stuck a finger up an inmate's anus?

A I've heard that.

Q How many times?

A Maybe once.

Q Other than Robert Johnson or just Robert Johnson?

MR. SANSONE: Objection.

A I'm not sure. It could be this patient. I'm not sure.

Q Could it be more than one or you're not sure?

A I don't think so. I only heard that once.

Q Would it surprise you if Nurse Practitioner Wanda Evelyn said that she has heard of more than one complaint since 2017?

A (No verbal response.)

MR. SANSONE: His question is, would it surprise you? That's his question.

A It wouldn't surprise me.

Q All right. Do you recall an incident on October 12, 2021 involving an inmate claiming that he was sexually assaulted by correctional staff?

MR. SANSONE: Objection.

You can answer.

A (No verbal response.)

MR. SANSONE: He's asking if you recall it.

THE WITNESS: No, I know. I'm trying to think. This was a while ago.

A After refreshing myself with the case, I believe Wanda Evelyn, the nurse practitioner, asked me if this patient who is claiming sexual assault, should go to the hospital and my answer at the time was yes. It was not in person with the patient. It was the, I believe, phone.

Q Okay. You said you spoke to the patient on the phone?

A I spoke to the nurse practitioner.

Q Oh, okay. Got it.

So that's your recollection based upon your review of the documents?

A Yes.

Q All right.

MR. BRADLEY: I'm going to pull up Plaintiff's Exhibit 4 which is the injury to inmate report. It's a bates number 8,802 to 8,803.

(Whereupon, Plaintiff's Exhibit 4 was marked for identification.)

(Whereupon, screen share was enabled for parties to view

Plaintiff's Exhibit 4.)

Q Doctor, do you see this document?

A Yes, I do.

Q Have you ever seen a document like this before?

A Yes.

Q Do you see on this document it says, Cause: Are the injuries observed consistent with the inmate's description?

Do you know what this means?

A Yes, I do.

Q What does it mean?

A After the examination of a patient, if the patient's subject -- If their complaints are consistent with the findings of the medical examination, then you would answer that's it's consistent with the inmates description, yes. You would answer yes.

Q Okay. So is that also saying that the subjective complaints of the inmate is confirmed by the objective findings of the medical examination?

A Yes.
Q Do you know who Investigator McMillan?
A I do.
Q Okay. If you go down to the second page at 8,803 at the top, it says, "On October 13, 2021, at approximately 1412 hours, I was notified by Dr. Henig."
Do you recall ever notifying Investigator McMillan of an incident regarding Robert Johnson?
A I'm really having a hard time trying to remember that. The only thing I say is when a patient needs to go out, sometimes they confer with me with regards to what's necessary. And I might have said, sexual assault, the patient has to be sent out. That's all I recall.
Q When you say, "has to be sent out," are you meaning that there is a policy of the medical unit that if an inmate complains of sexual assault that they have to be seen at the hospital?
A Yes. Well, with penetration.

Q Does the medical unit ever examine a patient that's claiming sexual assault through penetration?

A No.

Q All right. You'll see at the bottom at section 4, it says, "Medical staff did not generate a proper medical assessment form."

What is a medical assessment form?

A That's just the sick call evaluation or the urgent call evaluation, excuse me.

Q So there's a document called an urgent call evaluation?

A Urgent care evaluation.

Q Okay. Based upon your training and experience, do you have any idea why McMillan is claiming that medical staff did not generate a proper medical assessment form?

A I have no idea.

MR. SANSONE: Objection. How can she testify as to what the

workings of Mr. McMillan's mind is?

MR. BRADLEY: Because it's a deposition.

MR. SANSONE: I'm sorry? I missed that.

MR. BRADLEY: It's a deposition. You can object to form.

MR. SANSONE: No, no. You're asking her for the operation of someone else's mind. She's answered the question.

All right. That was my objection.

MR. BRADLEY: Okay.

Q Is a medical assessment form required to be generated if an inmate claims sexual assault by a corrections officer?

A Yes.

Q Okay. And what other situations would a medical assessment form be required to be created?

A Any time there is an injury to an inmate, we have to have an urgent care assessment form.

Q What kind of information is contained in the urgent care assessment form?

A Just like we talked about. We get a story. We do the subject, objective. We do the assessment and the plan. It's a typical medical examination.

Q So what if that information that we talked about was put on the sick call request? Would the medical staff still be required to create an urgent care evaluation form?

A No. It would just be on that sick call. It would be responded to either on the sick call or the section below that complaint or on a progress note.

Q Okay. In other words, an urgent care evaluation form isn't required to be created in all situations, especially where the medical evaluation is documented, maybe in a sick call request?

A Correct.

MR. BRADLEY: I'm going to pull up Plaintiff's Exhibit 5. It's the

sick call request form. It's bates number Nassau County 62 to Nassau County 73. I just want to focus on bates number 68 to 70.

(Whereupon, Plaintiff's Exhibit 5 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 5.)

Q Do you see on bates number 68? It's a sick call request, Doctor.

A Yes.

Q Did you review this prior to the deposition?

A Yes.

Q Okay. If you look at the top right, it says, Sharon Neysmith. Do you see that?

A Yes.

Q And it says, disposition and it appears that sick call was checked.

A Yes.

Q What does that mean?

A The next time sick call is, the

patient will be seen. We have sick call every single day, morning, afternoon and night.

Q Okay. So is this indicating that Ms. Naysmith likely reviewed this request and characterized it to be a non-emergent request?

A Yes.

Q And if you look at the sick call request, Mr. Johnson says that, I'm having problems with my chest, shortness of breath.

And you previously testified that chest and shortness of breath is an emergent situation, correct?

A I did say that a complaint can be but if you look at the context of the whole sick call, it says, "I've had this pain and trauma since today." So you look at everything. "My face is swollen. I have extreme pain. Can you help"? So I can't answer why she didn't feel this was urgent. I guess based on the time and the fact that we can see someone as early as in the

morning. He was seen that following morning, I guess.

Q So I'm saying, if you had reviewed this sick call, would you characterize it as emergent?

MR. SANSONE: Objection.

You can answer.

A I think that's hard to ask me. I know the context of the problem and everything. It really -- It's not that easy to say based on my knowledge of the case.

Q Okay. If the nurse received the sick call request, would the triage nurse typically see the patient or she would just examine the request to see if it was emergent or not?

A They can do both.

Q Okay. So the fact that the inmate states that he's in extreme pain, you would not characterize that as an emergent request?

A Not necessarily. I mean, obviously, if I was the person doing the triage and I had a person with chest pain,

shortness of breath, I don't think this would have waited for me.

Q You would have considered this to be an emergency?

A I would have checked it out. I would have someone go to the floor to check him out.

Q So if you look at right above part B, it says, nurses signature and there's some scribble there and it appears to be a signature. Do you recognize that signature there?

A I'm sorry, where?

Q So right above part B, in the middle of the document, it says, nurses signature.

A Yeah. I don't recognize that.

Q All right. And you see the date and time. What does this date and time mean?

A That's when the nurse reviewed this, signs off on it.

Q The nurse's signature that has that scribble, do you believe that to be a

different nurse than Naysmith or you're not sure?

A I couldn't say.

Q So if you look at it, it says, Time: 22:30. Do you see that?

A I do.

Q And if you look at the triage nurse, it says, 23:00.

A It looks like -- It's possible. I can't say for sure. Maybe the nurse picked up this sick call request at that time, whoever this J.T. is or whatever the signature is. And then, the triage nurse triaged it based on the nurse's evaluation. Do you follow me on that?

Q Yes.

A I mean, I can go into a million scenarios.

Q Okay. Nurse Practitioner Wanda Evelyn testified that she looked at the sick call request and she would have classified it as emergent. Would you disagree with her?

MR. SANSONE: Objection.

A I'm going to say it again. I don't know the actual circumstances surrounding how this sick call request was received. If the nurse was on the floor, was handed this sick call request, this J.T. or whoever this is, and he's saying that he's got shortness of breath and chest pain and he -- "I have problems with my chest." It doesn't say chest pain. "I have problems with my chest. I have some shortness of breath. My eye socket's in pain."

If I was evaluating this patient, I would say, you got into an altercation and it looks like he's stable, potentially. I don't know. This is an assessment. And then, I would take him to the triage nurse and say, this is the complaint. He looks stable enough to be seen in the morning or the next day when sick call is around.

Apparently, it's a young guy, correct? It's a relatively young person that probably isn't having a heart attack. These are things I would think of. The

shortness of breath may be anxiety. He looks stable. I mean, that's what's going through my head. And then, the triage nurse would say, this could probably go the next morning. I don't know why Wanda Evelyn said it was an emergency, based on maybe what she saw the next day.

But again, if there was also a sexual assault, I'm not sure why this wasn't written in the complaint. Most times when patients are sexually assaulted, they write it.

Q How many complaints of sexual assault have you dealt with in your career?

A Many, five in the last week.

Q Okay. But you stated that you've only heard of only one complaint by an inmate claiming sexual assault by correctional staff?

MR. SANSONE: Objection.

A That's not what I said.

You asked me if I heard of somebody being penetrated with a finger.

Q How many complaints of sexual

assault of an inmate by correctional staff have you heard of?

A Maybe ten.

Q Okay. And are you saying that in all ten situations, the inmate reported that to the medical unit on a sick call request?

A I don't know if all ten. Some of them were verbal.

Q Okay. And those ten, when was the first one you heard of? How long ago was that?

A I don't recall.

Q Okay. But you recall on that one that it was verbal or written on a sick call request?

MR. SANSONE: Objection.

A No. It's not written on the sick call request. I'm reading it.

MR. SANSONE: He's not talking about the one in front of you.

THE WITNESS: I'm not sure what he's talking about.

I'm not sure what you're

saying.
MR. BRADLEY: I'm going to pull up Plaintiff's Exhibit 6. It's a live book entry.
(Whereupon, Plaintiff's Exhibit 6 was marked for identification.)
(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 6.)
Q Doctor, you reviewed this document as part of the deposition, right?
A I looked at it.
Q Okay.
MR. BRADLEY: It's Plaintiff's Exhibit 6. It's bates number Nassau County 1151-1155.
Q You said you looked at it. What do you mean you looked at it?
A I was told. It's a, I believe, a logbook from corrections. It's something I never looked at before.
Q Okay. You've never seen a logbook before?
A No.

Q All right. You see on this document in the middle? Can you see it says, 10/12/21?

A Yes.

Q All right. Do you see here at 1525, it says, notified by staff? I see B2D9 I/M Johnson. There's a number claiming he has chest pains. Do you see that?

A Yes.

Q And you see it says, 1530 medical on post to evaluate I/M Johnson. Do you see that?

A Yes.

Q And then, it says at 1535 medical off post I/M Johnson remained in his cell. Do you see that?

A Yes.

Q Do you know whether or not the medical unit is required to sign in with correctional staff when they enter a tier or floor?

MR. SANSONE: Objection.

You can answer.

A Typically, when we go to any

tier or floor, the correctional staff asks us our name and they do what they do. That's all I know.

Q Okay. When they ask for your name, do you see them writing it in a book or anything like that?

A Yes.

Q Does it appear to you that they're taking down your information?

A Yes.

Q Okay.

MR. BRADLEY: I'm going to mark this as Plaintiff's Exhibit 7, the inmate file from the medical unit.

(Whereupon, Plaintiff's Exhibit 7 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 7.)

MR. SANSONE: What was 7?

MR. BRADLEY: It's Nassau County 26 to 175. It is the inmate medical records file.

Q Doctor, did you review this

file before the deposition, Robert Johnson's medical file?

A Yes.

Q And how much time did you spend reviewing the file?

A Not too much.

Q Can you approximate how many minutes?

A Maybe 20 minutes, 25.

Q So you spent 20 to 25 minutes looking at this medical file?

A Yes.

Q Did you find Robert Johnson's medical file or was it provided to you by somebody?

A I asked medical records to bring it to me.

Q Okay.

MR. BRADLEY: I'm going to request a copy of that file.

Q So when you spent 20 to 25 minutes reviewing Mr. Johnson's medical file from the medical unit, did you look to see if there was any record that Mr. Johnson was

treated by medical on October 12, 2021, at approximately 3:30 p.m.?

A I did.

Q Did you find any record of that?

A I did not.

Q Okay. Did it surprise you that there was no record of that?

MR. SANSONE: Objection.

A I just noted there was no note.

Q Were you expecting when you reviewed the file that there would be a record of that?

MR. SANSONE: Objection.

A Can you repeat that for me once more?

MR. SANSONE: I think the problem is with the nature of the question.

Q Well, let me ask you this.

Why did you look through the file to see if there was any records of any treatment of Robert Johnson on October 12, 2021, at approximately 3:30 p.m.?

A Because the patient was in an altercation on the 12th and it was stated in the inspection that you sent to me, the medical --

MR. SANSONE: The login.

A On the log stated that medical saw the patient. And we are trained from the orientation that any time medical sees anybody, there's always a documentation in the chart, patient seen cell side, something, something, vital signs, anything. There was no note at all in the chart. We have no documentation the patient was seen.

Q Okay, thank you.

MR. BRADLEY: Can we just take five minutes, please?

MR. SANSONE: Sure.

(Whereupon, a short recess was taken.)

MR. BRADLEY: I just have a couple more questions, Doctor.

THE WITNESS: Okay.

Q Is there any situation when correctional staff would accept a sick call

from an inmate and provide it to a medical unit?

A No.

Q You mentioned one of those reasons to be HIPAA, right, privacy?

A I can't get into the idea of why but it's just so they don't -- They don't interfere with medical's ability to take care of patients. That's all it is.

Q Okay. Do you think that it's important that correctional staff not be involved with that?

MR. SANSONE: Objection.

You can answer.

A I don't think they should be involved with the sick call process but we actively work together in any kind of emergency process because it's really -- It's basically the perception of the individual. If the person's perception is that they need urgent care, corrections has to notify us immediately. That's very important.

Q Do you think that there could

be a danger of interference by correctional staff of an inmate's sick call request?

MR. SANSONE: Objection.

A I can't answer that.

Q Why not?

A Because that's -- I don't know if it's conjecture to try to determine what they're thinking or what they're doing. I would hope not.

Q All right. But it was your words when you said to prevent interference. So what do you mean by that?

MR. SANSONE: She was explaining one of the reasons why you wouldn't want corrections involved.

MR. BRADLEY: Right.

Q To prevent interference, right?

A Potentially, I guess, yeah.

Q What do you mean by that?

A You just want to have it between medical and medical and keep information as private as possible.

Q But what do you mean by

interference?

MR. SANSONE: It could be anything. It could be it's lost. It could be that it's misplaced.

MR. BRADLEY: Mr. Sansone, I'm not asking you.

MR. SANSONE: But you're asking speculative questions.

MR. BRADLEY: You're not being deposed, sir.

A They could lose the sick call. They could misplace the sick call. It won't get into medical's hands. We want it to go from the patient to medical. That's the process of medical care here at the jail.

Q Okay, thank you.

MR. BRADLEY: I have no further questions.

(Time noted: 3:40 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF NASSAU )

I, DONNA HENIG, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of August 22, 2023; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

________________________
DONNA HENIG

Signed and subscribed to before me, this______________________day of____________________________, 2023.

___________________________________
Notary Public, State of New York

**INDEX**

**INDEX TO TESTIMONY**


| Witness | Examination By | Page |
|---|---|---|
| Donna Henig | Mr. Bradley | 4 |


**INDEX TO REQUESTS**


| | |
|---|---|
| Policies keeping of medical records | 5 |
| Policy responding to sexual assault By an inmate | 34 |
| Continuity, coordination and quality of care policy | 34 |
| Urgent Care policy | 47 |
| Nursing Schedule from 10/13/21 to 10/13/21 for B2D and E2B | 50 |
| COVID-19 protocols | 58 |
| Inmates that tested positive for COVID-19 in 10/21 B2D tier redacted | 61 |
| Last name of Nurse Amy | 64 |
| Robert Johnson's medical file | 84 |


**EXHIBITS**


| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 1 | Picture | 44 |


(Continued on next page.)

**EXHIBITS**



| **Plaintiff's** | **Description** | **Page** |
|---|---|---|
| Exhibit 2 | Sick Call Policy | 61 |
| Exhibit 3 | Picture | 65 |
| Exhibit 4 | Injury to Inmate Report | 68 |
| Exhibit 5 | Sick Call Request Form | 73 |
| Exhibit 6 | Live Book Entry | 81 |
| Exhibit 7 | Inmates Medical Record File | 83 |

ERRATA SHEET
FEVOLA REPORTING & TRANSCRIPTION INC.
CASE NAME: ROBERT JEFFERY JOHNSON, JR. V COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JOHN STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOE 1-9 SERVANTS AND REPRESENTATIVES OF NASSAU
DATE OF DEPOSITION: August 22, 2023
WITNESS' NAME: DR. DONNA HENIG

PAGE/LINE(S)/ CHANGE REASON
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________
____/________/__________________________/_________________

_______________________________

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _____ DAY
OF ______________, 2023.

________________________________
NOTARY PUBLIC

CERTIFICATION

I, CHRISTINA SCHMIDT, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of September, 2023.

CHRISTINA SCHMIDT

**'**

**'21** [1] - 61:10

**0**

**000659** [1] - 44:11

**1**

**1** [5] - 2:12, 44:10, 44:14, 44:17, 91:24
**1-9** [2] - 1:8, 93:5
**10/12/21** [1] - 82:4
**10/13/21** [2] - 91:15, 91:15
**10/21** [1] - 91:18
**100** [4] - 4:11, 41:13, 45:25, 63:6
**1000** [1] - 2:16
**11501** [1] - 2:12
**1151-1155** [1] - 81:17
**11544** [1] - 4:12
**11735** [1] - 2:5
**11740** [1] - 2:9
**11797** [1] - 2:16
**12** [5] - 8:9, 50:19, 66:15, 85:2, 85:24
**12th** [1] - 86:3
**13** [3] - 18:15, 50:20, 69:8
**1412** [1] - 69:8
**15** [1] - 15:23
**1525** [1] - 82:7
**1530** [1] - 82:11
**1535** [1] - 82:15
**175** [1] - 83:23

**2**

**2** [4] - 51:8, 51:11, 51:14, 92:4
**2.5** [1] - 52:23
**20** [3] - 84:10, 84:11, 84:22
**2010-2020** [1] - 15:6
**2017** [6] - 13:19, 14:5, 14:19, 14:20, 65:13, 66:8
**2018** [1] - 52:20
**2020** [1] - 57:11
**2021** [13] - 8:9, 50:19, 50:20, 56:23, 57:3, 57:20, 59:9, 60:20, 61:2, 66:15, 69:8, 85:2, 85:25
**2023** [6] - 1:13, 90:10, 90:21, 93:6, 93:23, 94:17
**22** [3] - 1:13, 90:10, 93:6
**22:30** [1] - 77:6
**23:00** [1] - 77:9
**25** [3] - 84:10, 84:11, 84:22
**26** [1] - 83:23
**268** [1] - 65:8
**29th** [1] - 94:16
**2:00** [1] - 1:13

**3**

**3** [5] - 64:23, 65:2, 65:5, 65:7, 92:5
**34** [2] - 91:11, 91:12
**3:30** [2] - 85:3, 85:25
**3:40** [1] - 89:20

**4**

**4** [6] - 67:19, 67:23, 68:2, 70:7, 91:7, 92:6
**402** [1] - 2:16
**44** [2] - 2:8, 91:24
**47** [1] - 91:14

**5**

**5** [5] - 72:25, 73:7, 73:10, 91:10, 92:8
**50** [2] - 15:22, 91:15
**58** [1] - 91:16

**6**

**6** [5] - 81:4, 81:7, 81:10, 81:16, 92:9
**61** [2] - 91:17, 92:4
**62** [1] - 73:3
**64** [1] - 91:19
**65** [1] - 92:5
**671** [1] - 44:12
**68** [3] - 73:5, 73:11, 92:6

**7**

**7** [5] - 83:14, 83:17, 83:20, 83:21, 92:10
**70** [1] - 73:5
**73** [2] - 73:4, 92:8
**77** [1] - 2:4

**8**

**8,802** [1] - 67:21
**8,803** [2] - 67:21, 69:7
**81** [1] - 92:9
**83** [1] - 92:10
**832** [1] - 17:20
**84** [1] - 91:20

**A**

**A-08** [1] - 32:6
**A-O8** [1] - 27:10
**ability** [2] - 57:19, 87:9
**abuse** [1] - 34:15
**Abuzo** [1] - 63:15
**accept** [1] - 86:25
**access** [3] - 26:17, 55:25, 56:7
**accompanied** [1] - 40:8
**accompanies** [1] - 39:15
**accordance** [1] - 32:5
**accreditation** [3] - 20:7, 20:21, 21:5
**accredited** [3] - 20:11, 20:23, 21:6
**accurately** [2] - 8:21, 11:13
**acquire** [1] - 20:19
**action** [1] - 94:12
**actively** [1] - 87:18
**actual** [2] - 59:13, 78:3
**addiction** [1] - 15:8
**addition** [1] - 13:11
**address** [3] - 4:10, 26:10, 58:12
**addressed** [1] - 42:20
**administer** [1] - 35:23
**administration** [2] - 16:20, 16:21
**administrative** [1] - 51:25
**administrator** [4] - 25:8, 25:15, 25:21, 52:2
**advisory** [1] - 51:24
**afternoon** [1] - 74:3
**aged** [1] - 63:22
**ago** [3] - 24:3, 66:25, 80:12
**agree** [7] - 8:12, 8:21, 9:3, 19:9, 30:6, 50:3, 61:15
**AGREED** [3] - 3:3, 3:8, 3:12
**agreement** [1] - 11:10
**aid** [1] - 36:10
**ailments** [1] - 36:11
**ALEXANDER** [1] - 2:9
**allow** [1] - 53:5
**allowed** [2] - 54:2, 54:8
**altercation** [2] - 78:15, 86:3
**ambulance** [1] - 40:18
**amy** [2] - 64:5, 64:6
**Amy** [2] - 64:13, 91:19
**AND** [8] - 1:8, 3:3, 3:8, 3:12, 93:5, 93:22
**answer** [26] - 9:12, 9:20, 10:13, 11:5, 19:13, 20:15, 29:16, 29:23, 34:2, 35:24, 38:9, 42:13, 46:9, 55:22, 56:4, 58:8, 60:11, 66:19, 67:6, 68:19, 68:21, 74:23, 75:8, 82:24, 87:15, 88:5
**answered** [1] - 71:11
**answering** [1] - 7:5
**answers** [1] - 90:12
**anticipate** [1] - 9:20
**anus** [1] - 65:17
**anxiety** [2] - 42:17, 79:2
**appear** [1] - 83:9
**appearing** [1] - 59:18
**applicable** [1] - 26:10
**appropriate** [1] - 48:25
**approved** [1] - 51:21
**approving** [1] - 52:7
**approximate** [1] - 84:8
**area** [14] - 42:3, 43:24, 44:22, 45:18, 45:20, 45:22, 46:6, 46:13, 46:15, 48:12, 50:22, 56:6, 56:19
**Armor** [1] - 14:18
**Asian** [2] - 63:21, 63:25
**assault** [12] - 23:7, 23:10, 67:5, 69:18, 69:23, 70:4, 71:18, 79:10, 79:15, 79:19, 80:2, 91:11
**assaulted** [2] - 66:17, 79:12
**assess** [5] - 35:11, 35:14, 35:15, 39:3, 41:16
**assessed** [1] - 40:21
**assessment** [13] - 23:17, 35:7, 36:4, 36:8, 70:8, 70:10, 70:21, 71:16, 71:21, 71:25, 72:3, 72:7, 78:17
**Assessment** [1] - 37:16
**assessors** [1] - 35:12
**assigned** [2] - 47:24, 48:4
**assist** [2] - 35:23, 49:16
**assistants** [1] - 18:17
**assume** [2] - 9:7, 48:15
**attack** [2] - 42:17, 78:24
**attain** [1] - 20:21
**attorney** [3] - 11:17, 11:19, 12:17
**ATTORNEY'S** [1] - 2:11
**Attorneys** [2] - 2:4, 2:15
**attorneys** [2] - 2:7, 2:11
**August** [4] - 1:13, 14:20, 90:10, 93:6
**authority** [2] - 24:22, 25:21
**available** [7] - 18:6, 18:7, 18:10, 25:24, 26:4, 49:16, 58:9
**Avenue** [1] - 4:12
**aware** [1] - 17:13

**B**

**B2** [1] - 50:23
**B2D** [6] - 51:4, 60:20, 61:2, 61:10, 91:15, 91:18
**B2D9** [1] - 82:8
**background** [1] - 12:21
**backtrack** [1] - 57:8
**bag** [3] - 39:14, 39:23, 40:2
**bandages** [1] - 40:3
**Barnard** [1] - 12:23
**bars** [1] - 44:23
**based** [12] - 20:16, 21:8, 27:20, 43:3, 62:4, 65:12, 67:15, 70:18, 74:24, 75:12, 77:15, 79:7
**basis** [1] - 61:17
**bates** [7] - 44:11, 65:7, 67:21, 73:2, 73:5, 73:11, 81:16
**BEFORE** [2] - 1:17, 93:23
**began** [1] - 14:6
**begin** [2] - 8:11, 14:3
**beginning** [1] - 57:14
**below** [1] - 72:16
**Benson** [1] - 62:23
**BENSON** [2] - 1:8, 93:5
**best** [2] - 35:20, 57:18

**between** [4] - 16:9, 19:10, 36:21, 88:23
**beyond** [1] - 44:23
**bit** [1] - 38:15
**blank** [1] - 54:4
**blood** [5] - 29:5, 29:8, 32:12, 41:23, 94:11
**board** [3] - 15:3, 15:5, 15:10
**boarded** [1] - 13:13
**book** [9] - 18:5, 21:22, 22:4, 22:8, 22:14, 27:14, 52:21, 81:5, 83:6
**Book** [1] - 92:9
**bottom** [1] - 70:7
**box** [8] - 46:23, 53:2, 53:11, 53:12, 53:14, 53:20, 54:13, 54:24
**boxes** [2] - 45:5, 53:4
**Bradley** [2] - 8:3, 91:7
**BRADLEY** [60] - 2:5, 4:14, 4:15, 4:24, 5:8, 5:21, 6:5, 6:9, 6:24, 7:18, 7:22, 8:2, 8:18, 8:24, 9:6, 9:11, 9:18, 10:2, 10:6, 10:11, 10:19, 11:2, 11:9, 26:6, 34:17, 35:3, 44:9, 47:3, 47:18, 50:17, 50:23, 51:2, 51:4, 51:6, 53:22, 58:16, 59:2, 60:16, 60:23, 61:7, 61:12, 62:20, 64:11, 64:22, 67:18, 71:3, 71:7, 71:15, 72:24, 81:3, 81:15, 83:13, 83:22, 84:20, 86:16, 86:21, 88:18, 89:6, 89:10, 89:18
**break** [3] - 7:7, 11:3, 11:5
**breath** [17] - 28:6, 30:18, 30:24, 31:7, 36:17, 37:23, 39:7, 39:20, 41:13, 43:4, 45:16, 74:13, 74:15, 76:2, 78:8, 78:12, 79:2
**BRIAN** [1] - 2:13
**bring** [6] - 35:12, 41:16, 41:17, 42:18, 43:6, 84:18
**Broadway** [1] - 2:8
**brought** [4] - 41:19, 45:21, 47:7, 55:2
**build** [1] - 21:2
**building** [14] - 16:18, 16:20, 16:24, 17:6, 17:12, 17:18, 17:20, 17:21, 17:22, 17:24, 21:2, 21:4
**buildings** [4] - 16:17, 17:3, 56:6, 56:14
**built** [1] - 34:4
**bunch** [1] - 5:6
**BY** [5] - 2:5, 2:9, 2:13, 2:17, 4:13

## C

**cannot** [2] - 11:13, 35:14
**capability** [1] - 46:24
**Care** [2] - 21:19, 91:14
**care** [24] - 13:13, 13:14, 15:5, 15:9, 16:13, 19:24, 20:22, 23:13, 26:17, 34:9, 34:21, 36:11, 38:3, 47:16, 49:16, 70:17, 71:24, 72:3, 72:12, 72:19, 87:10, 87:22, 89:16, 91:13
**career** [2] - 14:24, 79:15
**Carmen** [1] - 4:11
**cart** [3] - 46:21, 47:2, 47:3
**case** [3] - 10:9, 67:3, 75:12
**CASE** [1] - 93:3
**category** [1] - 47:15
**CCHP** [2] - 15:7, 15:11
**cell** [17] - 38:21, 41:4, 41:8, 42:10, 42:21, 42:23, 43:6, 43:7, 43:9, 43:12, 43:17, 43:21, 43:22, 45:20, 45:21, 82:17, 86:11
**Center** [8] - 8:10, 14:21, 16:3, 16:9, 16:12, 55:25, 58:6, 58:12
**center** [1] - 13:13
**CENTER** [2] - 1:7, 93:4
**certain** [1] - 39:10
**CERTIFICATION** [1] - 94:2
**certification** [2] - 3:6, 21:8
**certifications** [1] - 15:2
**Certified** [1] - 15:12
**certified** [13] - 15:4, 15:5, 15:6, 15:10, 20:3, 22:4, 23:22, 24:6, 24:7, 24:9, 24:11, 24:14, 24:19
**certify** [3] - 90:7, 94:5, 94:10
**chair** [1] - 45:12
**chance** [2] - 6:19, 10:16
**CHANGE** [1] - 93:8
**changing** [1] - 49:5
**characterize** [2] - 75:6, 75:21
**characterized** [1] - 74:7
**charge** [3] - 49:9, 49:11, 50:4
**chart** [3] - 39:12, 86:11, 86:13
**check** [3] - 31:14, 59:17, 76:7
**checked** [3] - 45:17, 73:22, 76:6
**chest** [26] - 28:5, 30:17, 30:24, 31:7, 36:16, 37:22, 38:6, 38:20, 38:22, 38:23, 39:6, 39:10, 39:19, 42:16, 43:4, 45:17, 46:20, 47:13, 74:12, 74:15, 75:25, 78:8, 78:9, 78:10, 78:11, 82:9
**Christina** [1] - 1:20
**CHRISTINA** [2] - 94:3, 94:21
**circumstances** [1] - 78:3
**claiming** [6] - 66:16, 67:5, 70:3, 70:20, 79:19, 82:8
**claims** [1] - 71:17
**classified** [1] - 77:22
**cleanly** [1] - 9:23
**clear** [1] - 7:10
**clearly** [1] - 8:19
**clinical** [3] - 27:4, 42:7, 42:11
**close** [1] - 64:3
**CMEs** [2] - 15:20, 15:22
**collect** [1] - 54:8
**collected** [2] - 52:24, 55:2
**collection** [5] - 52:25, 53:4, 53:10, 53:20, 54:13
**college** [1] - 12:22
**College** [1] - 12:23
**Commission** [9] - 19:19, 21:10, 21:19, 23:22, 26:11, 27:11, 32:7, 34:7, 52:16
**communicated** [1] - 61:21
**company** [1] - 14:16
**complained** [1] - 28:5
**complaining** [1] - 31:6
**complains** [1] - 69:23
**complaint** [18] - 29:22, 30:17, 38:4, 38:21, 39:6, 39:10, 39:19, 43:4, 45:16, 46:19, 49:7, 65:16, 66:8, 72:17, 74:17, 78:19, 79:11, 79:18
**complaints** [10] - 23:9, 34:14, 37:22, 38:13, 38:19, 47:13, 68:17, 68:23, 79:14, 79:25
**complete** [2] - 37:8, 90:11
**completed** [1] - 12:25
**completely** [1] - 40:16
**computer** [1] - 47:7
**concerning** [1] - 41:19
**confer** [1] - 69:16
**confirmed** [1] - 68:24
**conjecture** [1] - 88:8
**Conklin** [1] - 2:4
**Connecticut** [2] - 13:3, 13:8
**considered** [7] - 21:13, 30:16, 30:24, 31:2, 42:10, 76:4
**considers** [1] - 39:19
**consistent** [3] - 68:11, 68:17, 68:19
**contact** [2] - 6:23, 42:18
**contacted** [1] - 12:16
**contained** [2] - 22:4, 72:3
**contemporaneously** [1] - 33:7
**content** [1] - 22:3
**context** [2] - 74:18, 75:10
**continue** [2] - 14:22, 26:7
**continued** [1] - 91:25
**continuing** [1] - 15:18
**Continuity** [1] - 91:12
**continuity** [7] - 23:12, 33:12, 33:17, 33:19, 33:23, 34:9, 34:20
**coordinate** [1] - 25:10
**coordination** [5] - 23:12, 33:23, 34:9, 34:20, 91:12
**copy** [7] - 4:16, 22:7, 47:19, 50:18, 58:17, 60:17, 84:21
**core** [9] - 16:18, 16:21, 16:24, 17:6, 17:19, 17:21, 17:22, 17:23, 40:20
**CORPORAL** [2] - 1:7, 93:4
**Corporal** [2] - 46:4, 62:11
**correct** [36] - 10:22, 12:12, 14:17, 20:4, 22:5, 22:20, 27:7, 27:8, 28:13, 28:18, 28:19, 30:9, 30:10, 30:14, 30:25, 31:9, 31:12, 31:13, 31:17, 31:21, 31:22, 31:24, 31:25, 32:4, 32:8, 32:9, 32:16, 32:21, 33:3, 33:9, 42:11, 55:11, 59:23, 72:23, 74:16, 78:23, 90:11, 90:13
**Correction** [4] - 19:19, 62:14, 62:17, 62:22
**correction** [4] - 10:17, 26:25, 53:19, 65:16
**Correctional** [16] - 8:10, 14:2, 14:18, 15:12, 16:2, 21:11, 21:19, 23:23, 26:12, 27:11, 32:7, 34:8, 52:16, 55:25, 58:6, 58:11
**correctional** [16] - 13:16, 13:18, 13:21, 15:6, 15:22, 30:12, 31:4, 61:18, 66:17, 79:20, 80:2, 82:21, 83:2, 86:25, 87:12, 88:2
**CORRECTIONAL** [2] - 1:6, 93:3
**corrections** [11] - 16:13, 25:11, 39:8, 39:22, 43:19, 45:10, 54:2, 71:18, 81:21, 87:22, 88:16
**counsel** [2] - 3:4, 51:24
**COUNTY** [7] - 1:6, 2:11, 90:5, 93:3
**county** [1] - 12:17
**County** [15] - 2:15, 8:9, 13:25, 16:2, 20:25, 44:11, 55:24, 58:5, 58:11, 65:8, 65:14, 73:3, 73:4, 81:17, 83:23
**County's** [1] - 61:25
**couple** [3] - 24:3,

55:13, 86:22
course [1] - 43:13
court [3] - 3:16, 8:20, 9:23
COURT [3] - 1:2, 4:6, 4:9
courtroom [1] - 10:8
COVID-19 [10] - 56:25, 57:4, 58:12, 58:18, 59:8, 60:19, 60:25, 61:19, 91:16, 91:18
create [3] - 27:23, 60:7, 72:12
created [6] - 28:9, 30:8, 31:8, 33:6, 71:22, 72:20
creates [1] - 33:18
creating [4] - 22:17, 32:22, 33:5, 37:2
cross [1] - 52:13

## D

daily [7] - 52:25, 54:14, 54:15, 54:16, 54:18, 59:16, 61:21
danger [1] - 88:2
date [3] - 37:3, 76:20
DATE [1] - 93:6
DAY [1] - 93:23
day-to-day [1] - 61:17
days [2] - 59:15, 59:22
deal [2] - 5:7, 61:18
dealt [1] - 79:15
deaths [1] - 58:24
decision [1] - 25:2
decisions [1] - 27:4
Defendant [1] - 2:15
Defendants [2] - 1:10, 2:11
defibrillator [2] - 40:4
demand [1] - 58:17
demonstrate [1] - 33:17
demonstrates [1] - 33:11
dental [2] - 26:18, 49:4
dentists [2] - 18:22, 26:22
department [2] - 49:7, 56:20
Department [1] - 61:25
DEPARTMENT [2] - 1:7, 93:4
deposed [1] - 89:11
deposition [10] - 3:6, 3:13, 8:13, 10:13, 71:4, 71:8, 73:15, 81:12, 84:2, 90:9
DEPOSITION [1] - 93:6
dermatology [1] - 15:16
describe [2] - 12:20, 17:8
Description [2] - 91:23, 92:3
description [3] - 63:21, 68:11, 68:20
designated [1] - 56:19
designation [1] - 17:11
desk [2] - 22:11, 45:12
details [1] - 20:16
determine [2] - 55:5, 88:8
determines [1] - 48:24
developed [2] - 25:23, 26:9
difference [1] - 19:10
different [3] - 14:16, 38:11, 77:2
difficult [2] - 20:19, 57:9
difficulty [1] - 21:5
directly [1] - 54:3
director [14] - 14:9, 14:11, 14:13, 14:23, 15:17, 16:6, 19:7, 35:21, 48:13, 52:3, 52:4, 64:8, 65:13
disagree [1] - 77:23
discharge [1] - 19:2
discusses [1] - 5:10
disingenuous [1] - 41:11
disposition [2] - 32:13, 73:21
DISTRICT [2] - 1:2, 1:2
doctor [6] - 14:25, 51:15, 65:6, 65:12, 68:3, 81:11
Doctor [6] - 8:2, 35:4, 44:18, 73:12, 83:25, 86:22
doctors [1] - 18:18
document [9] - 29:21, 51:16, 68:4, 68:6, 68:9, 70:15, 76:16, 81:12, 82:3
documentation [5] - 36:5, 37:12, 37:19, 86:10, 86:14
documented [3] - 25:23, 36:22, 72:21
documenting [4] - 33:10, 33:15, 36:9, 36:15
documents [5] - 12:4, 12:7, 12:11, 60:24, 67:15
DOE [2] - 1:8, 93:5
dog [2] - 51:5, 51:6
done [3] - 46:2, 46:16, 59:4
Donna [3] - 2:8, 4:8, 7:25
donna [1] - 91:7
DONNA [4] - 1:17, 90:7, 90:18, 93:7
door [4] - 43:10, 43:12, 43:17, 43:19
doors [2] - 43:20, 45:4
dorm [5] - 39:10, 50:25, 53:16, 59:12, 59:13
double [1] - 13:13
double-boarded [1] - 13:13
down [14] - 9:24, 35:13, 39:21, 41:17, 41:18, 41:19, 42:18, 45:21, 46:21, 49:17, 52:23, 59:14, 69:6, 83:10
downstairs [1] - 56:20
DR [1] - 93:7
Dr [3] - 2:8, 7:25, 69:9
duly [2] - 4:3, 94:7
during [5] - 10:12, 23:13, 33:24, 34:10, 34:21
duties [1] - 35:18
dying [1] - 38:16

## E

E-09 [1] - 34:7
E2 [2] - 50:23, 50:25
e2B [1] - 51:3
E2B [2] - 51:4, 91:15
early [1] - 74:25
easily [1] - 55:25
East [3] - 4:12, 14:2, 17:2
EASTERN [1] - 1:2
easy [1] - 75:11
educational [1] - 12:21
EDWARD [1] - 2:7
effect [2] - 3:15, 57:20
either [3] - 40:10, 72:15, 94:11
EKG [1] - 40:22
elaborate [1] - 38:15
electronic [2] - 20:18, 32:20
emergencies [3] - 22:22, 40:12, 49:15
emergency [22] - 30:13, 30:15, 30:23, 31:3, 39:12, 39:16, 39:20, 39:25, 40:5, 40:6, 40:14, 40:16, 40:24, 41:22, 43:3, 45:16, 46:19, 49:24, 50:2, 76:5, 79:7, 87:19
emergent [10] - 36:15, 55:6, 55:8, 74:8, 74:16, 75:6, 75:17, 75:21, 77:23
employment [1] - 14:7
emptied [1] - 54:13
enabled [7] - 44:16, 51:13, 65:4, 67:25, 73:9, 81:9, 83:19
encounter [2] - 27:24, 36:20
encounters [4] - 22:18, 28:4, 33:10, 33:16
engage [1] - 37:19
ensure [2] - 25:22, 26:16
enter [1] - 82:21
entity [2] - 20:4, 20:6
Entry [1] - 92:9
entry [1] - 81:5
equipment [1] - 40:5
ER [1] - 40:25
ERRATA [1] - 93:2
errors [1] - 10:23
especially [1] - 72:20
ESQ [4] - 2:5, 2:9, 2:13, 2:17
evaluate [1] - 82:12
evaluating [1] - 78:13
evaluation [8] - 70:13, 70:16, 70:17, 72:13, 72:19, 72:21, 77:15
Evelyn [4] - 66:7, 67:3, 77:21, 79:6
eventually [1] - 13:8
exactly [3] - 7:11, 17:15, 39:13
exaggerated [1] - 38:14
Examination [1] - 91:6
examination [8] - 6:18, 10:21, 11:20, 12:5, 68:15, 68:18, 68:25, 72:8
EXAMINATION [2] - 1:17, 4:13
examine [2] - 70:3, 75:16
examined [1] - 4:4
except [1] - 3:9
excuse [1] - 70:14
exhibit [1] - 91:24
Exhibit [29] - 44:10, 44:13, 44:17, 51:8, 51:10, 51:14, 64:23, 64:25, 65:5, 65:7, 67:19, 67:22, 68:2, 72:25, 73:6, 73:10, 81:4, 81:6, 81:10, 81:16, 83:14, 83:16, 83:20, 92:4, 92:5, 92:6, 92:8, 92:9, 92:10
EXHIBITS [2] - 91:21, 92:2
exists [1] - 60:18
expecting [1] - 85:12
experience [2] - 65:13, 70:19
explaining [1] - 88:15
extend [1] - 29:25
extent [3] - 32:23, 34:19, 60:18
extreme [2] - 74:22, 75:20
eye [1] - 78:12

## F

face [1] - 74:21
Facilities [1] - 14:19
facility [3] - 5:3, 5:17, 57:17
Facility [1] - 14:2
fact [2] - 74:24, 75:19
fair [1] - 27:14
familiar [11] - 19:18, 21:9, 21:16, 22:3, 27:9, 34:6, 37:11, 42:2, 56:24, 62:5, 62:10
far [2] - 19:6, 20:22
Farmingdale [1] - 2:5
fashion [1] - 25:13
FEDERAL [1] - 3:2
Federal [1] - 1:19
female [1] - 63:7
Ferrere [2] - 63:2, 63:4
FEVOLA [1] - 93:2
figure [1] - 38:17
File [1] - 92:11
file [14] - 28:22, 55:16, 83:15, 83:24, 84:2, 84:3, 84:6, 84:12, 84:15, 84:21, 84:23, 85:13, 85:23, 91:20
filing [1] - 3:5
findings [2] - 68:18, 68:24

finger [4] - 29:8, 40:23, 65:17, 79:24
finish [1] - 9:19
finished [1] - 9:22
first [7] - 4:3, 8:14, 14:3, 14:6, 14:19, 36:10, 80:12
first-aid [1] - 36:10
fits [1] - 63:21
five [4] - 59:15, 59:22, 79:16, 86:17
floor [10] - 49:20, 50:2, 50:5, 50:23, 50:24, 53:13, 76:7, 78:5, 82:22, 83:2
focus [1] - 73:4
follow [3] - 47:20, 64:13, 77:16
followed [1] - 13:10
following [2] - 63:21, 75:2
follows [1] - 4:5
force [1] - 3:14
forced [1] - 59:21
forensic [2] - 19:3, 52:4
form [14] - 3:9, 29:20, 30:20, 70:9, 70:11, 70:22, 71:8, 71:16, 71:21, 71:25, 72:4, 72:13, 72:19, 73:2
Form [1] - 92:8
forth [2] - 21:10, 94:7
four [2] - 50:14, 54:21
freedom [1] - 26:23
frequently [1] - 50:5
front [1] - 80:22
full [1] - 64:13
FURTHER [2] - 3:8, 3:12

## G

gears [1] - 56:21
general [2] - 25:6, 34:5
generate [2] - 70:8, 70:21
generated [1] - 71:17
genuous [1] - 41:12
given [3] - 58:5, 90:13, 94:9
glucose [1] - 29:8
gold [1] - 21:13
grab [1] - 39:14
grabs [1] - 39:12
graduated [1] - 12:22
gravity [1] - 48:24
green [2] - 21:22, 52:21
Greenlawn [1] - 2:9
ground [1] - 8:12
GUERCIO [2] - 2:3
guess [6] - 9:13, 9:15, 44:25, 74:24, 75:3, 88:20
guidance [3] - 25:3, 61:17, 61:23
guide [3] - 36:4, 36:25, 58:11
guidelines [1] - 61:24
guy [1] - 78:22

## H

H-A-I-K-E-N [1] - 25:18
Haiken [1] - 25:18
half [1] - 12:2
hand [4] - 50:9, 53:6, 54:4, 94:16
handbook [1] - 18:3
handed [3] - 50:12, 54:19, 78:6
handles [1] - 48:14
hands [2] - 53:18, 89:14
handwritten [1] - 32:24
hard [2] - 69:13, 75:9
Hartford [2] - 13:2
Hawaiian [1] - 64:2
head [2] - 57:11, 79:4
Health [4] - 15:13, 21:17, 21:19, 61:25
health [31] - 15:7, 18:23, 18:24, 22:17, 22:18, 24:22, 25:7, 25:14, 25:20, 26:12, 26:18, 27:10, 27:23, 27:24, 28:4, 28:8, 28:17, 32:6, 33:5, 33:10, 33:15, 36:6, 36:22, 37:2, 37:4, 42:19, 49:6, 52:2, 52:20, 54:9
Healthcare [8] - 19:20, 21:11, 23:23, 26:12, 27:11, 32:7, 34:8, 52:16
healthcare [19] - 18:16, 18:18, 24:7, 25:22, 25:24, 27:5, 27:6, 28:21, 29:12, 33:12, 33:17, 33:19, 33:24, 35:13, 39:3, 39:16, 40:8, 40:10, 49:22
heard [10] - 9:8, 45:2, 65:15, 65:18, 66:4, 66:8, 79:18, 79:23, 80:3, 80:12
heart [2] - 29:7, 78:24
held [1] - 1:20
help [1] - 74:22
helpful [2] - 33:19, 44:7
HENIG [4] - 1:18, 90:7, 90:18, 93:7
Henig [6] - 2:8, 4:8, 7:23, 7:25, 69:9, 91:7
HEREBY [1] - 3:3
hereby [3] - 3:7, 90:7, 94:4
herein [1] - 1:18
hereinbefore [1] - 94:6
hereto [1] - 3:5
hereunto [1] - 94:15
hip [1] - 38:22
HIPAA [1] - 87:6
hired [1] - 14:22
hold [1] - 59:2
hope [1] - 88:10
hospital [3] - 19:11, 67:6, 69:24
hospital's [1] - 62:2
hospitalist [1] - 13:10
hour [1] - 12:2
hours [2] - 6:11, 69:9
house [3] - 17:17, 17:18, 17:19
Hussey [1] - 62:15
hyperbaric [2] - 13:14, 15:5

## I

I/M [3] - 82:8, 82:12, 82:16
idea [3] - 70:19, 70:23, 87:7
identification [7] - 44:14, 51:11, 65:2, 67:23, 73:7, 81:7, 83:17
immediately [3] - 54:23, 61:3, 87:23
important [2] - 87:12, 87:24
IN [1] - 94:15
inaccurate [1] - 10:14
INC [1] - 93:2
incarcerated [3] - 19:25, 46:14, 53:6
incarceration [4] - 23:13, 33:24, 34:10, 34:21
incarcerations [1] - 53:8
incentive [1] - 24:14
incident [3] - 8:8, 66:15, 69:11
include [13] - 18:16, 18:20, 22:14, 28:4, 29:5, 36:9, 36:15, 36:16, 37:2, 37:7, 37:18, 40:22, 46:23
including [1] - 52:2
incomplete [1] - 10:15
independent [1] - 64:19
INDEX [3] - 91:2, 91:4, 91:9
indicated [1] - 32:14
indicating [2] - 60:9, 74:5
individual [4] - 12:14, 46:15, 53:6, 87:21
individuals [2] - 19:25, 62:7
industry [1] - 21:14
infirmary [1] - 42:22
information [12] - 5:12, 19:17, 20:20, 28:17, 29:13, 31:20, 31:24, 54:10, 72:2, 72:9, 83:10, 88:24
injuries [1] - 68:10
injury [3] - 12:9, 67:20, 71:23
Injury [1] - 92:6
inmate [48] - 12:9, 23:10, 23:15, 27:25, 28:5, 28:18, 30:8, 30:17, 31:6, 31:12, 33:11, 33:16, 34:15, 36:12, 36:16, 36:21, 37:22, 39:6, 41:2, 42:10, 46:5, 46:20, 47:14, 53:9, 53:18, 55:9, 55:16, 59:7, 59:20, 60:2, 60:6, 60:25, 65:16, 66:16, 67:20, 68:23, 69:22, 71:17, 71:24, 75:20, 79:19, 80:2, 80:6, 83:15, 83:23, 87:2, 91:11
Inmate [1] - 92:6
inmate's [6] - 29:6, 43:5, 60:8, 65:17, 68:11, 88:3
inmate-patient [1] - 28:18
inmates [9] - 5:2, 22:15, 22:19, 26:17, 42:6, 56:17, 59:21, 60:18, 68:20
Inmates [2] - 91:17, 92:10
inspection [1] - 86:4
instance [2] - 30:7, 31:8
instances [1] - 30:11
interested [2] - 24:16, 94:13
interfere [1] - 87:9
interference [5] - 26:24, 88:2, 88:12, 88:19, 89:2
internal [3] - 13:6, 15:4, 15:9
internship [1] - 12:25
Investigator [2] - 69:3, 69:11
involved [3] - 87:13, 87:17, 88:17
involving [1] - 66:15
IS [3] - 3:3, 3:8, 3:12
isolating [1] - 57:18
isolation [3] - 57:13, 57:15, 59:13
IT [3] - 3:3, 3:8, 3:12
itself [1] - 45:20

## J

J.T [2] - 77:13, 78:6
jail [21] - 16:10, 16:13, 16:16, 17:4, 18:3, 20:10, 25:10, 26:10, 26:16, 26:22, 28:22, 29:21, 35:19, 38:11, 42:10, 47:24, 52:20, 55:19, 56:25, 65:15, 89:16
jails [4] - 20:7, 26:13, 42:3, 58:13
Jails [1] - 21:18
James [1] - 62:18
james [1] - 62:19
JANE [2] - 1:8, 93:5
January [2] - 14:5, 14:19
Jefferey [1] - 64:15
JEFFERY [1] - 93:3
JEFFREY [1] - 1:3
Jeffrey [1] - 8:4
Jiovani [1] - 62:25
job [1] - 14:7
JOHN [7] - 1:8, 1:8, 2:5, 93:5, 93:5
John [1] - 8:3
JOHNSON [2] - 1:3, 93:3
Johnson [14] - 8:5, 12:14, 64:16, 64:24, 65:9, 65:21, 65:22,

69:12, 74:11, 82:8, 82:12, 82:16, 84:25, 85:24
**Johnson's** [4] - 84:2, 84:14, 84:23, 91:20
**Jr** [1] - 64:16
**JR** [2] - 1:3, 93:3
**judgment** [1] - 62:4
**jump** [3] - 39:14, 39:23, 46:22

## K

**keep** [4] - 8:15, 8:18, 22:10, 88:23
**keeping** [5] - 5:16, 5:20, 7:14, 60:13, 91:10
**kept** [2] - 55:18, 56:5
**kind** [4] - 40:5, 49:16, 72:2, 87:18
**knowledge** [2] - 45:18, 75:12

## L

**last** [2] - 64:7, 79:16
**Last** [1] - 91:19
**LAW** [1] - 2:7
**least** [4] - 15:22, 15:23, 57:12, 59:15
**leave** [1] - 48:16
**left** [2] - 14:14, 45:6
**legible** [1] - 33:2
**less** [1] - 19:5
**level** [3] - 20:21, 29:6, 41:23
**levels** [1] - 32:12
**license** [2] - 35:17, 37:9
**lightly** [1] - 38:19
**likely** [1] - 74:6
**list** [2] - 61:6, 61:8
**live** [1] - 81:5
**Live** [1] - 92:9
**LLP** [1] - 2:14
**located** [4] - 16:16, 16:25, 17:7, 53:15
**Lockbox** [1] - 44:3
**lockbox** [9] - 12:8, 42:3, 43:24, 44:2, 44:5, 44:22, 45:9, 45:18, 46:6
**locked** [2] - 52:25, 59:14
**log** [4] - 60:13, 60:17, 60:24, 86:7
**logbook** [3] - 12:10, 81:21, 81:24
**login** [1] - 86:6
**logistics** [1] - 20:24
**look** [12] - 7:7, 27:16, 52:23, 73:17, 74:10, 74:18, 74:20, 76:9, 77:5, 77:8, 84:24, 85:22
**looked** [5] - 77:21, 81:13, 81:18, 81:19, 81:22
**looking** [5] - 5:5, 7:12, 17:11, 26:5, 84:12
**looks** [6] - 41:14, 63:5, 77:10, 78:15, 78:19, 79:3
**lose** [1] - 89:12
**lost** [1] - 89:4
**LPN** [5] - 35:16, 35:19, 39:12, 40:12, 63:11
**LPNs** [3] - 19:8, 35:11, 50:9

## M

**M.D.s** [1] - 18:17
**maintain** [1] - 32:19
**maintained** [2] - 28:21, 33:6
**maintaining** [2] - 22:17, 32:22
**maintains** [1] - 55:15
**MAKRIS** [1] - 2:14
**male** [3] - 63:7, 63:8, 63:18
**manage** [1] - 21:3
**managers** [1] - 35:25
**managing** [1] - 20:2
**March** [1] - 57:11
**mark** [3] - 44:9, 51:7, 83:13
**marked** [7] - 44:14, 51:11, 65:2, 67:23, 73:7, 81:7, 83:17
**marriage** [1] - 94:11
**matter** [3] - 8:5, 12:18, 94:14
**McCaffrey** [3] - 46:4, 62:9, 62:12
**MCCAFFREY** [2] - 1:7, 93:4
**MCLAUGHLIN** [1] - 2:13
**McMillan** [3] - 69:4, 69:11, 70:20
**McMillan's** [1] - 71:2
**MD** [1] - 40:11
**MDs** [1] - 49:24
**ME** [1] - 93:23
**Meadow** [3] - 4:12, 14:2, 17:2
**mean** [21] - 20:22, 21:7, 27:12, 38:7, 38:10, 38:23, 38:24, 44:2, 44:24, 48:16, 56:11, 68:14, 73:24, 75:23, 76:21, 77:18, 79:3, 81:19, 88:13, 88:21, 88:25
**meaning** [1] - 69:21
**means** [4] - 11:21, 21:6, 44:4, 68:12
**meant** [1] - 58:10
**med** [1] - 54:20
**medical** [136] - 4:17, 4:21, 5:2, 5:17, 5:20, 7:13, 7:15, 14:9, 14:11, 14:13, 14:23, 14:25, 15:15, 15:17, 16:2, 16:6, 16:15, 16:19, 18:3, 18:12, 18:14, 18:18, 19:11, 20:2, 20:7, 20:10, 20:18, 25:5, 25:11, 25:15, 25:20, 26:9, 26:15, 26:18, 26:21, 27:7, 27:20, 27:22, 28:24, 29:22, 30:4, 30:8, 30:12, 31:5, 31:11, 31:21, 32:2, 32:15, 32:19, 32:20, 32:23, 32:24, 33:4, 33:22, 34:13, 35:5, 36:9, 37:21, 39:5, 39:9, 39:18, 40:20, 41:17, 41:18, 41:20, 41:22, 42:5, 42:24, 42:25, 43:2, 45:15, 45:21, 46:21, 47:12, 47:25, 49:14, 49:17, 52:5, 52:8, 54:3, 55:15, 55:16, 56:2, 56:5, 56:6, 56:7, 56:14, 56:15, 56:19, 59:24, 59:25, 60:7, 61:16, 62:3, 65:13, 65:14, 65:15, 68:18, 68:25, 69:22, 70:2, 70:8, 70:10, 70:20, 70:21, 71:16, 71:21, 72:8, 72:11, 72:21, 80:7, 82:12, 82:16, 82:20, 83:15, 83:24, 84:3, 84:12, 84:15, 84:17, 84:23, 84:24, 85:2, 86:5, 86:7, 86:9, 87:2, 88:23, 89:15, 89:16, 91:10, 91:20
**Medical** [6] - 12:24, 14:21, 16:9, 16:12, 70:7, 92:10
**medical's** [2] - 87:9, 89:14
**medication** [5] - 35:23, 44:4, 49:5, 50:9, 50:12
**medications** [1] - 40:2
**medicine** [11] - 13:2, 13:7, 13:16, 13:18, 13:22, 15:4, 15:9, 15:22, 25:12, 34:5, 34:12
**meet** [2] - 11:19, 26:17
**member** [2] - 23:21, 31:4
**mental** [6] - 18:23, 18:24, 26:18, 42:18, 49:5, 49:6
**mentioned** [4] - 31:17, 39:23, 50:8, 87:5
**met** [1] - 64:21
**method** [2] - 37:12, 37:19
**middle** [3] - 63:22, 76:16, 82:3
**middle-aged** [1] - 63:22
**might** [3] - 30:21, 57:23, 69:17
**MILBER** [1] - 2:14
**mile** [1] - 16:23
**million** [1] - 77:18
**mind** [2] - 71:2, 71:11
**Mineola** [1] - 2:12
**minutes** [5] - 84:9, 84:10, 84:11, 84:23, 86:17
**misinterpret** [1] - 38:25
**misplace** [1] - 89:13
**misplaced** [1] - 89:5
**missed** [1] - 71:6
**Montefiore** [1] - 12:24
**morning** [5] - 74:3, 75:2, 75:3, 78:20, 79:6
**most** [2] - 17:25, 79:11
**movable** [1] - 40:18
**move** [2] - 6:17, 40:19
**moved** [3] - 13:8, 14:9, 14:11
**MR** [125] - 4:14, 4:15, 4:19, 4:24, 5:4, 5:8, 5:18, 5:21, 5:23, 6:3, 6:5, 6:8, 6:9, 6:16, 6:24, 7:2, 7:6, 7:13, 7:18, 7:19, 7:22, 8:2, 8:18, 8:24, 9:6, 9:11, 9:18, 10:2, 10:6, 10:11, 10:19, 11:2, 11:9, 14:15, 17:10, 19:12, 20:14, 26:6, 29:15, 30:19, 33:13, 33:25, 34:17, 34:23, 35:3, 38:8, 42:12, 43:14, 44:9, 46:8, 46:25, 47:3, 47:4, 47:18, 48:17, 50:6, 50:17, 50:21, 50:23, 51:2, 51:4, 51:6, 53:21, 53:22, 53:24, 55:21, 56:3, 58:7, 58:16, 58:20, 59:2, 60:10, 60:16, 60:21, 60:23, 61:3, 61:7, 61:8, 61:12, 61:20, 61:22, 62:19, 62:20, 64:11, 64:22, 65:23, 66:10, 66:18, 66:21, 67:18, 70:24, 71:3, 71:5, 71:7, 71:9, 71:15, 72:24, 75:7, 77:25, 79:21, 80:18, 80:21, 81:3, 81:15, 82:23, 83:13, 83:21, 83:22, 84:20, 85:10, 85:15, 85:18, 86:6, 86:16, 86:18, 86:21, 87:14, 88:4, 88:14, 88:18, 89:3, 89:6, 89:8, 89:10, 89:18
**multiple** [1] - 17:3

## N

**NAME** [2] - 93:3, 93:7
**name** [13] - 4:7, 7:24, 8:3, 37:4, 51:21, 62:10, 64:4, 64:7, 64:12, 64:13, 83:3, 83:6, 91:19
**named** [1] - 12:14
**NASSAU** [10] - 1:6, 1:7, 1:9, 2:11, 90:5, 93:3, 93:4, 93:6
**Nassau** [17] - 2:15, 8:9, 13:25, 14:20, 16:2, 16:9, 16:11, 44:11, 55:24, 58:5, 58:11, 65:8, 65:14, 73:3, 81:16, 83:22
**National** [9] - 19:19, 21:10, 21:18, 23:22, 26:11, 27:10, 32:6, 34:7, 52:15
**nature** [1] - 85:19
**Naysmith** [2] - 74:6, 77:2
**NCCHC** [1] - 52:15
**NCHCC** [1] - 52:14

**near** [1] - 45:20
**necessarily** [5] - 21:7, 38:14, 38:23, 42:14, 75:23
**necessary** [2] - 15:20, 69:17
**need** [6] - 6:13, 11:2, 11:5, 40:4, 41:16, 87:22
**needs** [5] - 25:2, 26:19, 44:4, 49:8, 69:15
**never** [4] - 44:25, 46:2, 81:22, 81:23
**nevertheless** [1] - 31:10
**NEW** [2] - 1:2, 90:4
**New** [11] - 1:21, 2:5, 2:9, 2:12, 2:16, 4:4, 4:12, 12:23, 13:8, 90:23, 94:4
**next** [7] - 35:4, 40:13, 73:25, 78:20, 79:5, 79:8, 91:25
**Neysmith** [1] - 73:18
**nice** [1] - 20:25
**night** [1] - 74:4
**non** [2] - 55:6, 74:8
**non-emergent** [2] - 55:6, 74:8
**nonmedical** [1] - 26:25
**Nonparty** [1] - 1:18
**normal** [3] - 19:11, 32:12, 46:18
**notary** [1] - 3:14
**Notary** [4] - 1:21, 4:3, 90:23, 94:3
**NOTARY** [1] - 93:25
**note** [6] - 29:18, 30:2, 43:14, 72:17, 85:11, 86:13
**noted** [3] - 14:15, 85:11, 89:20
**notes** [1] - 32:25
**notice** [1] - 45:11
**notified** [2] - 69:9, 82:7
**notify** [1] - 87:23
**notifying** [1] - 69:10
**NP** [1] - 40:11
**number** [15] - 6:18, 6:19, 13:7, 18:19, 24:2, 24:4, 24:6, 44:11, 65:7, 67:21, 73:3, 73:5, 73:11, 81:16, 82:8
**Nurse** [5] - 35:17, 62:25, 63:15, 66:6, 91:19
**nurse** [32] - 18:17, 35:25, 36:21, 36:25, 39:2, 48:4, 48:21, 49:10, 49:11, 49:18, 49:23, 49:25, 53:7, 54:20, 55:3, 63:11, 63:13, 63:20, 63:22, 67:3, 67:11, 75:13, 75:15, 76:22, 77:2, 77:9, 77:11, 77:14, 77:20, 78:5, 78:18, 79:4
**nurse's** [5] - 37:9, 48:9, 55:4, 76:24, 77:15
**nurses** [10] - 18:13, 19:6, 24:11, 26:23, 36:4, 47:23, 48:14, 50:4, 76:10, 76:16
**nursing** [19] - 19:7, 23:17, 35:6, 35:21, 35:24, 35:25, 36:3, 36:8, 36:19, 36:24, 37:17, 48:10, 48:13, 50:18, 52:3, 59:16, 63:14, 64:8, 64:9
**Nursing** [1] - 91:15

## O

**O8** [1] - 27:10
**oath** [3] - 10:3, 10:7, 90:9
**OBGYN** [1] - 18:20
**object** [1] - 71:8
**objection** [26] - 19:12, 20:14, 29:15, 30:19, 33:25, 38:8, 43:15, 46:8, 50:6, 53:24, 55:21, 58:7, 60:10, 61:20, 65:23, 66:18, 70:24, 71:14, 77:25, 79:21, 80:18, 82:23, 85:10, 85:15, 87:14, 88:4
**Objection** [2] - 42:12, 75:7
**objections** [1] - 3:9
**objective** [2] - 68:24, 72:6
**Objective** [1] - 37:15
**observed** [1] - 68:10
**obstacles** [1] - 21:4
**obviously** [5] - 6:12, 27:12, 43:16, 45:3, 75:24
**occur** [1] - 45:23
**occurred** [1] - 8:8
**occurrence** [1] - 37:3
**October** [13] - 8:8, 50:19, 50:20, 56:23, 57:21, 59:9, 60:20, 61:2, 61:10, 66:15, 69:8, 85:2, 85:24
**OF** [12] - 1:2, 1:6, 1:9, 1:17, 2:7, 2:11, 90:4, 90:5, 93:3, 93:6, 93:6, 93:23
**offer** [2] - 24:13, 24:16
**offers** [1] - 20:6
**office** [1] - 13:7
**OFFICE** [1] - 2:11
**OFFICER** [6] - 1:7, 1:8, 93:4, 93:5
**Officer** [3] - 62:15, 62:18, 62:23
**officer** [3] - 53:19, 65:17, 71:18
**officers** [1] - 27:2
**OFFICES** [1] - 2:7
**often** [2] - 38:18, 54:12
**old** [2] - 56:11, 63:9
**once** [3] - 65:20, 66:5, 85:16
**one** [16] - 6:18, 21:2, 21:3, 27:15, 27:16, 28:3, 58:22, 58:23, 66:2, 66:8, 79:18, 80:12, 80:16, 80:22, 87:5, 88:15
**ones** [3] - 35:10, 49:13, 49:15
**online** [1] - 18:4
**open** [5] - 43:9, 43:12, 43:16, 43:20, 45:4
**opens** [1] - 43:19
**operation** [1] - 71:10
**operations** [1] - 25:10
**opportunity** [1] - 10:20
**organization** [1] - 19:24
**orientation** [1] - 86:9
**orthopedist** [1] - 18:21
**otherwise** [1] - 9:7
**outcome** [1] - 94:14
**outlined** [1] - 26:11
**outside** [3] - 38:11, 43:22, 46:14
**own** [1] - 62:3
**oximetry** [1] - 29:9
**oxygen** [4] - 29:6, 32:12, 40:23, 41:23
**oxygenation** [1] - 41:14

## P

**p.m** [4] - 1:13, 85:3, 85:25, 89:20
**PA** [1] - 40:11
**page** [4] - 29:23, 29:24, 69:7, 91:25
**Page** [3] - 91:6, 91:23, 92:3
**PAGE/LINE(S** [1] - 93:8
**pain** [22] - 28:5, 30:25, 31:7, 36:16, 37:23, 38:20, 38:22, 38:23, 39:6, 39:10, 39:19, 42:16, 43:5, 45:17, 47:14, 74:20, 74:22, 75:20, 75:25, 78:8, 78:10, 78:12
**pains** [4] - 30:17, 38:6, 46:20, 82:9
**part** [5] - 4:19, 18:24, 76:10, 76:15, 81:12
**particular** [3] - 24:8, 29:10, 50:21
**parties** [9] - 3:4, 44:16, 51:13, 65:4, 67:25, 73:9, 81:9, 83:19, 94:11
**PAs** [1] - 49:23
**pass** [1] - 54:20
**past** [1] - 56:17
**patient** [43] - 5:2, 5:7, 5:11, 22:19, 27:25, 28:13, 28:16, 28:18, 28:21, 29:21, 32:11, 33:11, 33:16, 35:13, 35:14, 36:21, 36:22, 40:18, 40:19, 40:25, 41:11, 41:12, 41:14, 42:20, 43:21, 46:13, 65:25, 67:4, 67:7, 67:10, 68:16, 69:15, 69:18, 70:3, 74:2, 75:15, 78:14, 86:2, 86:8, 86:11, 86:14, 89:15
**patient's** [3] - 32:15, 45:20, 68:16
**patient-inmate** [4] - 27:25, 33:11, 33:16, 36:21
**patient-inmates** [2] - 5:2, 22:19
**patients** [14] - 16:14, 21:3, 23:3, 26:16, 27:5, 38:3, 42:15, 42:23, 46:12, 48:23, 49:17, 59:12, 79:12, 87:10
**PATRICK** [2] - 1:7, 93:4
**Patrick** [2] - 62:8, 62:12
**pediatrist** [1] - 18:21
**pending** [1] - 11:6
**penetrated** [1] - 79:24
**penetration** [2] - 69:25, 70:4
**people** [8] - 16:21, 19:4, 24:2, 24:5, 39:11, 49:4, 61:6, 64:9
**percent** [3] - 41:14, 46:2, 63:6
**perception** [2] - 87:20, 87:21
**person** [13] - 11:21, 24:25, 25:4, 25:9, 25:17, 40:15, 49:2, 64:17, 65:10, 67:7, 75:24, 75:25, 78:23
**person's** [1] - 87:21
**personal** [2] - 59:25, 60:8
**personnel** [2] - 26:25, 61:16
**PETER** [1] - 2:17
**pharmacy** [1] - 52:4
**phone** [4] - 6:25, 11:21, 67:8, 67:10
**phrase** [1] - 44:3
**physical** [1] - 18:23
**physician** [2] - 14:8, 18:16
**physicians** [1] - 26:22
**picked** [1] - 77:12
**picture** [5] - 12:13, 44:6, 44:19, 64:24, 65:8
**Picture** [2] - 91:24, 92:5
**PII** [1] - 61:13
**place** [3] - 25:12, 40:17, 59:12
**placed** [1] - 53:19
**plaintiff** [1] - 8:4
**Plaintiff** [3] - 1:4, 1:19, 2:4
**Plaintiff's** [25] - 44:10, 44:13, 44:17, 51:8, 51:10, 51:14, 64:23, 64:25, 65:5, 65:7, 67:19, 67:22, 68:2, 72:25, 73:6, 73:10, 81:4, 81:6, 81:10, 81:15, 83:14, 83:16, 83:20, 91:23, 92:3
**Plan** [1] - 37:16
**plan** [1] - 72:7

**planners** [1] - 19:2
**play** [2] - 52:10, 52:12
**PLOUSADIS** [1] - 2:14
**point** [4] - 7:7, 11:3, 34:25, 39:11
**policies** [6] - 5:6, 5:16, 25:22, 26:8, 47:11, 52:7, 52:11, 91:10
**Policy** [2] - 91:11, 92:4
**policy** [39] - 4:16, 4:20, 4:23, 5:5, 5:9, 5:19, 5:24, 6:21, 7:3, 7:8, 7:11, 7:20, 18:2, 25:19, 26:5, 26:15, 26:21, 27:20, 27:22, 30:5, 32:3, 32:24, 33:4, 33:23, 34:8, 34:14, 34:18, 35:5, 35:6, 42:6, 47:19, 51:9, 51:18, 51:23, 58:22, 58:23, 69:21, 91:13, 91:14
**positive** [10] - 59:8, 59:20, 60:3, 60:6, 60:9, 60:14, 60:19, 61:6, 61:9, 91:17
**possibility** [1] - 46:11
**possible** [5] - 23:4, 46:17, 53:21, 77:10, 88:24
**possibly** [1] - 45:25
**post** [2] - 82:12, 82:16
**potentially** [2] - 78:16, 88:20
**practice** [5] - 13:11, 13:12, 26:23, 34:5, 34:11
**Practicing** [1] - 35:17
**Practitioner** [2] - 66:7, 77:20
**practitioner** [6] - 49:19, 49:25, 63:12, 63:14, 67:4, 67:12
**practitioners** [2] - 18:17, 49:23
**preparation** [1] - 12:4
**prepare** [1] - 11:20
**preparing** [1] - 52:11
**pressure** [3] - 29:6, 32:12, 41:23
**pretty** [1] - 57:12
**prevent** [2] - 88:12, 88:19
**previously** [1] - 74:14
**printed** [1] - 37:3
**privacy** [2] - 54:9, 87:6
**private** [6] - 13:11, 13:12, 23:3, 38:11, 46:13, 88:24
**privy** [1] - 54:11
**problem** [5] - 4:20, 38:22, 61:4, 75:10, 85:19
**problems** [3] - 74:12, 78:9, 78:10
**procedure** [2] - 46:18, 59:9
**procedures** [5] - 25:23, 26:8, 36:10, 47:12, 52:7
**proceed** [2] - 6:11, 13:5
**proceeded** [1] - 6:15
**process** [4] - 14:12, 87:17, 87:19, 89:16
**profession** [1] - 26:24
**Professional** [1] - 15:13
**professional** [3] - 15:7, 29:12, 36:20
**professionals** [2] - 24:7, 27:7
**program** [2] - 18:22, 18:25
**progress** [3] - 29:18, 30:2, 72:17
**proper** [2] - 70:8, 70:21
**protocols** [20] - 22:14, 22:21, 23:2, 23:18, 35:7, 36:4, 36:9, 36:19, 36:24, 37:18, 56:25, 57:5, 57:12, 57:13, 57:15, 57:25, 58:4, 58:10, 58:18, 91:16
**protoporphyria** [1] - 15:16
**provide** [3] - 41:3, 64:12, 87:2
**provided** [8] - 5:12, 6:7, 27:5, 33:8, 36:11, 42:7, 61:23, 84:15
**provider** [5] - 35:13, 39:3, 39:16, 40:8, 40:10
**providers** [3] - 18:16, 18:19, 49:23
**providing** [2] - 23:2, 61:17
**psychiatrists** [1] - 19:4
**psychiatry** [1] - 52:5
**psychologists** [2] - 19:2, 19:3
**PUBLIC** [1] - 93:25
**public** [2] - 3:14, 18:6
**Public** [4] - 1:21, 4:3, 90:23, 94:4
**publication** [1] - 21:17
**publications** [1] - 15:14
**published** [2] - 15:15, 21:18
**pull** [4] - 64:22, 67:18, 72:24, 81:3
**pulse** [2] - 29:9, 41:13
**pursuant** [2] - 1:19, 32:2
**put** [7] - 28:16, 31:20, 31:23, 41:13, 53:9, 53:12, 72:10
**putting** [1] - 40:23

**Q**

**qualified** [3] - 21:7, 27:6, 42:24
**quality** [5] - 33:24, 34:9, 34:20, 51:23, 91:12
**quarantining** [1] - 57:19
**quarter** [1] - 16:23
**questioning** [1] - 6:22
**questions** [7] - 8:7, 8:16, 55:14, 59:3, 86:22, 89:9, 89:19

**R**

**radiology** [1] - 18:22
**rate** [2] - 29:7
**read** [1] - 90:8
**reading** [1] - 80:20
**ready** [1] - 25:24
**real** [2] - 38:17
**realize** [1] - 10:12
**really** [6] - 19:10, 20:24, 21:21, 69:13, 75:11, 87:19
**rearing** [1] - 57:11
**REASON** [1] - 93:8
**reason** [2] - 11:12, 42:17
**reasons** [2] - 87:6, 88:15
**receive** [2] - 13:20, 15:18
**received** [2] - 75:13, 78:5
**recess** [1] - 86:19
**recognize** [3] - 65:10, 76:12, 76:18
**recollection** [2] - 64:20, 67:14
**recommendation** [2] - 62:2, 62:3
**Record** [1] - 92:11
**record** [34] - 4:7, 6:14, 7:19, 7:24, 27:23, 28:9, 28:12, 28:15, 28:17, 28:21, 29:11, 29:12, 31:21, 31:24, 32:15, 32:16, 33:5, 36:22, 37:2, 37:4, 48:3, 48:7, 55:16, 59:25, 60:2, 60:8, 60:9, 84:25, 85:5, 85:9, 85:14, 90:11, 90:13, 94:8
**records** [30] - 4:17, 4:21, 5:15, 5:17, 5:20, 7:13, 7:15, 20:18, 22:18, 27:10, 28:20, 32:6, 32:20, 32:23, 32:25, 36:6, 52:5, 56:2, 56:5, 56:8, 56:10, 56:11, 56:12, 56:13, 56:15, 56:17, 83:24, 84:17, 85:23, 91:10
**redacted** [2] - 61:14, 91:18
**redactions** [3] - 61:7, 61:11, 61:12
**redo** [1] - 30:21
**refer** [1] - 44:21
**reference** [1] - 52:14
**referred** [2] - 39:17, 45:9
**referring** [3] - 21:21, 27:13, 44:22
**refreshing** [1] - 67:2
**regarding** [10] - 4:17, 4:20, 5:16, 5:19, 22:21, 27:4, 28:18, 34:8, 35:6, 69:12
**regards** [1] - 69:16
**related** [1] - 94:10
**relationship** [1] - 16:8
**relatively** [1] - 78:23
**relaxed** [1] - 57:15
**remain** [1] - 33:2
**remained** [1] - 82:16
**remember** [1] - 69:14
**removal** [1] - 59:11
**repeat** [3] - 9:2, 60:4, 85:16
**rephrase** [1] - 9:3
**report** [3] - 12:9, 67:20, 92:7
**reported** [1] - 80:6
**reporter** [2] - 8:20, 9:23
**REPORTER** [2] - 4:6, 4:9
**REPORTING** [1] - 93:2
**represent** [1] - 8:3
**REPRESENTATIVES** [2] - 1:9, 93:6
**represented** [1] - 11:16
**request** [33] - 29:22, 31:7, 34:18, 34:22, 47:19, 50:18, 53:10, 53:19, 54:5, 55:6, 58:17, 59:5, 60:17, 60:24, 72:11, 72:22, 73:2, 73:12, 74:7, 74:8, 74:11, 75:14, 75:16, 75:22, 77:12, 77:22, 78:4, 78:6, 80:8, 80:17, 80:20, 84:21, 88:3
**Request** [1] - 92:8
**requested** [1] - 4:18
**requesting** [3] - 5:15, 49:3, 49:4
**requests** [7] - 12:11, 48:23, 52:24, 54:5, 54:8, 54:19, 54:23
**REQUESTS** [1] - 91:9
**require** [2] - 24:8, 36:25
**required** [13] - 18:9, 20:17, 20:20, 22:2, 24:18, 31:23, 37:8, 55:9, 71:17, 71:22, 72:12, 72:19, 82:20
**requirement** [2] - 5:22, 37:18
**requirements** [1] - 5:10
**requires** [1] - 30:8
**reserved** [1] - 3:10
**residency** [2] - 12:25, 13:5
**respect** [7] - 4:21, 8:7, 12:17, 14:10, 22:18, 36:5, 47:12
**respective** [1] - 3:4
**respiratory** [1] - 29:7
**respond** [2] - 39:5, 41:22
**responded** [1] - 72:15
**responding** [7] - 22:21, 23:9, 34:14, 43:3, 46:19, 47:13, 91:11
**responds** [1] - 45:15
**response** [5] - 29:14, 51:17, 55:23, 66:9, 66:20
**responses** [1] - 8:15
**responsibility** [2] - 27:6, 55:5
**responsible** [3] - 24:22, 25:20, 52:6

responsive [1] - 41:2
results [1] - 32:13
resurgence [1] - 57:24
retention [1] - 7:20
review [8] - 10:20, 12:3, 12:7, 54:13, 55:3, 67:15, 73:14, 83:25
reviewed [8] - 10:22, 51:15, 54:23, 74:6, 75:5, 76:22, 81:11, 85:13
reviewing [2] - 84:6, 84:23
reviews [1] - 48:22
RN [7] - 35:15, 35:24, 39:2, 39:15, 40:7, 40:11, 63:11
RNs [2] - 19:7, 35:10
Road [1] - 2:16
Robert [12] - 8:4, 12:14, 64:15, 64:24, 65:8, 65:21, 65:22, 69:12, 84:2, 84:14, 85:24, 91:20
ROBERT [2] - 1:3, 93:3
role [3] - 15:19, 52:10, 52:12
room [3] - 40:20, 41:7, 56:15
rounds [1] - 53:7
rules [2] - 8:13, 11:10
Rules [1] - 1:19
run [2] - 25:13, 39:11
running [2] - 60:13, 60:24

S

S-T-A-I-B [1] - 62:20
SANSONE [68] - 2:9, 4:19, 5:4, 5:18, 5:23, 6:3, 6:8, 6:16, 7:2, 7:6, 7:13, 7:16, 7:19, 14:15, 17:10, 19:12, 20:14, 29:15, 30:19, 33:13, 33:25, 34:23, 38:8, 42:12, 43:14, 46:8, 46:25, 47:4, 48:17, 50:6, 50:21, 53:21, 53:24, 55:21, 56:3, 58:7, 58:20, 60:10, 60:21, 61:3, 61:8, 61:20, 61:22, 62:19, 65:23, 66:10, 66:18, 66:21, 70:24, 71:5, 71:9, 75:7, 77:25, 79:21, 80:18, 80:21, 82:23, 83:21, 85:10, 85:15, 85:18, 86:6, 86:18, 87:14, 88:4, 88:14, 89:3, 89:8
Sansone [2] - 4:15, 89:6
satellite [4] - 16:18, 17:20, 17:21, 40:21
satellites [1] - 16:22
saw [2] - 79:8, 86:8
scenarios [1] - 77:19
Schedule [1] - 91:15
schedule [3] - 48:9, 48:10, 50:19
schedules [1] - 47:22
scheduling [1] - 48:14
Schmidt [1] - 1:21
SCHMIDT [2] - 94:3, 94:21
School [1] - 12:24
school [1] - 15:15
screen [7] - 44:15, 51:12, 65:3, 67:24, 73:8, 81:8, 83:18
screenings [1] - 23:15
scribble [2] - 76:11, 76:25
sealing [1] - 3:5
second [3] - 56:22, 57:23, 69:7
section [3] - 30:2, 70:7, 72:16
sectors [1] - 38:12
see [33] - 21:20, 26:4, 27:13, 35:14, 42:19, 42:23, 44:18, 45:5, 51:20, 57:8, 59:17, 61:3, 68:3, 68:9, 70:6, 73:11, 73:18, 74:25, 75:15, 75:16, 76:19, 77:6, 82:2, 82:3, 82:6, 82:7, 82:9, 82:11, 82:13, 82:17, 83:6, 84:24, 85:23
seeing [1] - 43:21
sees [1] - 86:9
SEIDEN [1] - 2:14
seldom [1] - 45:22
send [1] - 34:25
sense [1] - 38:12
sent [5] - 4:22, 12:8, 69:18, 69:20, 86:4
separate [4] - 16:19, 47:25, 55:18, 56:18
separated [1] - 16:22
September [1] - 94:16
Sergeant [2] - 46:4, 62:11
serious [2] - 26:18, 38:3
seriously [2] - 37:23, 38:6
SERVANTS [2] - 1:8, 93:5
service [1] - 52:2
Services [2] - 21:18, 52:17
services [4] - 25:8, 25:14, 26:13, 52:20
set [3] - 21:9, 94:7, 94:16
sets [2] - 19:24, 21:4
setting [3] - 42:7, 42:11, 42:24
settings [1] - 23:3
seven [2] - 59:15, 59:22
sexual [13] - 23:6, 23:10, 34:14, 67:5, 69:18, 69:23, 70:3, 71:18, 79:10, 79:14, 79:19, 79:25, 91:11
sexually [2] - 66:16, 79:12
shall [3] - 3:6, 3:10, 36:21
share [7] - 44:15, 51:12, 65:3, 67:24, 73:8, 81:8, 83:18
Sharon [1] - 73:18
SHEET [1] - 93:2
sheet [1] - 30:3
SHERIFF'S [2] - 1:7, 93:4
shift [1] - 48:11
short [2] - 41:12, 86:19
shortness [16] - 28:6, 30:18, 30:24, 31:6, 36:17, 37:23, 39:7, 39:20, 43:4, 45:16, 74:12, 74:15, 76:2, 78:8, 78:11, 79:2
show [1] - 44:6
showing [1] - 65:6
Sick [2] - 92:4, 92:8
sick [51] - 12:10, 22:24, 29:20, 29:23, 29:24, 30:3, 30:5, 30:7, 31:7, 48:23, 48:24, 49:2, 51:9, 51:18, 52:25, 53:3, 53:10, 53:18, 54:12, 54:19, 54:22, 57:18, 59:18, 70:12, 72:10, 72:15, 72:16, 72:22, 73:2, 73:12, 73:22, 73:25, 74:2, 74:10, 74:19, 75:5, 75:14, 77:12, 77:21, 78:4, 78:6, 78:21, 80:7, 80:16, 80:20, 86:25, 87:17, 88:3, 89:12, 89:13
side [3] - 42:21, 42:23, 86:11
sign [1] - 82:20
signature [8] - 37:4, 37:7, 76:10, 76:12, 76:13, 76:17, 76:24, 77:14
signed [2] - 3:13, 3:15
Signed [1] - 90:20
signs [14] - 28:12, 28:16, 29:4, 29:9, 31:14, 38:7, 41:15, 43:6, 43:23, 45:17, 46:23, 59:17, 76:23, 86:12
single [2] - 42:23, 74:3
situation [13] - 28:8, 28:11, 30:13, 30:15, 30:23, 32:11, 39:4, 40:24, 41:8, 53:18, 62:4, 74:16, 86:24
situations [3] - 71:21, 72:20, 80:6
smoothly [1] - 25:13
SOAP [3] - 37:11, 37:14, 37:19
social [1] - 18:25
socket's [1] - 78:12
sole [1] - 27:5
someone [6] - 6:20, 25:2, 48:22, 71:11, 74:25, 76:7
sometimes [5] - 29:8, 39:2, 42:15, 45:24, 69:16
somewhat [1] - 46:13
somewhere [1] - 43:7
soon [1] - 6:22
sorry [4] - 43:11, 60:4, 71:5, 76:14
sort [3] - 19:23, 20:20, 40:24
sounds [1] - 62:10
specific [5] - 5:4, 20:19, 24:4, 29:20, 47:11
specifically [3] - 27:19, 30:3, 64:9
speculative [1] - 89:9
spend [1] - 84:5
spent [2] - 84:11, 84:22
spoken [1] - 46:11
ss [1] - 90:4
stabilize [1] - 40:25
stable [5] - 41:15, 78:15, 78:19, 79:3
staff [35] - 18:8, 18:10, 18:12, 23:21, 24:9, 24:14, 25:24, 27:24, 28:11, 28:15, 30:12, 31:4, 31:10, 46:24, 51:25, 54:4, 55:24, 56:7, 58:5, 58:9, 58:11, 61:18, 63:14, 66:17, 70:7, 70:20, 72:11, 79:20, 80:2, 82:7, 82:21, 83:2, 86:25, 87:12, 88:3
STAIB [2] - 1:8, 93:5
Staib [2] - 62:18, 62:20
stand [1] - 37:14
standard [6] - 19:24, 21:14, 26:10, 27:10, 32:5, 34:6
Standards [2] - 21:17, 26:12
standards [5] - 21:9, 22:3, 22:14, 27:15, 52:19
start [1] - 6:21
started [2] - 13:12, 57:10
state [4] - 4:9, 7:24, 36:20, 37:8
STATE [1] - 90:4
State [5] - 1:21, 4:4, 4:6, 90:23, 94:4
statement [2] - 33:14, 61:16
states [1] - 75:20
STATES [1] - 1:2
stating [1] - 31:5
stay [2] - 49:13, 59:21
stick [2] - 29:8, 40:23
still [3] - 57:16, 57:20, 72:11
STIPULATED [3] - 3:3, 3:8, 3:12
STIPULATIONS [1] - 3:2
store [2] - 56:16, 56:18
stored [1] - 56:10
story [2] - 33:18, 72:6
Street [2] - 2:4, 2:12
strict [1] - 57:12
stroke [1] - 38:7
struggling [1] - 38:16
stuck [1] - 65:17
STUSSEY [2] - 1:8, 93:5
subject [2] - 68:16, 72:6

subjective [2] - 37:15, 68:23
subpoena [4] - 4:18, 4:24, 5:13, 6:6
subpoenaed [1] - 64:18
subscribed [1] - 90:20
SUBSCRIBED [1] - 93:22
subspecialists [1] - 18:20
sufficient [1] - 5:13
suggest [1] - 6:16
Suite [1] - 2:16
superior [1] - 20:23
supervised [1] - 19:5
supervises [1] - 19:7
supervisors [1] - 36:2
supposed [1] - 54:10
surprise [6] - 46:3, 46:10, 66:6, 66:11, 66:13, 85:8
surrounding [1] - 78:4
switch [3] - 13:17, 13:21, 56:21
switched [1] - 13:16
swollen [1] - 74:21
SWORN [1] - 93:22
sworn [3] - 3:15, 4:3, 94:7
symptoms [1] - 36:15

T

TAMIGI [1] - 2:17
tan [1] - 63:21
teleservices [1] - 25:21
ten [5] - 13:15, 80:4, 80:6, 80:9, 80:11
tend [1] - 38:13
tends [1] - 16:20
test [4] - 41:23, 43:5, 43:7, 43:8
tested [13] - 43:24, 46:6, 59:8, 59:18, 59:20, 60:3, 60:6, 60:9, 60:14, 60:19, 61:6, 61:9, 91:17
testified [4] - 4:5, 46:5, 74:14, 77:21
testify [2] - 11:13, 70:25
Testimony [1] - 1:20
testimony [4] - 90:9, 90:12, 94:6, 94:9
TESTIMONY [1] - 91:4
testing [3] - 29:5, 32:14, 57:16
tests [2] - 24:3, 31:16
THAT [3] - 94:6, 94:8, 94:13
THE [34] - 4:6, 4:8, 4:9, 4:11, 5:25, 7:4, 7:9, 7:14, 7:21, 7:25, 8:17, 8:23, 9:5, 9:10, 9:17, 9:25, 10:5, 10:10, 10:18, 10:25, 11:8, 11:11, 14:17, 17:15, 26:3, 26:7, 43:18, 50:25, 51:3, 51:5, 58:22, 66:23, 80:23, 86:23
therapists [1] - 18:23
thinking [1] - 88:9
THIS [1] - 93:23
this______________ ______day [1] - 90:20
THOMAS [2] - 1:7, 93:4
Thomas [1] - 62:23
thoroughly [1] - 40:22
three [2] - 39:11, 50:14
tier [10] - 59:8, 59:13, 59:21, 60:3, 60:7, 60:20, 61:2, 82:21, 83:2, 91:18
timeframe [1] - 58:21
timely [1] - 25:13
title [1] - 14:7
TO [3] - 91:4, 91:9, 93:22
today [5] - 6:7, 10:4, 11:14, 11:24, 74:20
today's [1] - 10:21
Todd [1] - 25:18
together [1] - 87:18
took [1] - 14:21
toothache [1] - 49:3
top [2] - 69:7, 73:17
touched [1] - 55:12
trained [3] - 12:24, 24:15, 86:8
training [7] - 13:21, 15:8, 15:9, 15:18, 15:19, 65:12, 70:18
transcribe [1] - 8:20
transcribed [2] - 58:2, 58:19
transcript [5] - 10:20, 10:23, 90:8, 90:10, 94:8
TRANSCRIPTION [1] - 93:2
transfer [1] - 23:15
trauma [3] - 40:20, 41:7, 74:20
treat [3] - 22:15, 31:11, 41:7
treated [1] - 85:2
treating [4] - 23:6, 28:4, 39:13, 42:9
treatment [10] - 4:25, 5:7, 5:11, 23:3, 30:9, 33:7, 36:5, 41:3, 42:6, 85:24
treatments [2] - 35:22, 36:10
triage [12] - 48:20, 48:25, 49:6, 50:4, 55:2, 55:4, 75:14, 75:25, 77:8, 77:14, 78:18, 79:4
triaged [1] - 77:15
TRIAL [1] - 1:17
trial [2] - 3:11, 10:9
trick [1] - 9:16
TROY [1] - 2:7
true [3] - 90:11, 90:13, 94:8
truth [1] - 10:4
truthfully [1] - 11:13
try [3] - 6:17, 40:25, 88:8
trying [5] - 19:14, 57:8, 59:14, 66:24, 69:14
twice [1] - 50:12
two [8] - 6:10, 6:13, 6:19, 14:9, 15:21, 16:17, 16:19, 57:13
type [1] - 37:8
types [1] - 18:13
typical [4] - 39:4, 44:3, 48:5, 72:8
typically [11] - 28:12, 39:8, 42:5, 47:23, 49:14, 49:20, 50:5, 53:14, 59:11, 75:15, 82:25
typo [1] - 52:14

U

ultimate [1] - 25:2
unconscious [1] - 40:16
under [4] - 15:16, 44:4, 47:15, 90:9
understood [1] - 9:8
unit [52] - 16:2, 16:15, 18:3, 18:13, 18:14, 19:11, 20:10, 25:5, 25:15, 25:20, 26:9, 26:16, 26:22, 27:7, 28:24, 30:13, 31:5, 31:11, 32:19, 32:25, 33:5, 33:22, 34:13, 35:5, 37:22, 39:5, 39:9, 39:18, 41:22, 42:6, 42:25, 43:2, 45:15, 47:12, 48:2, 49:14, 49:17, 49:25, 52:8, 55:15, 56:14, 59:24, 60:7, 65:14, 65:15, 69:22, 70:2, 80:7, 82:20, 83:15, 84:24, 87:3
unit's [4] - 27:20, 27:22, 30:5, 32:2
UNITED [1] - 1:2
units [3] - 16:19, 20:2, 20:7
University [3] - 14:21, 16:9, 16:11
unless [1] - 9:6
unrestricted [1] - 59:5
up [17] - 8:19, 13:7, 14:9, 14:11, 18:12, 18:13, 42:16, 43:9, 47:20, 48:16, 64:13, 64:23, 65:17, 67:19, 72:25, 77:12, 81:4
urgent [12] - 41:18, 47:16, 70:13, 70:16, 70:17, 71:24, 72:3, 72:12, 72:19, 74:23, 87:22, 91:14

V

vendor [2] - 14:22, 16:12
verbal [8] - 8:16, 29:14, 51:17, 55:23, 66:9, 66:20, 80:10, 80:16
via [1] - 40:19
victims [1] - 23:6
Videoconference [1] - 1:12
view [7] - 44:16, 51:13, 65:4, 67:25, 73:9, 81:9, 83:19
Virtually [1] - 1:20
vital [12] - 28:12, 28:16, 29:4, 29:9, 31:14, 41:15, 43:5, 43:23, 45:17, 46:23, 59:17, 86:12
vitals [2] - 46:6, 46:15
voice [1] - 8:19

W

wait [2] - 9:18, 9:22
waited [1] - 76:3
waiting [1] - 6:24
waived [1] - 3:7
Wanda [4] - 66:7, 67:3, 77:20, 79:6
wants [1] - 21:2
week [1] - 79:16
weeks [1] - 14:9
West [1] - 2:12
wheelchair [3] - 39:14, 40:19, 46:22
wheeled [1] - 46:21
WHEREOF [1] - 94:15
whole [2] - 5:6, 74:19
Winthrop [1] - 13:10
witness [2] - 94:6, 94:9
WITNESS [33] - 4:8, 4:11, 5:25, 7:4, 7:9, 7:14, 7:21, 7:25, 8:17, 8:23, 9:5, 9:10, 9:17, 9:25, 10:5, 10:10, 10:18, 10:25, 11:8, 11:11, 14:17, 17:15, 26:3, 26:7, 43:18, 50:25, 51:3, 51:5, 58:22, 66:23, 80:23, 86:23, 94:15
Witness [3] - 1:18, 2:7, 91:6
WITNESS' [1] - 93:7
woman [1] - 63:22
Woodbury [2] - 2:16, 2:16
words [3] - 29:17, 72:18, 88:12
workers [1] - 18:25
workings [1] - 71:2
wound [4] - 13:13, 13:14, 15:5, 15:8
write [3] - 29:22, 29:25, 79:12
writing [7] - 35:2, 47:20, 58:2, 58:5, 58:19, 64:14, 83:6
written [8] - 23:17, 32:14, 47:11, 48:3, 52:24, 79:11, 80:16, 80:19

Y

year [1] - 13:17
years [5] - 13:7, 13:15, 15:21, 24:3, 57:13
YORK [2] - 1:2, 90:4
York [11] - 1:22, 2:5, 2:9, 2:12, 2:16, 4:4, 4:12, 12:23, 13:9, 90:23, 94:4
young [2] - 78:22, 78:23

**yourself** [1] - 23:20