ORIGINAL



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------x

ROBERT JEFFREY JOHNSON, JR.,

Plaintiff,

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JAMES STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOES 1-9 SERVANTS AND REPRESENTATIVES OF THE COUNTY OF NASSAU,

Defendants.

-----------------------------------------x

Videoconference

July 5, 2023
1:00 p.m.

EXAMINATION BEFORE TRIAL OF WANDA EVELYN, a Non-Party Witness herein, taken by Adverse Parties, pursuant to Federal Rules of Testimony and Subpoena, held at the above-mentioned time and place, before Denise Mantekas, Notary Public of the State of New York.

A P P E A R A N C E S:

GUERCIO & GUERCIO, LLP.
Attorneys for Plaintiff
77 Conklin Street
Farmingdale, New York 11735
BY: JOHN BRADLEY, ESQ.

NASSAU COUNTY ATTORNEY'S OFFICE
Attorneys for Defendants
1 West Street
Mineola, New York 11501
BY: RALPH REISSMAN, ESQ.

LAW OFFICES OF EDWARD TROY
Attorney for Witness
44 Broadway
Greenlawn, New York 11470
BY: ALEX SANSONE, ESQ.

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any notary public with the same force and effect as if signed and sworn to before the court.

* * *

W A N D A E V E L Y N, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: State your name for the record, please.

THE WITNESS: Wanda Evelyn.

THE COURT REPORTER: State your address, please.

THE WITNESS: 2201 Hempstead Turnpike, East Meadow, New York.

EXAMINATION BY

MR. BRADLEY:

MR. BRADLEY: Ms. Evelyn, my connection is a little poor. I'm going to do my best here.

Can you hear me well, Ms. Evelyn?

THE WITNESS: Yes.

MR. BRADLEY: I'm going to go through some rules of the deposition with you.

I just ask that you please state your name for the record

again.

THE WITNESS: Wanda Evelyn.

MR. BRADLEY: And please state your business address.

MR. SANSONE: 2201 Hempstead Turnpike.

MR. BRADLEY: Where do you want a copy of the transcript to go to?

MR. SANSONE: Your best bet is to send it to 245 Hillside Avenue, Williston Park 11596.

MR. BRADLEY: What is the 245 Hillside Avenue address? That's your office?

MR. SANSONE: That's my office. Alexander Sansone, 45 Hillside Avenue, Williston Park, 11596.

MR. BRADLEY: Thanks.

MR. SANSONE: You're welcome.

MR. BRADLEY: I'm going to go through some of the rules of the deposition. I'm just going to ask that you agree with them. You're free to disagree with them but I

think you'll agree to most of them.

Firstly, my name is John Bradley. I represent the plaintiff, Robert Jeffrey Johnson, in this case. It's a case against Nassau County and several correction officers involved in a date of incident October 12, 2021.

At this deposition, there's a court reporter here. She's taking down everything we're saying and we need to take it down in a question and answer format. Because of that, I ask that you keep all your responses to my questions verbal, no uh-huhs or no shaking of the head or anything like that. I just ask that you please keep your voice up, you speak clearly so that the court reporter can transcribe the deposition accurately; do you agree with those things?

THE WITNESS: Yes.

MR. BRADLEY: If there is a

question you don't understand, let me know and I'll repeat the question or rephrase it for you; will you agree to that?

THE WITNESS: Yes.

MR. BRADLEY: Unless you tell me otherwise, I will assume that you have understood and heard my question, okay?

THE WITNESS: Yes.

MR. BRADLEY: If you do not know the answer to a question that I ask you, please do not guess. Tell me that you don't know. I don't want you to guess at anything, okay?

THE WITNESS: Yes.

MR. BRADLEY: Please wait for me to finish my question. You'll probably anticipate the answer to my question while I'm asking it. I just ask that you wait until I'm finished so the court reporter can translate a full question and full answer; will you agree to that?

THE WITNESS: Yes.

MR. BRADLEY: Do you understand that the oath that you have just taken to tell the truth is the same oath that you would take at trial if you're called as a witness?

THE WITNESS: Yes.

MR. BRADLEY: If you realize during the deposition that an earlier answer you gave was inaccurate or incomplete, please let me know and I'll give you an opportunity to make a correction. I'm not here to trick you in any way, okay?

THE WITNESS: Yes.

MR. BRADLEY: You will have the opportunity to review today's transcript. After your review, you may correct any errors that you find in the transcript after your review, okay?

THE WITNESS: Okay.

MR. BRADLEY: If you need to

take a break at any point, let me know. First you must answer any question that is pending before we take a break, agreed?

THE WITNESS: Yes.

MR. BRADLEY: Are we in agreement on these rules?

THE WITNESS: Yes.

Q Is there any reason at all that you cannot testify truthfully and accurately today?

A No.

Q Okay. Have you ever been deposed before?

A No.

Q Have you ever been called as a witness in a case?

A No.

Q Other than this case, have you ever been a defendant in a civil lawsuit?

A No.

Q Have you ever been a plaintiff?

A No.

Q Have you ever been called for a

hearing before the Nassau County Correctional Center with respect to charges and specifications brought against a correction officer?

A No.

Q Can I ask how old you are?

A 58.

Q Have you ever been convicted of a crime?

A No.

Q Okay. I want to talk to you about your educational background.

Actually, first, do you have any military experience?

A Yes.

Q Okay. Can you describe that?

A I am a retfired captain in the United States Army, Army Reserves.

Q When did you first enter the United States Army Reserves?

A I did six years, 2006 until 2012.

Q What different ranks did you hold in that time period?

A 1st lieutenant and captain.
Q When were you promoted to 1st lieutenant?
A I came in as a 1st lieutenant.
Q What about 2nd lieutenant?
A 2nd lieutenant was about two years later.
Q Two years after your 1st lieutenant?
A Yes.
Q When were you promoted to captain?
A About three years later.
Q When did you withdraw from the reserves, in 2012?
A I resigned my commission in 2012.
Q So that would be an honorable discharge?
A Yes.
Q So I want to talk about your educational background. Can you please describe that?
A I did undergraduate at Hunter

College. My graduate degree, I obtained from Malloy. I have a post master certificate from Malloy College as well.

Q What was the field of study in your undergraduate education?

A It was health sciences.

Q When did you graduate?

A Undergraduate?

Q When did you graduate undergrad?

A 1987.

Q Okay. And you said Malloy was --

A Malloy -- Well, I had one degree as an adult nurse practitioner at Malloy. Then I did post master certificate as a family nurse practitioner.

Q For Malloy, when did you receive that first degree?

A 1996.

Q Okay. Can you repeat what that degree was in?

A It was adult health.

Q Okay.

A That was the first degree. The post master's was in family health.

Q Family health.

Are those two degrees associated with your nursing education?

A Yes.

Q When did you receive the family nurse degree?

A 1997.

Q And you are a registered nurse?

A Yes.

Q When did you become a registered nurse?

A 1988.

Q Okay. So you received it following a year of your degree from your first degree from Malloy?

A Yes.

MR. SANSONE: From Hunter.

A From Hunter.

Q From Hunter, okay.

So it was Hunter College that you received the degree in adult health, right?

A No. Malloy College is where I received the degree in adult health. Hunter College is when I received my RN degree. Malloy College is when I received the NP degree.

Q Okay. I'm sorry. So there's two Hunters. The first one was which degree?

A The Hunter College was BSN for nursing, the RN degree. That was in 1982 to 1987. Malloy College was the NP degree.

Q Got it.

So when you got registered as a nurse, what did you do after that?

A I worked in Lenox Hill emergency room. I worked in St. John's in Far Rockaway in the emergency room. I worked in the VA Hospital in the surgical intensive ICU and I worked at St. Francis in the emergency room.

Q So let's take that one at a time.

Lenox Hill, how long did you work there for?

A A year and a half.
Q And what was your role there?
A I worked as an RN in the emergency room.
Q Following your employment at Lenox Hill, how long were you employed at St. John's for?
A A year and a half.
Q What was your role at that job?
A I worked in the detox unit.
Q As a nurse?
A Yes.
Q And following your employment with St. John's, you went to work at the VA Hospital?
A Yes. I was in surgical ICU.
Q Surgical ICU?
A Yes.
Q As a nurse?
A Yes.
Q How long did you work there for?
A Three and a half years.
Q And then you went to go work at

St. Francis?
A Yes.
Q What was your role there?
A Registered nurse in the emergency room.
Q Okay. How long did you work there for?
A A year and a half.
Q And do you recall what date you left that job?
A No.
Q Probably somewhere in the 90s?
A Yes.
Q Then following St. Francis, what was your next employment?
A After St. Francis, I went to United Healthcare.
Q What did you do there?
A United Healthcare, I worked as a -- I worked in the nursing home.
Q As a nurse?
A As a nurse and then later as an NP.
Q What is an NP?

A A nurse practitioner.
Q Those other jobs, was your title just nurse?
A Registered nurse, yes.
Q What is the difference between a registered nurse and a nurse practitioner?
A So a nurse practitioner has an advanced degree. It's usually a master's prepared nurse has ability to diagnosis, prescribe, assess and treat chronic and acute conditions.
Q How did you get the NP? What does NP stand for?
A Nurse practitioner.
Q Oh.
A Yes. So the general title is nurse practitioner. Ahead of it, you can have adult or family or acute care but the general title is nurse practitioner. Mine is family.
Q Now, how were you able to get this certification?
A Well, first you have to get your degree. You have to go and get your

master's. It comes from Albany stating that you are a nurse practitioner. You get a license from Albany.

Q Do you recall when you got the license?

A 1997 -- 1997.

Q Okay. When you were at United Healthcare, how long did you work there for?

A I worked for United Healthcare twice. There was two incidents where I worked there. First I worked there as -- in the nursing home and I was only there for about like six months. Then later on, I became an NP. I went back and I worked in their house calls division and I worked there for about seven years.

Q So in between that gap at United Healthcare between the first and second time, did you work anywhere else?

A So when I became a nurse practitioner, I worked for a year at Brooklyn Hospital. I worked for four and a half years at Promesa.

Q Can you spell that?

A P-R-O-M-E-S-A.
Q Okay.
A I worked for a year and a half at Project Samaritan.
Q Okay.
A I worked for four and a half years at Nassau University Medical Center from 2006 to 2011. Then I was rehired in 2019 to present.
Q Okay. What was your role at Brooklyn Hospital?
A I was an inpatient nurse practitioner.
Q What about Promesa?
A Family practice nurse practitioner.
Q And the other one was project --
A Project Samaritan Aid Service.
Q What was your role there?
A Nurse practitioner.
Q And the four and a half years you were at Nassau University Medical Center, what was your role or roles at that

job?
A I was a nurse practitioner in the infectious disease department and a nurse practitioner in the correctional facility.
Q So after you left Nassau University Medical Center in 2011, you went back to United Healthcare?
A Yes.
Q Then you left United Healthcare in 2019?
A Yes.
Q And then you were rehired and you went to Nassau University Medical Center?
A Yes.
Q So have we discussed all of your prior employment with respect to your role as a nurse and nurse practitioner?
A Yes.
Q Okay. In all of those transfers that you made with those jobs that we talked about, were all of them voluntary?
A Yes.

Q Okay.

A Well, the first time I left Nassau University Medical Center, they laid us off because they privatized the jail. The contract went from the county to private institution so they laid all of us off that were from the hospital.

Q Okay. Do you know what that institution was?

MR. SANSONE: Which institution are we talking about? Are you talking about the private institution?

MR. BRADLEY: Yes.

MR. SANSONE: That was Armor Medical.

Q So with your current employment at Nassau University Medical Center, what is your role?

A I'm a nurse practitioner. I treat chronic and episodic illnesses and emergencies.

Q And on October 12, 2021, did you have different responsibilities?

A It's usually sick call, emergencies and sometimes chronic care.

Q So do you still respond to sick calls in your current role?

A Yes.

Q And when we say sick calls, is that from inmates at Nassau County Correctional Center?

A Yes.

Q When you were at Nassau County Medical Center, you mentioned from 2006 to 2011 that you were a nurse practitioner for the correction police departments?

MR. SANSONE: Objection.

You can answer.

A I was a nurse practitioner for infectious disease in the hospital. Then two years in, I transferred over to the correctional facility.

Q Okay. What does that mean to be transferred over to the --

A It's just the location, from the hospital to the jail.

Q And there's a medical center in

the jail?

A There's an infirmary inside the jail.

Q And there are other employees from Nassau University Medical Center at that location?

A Yes.

Q So when you worked at the jail, how long did you work there for, the time period?

A The first time or the second time?

Q We'll start with the first time.

A I was there two and a half years.

Q Do you recall what dates?

A No.

Q What about the second time?

A I resumed employment there -- It was July 11, 2019.

Q And how long were you there at that time?

A I am currently there.

Q So you're located in the jail?

A Yes.

Q So can you discuss your current job responsibilities as a nurse practitioner at the jail?

A So it's -- I do sick call. I review labs. I respond to emergencies. I do chronic care, managing patients that have high blood pressure, diabetes, long-term conditions, and I do intakes. Those are the new patients that come into the facility.

Q Are you located at the B2 floor of the B building?

A We are assigned different buildings. One day I can be in the core. One day I can be in the satellite. I don't have a permanent location but I have been assigned to the satellite.

Q Are you familiar with the B2 D tier?

A Yes. I've been up there, yes.

Q What do you know about that tier?

A So, generally, when they come

in, they're housed in the B2 building. It's B2, A, B, C and D. That's where they generally first house when they come in and they -- I guess they can be housed there for other reasons but my understanding is the B2D building is where a lot of the new intakes are housed. It's a dorm. It's divided to four sections.

Q Okay. So B2 C and D, we know that to be a tier where new inmates are housed, incoming inmates, right?

A Yes.

Q So typically, that's where you would do intake, right?

A No. They come from downstairs and they come up to medical in the core. They come up to medical.

Q I'm just going to shift gears a little bit. I'm going to ask you if you know these names or heard of these names.

A Okay.

Q Have you heard of the name Corporal James McCaffrey?

A I have heard of the name.

Q Have you ever met him before?
A I do not recall.
Q If you saw his face, would you recognize it?
A Yes, I think so.
Q Have you ever had conversations with him?
A No.
Q So how do you recall Corporal McCaffrey?
A Because generally, they come in. Like if there is a question they want to ask, they will come in medical and they will ask a question and you read the name tag and that's how you know who they are.
Q What about Correction Officer Thomas Benson?
A I do not recall that name, no.
Q What about Correction Officer James Staib?
A No.
Q What about Correction Officer Hussey?
A No.

Q What about Correction Officer Razenson?

A Yes.

Q How do you know him?

A He was in the medical -- He's usually in medical.

Q So Nassau County Correctional Center, they have a correction officer assigned to the medical unit?

A Well, in the jail, they have the medical unit. That's usually where we are if we're not going out and they have officers that are medical.

Q Okay.

A They're assigned there, yes. He's one of them.

Q What about Correction Investigator Robert Pierce?

A I do not know him.

Q What about Correction Lieutenant McMillan?

A Yes.

Q How do you know him?

A He was in medical so I would

see him when he would come through. Like every day, I'd speak to him.

Q And Correction Officer Field, do you know who that person is?

A No, I don't.

Q What about Detective Okeno?

A No.

Q Detective Mascera?

A No.

Q And what about Registered Nurse Janice Offley?

A Yes.

Q How do you know her?

A She works in medical.

Q At the jail?

A Yes. Well, she used to work in medical at the jail.

Q She no longer works there?

A No.

Q Do you know where she works now?

A No.

Q And what about Dr. Monsore?

A Oh, yes.

Q How do you know him?
A He works in medical.
Q So there's doctors assigned to medical?
A There's doctors, there's nurse practitioners and there's PAs.
Q Okay. And what about Dr. Carl Henry Sanchez?
A Yes.
Q How do you know him?
A He works in medical.
Q And do you know what the acronym OD stands for?
MR. SANSONE: In what context?
MR. BRADLEY: Medical.
A No.
Q Do you know a person by the name of Jay Suarez?
A Oh, he's the optometrist.
Q Okay. He works at the medical unit?
A Yes.
Q And what about Lori Pagano?
A She's a social worker.

Q Of the medical unit?
A Yes.
Q What about Ronald Longo?
A He's the director of mental health in the jail.
Q And what about C. Gandley?
A C. who?
Q C. Gandley.
A I don't recall.
MR. SANSONE: Can you spell that last name, please?
MR. BRADLEY: Gandley is spelled G-A-N-D-L-E-Y.
Q So Ms. Evelyn, the people that I've just mentioned, you recognize some of these names. You know some of them. They work in the medical unit.
Did you ever speak with them about this deposition?
A No.
Q Did you ever discuss with them Robert Jeffrey Johnson?
A No.
Q And the medical unit, you

mentioned that there is a medical unit on the B2 floor, right?
A There's a medical unit in the core on the second floor. It's in the B building, yeah, in the B building in the core.
Q Do you know how many medical units there are at Nassau County Correctional Center?
A There's a medical unit in the core. There's a medical unit in the satellite and there's an infirmary in the core building.
Q And you mentioned that you don't have an assigned specific location.
A No.
Q You rotate.
A Yes.
Q And so, typically, like how many hours is one of your shifts?
A 12 hours.
Q Are what are the shifts divided into? So it would be two shifts, right, I guess a morning and a night?

A There's a 7a to 7p. There's a 10a to 10p and there's a 7p to 7a.

Q Did you review any documents in preparation for this deposition?

A Yes.

Q What documents did you review?

A I reviewed the sick call and I reviewed the transfer to the hospital and I reviewed the incident sheet that they bring from the corrections.

Q Do you have an independent recollection of an incident involving Robert Jeffrey Johnson, Jr. that occurred on October 12, 2021?

A No.

Q Do you know who Robert Jeffrey Johnson, Jr. is?

A No.

Q Okay. And the documents that you reviewed, did that refresh your recollection as to an incident that occurred on October 12, 201 involving inmate Robert Jeffrey Johnson, Jr.?

A No.

Q Okay. So the unit in the correction center at the jail, did you have to apply to get into that area, to that transfer or job?

MR. SANSONE: I didn't quite understand that question.

Q Ms. Evelyn, do you understand the question?

A No.

Q So how was it that you came to work at the jail as a nurse practitioner with Nassau University Medical Center?

A So the first time I worked in infectious diseases and the hospital and we had to go over to the jail once a week so we would go to the jail once a week to see the inmates that had Hep C or any infectious diseases. I happened to run into the medical director and I told him I was interested in applying and he said he would -- He told me to e-mail and he submitted the e-mail on my behalf.

Q And that's how you got the job?

A Yes.

Q Why did you want to work there?
A Because I didn't like infectious diseases anymore.
Q So did you receive any specific training with respect to working as a nurse practitioner at Nassau County Correctional Center?
A No.
Q Did you receive any specific training regarding sick call requests by an inmate?
A As part of your orientation, you're told the process of sick call.
Q Okay. So when was orientation for you?
A The first time or the second time?
Q So you had two orientations?
A Yeah. When they laid me off and then they brought me back, they had to reorient me again.
Q What were some of the things they taught you at orientation?
A Well, you're told the process

of -- You review the forms, the intake form, the urgent care form, sick call form. You go over the computer on how to prescribe medications, the system that they use. You go over the Suboxone training and the protocol that they have now. That's about it.

Q And do they give you anything in writing with respect to the items that you just mentioned?

A They have -- It's called a shared file on the computer. That has the policies that are available.

Q So you have the policies on your computer?

A At work, yes. We have access to them.

Q And those policies, are they unique to Nassau County or Nassau University Medical Center or are they distributed to you by Nassau County Correctional Center?

MR. SANSONE: Objection.

You can answer.

A They're unique to the county,

to the jail.

Q Okay. So you are aware of polices and procedures that were provided to you with respect to the handling sick call request forms?

A Yes.

Q What is your understanding of those policies and procedures?

A My understanding is that the sick call is given to the nurse. The nurse triages the sick call. If she thinks it's emergent, she brings it to the provider. If it's something that can be seen as a regular sick call the next day, then it's put in to be seen as a regular sick call the next day.

Q So a sick call that is made the next day, are you saying that's classified as a non-urgent call?

A Yes.

MR. SANSONE: Objection.

You can answer.

A Well, it's not non-urgent. It's just that the acuity is so that it doesn't need to be seen immediately.

Q And what about sick call requests that need to be seen immediately, what kind of requests fall under that category?

A Chest pain, shortness of breath, injury, acute injury -- Those are generally those.

Q So if you got a sick call request that is classified as urgent, that means that they need to be seen immediately by the medical unit?

A Yes.

Q Okay. So with respect to responding to an emergency sick call request, what happens? How does that happen?

A So the nurse triages it. If she thinks it's emergent, she brings it to the provider. The provider looks at it and then she tells the corrections that this person needs to be seen. Then the person is brought down.

Q And when you say "provider," what do you mean by that?

A Nurse practitioner, doctor, PA.

Q And when you say, "brought down," what do you mean by that?

A So they usually brought down to the medical unit to be seen if it's an emergent request.

Q Okay. And what about the triage nurse, what does she do? Is she the first person to be notified of a sick call request?

A She's the first person -- It's usually the nurse that -- The nurse that brings the medications, the sick calls from the patients are given to her and she brings them back and gives them to the charge nurse.

Q So what are the duties and responsibilities of a triage nurse?

A I don't know.

Q Okay. So are you considered to be a healthcare provider?

A Yes, I am.

Q So you wouldn't really be going out and handing medications to inmates; is

that true?

A No, I would not.

Q So would that be more of a duty of a triage nurse?

A That would be the duty -- Usually, it's the duty of the RNs or the LPNs.

Q And do you know what a charge nurse is? You mentioned --

A The charge nurse is usually an RN.

Q What are the duties and responsibilities of a charge nurse?

A She supervises -- It's just general because I'm not sure. She supervises the LPNs and she handles the emergencies.

Q Okay. So did you receive any training in orientation with respect to filling out a sick call request?

A No.

Q What is your understanding of your obligation to fill out a sick call request?

A I don't.

Q What about an inmate to injury report? Have you ever heard of that?

A Yes.

Q What is that?

A Well, if an inmate has suffered an injury or has, for example, have been in a fight or they have injured themselves, they come down to sick hall and we do the urgent. Then afterwards, corrections brings us an injury to inmate form to fill out.

Q And would you fill out one of those forms?

A I fill out the bottom part, yes.

Q And did you receive any written policies and procedures regarding inmate to injury reports?

A No.

Q So you mentioned that you have filled out an injury to inmate report. What is your understanding of your obligation to do so?

MR. SANSONE: Objection.

You can answer.
A We're required to fill out the injury to inmate report.
Q Okay. You said that one of the things that you reviewed prior to this deposition was an emergency transfer request.
A Yes.
Q What is that document?
A So it's a document if you're gonna send someone to the hospital. It's an emergency transfer form.
Q Okay. And did you receive any policies, written policies and procedures regarding how to fill out that form?
A I received training in orientation but I did not receive a written policy regarding that, no.
Q Okay. Do you fill out those reports?
A Yes.
Q What is your understanding of your obligation, if any, to fill out that report?

A It's required prior to an inmate leaving the facility.

Q Okay. So when an inmate leaves a facility, we're talking about leaving the actual jail, right?

MR. SANSONE: Objection.

A Yes.

Q And one of those places could be a hospital, right?

A Yes.

Q Does a nurse like conduct patrols of the tiers where inmates are housed?

A No.

Q Is there any obligation of a nurse to check up on inmates during a specific rotation or time period?

A No.

Q For instance, are they required to check up on inmates every 15 minutes, 20 minutes, 30 minutes, two hours?

A No.

Q Okay. So typically, when a nurse comes to visit an inmate on a tier,

it's because of a sick call request, right?

MR. SANSONE: Objection.

You can answer.

A It's generally medication that they are giving out. That's usually when the nurse goes to the unit, to the dorm. And during that time, the inmates give the nurse the sick call request.

Q Okay. And based on your training and experience as a nurse practitioner, have you ever received a sick call request that an inmate claimed to be physically assaulted in the jail?

A Yes.

Q And how would you typically be notified by that? Is that by the sick call request? Could it sometimes be by correctional staff?

A Yes.

Q And are there instances when a nurse is distributing medical medication that he or she may come across an inmate that had suffered an acute physical injury?

A Yes.

Q And in that instance, does the nurse notify the medical unit?

A Yes.

Q And in that situation, would the inmate be required to fill out a sick call request?

A No.

Q Okay. So who gives the medical unit the sick call request in a typical situation generally?

A Usually, the nurses have the sick call forms. When they go out, they give them to the inmate. The inmate fills it out. When she comes back again, she collects the sick call sheets.

Q Okay. So if there was an emergency sick call request, would a nurse typically come back for it or bring the inmate straight to the medical unit?

MR. SANSONE: Objection.

You can answer.

A If it was an emergency, usually, the general procedure is that we're notified of emergencies by corrections. If

the nurse went on rounds and she found out that, you know, there was an inmate that had an emergency, she usually -- She comes back and lets the providers know and then we have the inmate brought down.

Q Okay. So let's say that you receive a sick call request or you receive information that an inmate claimed to be have been sexually assaulted by a correction officer, what documents are created by the medical unit in such a situation?

A They're brought down. If it's on a sick call, they're brought down. If they -- If they state that they were sexually assaulted in like a triage area or whatever, generally, they're sent to the hospital for evaluation. Within the 72 to 96 hours, they have to go to the hospital for evaluation and treatment.

Q But with respect to the documents that are created, one of those documents would be possibly a sick call request?

A Yes.

Q An injury to inmate form?
A Yes.
Q If the inmate is being transferred to the hospital for treatment, there would be an emergency transfer request form filled out?
A Yes.
Q Or emergency request form, right?
A It would be an emergency transfer form.
Q Thank you.
Any other documents created by the medical staff?
A No.
Q And you mentioned that the inmate has to be transferred to the hospital within 72 to 96 hours of complaint of a sexual assault?
A Yes.
Q Why is that a requirement?
MR. SANSONE: Objection.
You can answer.
A From my understanding, a sexual

kit has to obtained. They have a limited window for which they will receive any DNA.

Q And did you receive training on the 72 to 96-hour window?

A Yes.

Q Who trained you on that?

A I was informed of that by the medical director.

Q Do they instruct you to any written materials regarding --

A My understanding is that it's in the shared files through where all the policies and procedures are.

Q So are there policies and procedures regarding how the medical unit is to respond of a complaint of a sexual assault by an inmate?

A I have not seen the policy so I would not be able to tell you definitively.

Q But you were trained on some policy, correct?

A Yes. I was told verbally what the policy is.

Q Okay. And other than the 72 to

96-hour window, is there any other policies with respect to that that you were told?

A No.

Q So the medical unit, they would not conduct an evaluation of a sexual assault by an inmate?

MR. SANSONE: Objection.

You can answer.

A No.

Q Do you know what a SANE nurse means?

A My understanding is it is sexual assault nurse examiner.

Q And is that typically a nurse that would evaluate a sexual assault by an inmate?

A Yes.

Q Are you aware of any policies and procedures that were told to you or that you've read that discuss how a nurse or medical staff in the medical unit would respond to an allegation by an inmate of the use of force against him?

A No.

Q So if you received a complaint by an inmate of sexual assault by a correction officer, are you obligated to call the police department?

A No.

Q Do you know how far the Nassau County Correctional Center is from Nassau University Medical Center?

A The jail is located right behind the hospital.

Q So like a stone's throw?

MR. SANSONE: I think it's probably about three blocks.

Q Do you know what the Nassau County Center inmate handbook is?

A No.

Q Have you ever been given it before or no?

A No.

Q Do you know whether or not an advocate must be called of an allegation by an inmate of sexual assault?

A No.

Q Do you know what an advocate

is?

A I do.

Q What are they?

A An advocate is a person that represents the inmate or the person on a particular issue. To my knowledge, medical is not involved in that aspect of the patient care.

Q And what exactly does an advocate do?

MR. BRADLEY: Objection.

You can answer the question.

A The advocate is the person that stands -- I guess supposedly represents the person and their complaint regarding a specific issue. An advocate is either treatment or policy change or services for the person.

Q In your tenure working in the medical unit at Nassau University Medical Center, have you been aware of any complaints by an inmate of sexual assault by a correction officer?

MR. SANSONE: I think that's

been asked and answered.

You can answer it.

A Yes.

Q And how many complaints have you been aware of?

A Five.

Q Of those five complaints, do you recall when you heard of them specifically?

A Not specifically.

Q Okay. Can you estimate? Have you heard of any within the last five years?

A Yes.

Q How many?

A Five.

Q So you've heard of five within the last five years?

A Yes.

Q Okay.

A I've only been back for three years. Well, on the 11th will be four. So in the three years I've been back, I've heard of five.

Q And did you provide treatment

to any of those five inmates with respect to those allegations?

A Yes.

Q How many of them?

A I know for sure two but I think it might have been three.

Q And of the five complaints that you've heard of, did any of them involve an allegation by an inmate that a correctional officer stuck a finger up their rectum?

A Yes.

Q How many?

A Two.

Q Of those two, did you personally treat those inmates?

A Yes.

Q Of those two complaints, are you aware of the officer that was alleged to have done that?

A No.

Q Have you ever heard of the term "Nasty Nassau" being used to describe the Nassau County Correctional Center?

A No.

Q Okay. And of the five complaints that you heard about within a three-year time frame, did you find that to be odd?

MR. SANSONE: Objection.

Don't answer the question.

MR. BRADLEY: What is the basis?

MR. SANSONE: She's not here as an expert. You can ask her factual questions. Whether she finds it as odd or somebody else finds it as odd is irrelevant to what we're doing here.

MR. BRADLEY: Her being an expert or not does not have -- I'm asking her based on her knowledge, based on her training and experience.

MR. SANSONE: No. You're asking her for some opinion as to whether she personally finds it to be odd.

MR. BRADLEY: That's not a

proper basis.

MR. SANSONE: That's okay. I said she can't answer it. I think it's an improper question, improper area of inquiry.

MR. BRADLEY: But an improper question on what basis, that she's not a medical expert?

MR. SANSONE: This is not a medical expert question. Asking whether something is odd to her is not a medical expert question. It's an improper question for the purpose of this inquiry.

MR. BRADLEY: Let's mark it for a ruling.

MR. SANSONE: That's fine.

Q When you've heard of those past two instances that you've treated an inmate with that allegation, did you personally report that to anybody?

A No. I transferred -- I filled out the transfer form. I transferred the patient to the emergency room for evaluation

based on what they were told -- what I was told. I did it from the medical director.

MR. BRADLEY: Counselor, with respect to this objection that you're making about the odd question, what is the basis of privilege you're saying that she cannot answer this question?

MR. SANSONE: Didn't we go through this already?

MR. BRADLEY: I didn't ask you that question.

MR. SANSONE: Give me a basis for the question. If she finds it odd -- Anybody can find something odd. Somebody might not. I don't know the basis for asking the question and it's not part of the inquiry. I object to the question.

MR. BRADLEY: I don't understand the objection.

MR. SANSONE: I don't understand the question.

MR. BRADLEY: I don't see any

of the exceptions under --

MR. SANSONE: Counselor --

MR. BRADLEY: I mean, you can object to whatever you believe but this deposition is governed by Rule 30(d)(3). What basis of privilege are you instructing her not to answer?

MR. SANSONE: I made an objection. I can't guarantee to you I'm always right but she's not answering the question. You're asking her to evaluate some opinion when her testimony was she's heard of five of these instances and you're asking her if that's odd.

MR. BRADLEY: To her.

MR. SANSONE: That's exactly the point. What is the basis for the question?

MR. BRADLEY: If she doesn't understand the question, she can say so. Your objection does not fall under Rule 30(d)(3).

MR. SANSONE: I think you told me that three times. I don't believe it's a properly framed question.

MR. BRADLEY: Well, I'm going to say that that's not a valid basis.

MR. SANSONE: You know, it would be very helpful if you would just let me finish. I didn't cut you off. I don't think you should cut me off, okay?

You're asking a question as to whether or not it's odd. The average person might tell you that putting somebody's finger in somebody's rectum is odd. So I don't know the basis of what you're attempting to get out of this witness. You want to frame a different question, then frame a different question.

Q So based on your experience as a nurse practitioner at Nassau Correctional

Center, was it out of the ordinary for you to hear of five allegations by an inmate of sexual assault by a correction officer within a three-year timeframe?

MR. SANSONE: I'm going to object.

You can answer that question.

A Yes.

Q Why?

MR. SANSONE: Objection. Again, you're looking to have her as an expert.

MR. BRADLEY: She just said it was out of the ordinary so I want to --

MR. SANSONE: Because I think the activity itself is out of the ordinary.

MR. BRADLEY: Now you're cutting me off.

MR. SANSONE: Okay.

MR. BRADLEY: So she said it's out of the ordinary so I want her to define why she thinks that.

MR. SANSONE: I think you should define what out of the ordinary is because you asked the question.

Q Ms. Evelyn, based on your training and experience as a nurse practitioner at Nassau Correctional Center, why did you believe it was out of the ordinary to know of or hear of five complaints by an inmate of sexual assault by a correction officer?

MR. SANSONE: Objection.

You can answer.

A It is not the normal sick call that we would receive.

Q Thank you.

So with respect to the incident alleged by Robert Jeffrey Johnson as occurring on October 12, 2021, you mentioned that you don't remember this?

A No.

Q So my question is, do you believe that this didn't happen or that you were not involved in this or you could've

been involved in this but you don't remember?

MR. SANSONE: I'm going to object to that. It's a multipart question so I think that you're going to have to frame a different question.

Q Ms. Evelyn, do you understand the question?

MR. SANSONE: She's not answering the question in that form. I'm objecting to the form because it's a three-part question. When you ask her do you believe it happened is different from what her involvement was. She already --

MR. BRADLEY: Counsel, please stop with the speaking objections. Objection to form is not a valid basis to instruct the witness not to answer.

MR. SANSONE: So I would re-form your question. She's not answering in that form.

MR. BRADLEY: So you're objecting to this question and you're instructing her not to answer based on the form of the question?

MR. SANSONE: Correct.

MR. BRADLEY: That is not a valid basis.

MR. SANSONE: Listen, maybe I'm not making myself clear. If my objection is wrong, it's wrong, but I'm not -- Lecturing me about rule -- I don't believe -- You can formulate a better question.

MR. BRADLEY: I want this deposition --

MR. SANSONE: Counselor, if you don't want to formulate another question, she's not answering the question in that form. Telling me that she is supposed to is not gonna change my mind. I would suggest that you just reformulate the question and you can get the information you want but not in that

form. Reading the question, if you read it, it's a multipart question where if she answers yes to any part of it, it makes it yes to all of it and that's an improper form question. You can break the question down very easily.

MR. BRADLEY: Mr. Sansone, I appreciate the suggestion but I prefer and I believe that this deposition should proceed under what the law requires and the law states that you cannot instruct a witness to not answer a question based on a form objection and you know that. You know that.

I'm going to ask again. Are you instructing her not to answer this question on the basis of form?

MR. SANSONE: I would ask you to redo the question. If you don't want to redo it, we'll have the reporter read it back. I will then go into my particular position as to

what is wrong with the question.

MR. BRADLEY: Mark it for a ruling.

MR. SANSONE: You don't wanna read it back?

MR. BRADLEY: Based on what I'm hearing, that is not a valid basis to instruct --

MR. SANSONE: Have the question read back and I --

MR. BRADLEY: Counsel, this is my deposition. I don't need it read back to me.

MR. SANSONE: Okay, no problem.

Q Ms. Evelyn, do you recall an incident on October 12, 2021 involving Robert Jeffrey Johnson, Jr.?

MR. SANSONE: Objection.

You can answer the question.

She already told you she didn't recall it.

A No.

Q Okay. Ms. Evelyn, I'm showing you a document. It's bate stamped Nassau

County 62 to Nassau County 73. It was provided to your counsel before this deposition.

MR. BRADLEY: I'm going to have this marked as Plaintiff's Exhibit 1.

(Whereupon, Plaintiff's Exhibit Number 1 was marked for identification.)

Q I'm going to turn specifically to sick call request dated October 12, 2021.

A Yes.

Q Nassau County 68.

Do you see this document?

A Yes.

Q Do you recognize this document?

MR. SANSONE: If it's 68, the witness has it in front of her.

MR. BRADLEY: Okay.

Q Okay. Do you recognize the document, Ms. Evelyn?

A Yes.

Q Did you fill this document out?

A Yes.

Q What is the document?
A It's a sick call request.
Q Does this document indicate that Robert Jeffrey Johnson complained of an injury on October 12, 2021?
A Yes.
Q I want to take you through the document. There's two parts to this, right?
A Yes.
Q Part A is to be filled out by the inmate?
A Yes.
Q And Part B is to be filled out by medical personnel?
A Yes.
Q When this document says, "medical personnel," does that mean medical personnel from the medical unit in the jail?
A Yes.
Q And if you look at the document, you can notice that there's two signatures here. One of the signatures is under Part A; do you see that?
A Yes.

Q Do you know whose signature that is?

A No.

Q Why is there two spaces for signatures by nurses on this document? There's three actually. If you look at the top right corner, there is a box there.

A Well, my understanding is the triage nurse signs the first.

MR. SANSONE: And the witness is indicating to the signature on the top of the page.

A My understanding is the first, in the box is the triage nurse signature. I think the nurse -- Maybe it's the LPN. When they receive it, they sign the second but I'm not sure about that.

MR. SANSONE: Indicating the one in the middle of the page.

Q Do you recognize that signature in the middle of the page under Part A?

A No.

Q That specific signature, do you see the date and time there?

A Yes.

Q Do you have any understanding of why it would be dated and timed at that time? Do you have any understanding of that?

A I have no idea. Maybe that's when the nurse triaged it. I don't know. Or maybe it's when the nurse first received it. Then the second on top is when the charge nurse received it.

Q Okay. And do you know if this document is made in the ordinary course of business by the medical unit at the jail?

A Yes.

Q It's regular practice to make this record?

A Yes.

Q Was this document made by medical staff with knowledge of the information contained therein?

MR. SANSONE: Objection.

A I don't understand the question.

Q When you filled out this

document, did you fill it out at or near the time of the events transcribed within it?
A I filled out the document when the patient was brought to the triage room.
Q Do you know where this information would be stored by medical staff?
A It's usually when they come into the triage room and the urgent care and the emergency transfer notification. That's usually when they're brought down so these are done when they're brought down there.
MR. SANSONE: No. He wants to know where they're stored.
A In medical. They have a storage room. That's where the forms are stored. But the document itself after it's triaged by the nurses is usually put in the chart to be seen the next day.
Q Okay.
A Depending on whether or not it's emergent.
Q So if you look at the signature on the bottom of the page under Part B,

that's your signature?
A Yes.
Q And that stamp, is that a personal stamp that they gave you there?
A Yes. Everyone has a stamp.
Q What is that number below your name?
A That's your ID number.
Q Okay. What about the date and time? What does that indicate?
A What date and time?
Q It you look at the bottom, to the left of your signature.
A It's usually the date and time the person was seen.
Q That the inmate was seen?
A Yes.
Q And do you know why that date and time is not filled in on this document?
A Because I filled it out in the emergency transfer notification.
Q Okay. So the box on the top right, that is signed by Sharon Neysmith?
A Yes.

Q It says, "for use by medical personnel only." Below that, it says, "date received." Do you know what that means?
A My understanding is that's the date that she received it.
Q The sick call request?
A Yes.
Q The time would be the date that she received it on that day?
A Yes.
Q And below that, it says "disposition" and there are several boxes. One of the boxes that are checked is next sick call. What does that mean?
A Probably that he needs to be seen on the next sick call day.
Q Okay. So looking at this sick call request, would you characterize it based on your training and experience as an emergency request?
MR. SANSONE: Objection.
You can answer.
A Yes. It should have been emergency.

Q And the top right, is it your understanding that Ms. Neysmith is characterizing this request as a nonemergency?
A Yes.
Q And the reason for that is because she checked off the box next to sick call?
MR. SANSONE: Objection.
You can answer.
A Yes.
Q What are the reasons why based on your training and experience you would characterize this specific request to be an emergency?
A Because it's complaints of problems with his chest and shortness of breath. The shortness of breath would usually make it emergent.
Q Okay. Do you know how this sick call request would have been given to you, if you have any knowledge or recollection?
A If she characterized it as

nonemergent, it might have gone into the chart with the next -- with the next sick calls to be done. I don't recall specifically this one but if it was nonemergency, generally, it's put in the chart and it's given the next day.

Q Okay. So you mentioned that you partially filled out this document.

A Yes.

Q Does that mean that you would have seen or treated Robert Jeffrey Johnson, Jr. on the date indicated on this form?

A I saw him on the 12th, October 12th.

Q Okay. So would Part B, there's several boxes, several lines for you to fill out, and one of them to be BP; do you see that? That means blood pressure?

A Yes.

Q And that blood pressure, what does that say is the reading?

A 123/80.

Q Is that normal?

A Yes.

Q What about T, what does that mean?
A Temperature.
Q And what about R?
A Respiration.
Q And was that normal?
A Yes.
Q And what about WT?
A Weight.
Q Do you know why there is nothing indicated in that box?
A Because every sick call does not require weight.
Q You see P02? What is that?
A Pulse ox, oxygen saturation.
Q What number does that say?
A 98 percent.
Q Is that normal?
A Yes.
Q And BMI?
A BMI is related to the weight.
Q And are you required to indicate what the BMI is?
A No. It's only when

appropriate.

Q And do you see S on the bottom below BP?

A Yes.

Q What does that mean?

A That is a subjective.

Q And what do you mean by subjective?

A That is what the patient complaints are.

Q Can you please read what you wrote for subjective?

A "Upon arrival to sick call, patient complained of sexual assault 10/12/21 with penetration. Patient states was punched in face during assault."

Q And then below S, there is O. What is O?

A It's the objective.

Q What does that mean?

A That's what I see.

Q Can you read what you wrote for objective?

A "Alert and oriented times 3.

Face, bruise noted on left side of face, positive ecchymosis noted, left maxilla, no exude."

Q So below O, there is A. What does that mean?

A That's the assessment.

Q Would you --

A After I wrote that, I sent him to the hospital for evaluation so that would be on the emergency department transfer notification.

Q What about P, what does that mean?

A Plan.

Q Are you required to fill that out on this document?

A No, not if I sent him with the emergency department transfer notification.

Q All right. And then --

A Because that was the plan.

Q I'm sorry, can you say that again?

A Because that was the plan.

Q And what about distribution on

the bottom of the document? It says, "white, yellow, pink." What does that mean?
A My understanding now is that they only have one form.
Q Okay. But what did that mean when it says those colors?
A Medical is the white. Mental health is the yellow. The inmate copy is pink.
Q So each one of those entities, an inmate would receive a copy of this?
A Yes.
Q Signature and credentials of healthcare provider below your signature, that means that you are the healthcare provider at the medical unit?
A Yes.
Q With respect to Plaintiff's Exhibit 1, I'm going to turn to bate stamped Nassau County 70. The title of this document is Emergency Department Transfer Notification.
Ms. Evelyn, do you recognize this document?

A Yes.
Q This is one of the documents that you reviewed prior to the deposition?
A Yes.
Q Did you fill this document out?
A Yes, I did.
Q I would ask that you just take me through the document, please. There is a line that says "institution." What does that say?
A NCCF, Nassau County Correctional Facility.
Q Then it says, date and time. Do you know why --
A The date is on the bottom and the time is on the bottom.
Q But the date and time of what?
A Of when I saw the person. It's on the bottom of the sheet.
Q When you saw Robert Jeffrey Johnson, right?
A Yes.
Q So then it says, "transportation authorization number." What

does that mean?

A I don't know. That's never filled out.

Q Name of attending in medical unit. Can you read that?

A Dr. Henig.

Q That's a doctor in the medical unit?

A She's the medical director.

Q I don't think I asked this but, what were the duties and responsibilities of the medical director?

MR. SANSONE: Objection.

You can answer.

A She oversees the medical staff. I don't know anything else.

Q Okay. Then it says, "name of HCP authorizing transfer." Does that mean healthcare provider?

A Yes.

Q Your name is listed there?

A Yes.

Q But what does it mean by authorizing transfer?

A In order for an inmate or patient to be transferred out to the hospital, there has to be someone that authorizes the transfer.

Q Okay. And then it says, "name of hospital." Can you read what that says?

A NUMC.

Q And below that, address and telephone would be the name of the hospital's --

A Yes.

Q -- address and telephone, right?

A Yes.

Q And then it says, "transported by facility security" and that's circled. What does that mean?

A That means that it didn't require 911 transportation so they transferred him by facility security.

Q And transferred him to the hospital?

A Yes.

Q And below that, it says,

"clinical information reason for transfer." Can you please read that?

A "Complaint of sexual assault."

Q And it says "diagnosis." Is that what you diagnosed him with?

A Yes. I diagnosed him based on what he said so it's complaint of sexual assault.

Q And based on your training and experience, when you make a diagnosis, is it typically based on the subjective complaint by the patient?

MR. SANSONE: Objection.

A No. Generally, it's based on an objective assessment. There are exceptions to the rule. Since we do not perform a sexual kit evaluation, under those circumstances, if they complain of sexual assault, we transfer them based on what they say.

Q Okay. And based on your review of the documents, because I know you said you don't have an independent recollection of this incident, based on your review of

the documents, you understand that there were other complaints besides sexual assault?

A When he walked into the room, when I asked him what his complaint was, his complaint to me was that he was sexually assaulted. He did not complain of chest pain. He did not complain of any other problems other than the fact that he was sexually assaulted and that he was punched in the face. Those were his complaints.

Q Okay. And then below vital signs appears to be what we went through with --

A Yes.

Q It says, "additional clinical information." What does mean?

A So when you send someone to the hospital, you have to give a synopsis of why you are sending them there and that's where you write what that is.

Q Okay. Can you read what you wrote?

A "36-year old male complained of

sexual assault 10/12/21. Complained of penetration. Complained of bruise to side. Ecchymosis noted left side of face. Sent to emergency room for further evaluation and treatment."

Q Okay. So it appears that you did write there was a bruise to his face. Do you know why you did not write that in the reason for transfer?

A I did write that for a reason for transfer --

Q So you're saying you wrote it in the additional clinical information section?

A Yes.

Q And it says "allergies." What does that say?

A "No known drug allergies."

Q Okay. Do you see the signature line on the page?

A Yes. That's me.

Q And the date and time, what does that indicate?

A The date that I saw him and the

time I saw him.

Q So the date is October 12, 2021?

A Yes.

Q Is the time 15 --

A 18.

Q 1518 hours?

A Yes.

Q So that would be 3:18?

A Yes.

Q So looking on this document, does this tell you that you met with Robert Jeffrey Johnson on October 12, 2021 at 1518 hours?

A Yes.

Q Okay. So the emergency department transfer notification that we're looking at is bate stamped number Nassau County 70. Is this document made in the regular course of business of the medical unit at the jail?

A It's made in case of emergencies.

Q But it's your regular practice

to make this record, right?
A Yes.
Q And you create this record in the regular course of business when you receive a complaint by an inmate that warrants the emergency transfer of the inmate?
A Yes.
Q And the information contained in this document was made by you on October 12, 2021 which is the same date of incident alleged by Robert Johnson.
A Yes.
Q Okay. Where is this document stored?
A A copy is sent to the emergency room and a copy is placed in the chart.
Q All right.
MR. SANSONE: It might be a good time to take five minutes unless somebody has an objection.
MR. BRADLEY: I'm okay with that.
(Whereupon, a short recess was

taken.)

Q Ms. Evelyn, I'm going to turn back to bates number Nassau County 68. It's the sick call request dated October 12, 2021.

Looking at this document, is there any indication as to when Robert Johnson filled out this request?

A There's the date but I don't know -- If you're asking in terms of time, I have no idea.

Q Based on your training and experience, is it normal for an inmate to fill out a sick call request after being seen by you?

MR. SANSONE: Objection.

A If they were -- Sometimes they're seen and they come out and then they fill out another one for the same exact thing so it's not abnormal.

Q Why would they fill out another one?

A Because they didn't get something that they wanted.

Q Okay. So in the top right corner, it says -- with Sharon Neysmith's signature, it says she received this request on October 12, 2021 at 2300 which would be 11 o'clock, right?

A Yes.

MR. SANSONE: P.m.?

MR. BRADLEY: 11 p.m., yes. Sorry.

Q So we just went over the emergency department transfer notification and it indicates that you saw Robert Jeffrey Johnson, Jr. on October 12, 2021 at 3:18 p.m., right?

A As much as I can recall, yes.

Q So does it appear based upon your comparison of these documents that you may have saw Robert Johnson prior to Ms. Neysmith?

A I could've seen him prior to the sick call being given in.

Q Okay. And if that did occur, how would that occur?

A That would be the incident to

injury report. They could've been called down from -- by medical. It could've been brought down by the COs or they could've, you know.

Q Okay.

A He could've mentioned it to one of the nurses. The correction officers could've brought him down.

Q And that signature under Part A, we don't know who this nurse is, right? We've clarified that.

A Yes, I have no idea.

Q And it does appear there was a triage nurse named Ms. Neysmith that signed this document?

A Yes.

Q Do you have any idea what type of nurse would have signed under Part A?

A It could've been an LPN. It could've been an LPN. I don't know how nursing handles that.

Q And when you say that you don't know how nursing handles that, what do you mean?

A Because nursing does the triage.

Q Can you just clarify for me what LPN means?

A A licensed practical nurse.

Q And what is an LPN's responsibility?

A Well, in the correctional facility, my understanding is they do -- They distribute the meds. I think they do some of the treatments and I'm not sure about what else.

Q Okay. I don't think I've asked this question but, are you aware or do you have any obligation to notify your supervisor or anyone else of an allegation by an inmate of sexual assault by a correction officer?

A The medical director is notified because the inmate is transferred to the hospital so an e-mail or call is made prior to them being transferred.

Q And based upon your training and experience, why is the medical director

notified of such an allegation?

A Because she is notified of all the patients when there is a change in acuity or when they're transferred to another facility.

Q I'm going to show you what's going to be marked as Plaintiff's Exhibit 2.

Ms. Evelyn, can you see these photos?

A Yes.

MR. SANSONE: Right now we're just looking at one.

MR. SANSONE: Yes. This is going to be marked as Plaintiff's Exhibit 2. It's bate stamped Nassau County 268 through Nassau County 276.

(Whereupon, Plaintiff's Exhibit Number 2 was marked for identification.)

Q I'm going to go through those photos. If you want me to go back, I'll go back but I'm just going to start going through them, okay?

A Okay.
Q Ms. Evelyn, do you want me to go back to any of those?
A No.
Q Do you recognize this person?
A No.
Q Do you see on Nassau County 268 that there's a bruise below his left eye?
A Yes.
Q Based on your training and experience, what do you think that that bruise was caused by?
MR. SANSONE: Objection.
You can answer the question.
A Trauma.
Q A what?
A Trauma.
Q Do you think that that type of trauma could be caused by a physical strike to the face by another person?
MR. SANSONE: Objection.
You can answer the question.
A It's possible, yes.
Q I'm looking at Nassau County

276. Do you see the back of this person's neck?

A Yes.

Q Does there appear to be discoloration?

A (No verbal response.)

Q Based on your training and experience.

A No.

MR. BRADLEY: I'm going to mark this as Plaintiff's Exhibit 3. This is Nassau University Medical Center records. It's bates number Nassau County 530 to 618.

(Whereupon, Plaintiff's Exhibit Number 3 was marked for identification.)

Q Ms. Evelyn, this has been provided to your counsel prior to this deposition.

Ms. Evelyn, did you review those documents prior to the deposition?

A I did review them.

Q You didn't use them?

A I did review them.

Q These records, they're not created by the medical unit, right?

A No. They're created by the hospital.

Q And do you see this document Nassau County Police Department?

A Yes.

Q Have you ever seen this document before?

A No.

MR. SANSONE: You're talking about 530, correct?

MR. BRADLEY: Yes.

MR. SANSONE: Okay.

Q I'm going to show you another document that's going to be marked as Plaintiff's Exhibit 4. I'm going to show you the injury to inmate report. It's bates number Nassau County 374. It's been provided to your counsel prior to this deposition.

(Whereupon, Plaintiff's Exhibit Number 4 was marked for

identification.)

Q Can you see this document, Ms. Evelyn?

A Yes, I can.

Q Do you recognize it?

A Yes.

Q Did you review this document prior to the deposition?

A Yes.

Q So did you fill this document out?

A Yes.

Q But section 1 was not filled out by you, right?

A No.

Q So if we look at the top right, it says, date 10/13/2021. That's not your handwriting, right?

A No.

Q But do you know what that date would mean with respect to the document?

A It would mean 10/13. That would be the date that they sent -- that they give it to us, I guess.

Q So you see it says below that, "UOF number." Do you know what that means?
A No.
Q And injury number, do you know what that means?
A No.
Q Did you review the details section in section 1 when you filled this document out?
MR. SANSONE: Are you asking if she reviewed it before she wrote whatever she wrote on the document?
MR. BRADLEY: Yes.
A No.
Q Why not?
A Because generally, that comes afterwards.
Q Okay.
A So if they send the patient down, I see the patient. Generally, afterwards, the form comes. It rarely comes before.
Q Got it.
And you see a supervisor,

that's Lieutenant McMillan, right?

A Yes. Okay.

Q You know him?

A I do.

Q Do you know if at this time on October 13, 2021 he was working in the medical unit?

A I don't recall seeing him but I -- I don't recall seeing him.

Q Okay. Do you know if he was working around that time period in the medical unit?

A Yes.

Q And then you see right here, it says "employee." To me, that looks like Razenson; you would you agree?

A Yes.

Q Do you know whether or not Razenson was working in the medical unit around the time of October 13, 2021?

A Yes.

Q I want to proceed to section 2 of the document. You filled out section 2, right?

A Yes, I did.
Q And it says date of injury is October 13, 2021, right?
A Yes.
Q So that date is different from the date on the sick call request and the emergency transfer, right?
A Yes. So I might have written the wrong date on the emergency transfer.
Q Okay.
A 10/13 --
Q Because we saw on the emergency transfer that you signed it on October 12, 2021 at 3:18 p.m., right?
A Yes. So this is probably more consistent. It was probably 10/13.
Q Why do you say that?
A Because based on the injury to inmate report, the times align better.
Q Why do you say they align better?
A Because the injury to inmate report was initially done at 1415. He was transferred then 1518. He was seen by

medical at 1507 and I filled out the paper at 1518.

Q So it says, "supervisor notified." What do you believe that to mean?

A Oh, you mean Lieutenant McMillan?

Q Yes.

A I didn't write that.

Q Didn't you say that you believed that --

A So they --

MR. SANSONE: Let him finish his question.

Q So you stated that you believe that this document to be more accurate with respect to the date of injury than the emergency transfer request because of the date and time indicated by Lieutenant McMillan on this document?

MR. SANSONE: I don't think she said date of injury. I think it's more a question of when she saw the patient as opposed to when the

injury occurred.

Q So the emergency transfer request, I'm going to turn back to it.

MR. SANSONE: The witness has it in front of her.

Q So --

A The date on this should be --

MR. SANSONE: Wait. He'll ask you questions.

Q So the date says October 12, 2021 at 1518 p.m. and you previously testified that that was the date and time that you would have saw Robert Johnson, correct?

A I think I saw him October 13th.

Q Okay. And you also indicated in the emergency transfer under additional clinical information 10/12/21 which means that his injury occurred on 10/12/21, right?

A Yes. That's the date that he stated, 10/12.

Q So then looking at this document, it says, date of injury 10/13/21; do you see that?

A Yes.

MR. SANSONE: When you say, "this document," you're talking about injury to inmate report?

MR. BRADLEY: Yes.

MR. SANSONE: Okay.

Q So looking at the injury to inmate report which is marked as Plaintiff's Exhibit 4, under section 2, it says, date of injury 10/13/21.

A Yes.

Q That is not correct, right?

MR. SANSONE: Counselor, where are you referring to?

Q Under section 2, date of injury, it says 10/13/21. That's not correct, right?

MR. SANSONE: Okay. You can answer.

A The date that the patient told me was 10/12.

Q Okay. So when you wrote under section 2, date of injury, that's not correct, right?

A No. This is usually the --
This is filled out the date that the officers give me the form, not the date of injury. So when the officers fill out the form, they put out the date. They fill out the date and we put in the date.

Q So if we look at section 1 that's filled out by the employee of the jail, it says, date and time of injury 10/12/21.

A Yes.

Q So when you wrote date of injury 10/13/21, are you indicating the time that it was given to you, the report?

A What usually happens is the nurse fills out the date of injury and the report for medical attention. The provider fills out the sick call. We fill out the prognosis and we fill out the cause and then we sign it and we date it. This part, the date of injury part and the call for medical attention is filled out by the nurse.

Q Which nurse?

A The charge nurse.

Q And when we see reported for medical attention, is that to Nassau University Medical Center?

A No. That's when they're brought down to be triaged in the triage room.

Q Okay. So the documents that you created that we went over is a sick call request, the emergency transfer form and the injury to inmate form, right?

A No. The document that I created was the emergency transfer form. The other documents, the sick call was already -- The patient or the inmate fills out the top part and that's given to me. The injury to inmate, the top part is filled out by the officers. The date of injury, the report to medical attention is filled out by the nurses. The prognosis and the disposition and the treatment treated by is broken up by the healthcare provider.

Q Which is you?

A Yes.

Q So the sick call request, you

signed that document though, right?
A Yes.
Q And we saw and I'm turning back to it which is Plaintiff's Exhibit 1 which is a Nassau County 68 bates number, that's your signature at the bottom of the document and the date --
A Yes.
Q And the date is not filled in?
A Yes.
Q And you testified that the date and time correlates to the date and time that you saw Robert Johnson, right?
A Yes. And that would have been 10/13.
Q And then the reason why you didn't fill it out you testified was because it's indicated on the emergency transfer form?
A Yes.
Q So then, if we turn to the emergency transfer form at bates number Nassau 70, the date and time you indicate on this document that you saw Robert Johnson

says October 12, 2021 at 3:18 p.m., right?
A And it should have been October 13th at 1518.
Q Okay. And going to the inmate to injury report which is Plaintiff's Exhibit 4, why are you saying that the 10/13 date is more accurate?
A The 10/13 date is the date that he came to medical. That's the date that he came to medical. I don't know if the assault occurred 10/12. The 10/13 is the date that medical was -- that he was presented to medical.
Q Okay. So on this document, it says he reported to medical on October 13, 2021 at 1507 hours.
A Yes.
Q And on the emergency transfer, it says that he reported to medical on 10/12/21 at 1518?
A And the date on that document should be 10/13.
Q 1013. And the time is also not correct?

A No. The time is correct, 1518.
Q Okay. But this document says 1507.
A So he came in 1507 --
Q And -- Go ahead. I'm sorry.
A He came in 1507. After he was triaged and the form was filled out, this is the date of the -- This is the time of the completion of the form.
Q Okay. I got it.
A 1518.
Q I got it. Okay.
So when you filled out the injury to inmate report, at that time, the sick call was provided to you, right?
A (No verbal response.)
MR. SANSONE: He's asking you if you would have seen the sick call report before.
A Yes.
Q Okay. But looking at this document, at Plaintiff's Exhibit 4, you used the sick call request to help you fill this document out, right?

A No. This was a reference for them because there is a space here. We don't write in what happened. We write what form they can refer back to.
Q Okay. When you say --
A This is just for their documentation.
Q Who is "they"?
A Corrections.
Q Okay. And if you know, do you know why there may be a discrepancy between the date on the emergency transfer form and the injury to inmate form?
MR. SANSONE: Can I have that question read back, please?
(Whereupon, the court reporter read back the requested portion.)
Q Based on your review of these documents, do you know why there's a difference between the date and time on the emergency transfer form and the date and time indicated on the injury to inmate form?
MR. SANSONE: I think that she's explained that already.

MR. BRADLEY: Wait. Can I just have clarification because it's --

MR. SANSONE: I don't think she indicated there was a problem with the time. She indicated that the date on the emergency transfer form should have been 10/13.

MR. BRADLEY: Okay.

MR. SANSONE: I mean, if you look at the documents, the times line up. He's seen at 1507. The transfer form is signed off at 1518 and she signs the bottom of the injury to inmate form at 1522 indicating transfer to the hospital.

MR. BRADLEY: Right. But under section 2 where it says, date of injury, right, it says 10/13/21.

MR. SANSONE: Right. I think she already explained that, that that was put in by the triage nurse.

MR. BRADLEY: Okay.

Q So that's not your handwriting?

A No.

MR. SANSONE: I would also indicate that above that in the corrections portion in two different sections, it indicates that the injury took place on the 12th.

MR. BRADLEY: Yes. I think we went over that. Thank you.

Q So where it says, "nature of injury and cause" under section 2, what is your understanding of what needs to be filled out there?

A We don't fill out anything there. We fill out what document they can go back to to reference that.

Q Okay.

A So we don't fill out a complete note there. We just fill out see sick call, see use of force, see emergency transfer sheet. We don't fill out anything other than that.

Q And what about treatment, what does that mean?

A The treatment is, it's the same thing. You see the sick call sheet. You

see the emergency transfer sheet. You see the use of force sheet. That's what we use for that part.

Q That's why it says, "see sick call" in the middle of this line, to your knowledge?

A Yes.

Q So then, if we looked down below prognosis, what does that mean?

A The prognosis, if it's good. Is he stable? Is it fair? Is it poor?

Q So if you're not required to fill out the nature of injury and cause and treatment sections, why is it filled out for prognosis?

A Because you have to give a prognosis. According to the form that they have, you have to give a prognosis.

Q And then below prognosis says "Cause. Are the injuries observed consistent with inmate's description? Check one." It says yes or no. And the word "yes" is checked off. Did you check that off?

A Yes, I did.
Q So at this time, do you know what information you had as to what the inmate's injuries were?
A I had what the inmate told me. He told me that he had been sexually assaulted and he told me that he had been punched.
MR. SANSONE: And you had seen him.
THE WITNESS: Yes, and I had seen him.
Q You observed he had a bruise to the face?
A Yes.
Q So in order to check this box off yes, what did you need to determine for you to do so?
A Okay. So because it was a sexual assault and they have to go to the hospital for evaluation, there is no way for me to say that the injuries are not consistent because I don't do a physical exam so you have to check off yes.

Q Okay. So you said that he also told you that he was punched in the face by a correction officer, right?
A Yes.
Q So knowing what you know about that, do you believe that the injuries observed were consistent with the inmate's description of being punched in the face by a correction officer?
A I believe the injuries were consistent with the trauma. I don't know if it was a fist or it was consistent with the trauma.
Q Okay. So then, are the injuries observed consistent with the inmate's description? So if he's telling you that I was punched in the face by a correction officer, you don't consider the fact of who did it to determine if it's consistent?
A I consider the fact that he has an injury and he has a trauma, that, you know, he's saying that he was assaulted and he's saying that he was punched. The injury

to his face is consistent with a trauma. I don't know if someone punched him.

Q So is the fact that he claims to have been punched by a correction officer not relevant in determining whether the injuries observed is consistent with the inmate's description?

A The fact that he stated he was punched and the fact that he stated that he had a trauma -- The fact that he said he had a trauma and that he was punched, that's what I based it on. I don't know who punched him.

Q So my question is, is the identity of the person that he is saying punched him relevant to your answer to that question?

A I don't know who the person is.

MR. SANSONE: He just wants to know if it's relevant.

A No.

Q It's not relevant?

A Not at all, no.

Q Okay. So sitting back today

and looking at this document, it's been two years almost since this incident occurred, do you have any reason to doubt the reasoning behind why you checked off yes with respect to cause in the document?

A No.

Q Okay. So based on your training and experience as a nurse, is it ever relevant to you in giving a diagnosis to consider the facts surrounding how an injury happened?

MR. SANSONE: Objection.

You can answer the question.

A Yes.

Q And so, if an inmate is telling you that I was punched in the face by a correction officer, are those facts relevant to a diagnosis?

MR. SANSONE: Objection. I believe it's been asked and answered. She can answer the question again.

A Yes.

Q I know you testified that you

didn't have an independent recollection of this incident, but based on the testimony, based on what we talked about, based upon your review of the documents, does any of that refresh your recollection as to what occurred on October 12th or 13th of 2021?

A No.

MR. BRADLEY: Can we just take a 10-minute break so I can review my notes?

MR. SANSONE: Sure.

(Whereupon, a short recess was taken.)

Q I'm just going to pull up Plaintiff's Exhibit 4.

You mentioned that where it says cause of the injuries observed consistent with the inmate's description, one of your bases for checking yes was the report by Mr. Johnson of a sexual assault?

A Yes.

Q So where it says, "are the injuries observed consistent," would it be fair to say that you did not observe any

injuries on Robert Johnson of a sexual assault?

A I did not observe any injuries on him of a sexual assault.

Q And with respect to clicking yes regarding the sexual assault aspect of clicking yes, were you instructed that you must click yes or check yes any time an inmate complains of a sexual assault?

A I wasn't instructed that I must.

Q So you did that on your own volition?

A I did that based on what the patient told me.

Q Okay. And did you ever receive any training with respect to checking yes regarding cause on the injury to inmate form?

A No. There's no training for that.

Q So it was your understanding that you can click or check yes based upon the subjective complaint of the inmate?

MR. SANSONE: With respect to sexual assault she said.

Q With respect to sexual assault.

A Yes.

Q Okay. So nobody at the medical unit or Nassau University Medical Center instructed you that you must click or check yes when filling out the cause section of this document with respect to a sexual assault allegation by an inmate?

A No.

Q Okay. And there are no policies or procedures regarding checking yes on a cause section of injury to inmate report with respect to sexual assault allegations by an inmate?

A I am not aware of any.

Q Okay. So when you checked yes based on the sexual assault allegation, based on a subjective complaint by Mr. Johnson, that was not based on injuries observed of Robert Johnson, right?

MR. SANSONE: Objection.

You can answer. It's a dual

question but you can answer it.
A Can you repeat the question?
Q So the report like we went over says, "Are the injuries observed consistent with the inmate's description?" But with respect to clicking yes for the sexual assault, you based it on the subjective complaint rather than the observed injury of Mr. Johnson?
A Yes, because we did not do a sexual -- We did not do a rape kit.
Q Okay. And do you ever do rape kits as far as --
A No.
Q You never do rape kits as part of the medical unit?
MR. SANSONE: I believe it's been asked and answered.
You can answer it.
A No.
Q I'd like to show you what's going to be marked as Exhibit 5, Plaintiff's Exhibit 5. It's bates number Nassau County 1,007.

(Whereupon, Plaintiff's Exhibit Number 5 was marked for identification.)

Q Can you see this document?

A Yes.

Q Do you recognize it?

A No.

Q If I said that this was a map of the B2 floor at the jail, would you agree with that?

A I don't know.

Q So you mentioned that there's the medical unit on the B2 floor, right?

A Yes. It's on the second floor of B building, yes.

Q And there's a door where the medical unit is located that goes into the housing tiers on B2, right?

A Excuse me? Can you repeat that?

MR. SANSONE: I think you better redo the question.

Q So there is a medical unit on the B2 floor, right?

A Yep.

MR. SANSONE: I believe she's testified to a medical unit --

A There's a medical unit. It's in the second floor in the D building, the D building, yes, second floor in D building in the core.

Q And the D building connects to the B building, right?

A Yes. It's just -- There is a hallway.

Q Right. And if you go down that hallway, you get into the B building where just outside of the doorway are the housing tiers?

A So there are doors. There will be doors at the beginning here, yes. So there's doors and then outside the doors is the housing unit.

Q Okay. And do you know how far it would be to get from the medical unit in the D building to the housing unit in B building on the second floor?

A It's not far. It's five

minutes, three to five minutes. It's just right down the hall.

Q Okay. If it's right down the hall, do you think it could be less than three minutes?

A It could be. You go out the door and you just walk up -- It's two to three minutes, I guess. Yeah, I guess.

Q And we're saying by walking, right?

A Yes.

MR. SANSONE: Are there security guard gates when you go through?

THE WITNESS: They have to let you out. You have to be buzzed out of one door, the second door. Then you go around and get buzzed into the unit.

Q How do you get buzzed into the unit? Who does that?

A The officers.

Q And is there an officer that is by the door that is gonna buzz you in?

A They usually have a visual to the officers when you are walking down the tier to get to the unit. There is a gate there and they're usually a visual and they just open the gate.

Q Do they open the gate from the lobby of the B2 floor?

A No. So for the B2 floor, you walk around and there's a gate, yeah. You have to go through the gate. Then they open the gate for you. It's not the lobby. It's the second floor.

Q Okay. And do you know if there's any cameras in the B2 floor?

A I have no idea.

Q Do you know if there's any cameras in the D building by the medical unit?

A I have no idea.

Q Okay. So we reviewed the sick call request, the injury to inmate form and the emergency transfer form.

Looking at those documents, do you know what your shift was on October 12,

2021 and October 13, 2021? I can pull them back up, if you'd like.

A It might have been a 7a to 7p or a 10 to 10. I don't know. It's one of the two.

Q Okay.

A Or 8 to 8, 8 a.m. to 8 p.m.

Q 8 a.m. to 8 p.m.?

A Yes.

MR. SANSONE: In other words, you don't know?

THE WITNESS: I don't know.

MR. BRADLEY: What did counsel say?

MR. SANSONE: In other words, she doesn't know.

MR. BRADLEY: Okay. You said tell her that -- What did you say? You said tell him that you don't know. Is that what you said?

MR. SANSONE: No. I said, other words, she does not know.

MR. BRADLEY: Okay. I have no further questions.

EXAMINATION BY
MR. REISSMAN:

MR. REISSMAN: My name is Ralph Reissman. I'm a deputy county attorney. I'm filling in for Brian McLaughlin whose case this is now. I'm just covering his deposition but I just have one or two questions.

Q Just to be clear, you did not examine the inmate for sexual assault; is that correct?

A Yes.

MR. REISSMAN: I have no further questions.

MR. SANSONE: Any follow-up?

MR. BRADLEY: No.

MR. SANSONE: Thank you all.

(Time noted: 4:10 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF )

I, WANDA EVELYN, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of July 5, 2023; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________
WANDA EVELYN

Signed and subscribed to before
me, this___________________ day
of______________________ 2023.

________________________________
Notary Public, State of New York

**INDEX**

**INDEX TO TESTIMONY**


| | Page |
|---|---|
| Examination by Mr. Bradley | 4 |
| Examination by Mr. Reissman | 122 |


**EXHIBITS**


| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 1 | Sick Call Request Form | 64 |
| Exhibit 2 | Photos | 89 |
| Exhibit 3 | NUMC Records | 91 |
| Exhibit 4 | Injury to Inmate Report | 92 |
| Exhibit 5 | Map | 117 |


**RULINGS**


| PAGE | LINE |
|---|---|
| 53 | 2 |
| 59 | 23 |

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: Johnson v. County of Nassau, et al.
Deposition Date: July 5, 2023
Witness: Wanda Evelyn

CORRECTIONS

| PG | LN | NOW READS | SHOULD READ | REASON FOR |
|---|---|---|---|---|
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |
| __ | __ | ___________ | ___________ | __________ |

___________________________
Signature

Subscribed and sworn to before me this______ day of _________, 2023.

_________________________________
(NOTARY PUBLIC)

CERTIFICATION

I, DENISE MANTEKAS, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is herein before set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of July, 2023.

Denise Mantekas
___________________________

DENISE MANTEKAS

**1**

**1** [9] - 2:8, 64:7, 64:9, 76:20, 93:14, 94:9, 100:8, 102:5, 124:11
**1,007** [1] - 116:25
**1-9** [1] - 1:9
**10** [2] - 121:5
**10-minute** [1] - 113:10
**10/12** [3] - 98:22, 99:22, 103:12
**10/12/21** [6] - 74:16, 82:2, 98:19, 98:20, 100:11, 103:21
**10/13** [9] - 93:23, 96:12, 96:17, 102:16, 103:7, 103:9, 103:12, 103:23, 106:8
**10/13/2021** [1] - 93:18
**10/13/21** [5] - 98:24, 99:11, 99:17, 100:14, 106:19
**1013** [1] - 103:24
**10a** [1] - 32:3
**10p** [1] - 32:3
**11** [3] - 23:22, 86:6, 86:9
**11470** [1] - 2:11
**11501** [1] - 2:8
**11596** [2] - 5:12, 5:18
**117** [1] - 124:16
**11735** [1] - 2:5
**11th** [1] - 51:22
**12** [19] - 6:9, 21:24, 31:22, 32:15, 32:23, 59:20, 63:17, 64:12, 65:6, 83:3, 83:14, 84:12, 85:5, 86:5, 86:14, 96:14, 98:11, 103:2, 120:25
**122** [1] - 124:6
**123/80** [1] - 72:23
**12th** [4] - 72:14, 72:15, 107:6, 113:7
**13** [5] - 95:7, 95:21, 96:4, 103:16, 121:2
**13th** [3] - 98:16, 103:4, 113:7
**1415** [1] - 96:24
**15** [2] - 42:21, 83:6
**1507** [6] - 97:2, 103:17, 104:4, 104:5, 104:7, 106:12
**1518** [10] - 83:8, 83:15, 96:25, 97:3, 98:12, 103:4, 103:21, 104:2, 104:12, 106:13
**1522** [1] - 106:15
**18** [1] - 83:7
**1982** [1] - 14:11
**1987** [2] - 12:12, 14:12
**1988** [1] - 13:15
**1996** [1] - 12:21
**1997** [3] - 13:10, 18:7
**1:00** [1] - 1:14
**1st** [4] - 11:2, 11:3, 11:5, 11:9

**2**

**2** [12] - 89:8, 89:16, 89:20, 95:23, 95:24, 99:10, 99:16, 99:24, 106:18, 107:10, 124:12, 124:20
**20** [1] - 42:21
**2006** [3] - 10:22, 19:9, 22:12
**201** [1] - 32:23
**2011** [3] - 19:9, 20:8, 22:13
**2012** [3] - 10:23, 11:16, 11:18
**2019** [3] - 19:10, 20:12, 23:22
**2021** [23] - 6:9, 21:24, 32:15, 59:20, 63:17, 64:12, 65:6, 83:4, 83:14, 84:12, 85:6, 86:5, 86:14, 95:7, 95:21, 96:4, 96:15, 98:12, 103:2, 103:17, 113:7, 121:2
**2023** [6] - 1:14, 123:10, 123:19, 125:3, 125:24, 126:16
**2201** [2] - 4:11, 5:6
**23** [1] - 124:21
**2300** [1] - 86:5
**245** [2] - 5:11, 5:13
**268** [2] - 89:17, 90:8
**276** [2] - 89:18, 91:2
**28th** [1] - 126:15
**2nd** [2] - 11:6, 11:7

**3**

**3** [4] - 74:25, 91:12, 91:17, 124:13
**30** [1] - 42:22
**30(d)(3)** [2] - 56:7, 56:25
**36-year** [1] - 81:25
**374** [1] - 92:21
**3:18** [4] - 83:10, 86:14, 96:15, 103:2

**4**

**4** [8] - 92:19, 92:25, 99:10, 103:7, 104:23, 113:16, 124:5, 124:14
**44** [1] - 2:11
**45** [1] - 5:17
**4:10** [1] - 122:20

**5**

**5** [7] - 1:14, 116:23, 116:24, 117:3, 123:10, 124:16, 125:3
**53** [1] - 124:20
**530** [2] - 91:15, 92:14
**58** [1] - 10:8
**59** [1] - 124:21

**6**

**618** [1] - 91:15
**62** [1] - 64:2
**64** [1] - 124:11
**68** [4] - 64:14, 64:18, 85:4, 102:6

**7**

**70** [3] - 76:21, 83:20, 102:24
**72** [4] - 45:18, 46:19, 47:5, 47:25
**73** [1] - 64:2
**77** [1] - 2:5
**7a** [3] - 32:2, 32:3, 121:4
**7p** [3] - 32:2, 32:3, 121:4

**8**

**8** [6] - 121:8, 121:9
**89** [1] - 124:12

**9**

**90s** [1] - 16:13
**91** [1] - 124:13
**911** [1] - 79:20
**92** [1] - 124:15
**96** [2] - 45:19, 46:19
**96-hour** [2] - 47:5, 48:2
**98** [1] - 73:18

**A**

**a.m** [2] - 121:8, 121:9
**ability** [1] - 17:10
**able** [2] - 17:22, 47:20
**abnormal** [1] - 85:21
**above-mentioned** [1] - 1:23
**access** [1] - 35:17
**according** [1] - 108:18
**accurate** [2] - 97:17, 103:8
**accurately** [2] - 6:22, 9:11
**acronym** [1] - 29:14
**action** [1] - 126:11
**activity** [1] - 58:18
**actual** [1] - 42:6
**acuity** [2] - 36:24, 89:5
**acute** [4] - 17:12, 17:19, 37:7, 43:24
**additional** [3] - 81:17, 82:14, 98:18
**address** [5] - 4:10, 5:5, 5:14, 79:9, 79:13
**adult** [5] - 12:16, 12:24, 13:24, 14:3, 17:19
**advanced** [1] - 17:9
**Adverse** [1] - 1:21
**advocate** [6] - 49:22, 49:25, 50:5, 50:11, 50:14, 50:17
**afterwards** [3] - 40:11, 94:18, 94:22
**agree** [7] - 5:24, 6:2, 6:22, 7:5, 7:25, 95:17, 117:10
**AGREED** [3] - 3:3, 3:8, 3:12
**agreed** [1] - 9:5
**agreement** [1] - 9:8
**ahead** [2] - 17:18, 104:6
**Aid** [1] - 19:20
**al** [1] - 125:3
**Albany** [2] - 18:2, 18:4
**Alert** [1] - 74:25
**ALEX** [1] - 2:12
**Alexander** [1] - 5:17
**align** [2] - 96:20, 96:21
**allegation** [8] - 48:23, 49:22, 52:10, 54:21, 88:17, 89:2, 115:11, 115:20
**allegations** [3] - 52:3, 58:3, 115:17
**alleged** [3] - 52:19, 59:19, 84:13
**allergies** [2] - 82:17, 82:19
**almost** [1] - 112:3
**AND** [5] - 1:9, 3:3, 3:8, 3:12
**answer** [39] - 6:14, 7:13, 7:20, 7:25, 8:11, 9:3, 22:16, 35:24, 36:22, 41:2, 43:4, 44:22, 46:24, 48:9, 50:13, 51:3, 53:7, 54:4, 55:9, 56:9, 58:8, 59:14, 60:22, 61:4, 62:15, 62:19, 63:20, 70:23, 71:11, 78:15, 90:15, 90:23, 99:20, 111:17, 112:14, 112:22, 115:25, 116:2, 116:20
**answered** [3] - 51:2, 112:22, 116:19
**answering** [4] - 56:13, 60:12, 60:25, 61:19
**answers** [2] - 62:4, 123:12
**anticipate** [1] - 7:20
**appear** [3] - 86:17, 87:14, 91:5
**apply** [1] - 33:4
**applying** [1] - 33:21
**appreciate** [1] - 62:10
**appropriate** [1] - 74:2
**area** [3] - 33:4, 45:16, 54:6
**Armor** [1] - 21:16
**Army** [3] - 10:19, 10:21
**arrival** [1] - 74:14
**aspect** [2] - 50:8, 114:7
**assault** [32] - 46:20, 47:18, 48:7, 48:14, 48:16, 49:3, 49:23, 50:23, 58:4, 59:11, 74:15, 74:17, 80:4, 80:9, 80:20, 81:4, 82:2, 88:18, 103:12, 109:21, 113:21, 114:3, 114:5, 114:7, 114:10, 115:3, 115:4, 115:11, 115:16, 115:20, 116:8, 122:12
**assaulted** [7] - 43:14, 45:10, 45:16, 81:8, 81:11, 109:8, 110:24
**assess** [1] - 17:11
**assessment** [2] - 75:7, 80:16

**assigned** [6] - 24:15, 24:19, 27:10, 27:16, 29:4, 31:16
**associated** [1] - 13:6
**assume** [1] - 7:8
**attempting** [1] - 57:20
**attending** [1] - 78:5
**attention** [4] - 100:18, 100:23, 101:3, 101:19
**Attorney** [1] - 2:10
**attorney** [1] - 122:6
**ATTORNEY'S** [1] - 2:7
**Attorneys** [2] - 2:4, 2:7
**authorization** [1] - 77:25
**authorizes** [1] - 79:5
**authorizing** [2] - 78:19, 78:25
**available** [1] - 35:14
**Avenue** [3] - 5:11, 5:14, 5:18
**average** [1] - 57:16
**aware** [7] - 36:3, 48:19, 50:22, 51:6, 52:19, 88:15, 115:18

## B

**B2** [13] - 24:13, 24:20, 25:2, 25:3, 25:10, 31:3, 117:10, 117:14, 117:19, 117:25, 120:8, 120:9, 120:15
**B2D** [1] - 25:7
**background** [2] - 10:13, 11:23
**Based** [2] - 63:7, 105:19
**based** [34] - 43:10, 53:18, 53:19, 55:2, 57:24, 59:6, 61:5, 62:15, 70:20, 71:13, 80:7, 80:10, 80:12, 80:15, 80:20, 80:22, 80:25, 85:13, 86:17, 88:24, 90:11, 91:8, 96:19, 111:13, 112:8, 113:3, 113:4, 114:15, 114:24, 115:20, 115:21, 115:22, 116:8
**bases** [1] - 113:20
**basis** [14] - 53:9, 54:2, 54:8, 55:7, 55:14, 55:18, 56:7, 56:20, 57:8, 57:19, 60:21, 61:8, 62:20, 63:8
**bate** [4] - 63:25, 76:20, 83:19, 89:16
**bates** [6] - 85:4, 91:14, 92:20, 102:6, 102:23, 116:24
**became** [2] - 18:15, 18:21
**become** [1] - 13:13
**BEFORE** [1] - 1:19
**beginning** [1] - 118:18
**behalf** [1] - 33:23
**behind** [2] - 49:11, 112:5
**below** [13] - 69:7, 70:12, 74:4, 74:18, 75:5, 76:15, 79:9, 79:25, 81:13, 90:9, 94:2, 108:10, 108:20
**Below** [1] - 70:3
**Benson** [1] - 26:18
**BENSON** [1] - 1:8
**best** [2] - 4:17, 5:10
**bet** [1] - 5:10
**better** [4] - 61:14, 96:20, 96:22, 117:23
**between** [5] - 17:6, 18:18, 18:19, 105:12, 105:21
**bit** [1] - 25:20
**blocks** [1] - 49:14
**blood** [4] - 24:10, 72:19, 72:21, 126:10
**BMI** [3] - 73:21, 73:22, 73:24
**bottom** [10] - 40:15, 68:25, 69:13, 74:3, 76:2, 77:16, 77:17, 77:20, 102:7, 106:14
**box** [6] - 66:8, 66:15, 69:23, 71:8, 73:12, 109:17
**boxes** [3] - 70:13, 70:14, 72:17
**BP** [2] - 72:18, 74:4
**BRADLEY** [64] - 2:6, 4:14, 4:15, 4:21, 5:4, 5:8, 5:13, 5:19, 5:21, 6:25, 7:7, 7:12, 7:18, 8:3, 8:9, 8:18, 8:25, 9:7, 21:15, 29:16, 30:13, 50:12, 53:8, 53:16, 53:25, 54:7, 54:16, 55:4, 55:12, 55:21, 55:25, 56:4, 56:18, 56:22, 57:6, 58:14, 58:20, 58:23, 60:18, 61:2, 61:7, 61:15, 62:9, 63:3, 63:7, 63:12, 64:5, 64:20, 84:23, 86:9, 91:11, 92:15, 94:14, 99:6, 106:2, 106:9, 106:17, 106:23, 107:7, 113:9, 121:14, 121:18, 121:24, 122:18
**Bradley** [2] - 6:4, 124:5
**break** [4] - 9:2, 9:5, 62:7, 113:10
**breath** [3] - 37:7, 71:19
**Brian** [1] - 122:6
**bring** [2] - 32:10, 44:19
**brings** [5] - 36:13, 37:19, 38:14, 38:15, 40:11
**Broadway** [1] - 2:11
**broken** [1] - 101:22
**Brooklyn** [2] - 18:23, 19:12
**brought** [14] - 10:4, 34:21, 37:23, 38:3, 38:5, 45:6, 45:13, 45:14, 68:5, 68:12, 68:13, 87:4, 87:9, 101:6
**bruise** [6] - 75:2, 82:3, 82:8, 90:9, 90:13, 109:14
**BSN** [1] - 14:10
**building** [16] - 24:14, 25:2, 25:7, 31:6, 31:14, 117:16, 118:6, 118:7, 118:9, 118:10, 118:14, 118:23, 118:24, 120:18
**buildings** [1] - 24:16
**business** [4] - 5:5, 67:14, 83:21, 84:5
**buzz** [1] - 119:25
**buzzed** [3] - 119:17, 119:19, 119:21
**BY** [5] - 2:6, 2:9, 2:12, 4:13, 122:2

## C

**cameras** [2] - 120:15, 120:18
**cannot** [3] - 9:11, 55:9, 62:14
**captain** [3] - 10:18, 11:2, 11:13
**care** [6] - 17:19, 22:3, 24:9, 35:3, 50:9, 68:10
**Carl** [1] - 29:8
**case** [6] - 6:6, 9:18, 9:20, 83:23, 122:7
**Case** [1] - 125:2
**category** [1] - 37:5
**caused** [2] - 90:13, 90:20
**Center** [26] - 10:3, 19:8, 19:25, 20:8, 20:16, 21:4, 21:19, 22:9, 22:12, 23:6, 27:9, 31:10, 33:13, 34:8, 35:21, 35:22, 49:8, 49:9, 49:16, 50:22, 52:24, 58:2, 59:8, 91:13, 101:4, 115:7
**CENTER** [1] - 1:7
**center** [2] - 22:25, 33:3
**certificate** [2] - 12:4, 12:17
**certification** [2] - 3:6, 17:23
**CERTIFICATION** [1] - 126:2
**certify** [3] - 123:7, 126:4, 126:9
**change** [3] - 50:18, 61:22, 89:4
**characterize** [2] - 70:19, 71:15
**characterized** [1] - 71:25
**characterizing** [1] - 71:4
**charge** [6] - 38:16, 39:9, 39:11, 39:14, 67:11, 100:25
**charges** [1] - 10:3
**chart** [4] - 68:20, 72:3, 72:7, 84:18
**check** [9] - 42:17, 42:21, 108:22, 108:24, 109:17, 109:25, 114:9, 114:24, 115:8
**checked** [5] - 70:14, 71:8, 108:24, 112:5, 115:19
**checking** [3] - 113:20, 114:18, 115:14
**chest** [3] - 37:6, 71:18, 81:8
**chronic** [4] - 17:11, 21:22, 22:3, 24:9
**circled** [1] - 79:17
**circumstances** [1] - 80:19
**civil** [1] - 9:21
**claimed** [2] - 43:13, 45:9
**claims** [1] - 111:4
**clarification** [1] - 106:3
**clarified** [1] - 87:12
**clarify** [1] - 88:4
**classified** [2] - 36:18, 37:10
**clear** [2] - 61:10, 122:11
**clearly** [1] - 6:20
**click** [3] - 114:9, 114:24, 115:8
**clicking** [3] - 114:6, 114:8, 116:7
**clinical** [4] - 80:2, 81:17, 82:14, 98:19
**collects** [1] - 44:16
**College** [8] - 12:2, 12:4, 13:23, 14:2, 14:4, 14:5, 14:10, 14:12
**colors** [1] - 76:7
**commission** [1] - 11:17
**comparison** [1] - 86:18
**complain** [3] - 80:19, 81:8, 81:9
**complained** [5] - 65:5, 74:15, 81:25, 82:2, 82:3
**complains** [1] - 114:10
**complaint** [13] - 46:19, 47:17, 49:2, 50:16, 80:4, 80:8, 80:12, 81:6, 81:7, 84:6, 114:25, 115:21, 116:9
**complaints** [11] - 50:23, 51:5, 51:8, 52:8, 52:18, 53:3, 59:11, 71:17, 74:11, 81:3, 81:12
**complete** [2] - 107:17, 123:11
**completion** [1] - 104:10
**computer** [3] - 35:4, 35:13, 35:16
**conditions** [2] - 17:12, 24:11
**conduct** [2] - 42:12, 48:6
**Conklin** [1] - 2:5
**connection** [1] - 4:16
**connects** [1] - 118:9
**consider** [3] - 110:19, 110:22, 112:11

**considered** [1] - 38:21
**consistent** [13] - 96:17, 108:22, 109:24, 110:8, 110:12, 110:13, 110:16, 110:21, 111:2, 111:7, 113:19, 113:24, 116:5
**contained** [2] - 67:21, 84:10
**context** [1] - 29:15
**contract** [1] - 21:6
**conversations** [1] - 26:7
**convicted** [1] - 10:9
**copy** [5] - 5:9, 76:9, 76:12, 84:17, 84:18
**core** [7] - 24:16, 25:17, 31:5, 31:7, 31:12, 31:14, 118:8
**corner** [2] - 66:8, 86:3
**CORPORAL** [1] - 1:8
**Corporal** [2] - 25:24, 26:10
**correct** [13] - 8:21, 47:22, 61:6, 92:14, 98:15, 99:13, 99:18, 99:25, 103:25, 104:2, 122:13, 123:11, 123:13
**Correction** [7] - 26:17, 26:20, 26:23, 27:2, 27:18, 27:21, 28:4
**correction** [18] - 6:7, 8:14, 10:5, 22:14, 27:9, 33:3, 45:10, 49:4, 50:24, 58:4, 59:12, 87:8, 88:19, 110:4, 110:10, 110:19, 111:5, 112:18
**correctional** [5] - 20:5, 22:20, 43:19, 52:10, 88:9
**CORRECTIONAL** [1] - 1:7
**Correctional** [11] - 10:3, 22:9, 27:8, 31:10, 34:7, 35:22, 49:8, 52:24, 57:25, 59:8, 77:13
**corrections** [6] - 32:11, 37:21, 40:11, 44:25, 105:10, 107:4
**CORRECTIONS** [1] - 125:5
**correlates** [1] - 102:13
**COs** [1] - 87:4
**could've** [9] - 59:25, 86:21, 87:2, 87:3, 87:4, 87:7, 87:9, 87:20, 87:21
**counsel** [7] - 3:4, 60:18, 63:12, 64:3, 91:20, 92:22, 121:14
**Counselor** [2] - 55:4, 56:3
**counselor** [2] - 61:17, 99:14
**County** [29] - 6:7, 10:2, 22:8, 22:11, 27:8, 31:9, 34:7, 35:20, 35:22, 49:8, 49:16, 52:24, 64:2, 64:14, 76:21, 77:12, 83:20, 85:4, 89:17, 90:8, 90:25, 91:15, 92:8, 92:21, 102:6, 116:24, 125:2
**COUNTY** [6] - 1:7, 1:7, 1:9, 2:7, 123:5
**county** [3] - 21:6, 35:25, 122:5
**course** [3] - 67:13, 83:21, 84:5
**court** [5] - 3:16, 6:11, 6:20, 7:23, 105:17
**COURT** [3] - 1:2, 4:6, 4:9
**covering** [1] - 122:8
**create** [1] - 84:4
**created** [7] - 45:11, 45:22, 46:14, 92:4, 92:5, 101:9, 101:13
**credentials** [1] - 76:14
**crime** [1] - 10:10
**current** [3] - 21:18, 22:5, 24:4
**cut** [2] - 57:11, 57:13
**cutting** [1] - 58:21

## D

**Date** [1] - 125:3
**date** [66] - 6:8, 16:10, 66:25, 69:10, 69:12, 69:15, 69:19, 70:3, 70:6, 70:9, 72:13, 77:14, 77:16, 77:18, 82:23, 82:25, 83:3, 84:12, 85:10, 93:18, 93:21, 93:24, 96:3, 96:6, 96:7, 96:10, 97:18, 97:20, 97:23, 98:8, 98:11, 98:13, 98:21, 98:24, 99:10, 99:16, 99:21, 99:24, 100:3, 100:4, 100:6, 100:7, 100:10, 100:13, 100:17, 100:21, 100:22, 101:18, 102:8, 102:10, 102:12, 102:13, 102:24, 103:8, 103:9, 103:10, 103:13, 103:22, 104:9, 105:13, 105:21, 105:22, 106:7, 106:18
**dated** [3] - 64:12, 67:4, 85:5
**dates** [1] - 23:18
**defendant** [1] - 9:21
**Defendants** [2] - 1:10, 2:7
**define** [2] - 58:25, 59:3
**definitively** [1] - 47:20
**degree** [17] - 12:2, 12:16, 12:20, 12:23, 13:2, 13:9, 13:17, 13:18, 13:24, 14:3, 14:4, 14:6, 14:9, 14:11, 14:12, 17:9, 17:25
**degrees** [1] - 13:5
**Denise** [1] - 1:24
**DENISE** [2] - 126:3, 126:20
**DEPARTMENT** [1] - 1:7
**department** [6] - 20:4, 49:5, 75:11, 75:19, 83:18, 86:12
**Department** [2] - 76:22, 92:8
**departments** [1] - 22:14
**deposed** [1] - 9:15
**Deposition** [1] - 125:3
**deposition** [22] - 3:6, 3:13, 4:22, 5:23, 6:10, 6:22, 8:10, 30:20, 32:5, 41:7, 56:6, 61:16, 62:12, 63:13, 64:4, 77:4, 91:21, 91:23, 92:23, 93:9, 122:8, 123:9
**deputy** [1] - 122:5
**describe** [3] - 10:17, 11:24, 52:23
**description** [6] - 108:22, 110:9, 110:17, 111:8, 113:19, 116:6
**Description** [1] - 124:10
**details** [1] - 94:8
**Detective** [1] - 28:7
**detective** [1] - 28:9
**determine** [2] - 109:18, 110:20
**determining** [1] - 111:6
**detox** [1] - 15:11
**diabetes** [1] - 24:10
**diagnosed** [2] - 80:6, 80:7
**diagnosis** [5] - 17:10, 80:5, 80:11, 112:10, 112:19
**difference** [2] - 17:6, 105:21
**different** [9] - 10:24, 21:25, 24:15, 57:22, 57:23, 60:7, 60:16, 96:6, 107:4
**director** [8] - 30:5, 33:20, 47:9, 55:3, 78:10, 78:13, 88:20, 88:25
**disagree** [1] - 5:25
**discharge** [1] - 11:20
**discoloration** [1] - 91:6
**discrepancy** [1] - 105:12
**discuss** [3] - 24:4, 30:22, 48:21
**discussed** [1] - 20:18
**disease** [2] - 20:4, 22:18
**diseases** [3] - 33:15, 33:19, 34:4
**disposition** [2] - 70:13, 101:21
**distribute** [1] - 88:11
**distributed** [1] - 35:21
**distributing** [1] - 43:22
**distribution** [1] - 75:25
**DISTRICT** [2] - 1:2, 1:2
**divided** [2] - 25:9, 31:23
**division** [1] - 18:16
**DNA** [1] - 47:3
**doctor** [2] - 38:2, 78:8
**doctors** [2] - 29:4, 29:6
**document** [60] - 41:10, 41:11, 63:25, 64:15, 64:17, 64:22, 64:24, 65:2, 65:4, 65:9, 65:17, 65:22, 66:6, 67:13, 67:19, 68:2, 68:4, 68:18, 69:20, 72:9, 75:17, 76:2, 76:22, 76:25, 77:6, 77:9, 83:12, 83:20, 84:11, 84:15, 85:7, 87:16, 92:7, 92:11, 92:18, 93:3, 93:8, 93:11, 93:22, 94:10, 94:13, 95:24, 97:17, 97:21, 98:24, 99:4, 101:12, 102:2, 102:7, 102:25, 103:15, 103:22, 104:3, 104:23, 104:25, 107:14, 112:2, 112:6, 115:10, 117:5
**documentation** [1] - 105:8
**documents** [18] - 32:4, 32:7, 32:20, 45:11, 45:22, 45:23, 46:14, 77:3, 80:23, 81:2, 86:18, 91:23, 101:8, 101:14, 105:20, 106:11, 113:5, 120:24
**DOES** [1] - 1:9
**done** [4] - 52:20, 68:13, 72:4, 96:24
**door** [5] - 117:17, 119:8, 119:18, 119:25
**doors** [4] - 118:17, 118:18, 118:19
**doorway** [1] - 118:15
**dorm** [2] - 25:8, 43:7
**doubt** [1] - 112:4
**down** [22] - 6:12, 6:13, 37:23, 38:4, 38:5, 40:10, 45:6, 45:13, 45:14, 62:8, 68:12, 68:13, 87:3, 87:4, 87:9, 94:21, 101:6, 108:9, 118:13, 119:3, 119:4, 120:3
**downstairs** [1] - 25:16
**Dr** [3] - 28:24, 29:8, 78:7
**drug** [1] - 82:19
**dual** [1] - 115:25
**duly** [2] - 4:3, 126:6
**during** [4] - 8:10, 42:17, 43:8, 74:17
**duties** [3] - 38:18, 39:13, 78:12
**duty** [3] - 39:4, 39:6, 39:7

## E

**e-mail** [3] - 33:22,

33:23, 88:22
**easily** [1] - 62:8
**East** [1] - 4:12
**EASTERN** [1] - 1:2
**ecchymosis** [2] - 75:3, 82:4
**education** [2] - 12:6, 13:6
**educational** [2] - 10:13, 11:23
**EDWARD** [1] - 2:10
**effect** [1] - 3:15
**either** [2] - 50:17, 126:10
**emergencies** [6] - 21:23, 22:3, 24:8, 39:18, 44:25, 83:24
**Emergency** [1] - 76:22
**emergency** [44] - 14:17, 14:18, 14:21, 15:5, 16:6, 37:15, 41:7, 41:13, 44:18, 44:23, 45:4, 46:6, 46:9, 46:11, 54:25, 68:11, 69:22, 70:21, 70:25, 71:16, 75:11, 75:19, 82:5, 83:17, 84:7, 84:17, 86:12, 96:8, 96:10, 96:13, 97:19, 98:3, 98:18, 101:10, 101:13, 102:19, 102:23, 103:19, 105:13, 105:22, 106:7, 107:19, 108:2, 120:23
**emergent** [5] - 36:13, 37:19, 38:7, 68:23, 71:20
**employed** [1] - 15:7
**employee** [2] - 95:16, 100:9
**employees** [1] - 23:5
**employment** [6] - 15:6, 15:14, 16:16, 20:19, 21:18, 23:21
**enter** [1] - 10:20
**entities** [1] - 76:11
**episodic** [1] - 21:22
**ERRATA** [1] - 125:2
**errors** [1] - 8:21
**ESQ** [3] - 2:6, 2:9, 2:12
**estimate** [1] - 51:12
**et** [1] - 125:2
**evaluate** [2] - 48:16, 56:14
**evaluation** [8] - 45:18, 45:20, 48:6, 54:25, 75:10, 80:18, 82:5,
109:22
**Evelyn** [18] - 4:8, 4:15, 4:19, 5:3, 30:15, 33:8, 59:6, 60:9, 63:16, 63:24, 64:22, 76:24, 85:3, 89:9, 90:3, 91:19, 91:22, 125:4
**EVELYN** [3] - 1:20, 123:7, 123:16
**evelyn** [1] - 93:4
**events** [1] - 68:3
**exact** [1] - 85:20
**exactly** [2] - 50:10, 56:19
**exam** [1] - 109:25
**Examination** [2] - 124:5, 124:6
**EXAMINATION** [3] - 1:19, 4:13, 122:2
**examine** [1] - 122:12
**examined** [1] - 4:4
**examiner** [1] - 48:14
**example** [1] - 40:8
**except** [1] - 3:9
**exceptions** [2] - 56:2, 80:17
**Excuse** [1] - 117:20
**Exhibit** [23] - 64:7, 64:8, 76:20, 89:8, 89:16, 89:19, 91:12, 91:16, 92:19, 92:24, 99:10, 102:5, 103:7, 104:23, 113:16, 116:23, 116:24, 117:2, 124:11, 124:12, 124:13, 124:14, 124:16
**EXHIBITS** [1] - 124:8
**experience** [13] - 10:15, 43:11, 53:20, 57:24, 59:7, 70:20, 71:14, 80:11, 85:14, 88:25, 90:12, 91:9, 112:9
**expert** [6] - 53:11, 53:17, 54:9, 54:11, 54:13, 58:13
**explained** [2] - 105:25, 106:21
**exude** [1] - 75:4
**eye** [1] - 90:9

## F

**face** [14] - 26:4, 74:17, 75:2, 81:12, 82:4, 82:8, 90:21, 109:15, 110:3, 110:9, 110:18, 111:2,
112:17
**Facility** [1] - 77:13
**facility** [9] - 20:6, 22:20, 24:12, 42:3, 42:5, 79:17, 79:21, 88:10, 89:6
**fact** [7] - 81:10, 110:20, 110:22, 111:4, 111:9, 111:10, 111:11
**facts** [2] - 112:11, 112:18
**factual** [1] - 53:11
**fair** [2] - 108:12, 113:25
**fall** [2] - 37:4, 56:24
**familiar** [1] - 24:20
**family** [6] - 12:18, 13:3, 13:8, 17:19, 17:21, 19:16
**Family** [1] - 13:4
**far** [4] - 49:7, 116:14, 118:21, 118:25
**Far** [1] - 14:18
**Farmingdale** [1] - 2:5
**Federal** [1] - 1:21
**FEDERAL** [1] - 3:2
**Field** [1] - 28:4
**field** [1] - 12:5
**fight** [1] - 40:9
**file** [1] - 35:13
**files** [1] - 47:13
**filing** [1] - 3:5
**fill** [30] - 39:24, 40:12, 40:13, 40:15, 41:3, 41:16, 41:20, 41:24, 44:6, 64:24, 68:2, 72:17, 75:16, 77:6, 85:15, 85:20, 85:22, 93:11, 100:5, 100:6, 100:19, 100:20, 102:18, 104:24, 107:13, 107:14, 107:17, 107:18, 107:20, 108:14
**filled** [26] - 40:22, 46:7, 54:23, 65:11, 65:14, 67:25, 68:4, 69:20, 69:21, 72:9, 78:4, 85:9, 93:14, 94:9, 95:24, 97:2, 100:3, 100:9, 100:23, 101:17, 101:19, 102:10, 104:8, 104:14, 107:12, 108:15
**filling** [3] - 39:21, 115:9, 122:6
**fills** [4] - 44:14, 100:17, 100:19,
101:15
**fine** [1] - 54:18
**finger** [2] - 52:11, 57:17
**finish** [3] - 7:19, 57:11, 97:14
**finished** [1] - 7:23
**first** [22] - 4:3, 9:3, 10:14, 10:20, 12:20, 13:2, 13:18, 14:8, 17:24, 18:12, 18:19, 21:3, 23:12, 23:14, 25:4, 33:14, 34:17, 38:10, 38:12, 66:10, 66:14, 67:9
**firstly** [1] - 6:3
**fist** [1] - 110:13
**five** [16] - 51:7, 51:8, 51:13, 51:16, 51:17, 51:18, 51:24, 52:2, 52:8, 53:2, 56:16, 58:3, 59:10, 84:21, 118:25, 119:2
**floor** [14] - 24:13, 31:3, 31:5, 117:10, 117:14, 117:15, 117:25, 118:6, 118:7, 118:24, 120:8, 120:9, 120:13, 120:15
**follow** [1] - 122:17
**follow-up** [1] - 122:17
**following** [4] - 13:17, 15:6, 15:14, 16:15
**follows** [1] - 4:5
**FOR** [2] - 125:2, 125:6
**force** [4] - 3:14, 48:24, 107:19, 108:3
**form** [47] - 3:9, 35:2, 35:3, 40:12, 41:13, 41:16, 46:2, 46:7, 46:9, 46:12, 54:24, 60:12, 60:13, 60:20, 60:24, 60:25, 61:5, 61:20, 62:2, 62:6, 62:16, 62:20, 72:13, 76:5, 94:22, 100:4, 100:6, 101:10, 101:11, 101:13, 102:20, 102:23, 104:8, 104:10, 105:5, 105:13, 105:14, 105:22, 105:23, 106:7, 106:13, 106:15, 108:18, 114:20, 120:22, 120:23
**Form** [1] - 124:11
**format** [1] - 6:14
**forms** [5] - 35:2, 36:6,
40:14, 44:13, 68:17
**formulate** [2] - 61:14, 61:18
**forth** [1] - 126:6
**four** [5] - 18:23, 19:7, 19:23, 25:9, 51:22
**frame** [4] - 53:4, 57:21, 57:22, 60:7
**framed** [1] - 57:4
**Francis** [4] - 14:20, 16:2, 16:15, 16:17
**free** [1] - 5:25
**front** [2] - 64:19, 98:6
**full** [2] - 7:24
**FURTHER** [2] - 3:8, 3:12

## G

**G-A-N-D-L-E-Y** [1] - 30:14
**Gandley** [3] - 30:7, 30:9, 30:13
**gap** [1] - 18:18
**gate** [6] - 120:4, 120:6, 120:7, 120:10, 120:11, 120:12
**gates** [1] - 119:14
**gears** [1] - 25:19
**general** [4] - 17:17, 17:20, 39:16, 44:24
**Generally** [1] - 94:21
**generally** [10] - 24:25, 25:4, 26:12, 37:8, 43:5, 44:11, 45:17, 72:6, 80:15, 94:17
**given** [10] - 36:11, 38:15, 49:18, 71:22, 72:7, 86:22, 100:15, 101:16, 123:13, 126:8
**gonna** [3] - 41:12, 61:21, 119:25
**governed** [1] - 56:6
**graduate** [3] - 12:2, 12:8, 12:10
**Greenlawn** [1] - 2:11
**guarantee** [1] - 56:11
**guard** [1] - 119:14
**GUERCIO** [2] - 2:4
**guess** [8] - 7:14, 7:16, 25:5, 31:25, 50:15, 93:25, 119:9

## H

**half** [9] - 15:2, 15:9, 15:24, 16:9, 18:24, 19:4, 19:7, 19:23, 23:16

**hall** [3] - 40:10, 119:3, 119:5
**hallway** [2] - 118:12, 118:14
**hand** [1] - 126:15
**handbook** [1] - 49:16
**handing** [1] - 38:25
**handles** [3] - 39:17, 87:22, 87:24
**handling** [1] - 36:5
**handwriting** [2] - 93:19, 106:24
**HCP** [1] - 78:19
**head** [1] - 6:17
**health** [8] - 12:7, 12:24, 13:3, 13:4, 13:24, 14:3, 30:6, 76:9
**healthcare** [5] - 38:22, 76:15, 76:16, 78:20, 101:22
**Healthcare** [7] - 16:18, 16:20, 18:9, 18:10, 18:19, 20:9, 20:11
**hear** [3] - 4:18, 58:3, 59:10
**heard** [14] - 7:9, 25:21, 25:23, 25:25, 40:4, 51:9, 51:13, 51:17, 51:24, 52:9, 52:22, 53:3, 54:19, 56:15
**hearing** [2] - 10:2, 63:8
**held** [1] - 1:22
**help** [1] - 104:24
**helpful** [1] - 57:10
**Hempstead** [2] - 4:11, 5:6
**Henig** [1] - 78:7
**Henry** [1] - 29:9
**Hep** [1] - 33:18
**HEREBY** [1] - 3:3
**hereby** [3] - 3:7, 123:7, 126:4
**herein** [2] - 1:20, 126:5
**hereto** [1] - 3:5
**hereunto** [1] - 126:14
**high** [1] - 24:10
**Hill** [3] - 14:16, 14:24, 15:7
**Hillside** [3] - 5:11, 5:14, 5:17
**hold** [1] - 10:25
**home** [2] - 16:21, 18:13
**honorable** [1] - 11:19
**hospital** [21] - 21:8, 22:18, 22:24, 32:9, 33:15, 41:12, 42:10, 45:18, 45:19, 46:5, 46:18, 49:11, 75:10, 79:4, 79:7, 79:23, 81:20, 88:22, 92:6, 106:16, 109:22
**Hospital** [4] - 14:19, 15:16, 18:23, 19:12
**hospital's** [1] - 79:11
**hours** [8] - 31:21, 31:22, 42:22, 45:19, 46:19, 83:8, 83:15, 103:17
**house** [2] - 18:16, 25:4
**housed** [5] - 25:2, 25:5, 25:8, 25:12, 42:14
**housing** [4] - 117:19, 118:15, 118:20, 118:23
**huhs** [1] - 6:17
**Hunter** [7] - 11:25, 13:20, 13:21, 13:22, 13:23, 14:3, 14:10
**Hunters** [1] - 14:8
**Hussey** [1] - 26:24

**I**

**ICU** [3] - 14:20, 15:17, 15:18
**ID** [1] - 69:9
**idea** [6] - 67:7, 85:12, 87:13, 87:18, 120:16, 120:20
**identification** [5] - 64:10, 89:21, 91:18, 93:2, 117:4
**identity** [1] - 111:16
**illnesses** [1] - 21:22
**immediately** [3] - 36:25, 37:3, 37:11
**improper** [5] - 54:5, 54:7, 54:14, 62:6
**IN** [1] - 126:14
**inaccurate** [1] - 8:12
**incident** [11] - 6:9, 32:10, 32:13, 32:22, 59:18, 63:17, 80:25, 84:12, 86:25, 112:3, 113:3
**incidents** [1] - 18:11
**incoming** [1] - 25:12
**incomplete** [1] - 8:12
**independent** [3] - 32:12, 80:24, 113:2
**INDEX** [2] - 124:2, 124:3
**indicate** [6] - 65:4, 69:11, 73:24, 82:24, 102:24, 107:3
**indicated** [8] - 72:13, 73:12, 97:20, 98:17, 102:19, 105:23, 106:5, 106:6
**indicates** [2] - 86:13, 107:5
**indicating** [4] - 66:12, 66:19, 100:14, 106:16
**indication** [1] - 85:8
**infectious** [5] - 20:4, 22:18, 33:15, 33:18, 34:4
**infirmary** [2] - 23:3, 31:13
**information** [10] - 45:9, 61:25, 67:21, 68:7, 80:2, 81:18, 82:14, 84:10, 98:19, 109:4
**informed** [1] - 47:8
**injured** [1] - 40:9
**injuries** [13] - 108:21, 109:5, 109:23, 110:7, 110:11, 110:16, 111:7, 113:18, 113:24, 114:2, 114:4, 115:22, 116:5
**Injury** [1] - 124:14
**injury** [51] - 37:7, 40:3, 40:8, 40:12, 40:19, 40:22, 41:4, 43:24, 46:2, 65:6, 87:2, 92:20, 94:5, 96:3, 96:19, 96:23, 97:18, 97:23, 98:2, 98:20, 98:24, 99:5, 99:8, 99:11, 99:17, 99:24, 100:5, 100:10, 100:14, 100:17, 100:22, 101:11, 101:17, 101:18, 103:6, 104:15, 105:14, 105:23, 106:15, 106:19, 107:6, 107:10, 108:14, 110:23, 110:25, 112:12, 114:19, 115:15, 116:9, 120:22
**inmate** [69] - 32:23, 34:12, 40:3, 40:7, 40:12, 40:18, 40:22, 41:4, 42:3, 42:4, 42:25, 43:13, 43:23, 44:6, 44:14, 44:20, 45:3, 45:6, 45:9, 46:2, 46:4, 46:18, 47:18, 48:7, 48:17, 48:23, 49:3, 49:16, 49:23, 50:6, 50:23, 52:10, 54:20, 58:3, 59:11, 65:12, 69:17, 76:9, 76:12, 79:2, 84:6, 84:8, 85:14, 88:18, 88:21, 92:20, 96:20, 96:23, 99:5, 99:9, 101:11, 101:15, 101:17, 103:5, 104:15, 105:14, 105:23, 106:15, 109:6, 112:16, 114:10, 114:19, 114:25, 115:11, 115:15, 115:17, 120:22, 122:12
**Inmate** [1] - 124:14
**inmate's** [7] - 108:22, 109:5, 110:8, 110:17, 111:8, 113:19, 116:6
**inmates** [11] - 22:8, 25:11, 25:12, 33:18, 38:25, 42:13, 42:17, 42:21, 43:8, 52:2, 52:16
**inpatient** [1] - 19:13
**inquiry** [3] - 54:6, 54:15, 55:20
**inside** [1] - 23:3
**instance** [2] - 42:20, 44:2
**instances** [3] - 43:21, 54:20, 56:16
**institution** [5] - 21:7, 21:10, 21:11, 21:14, 77:10
**instruct** [4] - 47:10, 60:21, 62:14, 63:9
**instructed** [3] - 114:8, 114:11, 115:8
**instructing** [3] - 56:8, 61:4, 62:19
**intake** [2] - 25:15, 35:2
**intakes** [2] - 24:11, 25:8
**intensive** [1] - 14:20
**interested** [2] - 33:21, 126:12
**Investigator** [1] - 27:19
**involve** [1] - 52:9
**involved** [4] - 6:8, 50:8, 59:25, 60:2
**involvement** [1] - 60:17
**involving** [3] - 32:13, 32:23, 63:17
**irrelevant** [1] - 53:14
**IS** [3] - 3:3, 3:8, 3:12
**issue** [2] - 50:7, 50:17
**IT** [3] - 3:3, 3:8, 3:12
**items** [1] - 35:10
**itself** [2] - 58:18, 68:18

**J**

**jail** [24] - 21:5, 22:24, 23:2, 23:4, 23:9, 24:2, 24:6, 27:11, 28:16, 28:18, 30:6, 33:3, 33:12, 33:16, 33:17, 36:2, 42:6, 43:14, 49:10, 65:19, 67:14, 83:22, 100:10, 117:10
**JAMES** [1] - 1:8
**James** [2] - 25:24, 26:21
**JANE** [1] - 1:9
**Janice** [1] - 28:12
**Jay** [1] - 29:19
**Jeffrey** [12] - 6:5, 30:23, 32:14, 32:17, 32:24, 59:19, 63:18, 65:5, 72:12, 77:21, 83:14, 86:13
**JEFFREY** [1] - 1:4
**job** [6] - 15:10, 16:11, 20:2, 24:5, 33:5, 33:24
**jobs** [2] - 17:3, 20:23
**JOHN** [3] - 1:8, 1:9, 2:6
**John** [1] - 6:3
**John's** [3] - 14:17, 15:8, 15:15
**johnson** [1] - 125:2
**Johnson** [23] - 6:5, 30:23, 32:14, 32:18, 32:24, 59:19, 63:18, 65:5, 72:12, 77:22, 83:14, 84:13, 85:9, 86:14, 86:19, 98:14, 102:14, 102:25, 113:21, 114:2, 115:22, 115:23, 116:10
**JOHNSON** [1] - 1:4
**Jr** [6] - 32:14, 32:18, 32:24, 63:18, 72:13, 86:14
**JR** [1] - 1:4
**July** [5] - 1:14, 23:22, 123:10, 125:3, 126:15

## K

**keep** [2] - 6:15, 6:19
**kind** [1] - 37:4
**kit** [3] - 47:2, 80:18, 116:12
**kits** [2] - 116:14, 116:16
**knowing** [1] - 110:6
**knowledge** [5] - 50:7, 53:18, 67:20, 71:23, 108:7
**known** [1] - 82:19

## L

**labs** [1] - 24:8
**laid** [3] - 21:4, 21:7, 34:20
**last** [3] - 30:12, 51:13, 51:18
**LAW** [1] - 2:10
**law** [2] - 62:13
**lawsuit** [1] - 9:21
**leaves** [1] - 42:4
**leaving** [2] - 42:3, 42:5
**Lecturing** [1] - 61:12
**left** [9] - 16:11, 20:7, 20:11, 21:3, 69:14, 75:2, 75:3, 82:4, 90:9
**Lenox** [3] - 14:16, 14:24, 15:7
**less** [1] - 119:5
**license** [2] - 18:4, 18:6
**licensed** [1] - 88:6
**lieutenant** [6] - 11:2, 11:4, 11:5, 11:6, 11:7, 11:10
**Lieutenant** [4] - 27:22, 95:2, 97:7, 97:20
**limited** [1] - 47:2
**line** [4] - 77:10, 82:21, 106:12, 108:6
**LINE** [1] - 124:19
**lines** [1] - 72:17
**listed** [1] - 78:22
**listen** [1] - 61:9
**LLP** [1] - 2:4
**LN** [1] - 125:6
**lobby** [2] - 120:8, 120:12
**located** [4] - 24:2, 24:13, 49:10, 117:18
**location** [4] - 22:23, 23:7, 24:18, 31:16
**long-term** [1] - 24:10
**Longo** [1] - 30:4
**look** [7] - 65:21, 66:7, 68:24, 69:13, 93:17, 100:8, 106:11
**looked** [1] - 108:9
**Looking** [1] - 85:7
**looking** [11] - 58:12, 70:18, 83:12, 83:19, 89:13, 90:25, 98:23, 99:8, 104:22, 112:2, 120:24
**looks** [2] - 37:20, 95:16
**Lori** [1] - 29:24
**LPN** [4] - 66:16, 87:20, 87:21, 88:5
**LPN's** [1] - 88:7
**LPNs** [2] - 39:8, 39:17

## M

**mail** [3] - 33:22, 33:23, 88:22
**male** [1] - 81:25
**Malloy** [10] - 12:3, 12:4, 12:13, 12:15, 12:17, 12:19, 13:18, 14:2, 14:5, 14:12
**managing** [1] - 24:9
**MANTEKAS** [2] - 126:3, 126:20
**Mantekas** [1] - 1:24
**map** [1] - 117:9
**Map** [1] - 124:16
**mark** [3] - 54:16, 63:3, 91:11
**marked** [11] - 64:6, 64:9, 89:8, 89:15, 89:20, 91:17, 92:18, 92:25, 99:9, 116:23, 117:3
**marriage** [1] - 126:10
**Mascera** [1] - 28:9
**master** [2] - 12:3, 12:17
**master's** [3] - 13:3, 17:9, 18:2
**materials** [1] - 47:11
**matter** [1] - 126:13
**maxilla** [1] - 75:3
**McCaffrey** [2] - 25:24, 26:11
**MCCAFFREY** [1] - 1:8
**McLaughlin** [1] - 122:7
**McMillan** [4] - 27:22, 95:2, 97:8, 97:21
**Meadow** [1] - 4:12
**mean** [28] - 22:21, 37:25, 38:4, 56:4, 65:18, 70:15, 72:11, 73:3, 74:6, 74:8, 74:21, 75:6, 75:14, 76:3, 76:6, 78:2, 78:19, 78:24, 79:18, 81:18, 87:25, 93:22, 93:23, 97:6, 97:7, 106:10, 107:23, 108:10
**means** [10] - 37:11, 48:12, 70:4, 72:19, 76:16, 79:19, 88:5, 94:3, 94:6, 98:19
**Medical** [16] - 19:8, 19:24, 20:8, 20:15, 21:4, 21:17, 21:19, 22:12, 23:6, 33:13, 35:21, 49:9, 50:21, 91:13, 101:4, 115:7
**medical** [89] - 22:25, 25:17 25:18, 26:14, 27:6, 27:7, 27:10, 27:12, 27:14, 27:25, 28:15, 28:18, 29:3, 29:5, 29:12, 29:16, 29:21, 30:2, 30:18, 30:25, 31:2, 31:4, 31:8, 31:11, 31:12, 33:20, 37:12, 38:6, 43:22, 44:3, 44:9, 44:20, 45:12, 46:15, 47:9, 47:16, 48:5, 48:22, 50:7, 50:21, 54:9, 54:11, 54:13, 55:3, 65:15, 65:18, 65:19, 67:14, 67:20, 68:7, 68:16, 70:2, 76:8, 76:17, 78:5, 78:8, 78:10, 78:13, 78:16, 83:21, 87:3, 88:20, 88:25, 92:4, 95:8, 95:13, 95:20, 97:2, 100:18, 100:22, 101:3, 101:19, 103:10, 103:11, 103:13, 103:14, 103:16, 103:20, 115:6, 116:17, 117:14, 117:18, 117:24, 118:4, 118:5, 118:22, 120:18
**medication** [2] - 43:5, 43:22
**medications** [3] - 35:5, 38:14, 38:25
**meds** [1] - 88:11
**mental** [2] - 30:5, 76:8
**mentioned** [14] - 1:23, 22:12, 30:16, 31:2, 31:15, 35:11, 39:10, 40:21, 46:17, 59:20, 72:8, 87:7, 113:17, 117:13
**met** [2] - 26:2, 83:13
**middle** [3] - 66:20, 66:22, 108:6
**might** [7] - 52:7, 55:17, 57:16, 72:2, 84:20, 96:9, 121:4
**military** [1] - 10:15
**mind** [1] - 61:22
**mine** [1] - 17:20
**Mineola** [1] - 2:8
**minutes** [8] - 42:21, 42:22, 84:21, 119:2, 119:6, 119:9
**Monsore** [1] - 28:24
**months** [1] - 18:14
**morning** [1] - 31:25
**most** [1] - 6:2
**MR** [167] - 4:14, 4:15, 4:21, 5:4, 5:6, 5:8, 5:10, 5:13, 5:16, 5:19, 5:20, 5:21, 6:25, 7:7, 7:12, 7:18, 8:3, 8:9, 8:25, 9:7, 13:20, 21:11, 21:15, 21:16, 22:15, 29:15, 29:16, 30:11, 30:13, 33:6, 35:23, 36:21, 40:25, 42:7, 43:3, 44:21, 46:23, 48:8, 49:13, 50:12, 50:25, 53:6, 53:8, 53:10, 53:16, 53:21, 53:25, 54:3, 54:7, 54:10, 54:16, 54:18, 55:4, 55:10, 55:12, 55:14, 55:21, 55:23, 55:25, 56:3, 56:4, 56:10, 56:18, 56:19, 56:22, 57:2, 57:6, 57:9, 58:6, 58:11, 58:14, 58:17, 58:20, 58:22, 58:23, 59:2, 59:13, 60:4, 60:11, 60:18, 60:23, 61:2, 61:6, 61:7, 61:9, 61:15, 61:17, 62:9, 62:21, 63:3, 63:5, 63:7, 63:10, 63:12, 63:15, 63:19, 64:5, 64:18, 64:20, 66:11, 66:19, 67:22, 68:14, 70:22, 71:10, 78:14, 80:14, 84:20, 84:23, 85:17, 86:8, 86:9, 89:12, 89:14, 90:14, 90:22, 91:11, 92:13, 92:15, 92:16, 94:11, 94:14, 97:14, 97:22, 98:5, 98:9, 99:3, 99:6, 99:7, 99:14, 99:19, 104:18, 105:15, 105:24, 106:2, 106:4, 106:9, 106:10, 106:17, 106:20, 106:23, 107:2, 107:7, 109:10, 111:20, 112:13, 112:20, 113:9, 113:12, 115:2, 115:24, 116:18, 117:22, 118:3, 119:13, 121:11, 121:14, 121:16, 121:18, 121:22, 121:24, 122:3, 122:4, 122:15, 122:17, 122:18, 122:19
**multipart** [2] - 60:5, 62:3
**must** [5] - 9:3, 49:22, 114:9, 114:12, 115:8

## N

**Name** [1] - 125:2
**name** [16] - 4:7, 4:25, 6:3, 25:23, 25:25, 26:15, 26:19, 29:19, 30:12, 69:8, 78:5, 78:18, 78:22, 79:6, 79:10, 122:4
**named** [1] - 87:15
**names** [3] - 25:21, 30:17
**NASSAU** [5] - 1:7, 1:7, 1:9, 2:7
**Nassau** [47] - 6:6, 10:2, 19:8, 19:24, 20:7, 20:15, 21:4, 21:19, 22:8, 22:11, 23:6, 27:8, 31:9, 33:13, 34:7, 35:20, 35:22, 49:7, 49:8, 49:15, 50:21, 52:23, 52:24, 57:25, 59:8, 63:25, 64:2, 64:14, 76:21, 77:12, 83:19, 85:4, 89:16, 89:17, 90:8, 90:25, 91:13, 91:14, 92:8, 92:21, 101:3, 102:6, 102:24, 115:7, 116:24, 125:2
**Nasty** [1] - 52:23
**nature** [2] - 107:9, 108:14
**NCCF** [1] - 77:12
**near** [1] - 68:2

**neck** [1] - 91:3
**need** [7] - 6:13, 8:25, 36:25, 37:3, 37:11, 63:13, 109:18
**needs** [3] - 37:22, 70:16, 107:11
**never** [2] - 78:3, 116:16
**New** [8] - 1:25, 2:5, 2:8, 2:11, 4:4, 4:12, 123:21, 126:4
**new** [3] - 24:12, 25:7, 25:11
**NEW** [2] - 1:2, 123:4
**next** [11] - 16:16, 36:15, 36:16, 36:18, 68:20, 70:14, 70:17, 71:8, 72:3, 72:7
**Neysmith** [4] - 69:24, 71:3, 86:20, 87:15
**Neysmith's** [1] - 86:3
**night** [1] - 31:25
**nobody** [1] - 115:6
**non** [2] - 36:19, 36:23
**Non** [1] - 1:20
**Non-Party** [1] - 1:20
**non-urgent** [2] - 36:19, 36:23
**nonemergency** [2] - 71:5, 72:6
**nonemergent** [1] - 72:2
**normal** [5] - 59:15, 72:24, 73:7, 73:19, 85:14
**Notary** [4] - 1:24, 4:3, 123:21, 126:3
**NOTARY** [1] - 125:25
**notary** [1] - 3:14
**note** [1] - 107:18
**noted** [4] - 75:2, 75:3, 82:4, 122:20
**notes** [1] - 113:11
**nothing** [1] - 73:12
**notice** [1] - 65:22
**Notification** [1] - 76:23
**notification** [6] - 68:11, 69:22, 75:12, 75:19, 83:18, 86:12
**notified** [7] - 38:10, 43:17, 44:25, 88:21, 89:2, 89:3, 97:5
**notify** [2] - 44:3, 88:16
**NOW** [1] - 125:6
**NP** [7] - 14:5, 14:12, 16:24, 16:25, 17:13, 17:14, 18:15
**Number** [5] - 64:9, 89:20, 91:17, 92:25, 117:3
**number** [13] - 69:7, 69:9, 73:17, 77:25, 83:19, 85:4, 91:14, 92:21, 94:3, 94:5, 102:6, 102:23, 116:24
**nUMC** [1] - 79:8
**NUMC** [1] - 124:13
**nurse** [82] - 12:16, 12:18, 13:9, 13:11, 13:14, 14:15, 15:12, 15:20, 16:5, 16:22, 16:23, 17:2, 17:4, 17:5, 17:7, 17:8, 17:10, 17:15, 17:18, 17:20, 18:3, 18:21, 19:13, 19:16, 19:22, 20:3, 20:5, 20:20, 21:21, 22:13, 22:17, 24:5, 29:6, 33:12, 34:6, 36:11, 37:18, 38:2, 38:9, 38:13, 38:17, 38:19, 39:5, 39:10, 39:11, 39:14, 42:12, 42:17, 42:25, 43:7, 43:9, 43:11, 43:22, 44:3, 44:18, 45:2, 48:11, 48:14, 48:15, 48:21, 57:25, 59:7, 66:10, 66:15, 66:16, 67:8, 67:9, 67:11, 87:11, 87:15, 87:19, 88:6, 100:17, 100:23, 100:24, 100:25, 106:22, 112:9
**Nurse** [1] - 28:11
**nurses** [5] - 44:12, 66:6, 68:19, 87:8, 101:20
**nursing** [7] - 13:6, 14:11, 16:21, 18:13, 87:22, 87:24, 88:2

**O**

**o'clock** [1] - 86:6
**oath** [3] - 8:4, 8:6, 123:9
**object** [4] - 55:20, 56:5, 58:7, 60:5
**objecting** [2] - 60:13, 61:3
**objection** [32] - 22:15, 35:23, 36:21, 40:25, 43:3, 44:21, 46:23, 48:8, 50:12, 53:6, 55:5, 55:22, 56:11, 56:24, 58:11, 59:13, 60:20, 61:11, 62:16, 63:19, 67:22, 70:22, 71:10, 78:14, 80:14, 84:22, 85:17, 90:14, 90:22, 112:13, 112:20, 115:24
**Objection** [1] - 42:7
**objections** [2] - 3:9, 60:19
**objective** [3] - 74:20, 74:24, 80:16
**obligated** [1] - 49:4
**obligation** [5] - 39:24, 40:23, 41:24, 42:16, 88:16
**observe** [2] - 113:25, 114:4
**observed** [10] - 108:21, 109:14, 110:8, 110:16, 111:7, 113:18, 113:24, 115:23, 116:5, 116:9
**obtained** [2] - 12:2, 47:2
**occur** [2] - 86:23, 86:24
**occurred** [7] - 32:14, 32:22, 98:2, 98:20, 103:12, 112:4, 113:7
**occurring** [1] - 59:20
**October** [27] - 6:9, 21:24, 32:15, 32:23, 59:20, 63:17, 64:12, 65:6, 72:14, 83:3, 83:14, 84:11, 85:5, 86:5, 86:14, 95:7, 95:21, 96:4, 96:14, 98:11, 98:16, 103:2, 103:4, 103:16, 113:7, 120:25, 121:2
**OD** [1] - 29:14
**odd** [11] - 53:5, 53:13, 53:24, 54:12, 55:6, 55:16, 55:17, 56:17, 57:15, 57:18
**OF** [9] - 1:2, 1:7, 1:9, 1:19, 2:10, 123:4, 123:5, 125:2
**office** [2] - 5:15, 5:16
**OFFICE** [1] - 2:7
**officer** [16] - 10:5, 27:9, 45:11, 49:4, 50:24, 52:11, 52:19, 58:4, 59:12, 88:19, 110:4, 110:10, 110:19, 111:5, 112:18, 119:24
**Officer** [5] - 26:17, 26:20, 26:23, 27:2, 28:4
**OFFICER** [3] - 1:8, 1:8
**officers** [8] - 6:8, 27:14, 87:8, 100:4, 100:5, 101:18, 119:23, 120:3
**OFFICES** [1] - 2:10
**Offley** [1] - 28:12
**Okeno** [1] - 28:7
**old** [2] - 10:7, 81:25
**once** [2] - 33:16, 33:17
**One** [2] - 24:16, 24:17
**one** [27] - 12:16, 14:8, 14:22, 19:18, 27:17, 31:21, 40:13, 41:5, 42:9, 45:22, 65:23, 66:20, 70:14, 72:5, 72:18, 76:5, 76:11, 77:3, 85:20, 85:23, 87:7, 89:13, 108:23, 113:20, 119:18, 121:5, 122:9
**open** [3] - 120:6, 120:7, 120:11
**opinion** [2] - 53:22, 56:14
**opportunity** [2] - 8:14, 8:19
**opposed** [1] - 97:25
**optometrist** [1] - 29:20
**order** [2] - 79:2, 109:17
**ordinary** [7] - 58:2, 58:15, 58:19, 58:24, 59:4, 59:10, 67:13
**orientation** [5] - 34:13, 34:15, 34:24, 39:20, 41:18
**orientations** [1] - 34:19
**oriented** [1] - 74:25
**otherwise** [1] - 7:8
**outcome** [1] - 126:13
**outside** [2] - 118:15, 118:19
**oversees** [1] - 78:16
**own** [1] - 114:13
**ox** [1] - 73:16
**oxygen** [1] - 73:16

**P**

**P-R-O-M-E-S-A** [1] - 19:2
**p.m** [10] - 1:14, 86:8, 86:9, 86:15, 96:15, 98:12, 103:2, 121:8, 121:9, 122:20
**P02** [1] - 73:15
**PA** [1] - 38:2
**Pagano** [1] - 29:24
**Page** [2] - 124:4, 124:10
**page** [5] - 66:13, 66:20, 66:22, 68:25, 82:21
**PAGE** [1] - 124:19
**pain** [2] - 37:6, 81:9
**paper** [1] - 97:2
**Park** [2] - 5:12, 5:18
**part** [12] - 34:13, 40:15, 55:19, 60:14, 62:4, 65:11, 100:21, 100:22, 101:16, 101:17, 108:4, 116:16
**Part** [7] - 65:14, 65:24, 66:22, 68:25, 72:16, 87:10, 87:19
**partially** [1] - 72:9
**particular** [2] - 50:7, 62:25
**parties** [2] - 3:4, 126:10
**Parties** [1] - 1:21
**parts** [1] - 65:9
**Party** [1] - 1:20
**PAs** [1] - 29:7
**past** [1] - 54:19
**patient** [14] - 50:9, 54:25, 68:5, 74:10, 74:15, 74:16, 79:3, 80:13, 94:20, 94:21, 97:25, 99:21, 101:15, 114:16
**patients** [4] - 24:9, 24:12, 38:15, 89:4
**PATRICK** [1] - 1:8
**patrols** [1] - 42:13
**pending** [1] - 9:4
**penetration** [2] - 74:16, 82:3
**people** [1] - 30:15
**percent** [1] - 73:18
**perform** [1] - 80:18
**period** [4] - 10:25, 23:11, 42:18, 95:12
**permanent** [1] - 24:18
**person** [18] - 28:5, 29:18, 37:22, 38:10, 38:12, 50:5, 50:6, 50:14, 50:16, 50:19, 57:16, 69:16, 77:19, 90:6, 90:21, 111:16, 111:19
**person's** [1] - 91:2
**personal** [1] - 69:5
**personally** [3] - 52:16, 53:23, 54:21

personnel [4] - 65:15, 65:18, 65:19, 70:3
PG [1] - 125:6
photos [2] - 89:10, 89:23
Photos [1] - 124:12
physical [3] - 43:24, 90:20, 109:24
physically [1] - 43:14
Pierce [1] - 27:19
pink [2] - 76:3, 76:10
place [2] - 1:23, 107:6
placed [1] - 84:18
places [1] - 42:9
plaintiff [2] - 6:4, 9:23
Plaintiff [2] - 1:5, 2:4
Plaintiff's [18] - 64:6, 64:8, 76:19, 89:8, 89:15, 89:19, 91:12, 91:16, 92:19, 92:24, 99:9, 102:5, 103:6, 104:23, 113:16, 116:23, 117:2, 124:10
plan [3] - 75:15, 75:21, 75:24
point [2] - 9:2, 56:20
police [2] - 22:14, 49:5
Police [1] - 92:8
polices [1] - 36:4
policies [12] - 35:14, 35:15, 35:19, 36:9, 40:18, 41:15, 47:14, 47:15, 48:2, 48:19, 115:14
policy [5] - 41:19, 47:19, 47:22, 47:24, 50:18
poor [2] - 4:16, 108:12
portion [2] - 105:18, 107:4
position [1] - 62:25
positive [1] - 75:3
possible [1] - 90:24
possibly [1] - 45:23
post [3] - 12:3, 12:17, 13:3
practical [1] - 88:6
practice [3] - 19:16, 67:16, 83:25
practitioner [26] - 12:16, 12:18, 17:2, 17:7, 17:8, 17:15, 17:18, 17:20, 18:3, 18:22, 19:14, 19:17, 19:22, 20:3, 20:5, 20:20, 21:21, 22:13, 22:17, 24:5, 33:12, 34:7, 38:2, 43:12, 57:25, 59:8
practitioners [1] - 29:7
prefer [1] - 62:11
preparation [1] - 32:5
prepared [1] - 17:10
prescribe [2] - 17:11, 35:4
present [1] - 19:10
presented [1] - 103:14
pressure [3] - 24:10, 72:19, 72:21
previously [1] - 98:12
private [2] - 21:6, 21:13
privatized [1] - 21:5
privilege [2] - 55:8, 56:7
problem [2] - 63:15, 106:5
problems [2] - 71:18, 81:10
procedure [1] - 44:24
procedures [8] - 36:4, 36:9, 40:18, 41:15, 47:14, 47:16, 48:20, 115:14
proceed [2] - 62:12, 95:23
process [2] - 34:14, 34:25
prognosis [8] - 100:20, 101:20, 108:10, 108:11, 108:16, 108:18, 108:19, 108:20
Project [1] - 19:5
project [2] - 19:18, 19:20
Promesa [2] - 18:24, 19:15
promoted [2] - 11:3, 11:12
proper [1] - 54:2
properly [1] - 57:4
protocol [1] - 35:7
provide [1] - 51:25
provided [5] - 36:4, 64:3, 91:20, 92:22, 104:16
provider [10] - 36:13, 37:20, 37:24, 38:22, 76:15, 76:17, 78:20, 100:18, 101:22
providers [1] - 45:5
PUBLIC [1] - 125:25
Public [4] - 1:24, 4:3, 123:21, 126:3
public [1] - 3:14
pull [2] - 113:15, 121:2
pulse [1] - 73:16
punched [14] - 74:17, 81:11, 109:9, 110:3, 110:9, 110:18, 110:25, 111:3, 111:5, 111:10, 111:12, 111:14, 111:17, 112:17
purpose [1] - 54:14
pursuant [1] - 1:21
put [6] - 36:15, 68:19, 72:6, 100:6, 100:7, 106:22
putting [1] - 57:17

Q

questions [6] - 6:16, 53:12, 98:10, 121:25, 122:10, 122:16
quite [1] - 33:6

R

RALPH [1] - 2:9
Ralph [1] - 122:4
ranks [1] - 10:24
rape [3] - 116:12, 116:13, 116:16
rarely [1] - 94:22
rather [1] - 116:9
Razenson [3] - 27:3, 95:17, 95:20
re [1] - 60:24
re-form [1] - 60:24
read [16] - 26:15, 48:21, 62:3, 62:24, 63:6, 63:11, 63:13, 74:12, 74:23, 78:6, 79:7, 80:3, 81:23, 105:16, 105:18, 123:8
READ [1] - 125:6
reading [2] - 62:2, 72:22
READS [1] - 125:6
realize [1] - 8:9
really [1] - 38:24
REASON [1] - 125:6
reason [7] - 9:10, 71:7, 80:2, 82:10, 82:11, 102:17, 112:4
reasoning [1] - 112:5
reasons [2] - 25:6, 71:13
receive [17] - 12:20, 13:8, 34:5, 34:10, 39:19, 40:17, 41:14, 41:18, 45:8, 47:3, 47:4, 59:16, 66:17, 76:12, 84:6, 114:17
received [14] - 13:16, 13:24, 14:3, 14:4, 14:5, 41:17, 43:12, 49:2, 67:9, 67:11, 70:4, 70:6, 70:10, 86:4
recess [2] - 84:25, 113:13
recognize [9] - 26:5, 30:16, 64:17, 64:21, 66:21, 76:24, 90:6, 93:6, 117:7
recollection [6] - 32:13, 32:22, 71:24, 80:24, 113:2, 113:6
record [8] - 4:7, 4:25, 67:17, 84:2, 84:4, 123:11, 123:13, 126:7
Records [1] - 124:13
records [2] - 91:14, 92:3
rectum [2] - 52:11, 57:18
redo [3] - 62:22, 62:23, 117:23
refer [1] - 105:5
reference [2] - 105:2, 107:15
referring [1] - 99:15
reformulate [1] - 61:23
refresh [2] - 32:21, 113:6
regarding [10] - 34:11, 40:18, 41:16, 41:19, 47:11, 47:16, 50:16, 114:7, 114:19, 115:14
Registered [1] - 28:11
registered [6] - 13:11, 13:14, 14:14, 16:5, 17:5, 17:7
regular [6] - 36:14, 36:16, 67:16, 83:21, 83:25, 84:5
rehired [2] - 19:9, 20:14
REISSMAN [4] - 2:9, 122:3, 122:4, 122:15
Reissman [2] - 122:5, 124:6
related [2] - 73:22, 126:9
relevant [6] - 111:6, 111:17, 111:21, 111:23, 112:10, 112:18
remember [2] - 59:21, 60:3
reorient [1] - 34:22
repeat [4] - 7:3, 12:22, 116:3, 117:20
rephrase [1] - 7:4
report [20] - 40:4, 40:22, 41:4, 41:25, 54:22, 87:2, 92:20, 96:20, 96:24, 99:5, 99:9, 100:15, 100:18, 101:19, 103:6, 104:15, 104:20, 113:21, 115:16, 116:4
Report [1] - 124:15
reported [3] - 101:2, 103:16, 103:20
REPORTER [2] - 4:6, 4:9
reporter [5] - 6:11, 6:21, 7:23, 62:24, 105:17
reports [2] - 40:19, 41:21
represent [1] - 6:4
REPRESENTATIVES [1] - 1:9
represents [2] - 50:6, 50:15
request [38] - 36:6, 37:10, 37:16, 38:7, 38:11, 39:21, 39:25, 41:8, 43:2, 43:9, 43:13, 43:18, 44:7, 44:10, 44:18, 45:8, 45:24, 46:6, 46:9, 64:12, 65:3, 70:7, 70:19, 70:21, 71:4, 71:15, 71:22, 85:5, 85:9, 85:15, 86:4, 96:7, 97:19, 98:4, 101:10, 101:25, 104:24, 120:22
Request [1] - 124:11
requested [1] - 105:18
requests [3] - 34:11, 37:3, 37:4
require [2] - 73:14, 79:20
required [7] - 41:3, 42:2, 42:20, 44:6, 73:23, 75:16, 108:13
requirement [1] - 46:22
requires [1] - 62:13
reserved [1] - 3:10
Reserves [2] - 10:19, 10:21
reserves [1] - 11:16
resigned [1] - 11:17

**respect** [23] - 10:3, 20:19, 34:6, 35:10, 36:5, 37:14, 39:20, 45:21, 48:3, 52:2, 55:5, 59:18, 76:19, 93:22, 97:18, 112:6, 114:6, 114:18, 115:2, 115:4, 115:10, 115:16, 116:7
**respective** [1] - 3:4
**respiration** [1] - 73:6
**respond** [4] - 22:4, 24:8, 47:17, 48:23
**responding** [1] - 37:15
**response** [2] - 91:7, 104:17
**responses** [1] - 6:16
**responsibilities** [5] - 21:25, 24:5, 38:19, 39:14, 78:12
**responsibility** [1] - 88:8
**resumed** [1] - 23:21
**retfired** [1] - 10:18
**review** [17] - 8:19, 8:20, 8:22, 24:8, 32:4, 32:7, 35:2, 80:22, 80:25, 91:22, 91:24, 92:2, 93:8, 94:8, 105:19, 113:5, 113:10
**reviewed** [8] - 32:8, 32:9, 32:10, 32:21, 41:6, 77:4, 94:12, 120:21
**RN** [4] - 14:4, 14:11, 15:4, 39:12
**RNs** [1] - 39:7
**Robert** [21] - 6:5, 27:19, 30:23, 32:13, 32:17, 32:23, 59:19, 63:18, 65:5, 72:12, 77:21, 83:13, 84:13, 85:8, 86:13, 86:19, 98:14, 102:14, 102:25, 114:2, 115:23
**ROBERT** [1] - 1:4
**Rockaway** [1] - 14:18
**role** [9] - 15:3, 15:10, 16:4, 19:11, 19:21, 19:25, 20:20, 21:20, 22:5
**roles** [1] - 19:25
**Ronald** [1] - 30:4
**room** [13] - 14:17, 14:18, 14:21, 15:5, 16:6, 54:25, 68:5, 68:10, 68:17, 81:5, 82:5, 84:18, 101:7
**rotate** [1] - 31:18
**rotation** [1] - 42:18
**rounds** [1] - 45:2
**rule** [2] - 61:12, 80:17
**Rule** [2] - 56:6, 56:25
**rules** [3] - 4:22, 5:22, 9:8
**Rules** [1] - 1:21
**ruling** [2] - 54:17, 63:4
**RULINGS** [1] - 124:18
**run** [1] - 33:19

## S

**Samaritan** [2] - 19:5, 19:20
**Sanchez** [1] - 29:9
**SANE** [1] - 48:11
**SANSONE** [103] - 2:12, 5:6, 5:10, 5:16, 5:20, 13:20, 21:11, 21:16, 22:15, 29:15, 30:11, 33:6, 35:23, 36:21, 40:25, 42:7, 43:3, 44:21, 46:23, 48:8, 49:13, 50:25, 53:6, 53:10, 53:21, 54:3, 54:10, 54:18, 55:10, 55:14, 55:23, 56:3, 56:10, 56:19, 57:2, 57:9, 58:6, 58:11, 58:17, 58:22, 59:2, 59:13, 60:4, 60:11, 60:23, 61:6, 61:9, 61:17, 62:21, 63:5, 63:10, 63:15, 63:19, 64:18, 66:11, 66:19, 67:22, 68:14, 70:22, 71:10, 78:14, 80:14, 84:20, 85:17, 86:8, 89:12, 89:14, 90:14, 90:22, 92:13, 92:16, 94:11, 97:14, 97:22, 98:5, 98:9, 99:3, 99:7, 99:14, 99:19, 104:18, 105:15, 105:24, 106:4, 106:10, 106:20, 107:2, 109:10, 111:20, 112:13, 112:20, 113:12, 115:2, 115:24, 116:18, 117:22, 118:3, 119:13, 121:11, 121:16, 121:22, 122:17, 122:19
**Sansone** [2] - 5:17, 62:9
**satellite** [3] - 24:17, 24:19, 31:13
**saturation** [1] - 73:16
**saw** [15] - 26:4, 72:14, 77:19, 77:21, 82:25, 83:2, 86:13, 86:19, 96:13, 97:24, 98:14, 98:16, 102:4, 102:14, 102:25
**sciences** [1] - 12:7
**sealing** [1] - 3:5
**second** [13] - 18:20, 23:12, 23:20, 31:5, 34:17, 66:17, 67:10, 117:15, 118:6, 118:7, 118:24, 119:18, 120:13
**section** [14] - 82:15, 93:14, 94:9, 95:23, 95:24, 99:10, 99:16, 99:24, 100:8, 106:18, 107:10, 115:9, 115:15
**sections** [3] - 25:9, 107:5, 108:15
**security** [3] - 79:17, 79:21, 119:14
**see** [30] - 28:2, 33:17, 55:25, 64:15, 65:24, 66:25, 72:18, 73:15, 74:3, 74:22, 82:20, 89:9, 90:8, 91:2, 92:7, 93:3, 94:2, 94:21, 94:25, 95:15, 98:25, 101:2, 107:18, 107:19, 107:25, 108:2, 108:5, 117:5
**seeing** [2] - 95:9, 95:10
**send** [4] - 5:11, 41:12, 81:19, 94:20
**sending** [1] - 81:21
**sent** [6] - 45:17, 75:9, 75:18, 82:4, 84:17, 93:24
**SERVANTS** [1] - 1:9
**Service** [1] - 19:20
**services** [1] - 50:18
**set** [2] - 126:6, 126:15
**seven** [1] - 18:17
**several** [4] - 6:7, 70:13, 72:17
**sexual** [33] - 46:20, 46:25, 47:17, 48:6, 48:14, 48:16, 49:3, 49:23, 50:23, 58:4, 59:11, 74:15, 80:4, 80:8, 80:18, 80:19, 81:3, 82:2, 88:18, 109:21, 113:21, 114:2, 114:5, 114:7, 114:10, 115:3, 115:4, 115:10, 115:16, 115:20, 116:7, 116:12, 122:12
**sexually** [5] - 45:10, 45:16, 81:7, 81:11, 109:7
**shaking** [1] - 6:17
**shall** [2] - 3:6, 3:10
**shared** [2] - 35:13, 47:13
**Sharon** [2] - 69:24, 86:3
**SHEET** [1] - 125:2
**sheet** [6] - 32:10, 77:20, 107:20, 107:25, 108:2, 108:3
**sheets** [1] - 44:16
**SHERIFF'S** [1] - 1:7
**shift** [2] - 25:19, 120:25
**shifts** [3] - 31:21, 31:23, 31:24
**short** [2] - 84:25, 113:13
**shortness** [3] - 37:6, 71:18, 71:19
**SHOULD** [1] - 125:6
**show** [4] - 89:7, 92:17, 92:19, 116:22
**showing** [1] - 63:24
**Sick** [1] - 124:11
**sick** [61] - 22:2, 22:4, 22:7, 24:7, 32:8, 34:11, 34:14, 35:3, 36:5, 36:11, 36:12, 36:15, 36:16, 36:17, 37:2, 37:9, 37:15, 38:10, 38:14, 39:21, 39:24, 40:10, 43:2, 43:9, 43:12, 43:17, 44:6, 44:10, 44:13, 44:16, 44:18, 45:8, 45:14, 45:23, 59:15, 64:12, 65:3, 70:7, 70:15, 70:17, 70:18, 71:8, 71:22, 72:3, 73:13, 74:14, 85:5, 85:15, 86:22, 96:7, 100:19, 101:9, 101:14, 101:25, 104:16, 104:19, 104:24, 107:18, 107:25, 108:5, 120:21
**side** [3] - 75:2, 82:3, 82:4
**sign** [2] - 66:17, 100:21
**Signature** [1] - 125:21
**signature** [14] - 66:2, 66:12, 66:15, 66:21, 66:24, 68:24, 69:2, 69:14, 76:14, 76:15, 82:20, 86:4, 87:10, 102:7
**signatures** [3] - 65:23, 66:6
**Signed** [1] - 123:18
**signed** [8] - 3:13, 3:15, 69:24, 87:15, 87:19, 96:14, 102:2, 106:13
**signs** [3] - 66:10, 81:14, 106:14
**sitting** [1] - 111:25
**situation** [3] - 44:5, 44:11, 45:12
**six** [2] - 10:22, 18:14
**social** [1] - 29:25
**someone** [4] - 41:12, 79:4, 81:19, 111:3
**Sometimes** [1] - 85:18
**sometimes** [2] - 22:3, 43:18
**somewhere** [1] - 16:13
**sorry** [4] - 14:7, 75:22, 86:10, 104:6
**space** [1] - 105:3
**spaces** [1] - 66:5
**speaking** [1] - 60:19
**specific** [7] - 31:16, 34:5, 34:10, 42:18, 50:17, 66:24, 71:15
**specifically** [4] - 51:10, 51:11, 64:11, 72:5
**specifications** [1] - 10:4
**spell** [2] - 18:25, 30:11
**spelled** [1] - 30:14
**ss** [1] - 123:4
**St** [7] - 14:17, 14:20, 15:8, 15:15, 16:2, 16:15, 16:17
**stable** [1] - 108:12
**staff** [6] - 43:19, 46:15, 48:22, 67:20, 68:8, 78:16
**STAIB** [1] - 1:8
**Staib** [1] - 26:21
**stamp** [3] - 69:4, 69:5, 69:6
**stamped** [4] - 63:25, 76:20, 83:19, 89:16

stand [1] - 17:14
stands [2] - 29:14, 50:15
start [2] - 23:14, 89:24
State [5] - 1:24, 4:4, 4:6, 123:21, 126:4
state [4] - 4:9, 4:25, 5:4, 45:15
STATE [1] - 123:4
states [2] - 62:13, 74:16
States [2] - 10:19, 10:21
STATES [1] - 1:2
stating [1] - 18:2
still [1] - 22:4
STIPULATED [3] - 3:3, 3:8, 3:12
STIPULATIONS [1] - 3:2
stone's [1] - 49:12
stop [1] - 60:19
storage [1] - 68:17
stored [4] - 68:7, 68:15, 68:18, 84:16
straight [1] - 44:20
Street [2] - 2:5, 2:8
strike [1] - 90:20
stuck [1] - 52:11
study [1] - 12:5
STUSSEY [1] - 1:9
Suarez [1] - 29:19
subjective [7] - 74:7, 74:9, 74:13, 80:12, 114:25, 115:21, 116:8
submitted [1] - 33:22
Suboxone [1] - 35:6
Subpoena [1] - 1:22
subscribed [1] - 123:18
Subscribed [1] - 125:23
suffered [2] - 40:7, 43:24
suggest [1] - 61:22
suggestion [1] - 62:10
supervises [2] - 39:15, 39:17
supervisor [3] - 88:17, 94:25, 97:4
supposed [1] - 61:21
supposedly [1] - 50:15
surgical [3] - 14:19, 15:17, 15:18
surrounding [1] - 112:11
sworn [4] - 3:15, 4:3, 125:23, 126:6
synopsis [1] - 81:20
system [1] - 35:5

**T**

tag [1] - 26:16
taught [1] - 34:24
telephone [2] - 79:10, 79:13
temperature [1] - 73:4
tenure [1] - 50:20
term [2] - 24:10, 52:22
terms [1] - 85:11
testified [6] - 4:5, 98:13, 102:12, 102:18, 112:25, 118:4
testify [1] - 9:11
Testimony [1] - 1:22
TESTIMONY [1] - 124:3
testimony [6] - 56:15, 113:3, 123:9, 123:12, 126:5, 126:8
THAT [3] - 126:5, 126:7, 126:12
THE [21] - 1:9, 4:6, 4:8, 4:9, 4:11, 4:20, 5:3, 6:24, 7:6, 7:11, 7:17, 8:2, 8:8, 8:17, 8:24, 9:6, 9:9, 109:12, 119:16, 121:13, 125:2
themselves [1] - 40:9
therein [1] - 67:21
thinks [3] - 36:12, 37:19, 58:25
Thomas [1] - 26:18
THOMAS [1] - 1:8
three [14] - 11:14, 15:24, 49:14, 51:21, 51:23, 52:7, 53:4, 57:3, 58:5, 60:14, 66:7, 119:2, 119:6, 119:9
three-part [1] - 60:14
three-year [2] - 53:4, 58:5
throw [1] - 49:12
tier [5] - 24:21, 24:24, 25:11, 42:25, 120:4
tiers [3] - 42:13, 117:19, 118:16
timed [1] - 67:4
timeframe [1] - 58:5
title [4] - 17:4, 17:17, 17:20, 76:21
TO [1] - 124:3
today [2] - 9:12, 111:25
today's [1] - 8:19
took [1] - 107:6
top [9] - 66:8, 66:13, 67:10, 69:23, 71:2, 86:2, 93:17, 101:16, 101:17
trained [2] - 47:7, 47:21
training [19] - 34:6, 34:11, 35:6, 39:20, 41:17, 43:11, 47:4, 53:19, 59:7, 70:20, 71:14, 80:10, 85:13, 88:24, 90:11, 91:8, 112:9, 114:18, 114:21
transcribe [1] - 6:21
transcribed [1] - 68:3
TRANSCRIPT [1] - 125:2
transcript [6] - 5:9, 8:20, 8:22, 123:8, 123:10, 126:7
Transfer [1] - 76:22
transfer [40] - 32:9, 33:5, 41:7, 41:13, 46:6, 46:12, 54:24, 68:11, 69:22, 75:11, 75:19, 78:19, 78:25, 79:5, 80:2, 80:20, 82:10, 82:12, 83:18, 84:7, 86:12, 96:8, 96:10, 96:14, 97:19, 98:3, 98:18, 101:10, 101:13, 102:19, 102:23, 103:19, 105:13, 105:22, 106:7, 106:13, 106:16, 107:19, 108:2, 120:23
transferred [13] - 22:19, 22:22, 46:5, 46:18, 54:23, 54:24, 79:3, 79:21, 79:22, 88:21, 88:23, 89:5, 96:25
transfers [1] - 20:23
translate [1] - 7:24
transportation [2] - 77:25, 79:20
transported [1] - 79:16
trauma [9] - 90:16, 90:18, 90:20, 110:12, 110:14, 110:23, 111:2, 111:11, 111:12
treat [3] - 17:11, 21:22, 52:16
treated [3] - 54:20, 72:12, 101:21
treatment [9] - 45:20, 46:5, 50:18, 51:25, 82:6, 101:21, 107:22, 107:24, 108:15
treatments [1] - 88:12
triage [12] - 38:9, 38:19, 39:5, 45:16, 66:10, 66:15, 68:5, 68:10, 87:15, 88:3, 101:6, 106:22
triaged [4] - 67:8, 68:19, 101:6, 104:8
triages [2] - 36:12, 37:18
trial [2] - 3:11, 8:6
TRIAL [1] - 1:19
trick [1] - 8:15
TROY [1] - 2:10
true [4] - 39:2, 123:11, 123:13, 126:7
truth [1] - 8:5
truthfully [1] - 9:11
turn [5] - 64:11, 76:20, 85:3, 98:4, 102:22
turning [1] - 102:4
Turnpike [2] - 4:12, 5:7
twice [1] - 18:11
two [22] - 11:7, 13:5, 14:8, 18:11, 22:19, 23:16, 31:24, 34:19, 42:22, 52:6, 52:14, 52:15, 52:18, 54:20, 65:9, 65:22, 66:5, 107:4, 112:3, 119:8, 121:6, 122:9
Two [1] - 11:9
type [2] - 87:18, 90:19
typical [1] - 44:10
typically [7] - 25:14, 31:20, 42:24, 43:16, 44:19, 48:15, 80:12

**U**

uh-huhs [1] - 6:17
under [17] - 37:4, 56:2, 56:25, 62:12, 65:24, 66:22, 68:25, 80:18, 87:10, 87:19, 98:18, 99:10, 99:16, 99:23, 106:17, 107:10, 123:9
undergrad [1] - 12:11
undergraduate [3] - 11:25, 12:6, 12:9
understood [1] - 7:9
unique [2] - 35:20, 35:25
unit [47] - 15:11, 27:10, 27:12, 29:22, 30:2, 30:18, 30:25, 31:2, 31:4, 31:11, 31:12, 33:2, 37:12, 38:6, 43:7, 44:3, 44:10, 44:20, 45:12, 47:16, 48:5, 48:22, 50:21, 65:19, 67:14, 76:17, 78:6, 78:9, 83:22, 92:4, 95:8, 95:13, 95:20, 115:7, 116:17, 117:14, 117:18, 117:24, 118:4, 118:5, 118:20, 118:22, 118:23, 119:20, 119:22, 120:4, 120:19
United [8] - 10:19, 10:21, 16:18, 18:8, 18:10, 18:19, 20:9, 20:11
united [1] - 16:20
UNITED [1] - 1:2
units [1] - 31:9
University [14] - 19:8, 19:24, 20:8, 20:15, 21:4, 21:19, 23:6, 33:13, 35:20, 49:9, 50:21, 91:13, 101:4, 115:7
unless [2] - 7:7, 84:22
UOF [1] - 94:3
up [13] - 6:19, 24:22, 25:17, 25:18, 42:17, 42:21, 52:11, 101:22, 106:12, 113:15, 119:8, 121:3, 122:17
urgent [6] - 35:3, 36:19, 36:23, 37:10, 40:11, 68:10

**V**

VA [2] - 14:19, 15:15
valid [4] - 57:7, 60:20, 61:8, 63:8
verbal [3] - 6:16, 91:7, 104:17
verbally [1] - 47:23
Videoconference [1] - 1:13
visit [1] - 42:25
visual [2] - 120:2, 120:5
vital [1] - 81:13
voice [1] - 6:19

**volition** [1] - 114:14
**voluntary** [1] - 20:24

## W

**wait** [3] - 7:18, 7:22, 98:9
**Wait** [1] - 106:2
**waived** [1] - 3:7
**walk** [2] - 119:8, 120:10
**walked** [1] - 81:5
**walking** [2] - 119:10, 120:3
**Wanda** [3] - 4:8, 5:3, 125:4
**WANDA** [3] - 1:19, 123:7, 123:16
**wanna** [1] - 63:5
**wants** [2] - 68:14, 111:20
**warrants** [1] - 84:7
**week** [2] - 33:16, 33:17
**Weight** [1] - 73:10
**weight** [2] - 73:14, 73:22
**welcome** [1] - 5:20
**West** [1] - 2:8
**WHEREOF** [1] - 126:14
**white** [2] - 76:3, 76:8
**Williston** [2] - 5:12, 5:18
**window** [3] - 47:3, 47:5, 48:2
**withdraw** [1] - 11:15
**Witness** [3] - 1:20, 2:10, 125:4
**witness** [10] - 8:7, 9:18, 57:21, 60:21, 62:14, 64:19, 66:11, 98:5, 126:5, 126:8
**WITNESS** [16] - 4:8, 4:11, 4:20, 5:3, 6:24, 7:6, 7:11, 7:17, 8:2, 8:8, 8:17, 8:24, 9:6, 9:9, 109:12, 119:16, 121:13, 126:14
**word** [1] - 108:23
**words** [3] - 121:11, 121:16, 121:23
**worker** [1] - 29:25
**works** [6] - 28:15, 28:19, 28:21, 29:3, 29:12, 29:21
**write** [7] - 81:22, 82:8, 82:9, 82:11, 97:10, 105:4
**writing** [1] - 35:10
**written** [5] - 40:17, 41:15, 41:18, 47:11, 96:9
**wrote** [9] - 74:13, 74:23, 75:9, 81:24, 82:13, 94:12, 94:13, 99:23, 100:13
**WT** [1] - 73:9

## Y

**year** [8] - 13:17, 15:2, 15:9, 16:9, 18:22, 19:4, 53:4, 58:5
**years** [16] - 10:22, 11:8, 11:9, 11:14, 15:24, 18:17, 18:24, 19:8, 19:23, 22:19, 23:17, 51:13, 51:18, 51:22, 51:23, 112:3
**yellow** [2] - 76:3, 76:9
**York** [8] - 1:25, 2:5, 2:8, 2:11, 4:4, 4:12, 123:21, 126:4
**YORK** [2] - 1:2, 123:4