UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------x

ROBERT JEFFREY JOHNSON, JR.,

Plaintiff, ORIGINAL

CV No.:
23-cv-00167 (BMC)

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JAMES STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOES 1-9 SERVANTS AND REPRESENTATIVES OF THE COUNTY OF NASSAU,

Defendants.

---------------------------------------------x

Held Via Zoom

June 8, 2023
10:18 A.M.

DEPOSITION of JAMES TIMOTHY STAIB, a Defendant in the above-entitled action, at the above-mentioned place, before Nancy Dionisio a Notary Public of the State of New York, taken pursuant to Federal Rules of Civil Procedure, and pursuant to Notice, and stipulations between Counsel.

A P P E A R A N C E S:

GUERCIO & GUERCIO, LLP
Attorneys for Plaintiff
77 Conklin Street
Farmingdale, New York 11735

BY: JOHN BRADLEY, ESQ.

COUNTY OF NASSAU
OFFICE OF THE COUNTY ATTORNEY
Attorney for Defendants
One West Street
Mineola, New York 11501

BY: VICTORIA LaGRECA, ESQ.

* * * *

ORIGINAL

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto, that filing, sealing, and certification are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within Deposition may be signed before any Notary Public with the same force and effect as though subscribed and sworn to before this Court.

* * * *

THE COURT REPORTER: Ms. LaGreca, will you be ordering a copy?

MS. LaGRECA: Yes, please.

J A M E S T I M O T H Y S T A I B , a Defendant herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. BRADLEY:

**Q. May I have your full name for the record, please?**

A. James Timothy Staib.

**Q. State your current address for the record, please.**

A. 100 Carman Avenue, East Meadow, New York 11554.

**Q. Officer, can you state your first name again?**

A. James.

**Q. Thank you. Officer Staib this is John Bradley I represent the Plaintiff Robert Jeffrey Johnson, Jr. I'm going to be asking you some questions about an incident that occurred on**

**Staib**

**October 12, 2021 in Nassau County jail.**

A. Okay.

MR. BRADLEY: I just would like to make a statement on the record. I requested discovery in this matter, there's a few items that remain outstanding, I've been trying to get them. Among them have been the disciplinary files of the named Defendants. There was recently certain documents that were disclosed to me yesterday, one of them included the logbook that identified some new information that we were previously not aware of, so I would just like to state on the record that we respectfully reserve our right to a further deposition of this witness pending the receipt of outstanding discovery.

MS. LaGRECA: Understood.

**Q. Officer, just please state your name for the record again.**

A. James Timothy Staib, S-T-A-I-B as in

Staib

boy.

Q. Before we begin, Officer, I just want to go over some rules of the deposition and hopefully you can agree to them, okay?

A. Okay.

Q. So firstly, I just ask that you keep your responses verbal, please don't shake your head or go huh-huh because the court reporter is taking down everything we are talking about in a question and answer format and she won't be able to pick up on shaking of the head or saying huh-huh, okay?

A. Okay.

Q. I just ask that you please keep your voice up, you've been good already, will you agree to that?

A. Yes.

Q. If there is a question you don't understand, let me know and I'll repeat the question and rephrase it, will you agree to that?

A. Yes.

Q. Unless you tell me otherwise I will assume that you have understood and heard my

Staib

question, okay?

A. Okay.

Q. I'm not here to trick you or play games at all, okay?

A. Okay.

Q. If you don't know the answer to a question, please don't guess, tell me that you don't know, I don't want you to guess at anything, okay?

A. Okay.

Q. You will probably anticipate the answers to some of my questions while I'm asking the question, I just ask that you please let me finish the question before you answer it so the court reporter can take down a clean question and answer for the record.

A. Okay.

Q. Do you understand that the oath that you've just taken is the same oath that you would take at trial?

A. Yes.

Q. If you realize during the deposition that an earlier answer that you gave was inaccurate or incomplete please let me know and

Staib

I'll give you a chance to make the correction, okay?

A. Okay.

Q. At some point you're going to have an opportunity to review the transcript of today's examination, after your review you may correct any errors that you find in the transcript, okay?

A. Okay.

Q. If you need to take a break at any time, which may be the case, I just ask that you answer the question pending before you, before you take a break, okay?

A. Okay.

Q. Do you agree with all those rules?

A. Yes.

Q. Do you have any questions about them?

A. No.

Q. So finally I'm going to ask is there any reason at all, at all, that you cannot testify truthfully and accurately today?

A. No.

Q. Thank you. Officer, have you ever been deposed before?

Staib

A. No.

**Q. Have you ever testified as a witness before?**

A. No.

**Q. Have you ever been a Defendant in a civil lawsuit?**

A. No.

**Q. Have you ever been a Plaintiff in a civil lawsuit?**

A. No.

**Q. Have you ever testified at a hearing where charges or specifications were brought against a corrections officer?**

A. No.

**Q. Please state your business address for the record.**

A. 100 Carman Avenue, East Meadow, New York.

MR. BRADLEY: Counsel, will you accept a subpoena on behalf of this witness?

MS. LaGRECA: Yes.

**Q. Officer, how old are you?**

A. 25.

Staib

**Q. Have you ever been convicted of a crime?**

A. No.

**Q. Please state your educational background.**

A. After I finished high school I did one semester at Nassau Community College and that's it.

**Q. Do you know how many credits at Nassau Community you got?**

A. Not approximately.

**Q. Do you have any military experience?**

A. No.

**Q. Are you currently employed?**

A. For the Nassau County Sheriff's Department at the jail in East Meadow.

**Q. And you're wearing a uniform today?**

A. Yes.

**Q. Is that the uniform you wear for work everyday?**

A. Yes.

**Q. Prior to working at the Nassau County Sheriff's Department can you please describe your previous employment?**

**Staib**

A. I worked at Zorn's of Bethpage for two years and then Stop and Shop in Levittown for a year and a half before I started here.

**Q. What year did you first start working for the Nassau County Sheriff's Department?**

A. It was 2019.

**Q. Do you volunteer for any organizations?**

A. No.

**Q. When you started working for the Nassau County Sheriff's Department in 2019, is that when you graduated from the academy?**

A. Yes.

**Q. Do you know when you began the academy?**

A. It was June 17th.

**Q. Of 2019?**

A. Yes.

**Q. What was your rank when you went to the academy?**

A. Corrections recruit.

**Q. How long is the academy?**

A. 12 weeks.

**Q. So three months?**

Staib

A. Yes.

**Q. Did you receive extensive training at the academy?**

A. Yes.

**Q. When you attended the academy were you taught proper procedures and practices to be followed by a correction officer?**

A. Yes.

**Q. You were taught the proper conduct of a correction officer?**

A. Yes.

**Q. Were you taught the standards of care of a correction officer?**

A. Yes.

**Q. When you were taught the proper procedures and practices of a correction officer, were you given any written materials?**

A. Written materials, not to my knowledge.

**Q. Were you given any written materials while at the academy?**

A. Yes.

**Q. What were they?**

A. I guess just notes that the

Staib

instructors probably came up with.

**Q. Did they give you a booklet containing the policies and procedures of the Nassau County Sheriff's Department?**

A. I'm not sure.

**Q. At the academy were you trained on the use of force on an inmate?**

A. Yes.

**Q. Can you describe that training?**

A. Our use of force starts with verbal commands, if the aggressive behavior doesn't stop the next step is OC spray and then soft hand techniques and cuffing.

**Q. What is soft hand techniques?**

A. Like holding shoulders, grabbing wrists, like open hand stuff, nothing closed.

**Q. At the academy are you ever taught to use force with a closed fist?**

A. A closed fist? Only in like an extreme emergency.

**Q. Did they train you on how to punch?**

A. Yes.

**Q. So other than verbal commands, OC spray, soft hand techniques, what about any**

Staib

**weapons?**

A. No. I'm not a member of our SERT Team so I have no weapons other than firearm which is not in the jail.

**Q. At the academy do you believe that you received written materials?**

A. I believe so, but I don't know for sure.

**Q. Are you familiar with written materials such as bulletins, orders and interim orders and memorandum?**

A. No.

**Q. So would it be fair to say that you only learned the minimum standards of care as a corrections officer while at the academy?**

A. Yeah, that's fair.

**Q. Were you ever trained about the policies and procedures of the Sheriff's Department?**

A. Policy and procedure. Yeah.

**Q. Such as the Sheriff's Department has a use of force procedure, right?**

A. Yes.

**Q. And an antidiscrimination procedure?**

Staib

A. Yes.

**Q. Does it have a procedure regarding how to handle a case of sexual assault?**

A. Sexual assault, I don't believe so.

**Q. Well, the use of force and the antidiscrimination policies, if you violated those policies you would agree with me that you could be disciplined?**

A. If I violated, yes.

**Q. One purpose of the training at the academy is to prepare you for emergency situations, right?**

A. Yes.

**Q. Another purpose of your training was to prepare you for circumstance an ordinary civilian would not encounter?**

A. Yes.

**Q. You were taught how to respond differently to daily circumstances that a correction officer might encounter?**

A. Can you repeat the question? I'm sorry.

**Q. You were taught how to respond differently to daily circumstances that a**

corrections officer may encounter?

A. Yes.

Q. You were taught to expect the unexpected?

A. Yes.

Q. And you were taught as a professional correction officer you were expected to have a higher code of conduct than the average civilian?

A. Yes.

Q. The average inmate?

A. Yes.

Q. Mr. Johnson was an inmate on October 12, 2021, correct?

A. I don't remember the name, but, could be.

Q. You mentioned that use of force begins with verbal commands?

A. Yes.

Q. And then it progresses to OC spray?

A. Yes.

Q. And then to soft hand techniques?

A. Yes.

Q. Would you characterize that as a force

Staib

**continuum?**

A. Yes.

**Q. That's what you were trained on?**

A. Yes.

**Q. You were also trained about escalation and de-escalation, right?**

A. Yes.

**Q. What do those words mean?**

A. To calm down a situation being de-escalation and to make a situation worse by being escalation.

**Q. Is escalation prohibited by the Sheriff's Department?**

A. I believe yes.

**Q. Were you trained that it's not appropriate to escalate the situation?**

A. Yes.

**Q. Were you trained at the academy to avoid confrontations?**

A. Yes, we don't look for them.

**Q. Were you taught at the academy to use the minimum necessary force?**

A. Yes.

**Q. You were taught at the academy that**

Staib

excessive force will never be tolerated?
A. Yes.
Q. Unnecessary force is excessive force?
A. Yes.
Q. You were taught that the use of excessive force is a violation of the policies and procedures of the Sheriff's Department?
A. Yes.
Q. It is a violation of good and accepted correction office practices and procedures?
A. Yes.
Q. It is a violation of the standard of care of the correction officer?
A. Yes.
Q. As a correction officer you have a duty to report the use of force by a fellow correction officer?
A. Yes.
Q. Your failure to report the use of force by another correction officer may result in your discipline?
A. Yes.
Q. You were taught to treat prisoners courteously, humanely and with respect, true?

**Staib**

A. True.

**Q. You were taught to never threaten a prisoner?**

A. True.

**Q. That would be a violation of Sheriff's Department policies and procedures?**

A. Yes.

**Q. Other than the academy that we have spoken about, did you receive any additional training?**

A. No.

**Q. I'm sorry if you already said it, but can you repeat the exact date that you graduated from the academy?**

A. It was June 17, 2019.

**Q. When you graduated from the academy, what was your rank?**

A. It would be correction officer when I graduated.

**Q. That's your current rank right now?**

A. Yes.

**Q. Have you ever received any training about how to handcuff an inmate?**

A. How to handcuff, yes.

Staib

**Q. Can you describe that training?**

A. Put their hands behind their back, thumbs up and then just put the handcuffs on, keyholes facing out and that's it.

**Q. Why do they train you to handcuff someone behind the back?**

A. Easier to escort somebody, I guess, I'm not entirely sure.

**Q. Do you think that it's safer to handcuff someone in the back than the front?**

A. Yes.

**Q. Why?**

A. Because they can't hit you with their hands.

**Q. Right, because there is more freedom of movement if you handcuff somebody from the front, true?**

A. True.

**Q. Have you ever been trained about how to handcuff a prisoner from the front?**

A. We have.

**Q. When we say the front, you believe that I'm talking about both hands in front of the chest, right?**

**Staib**

A. Yes.

**Q. In front of his body?**

A. Yes.

**Q. Can you describe the training about handcuffing an officer to the front?**

A. We only have to handcuff to the front really if they have a body belt on because you can't do it from the back.

**Q. What is a body belt?**

A. It's a leather belt that goes around the waist.

**Q. What is the purpose of a body belt?**

A. I guess to keep the handcuffs close to the body.

**Q. Are you saying that the handcuffs are attached to the body belt?**

A. They are.

**Q. Are there any other circumstances that you were trained on where it would be appropriate to handcuff an inmate from the front?**

A. Not to my knowledge.

**Q. Are there any written policies and procedures about handcuffing inmates'**

Staib

**positioning in the possession of the Sheriff's Department that you're aware of?**

A. Not that I'm aware of.

**Q. Were you ever given any written materials regarding the handcuffing of inmates?**

A. Not that I'm aware of.

**Q. Is it your discretion to handcuff an inmate from the front or the back or do you just generally handcuff from the back?**

A. Generally from the back.

**Q. If a prisoner is in their cell, or an inmate, how would you go about handcuffing that person to take them out of the cell?**

A. They would put their hands through -- we have a slot, like attached to the bars, like an opening and they would put their hands through and we would cuff them through there.

**Q. Have you ever received any training about searches?**

A. Searches, yes.

**Q. Can you describe that training?**

A. When we search a cell we start from the bed, we work our way around the room, the cells aren't very big it takes a couple of

Staib

minutes. We search, we pat down the inmate and if we find nothing then that's it, the search is over.

**Q. So I want to talk about pat-down searches of an inmate.**

A. Okay.

**Q. When are pat-down searches of an inmate appropriate?**

A. If we have reason to believe that they have something on their possession.

**Q. So is that of the reasonable suspicion standard?**

MS. LaGRECA: Objection. Calls for a legal conclusion. But you can answer.

A. To the best of my knowledge.

**Q. Are you free to pat down an inmate at any time, anywhere, anyplace?**

A. No, I don't think so.

**Q. You have to have a reasonable suspicion to pat down an inmate?**

A. Yeah.

**Q. And a reasonable suspicion that maybe he's hiding illegal contraband?**

**Staib**

A. Could be, yes.

**Q. If you spelled smoke on a tier, do you believe that that would give you reasonable suspicion to pat down the inmates on that tier?**

A. No, I don't believe so.

**Q. Why not?**

A. I would need some sort of proof, we have smoke alarms in the back of every cell, that's normally an indicator.

**Q. So you don't believe that the smell of smoke on a tier is not enough information to give you reasonable suspicion and a reasonable cause to pat down an inmate?**

A. No.

**Q. Are you familiar with cavity searches?**

A. Never done one, but I know what they mean.

**Q. Have you been trained on cavity searches?**

A. No.

**Q. What is a cavity search?**

A. A search involving an inmate's behind, a polite way to say it.

**Q. Do you have any knowledge of the**

Staib

**proper policies and procedures regarding cavity searches?**

A. No.

**Q. Were you trained on antidiscrimination at the Sheriff's Department?**

A. Yes.

**Q. Describe that training.**

A. Probably just PowerPoint, just, you know, treating all inmates fairly and the same.

**Q. Were you ever provided a policy and procedure regarding antidiscrimination?**

A. I believe so, yes.

**Q. When do you think that you received that?**

A. Could have been through the academy, but we do a course yearly online about antidiscrimination, so it could be through there as well.

**Q. Do you know what standard operating procedures are?**

A. No.

**Q. I want to talk about prisoner complaints. Were you ever trained about prisoner complaints and how to handle them?**

Staib

A. As far as I know on our end we would hand out a grievance form and they would submit it through our internal mail and then a grievance officer would, I guess, investigate what has to be investigated.

**Q. What is a grievance?**

A. It's a piece of paper where inmates other than writing their names and location can write, you know, if they feel like either a right has been violated or they haven't gotten the appropriate medical care or something along those lines.

**Q. Were you ever trained on prisoner complaints regarding an inmate complaining that he was either sick or in pain?**

A. No, but if an inmate complained I would just call medical.

**Q. So if an inmate was complaining on the tier that he was in pain or that he was sick, what would you do?**

A. I would call medical, have nurses come down, take a look at him.

**Q. Is that standard procedure?**

A. I mean it's just courtesy, I'm sure

it's -- they have sick call forms that the nurses handout, but they usually take a little while longer, that's probably the quicker route.

**Q. Do you have discretion to deny inmates' request to be taken for treatment or to the hospital?**

A. No.

**Q. Why not?**

A. I'm not a medical professional.

**Q. So are you trained that every time an inmate requests to be taken to medical or to treatment that you must do so?**

A. Yes.

**Q. Is that training in writing that you're aware of?**

A. I'm not sure.

**Q. Do you know what security checks are?**

A. No.

**Q. When you're working on the tier, how often do you have to check the tier?**

A. Patrols on my floor are every 15 minutes. Some other housing areas it's 30.

**Q. Where is your housing unit?**

A. I'm on B2 in the core main that

Staib

handles new admits.

**Q. So for patrols were you trained on patrols at the academy?**

A. Yes.

**Q. Describe that training.**

A. We have four linear tiers, the A and B officer would walk down A and B, at the end of each hallway there is a key that you turn to the right you look in every cell make sure nothing is going on down the tier and then the C and D officer would do the same thing on the C and D side.

MR. BRADLEY: (Screen sharing.) I'm going to pull up an exhibit, I guess we will mark it as Plaintiff's Exhibit 1, it's been disclosed by Defendants, it's Bates stamped Nassau County 619 to 645, it's the Use of Force Policy.

(Plaintiff's Exhibit 1, Use of Force Policy Bates Stamp Nassau County 619 to 645, marked for identification.)

**Q. Officer, have you ever seen this document before?**

**Staib**

A. Yes.

**Q. Would you like me to keep scrolling down so you can just see what it is?**

A. You can, it looks like our use of force continuum.

MR. BRADLEY: (Scrolling.)

**Q. Right, it talks about unnecessary force?**

A. Yes.

**Q. Excessive force, use of force, show of force verbal direction, we talked about those?**

A. Yes.

**Q. This policy, you mentioned that you've seen it before?**

A. Yes.

**Q. When was the first time you've seen it?**

A. During the academy.

**Q. Was it provided to you at the academy?**

A. I don't know to take home, but definitely reviewed.

**Q. Were you tested on this policy?**

A. Yes.

**Q. It was a written test?**

A. Yes.

**Q. You would agree with me that this policy regarding use of force is authoritative to you as a correction officer?**

A. Yes.

**Q. And that your failure to abide by the policies and procedures contained within this policy could result in your discipline?**

A. Yes.

MR. BRADLEY: (Screen sharing.) I'm pulling up what will be marked as Plaintiff's Exhibit 2 this is Bates Number 646 to 655 Nassau County.

(Plaintiff's Exhibit 2, Bates Stamp Nassau County 646 to 655, marked for identification.)

**Q. Officer, do you recognize this document?**

A. I'd have to read a little bit more.

MR. BRADLEY: (Scrolling.)

A. Yes.

**Q. Did you ever receive this document?**

A. Same as the last one, I'm not sure about to take home, but we definitely reviewed.

Staib

**Q. When did you first receive it or review it?**

A. In the academy.

**Q. Were you tested on this policy?**

A. Yes.

**Q. Do you know what is this policy?**

A. What to do if an inmate -- anything from chest pains, if an inmate is claiming that they were injured, anything along those lines what to do.

**Q. Were you tested on this policy?**

A. To the best of my knowledge, yes.

**Q. You would agree with me that your failure to comply with the policies and procedures and directives contained within this policy could result in your discipline?**

A. Yes.

MR. BRADLEY: (Screen sharing.) I'm showing you what will be marked as Plaintiff's Exhibit 3 it's Bates stamp Nassau County 472.

(Plaintiff's Exhibit 3, Bates Stamp Nassau County 472, marked for identification.)

Staib

**Q. Officer, do you recognize this document?**

A. I have to read a little bit more.

MR. BRADLEY: (Scrolling.)

A. Yes, looks familiar.

**Q. Why is it familiar to you?**

A. It's an antidiscrimination policy.

**Q. Were you provided with this document at the academy?**

A. I'm not sure to take home, but definitely reviewed.

**Q. Were you tested on this policy?**

A. Yes.

**Q. You would agree that your failure to comply with the directives, policies and procedures contained within this policy could result in your discipline?**

A. Yes.

MR. BRADLEY: (Screen sharing.) I'm showing you what will be marked as Plaintiff's Exhibit 4, it's Bates stamp Nassau County 673 to 698.

(Plaintiff's Exhibit 4, Bates Stamp Nassau County 673 to 698, marked

Staib

for identification.)

**Q. Do you recognize this document?**

A. I see it says Inmate Handbook but I've never read it myself.

**Q. Have you ever been provided with the Inmate Handbook?**

A. I have one on the floor.

**Q. Have you ever read it?**

A. No.

**Q. Are you required to read it?**

A. Not to my knowledge.

**Q. What is the purpose of the Inmate Handbook?**

A. I guess to show inmates how to act while they are here, what they are entitled to, I'm sure.

MR. BRADLEY: I'm turning to 688. (Scrolling.)

**Q. All right, Officer, I'm on 688. Do you see Rule 54?**

A. Yes.

**Q. Can you read that please let me know when you are done?**

A. (Reading.)

Staib

Okay, I've read it.

Q. **Would you agree with me that this handbook is telling prisoners that they will only be subject to a strip search in certain circumstances?**

A. Yes.

Q. **And it says it's a Class C violation, do you know what they mean by violation?**

A. No.

MR. BRADLEY: (Scrolling.)

Q. **I'm turning to the next page, it's 689 at Rule 64, would you read that to yourself please and let me know when you're done.**

A. (Reading.)

Okay.

Q. **Would you agree that that's telling inmates that they cannot be smoking on the tier and that they could be subject to some penalty?**

A. Yes.

MR. BRADLEY: (Screen sharing stopped.)

Q. **Do you have an employee handbook at the Sheriff's Department?**

A. I believe it's just the SOPs that you

Staib

were reading from, I believe that's it.

**Q. Do they provide you with a book saying here's the SOPs which is standard operating procedures?**

A. It's on our computers which are on every floor, but I don't have a hardcopy myself.

**Q. Have you ever seen it?**

A. Yes.

**Q. How many pages is it?**

A. I'm not sure.

**Q. Is it over 100?**

A. Could be.

**Q. Over 200?**

A. I'm not sure.

**Q. Are you required to review that yearly?**

A. A lot of things from there get brought over at in-service training which we go through once a year, but I believe so.

**Q. What are the types of things that you learn at in-service training?**

A. We go over OC spray, we go through use of force continuum, antidiscrimination, if there is any new policy and procedures that get

Staib

brought out. That's pretty much it.

**Q. Are you required to sign off on something that says I have reviewed the standard operating procedures of the Sheriff's Department?**

A. I'm not sure.

**Q. Now I want to talk to you about some documents that are unique to the Sheriff's Department, sheriff's office. One of them is called an Injury to Inmate Report, are you familiar with that report?**

A. Yes.

**Q. What is that report?**

A. It's a report that I fill out if an inmate is either claiming an injury or something is wrong with them medically and they need to be, I guess, taken to medical immediately.

**Q. In a typical day there's multiple correction officers that could work in your unit, right?**

A. Yes.

**Q. Let's say that there is a use of force incident, which correction officer would be responsible for writing an Injury to Inmate**

Staib

**Report?**
A. Those reports are normally done by the officer that is assigned to the block that the inmate is assigned to.
**Q. The officer assigned to the block?**
A. Yeah, block, tier.
**Q. Do you know what a cell census report is?**
A. Not really, no.
**Q. Do you know what a sick call request form is?**
A. Yes.
**Q. What is that?**
A. It's where an inmate can fill out if either they need a certain type of medication or if something is bothering them medically and it gets handed to a nurse and then from there I guess probably get seen by a doctor.
**Q. How is an inmate provided with a sick call request form?**
A. They get them from the nurses that come around multiple times daily.
**Q. Nurses come around multiple times daily?**

Staib

A. Yes.

**Q. When an inmate fills out a sick or request form, who do they give it to?**

A. The nurse.

**Q. Then once it's given to the nurse do you know what happens?**

A. Either they get seen by a doctor, I'm not really sure.

**Q. So in a situation where an inmate initially complains on the tier that he's in pain or that he's sick, would an officer that's assigned to the tier go and check on him?**

A. Yes.

**Q. If an officer checked on him but then the inmate said that he no longer wanted to be seen by medical, what would typically a correction officer do?**

A. I would probably still have a nurse come down and if he still wanted to refuse he could refuse to the nurse.

**Q. Why would you still want to have a nurse come down?**

A. Just in case either he changes his mind, I don't know what's wrong with him, I'm

Staib

not medically trained.

**Q. If you were having inmates on the tier, how does a cell door get open for an individual cell?**

A. For an individual cell, they get opened at the times that the inmates are out on the tier that they are not, I guess, just behind their cell, if they have to be called out for -- either if they are moving or if they are going somewhere else in the jail that they need to be out of their cell for.

**Q. In other words, do you have, like, a key to an individual cell where you can go up and take that guy out individually?**

A. We have a lockbox that's outside the tier in the hallway and you can open either multiple cells at the same time or an individual cell if you wanted to.

**Q. If you went to a lockbox and you decided to open an individual cell, would any record or electronic record be created in that event?**

A. I'm not sure.

**Q. Is it possible?**

**Staib**

A. Could be.

**Q. Have you ever seen an electronic record that I'm talking about like that?**

A. No.

**Q. Do you know what a logbook is?**

A. Yes.

**Q. What is a logbook?**

A. They get -- it's -- well, for us it's green, it's like probably over 100 pages. A lot of them are assigned to individual tiers or blocks and there is a main one that everything generally on the floor is written whether somebody comes on post or anything happens.

**Q. All right, so there is a main logbook and then there is a logbook for each individual tier?**

A. For -- unless the tier requires its own -- unless it's like a mental observation housing. For us, A and B is one logbook and C and D is another logbook. Then we also have our own logbook just for A Block because it's mental observation housing.

**Q. Is one of the reasons why they have a separate logbook for A is there is probably a**

**Staib**

**lot of medical treatment going on?**

A. It could be.

**Q. And also if you're under mental observation you probably need to check on them a lot more?**

A. Same time as all the rest, but there is an officer patrolling up and down a block.

**Q. At the academy were you trained how write a logbook?**

A. Yes.

**Q. Describe that training.**

A. Other than it being dated at the time, it's always patrol and then what's going on on what you're assigned to or if someone is on or off post, I guess.

**Q. Why are you required to keep a logbook?**

A. I'm not sure. I'm sure it's a state mandated thing.

**Q. At the academy did they teach you the importance of keeping a logbook?**

A. What was it? The importance? I'm sorry, you cutout.

**Q. The importance of keeping a logbook.**

Staib

A. I'm sure they didn't go through the reason that's just -- they probably just told us that's what we have to do. That's just how the job is, I guess.

**Q. Why do you personally think it may be important to keep a logbook?**

A. I think written records are important, just in case anything happens you can review it at any time.

**Q. Have you ever reviewed a logbook from the past?**

A. I'm not really sure. I probably did at some point.

**Q. Do you think that if you reviewed a logbook from the past it would refresh your recollection as to that date and time?**

A. Yes.

**Q. When you fill out a logbook do you indicate information in it?**

A. Yes.

**Q. If you put information in the logbook do you sign your name next to that information?**

A. Yes.

**Q. And you were trained you were required**

Staib

**to do that?**

A. Yes.

**Q. At any given time is there only one person responsible for filling out the logbook?**

A. For that specific logbook, yes.

**Q. Is somebody assigned that day that, okay, you're going to do the logbook today?**

A. Okay.

**Q. Does that happen?**

A. Yeah.

**Q. You said that you would be assigned to the B unit?**

A. B2.

**Q. B2?**

A. Yes.

**Q. So would you be responsible doing patrols on A, B, C and D tier?**

A. Not at the same time. The A and B officer patrols A and B and the C and D officer patrols C and D.

**Q. So on a typical day would there only be two officers doing patrols?**

A. Yes, plus the corporal sometimes during the count or other times. Mostly just

Staib

two.

**Q. Is there one officer responsible that does the logbook all day or do you alternate between the both of you?**

A. All those tiers have their own separate logbook so everybody would have their own.

**Q. So on a typical day, so there's going to be two officers doing patrols, right?**

A. Yes.

**Q. There may be a corporal there that's going to assist with count, head count?**

A. Yes.

**Q. Are there any other officers present?**

A. You have the A officer who is just assigned to A Block and if for any reason we have a meal relief, the meal relief officer could be heading some patrols throughout the day, other than that, no.

**Q. What are the job's responsibilities of a corporal?**

A. They are responsible for the floor as a whole so every inmate and officers that are on that floor. They are responsible for making

Staib

sure everybody is okay, everybody is here, present and that the floor runs as smooth as possible.

**Q. Would that be your superior officer?**

A. Yes.

**Q. What are the duties of a sergeant?**

A. They are responsible for the whole building, instead of the whole floor. They come around multiple times a day just to make sure everything is running okay. If for any reason you have any reports, that's how our chain of command is, it would go from the corporal to the sergeant next.

**Q. Who is above the sergeant?**

A. It would then be the lieutenant, the building lieutenant.

**Q. What does the lieutenant do?**

A. He's responsible for the whole building instead of the whole, I guess -- it's kind of hard to explain. There's two buildings on my side, the lieutenant is responsible for both of them. The reports would then go from the sergeant to him if there's any problems. He normally is around once a day.

Staib

**Q. Who is above the lieutenant?**
A. It would then be the captain.
**Q. What does the captain do?**
A. I'm not sure.
**Q. Then who is above the captain?**
A. I guess it would then be the undersheriff and then the sheriff.
**Q. Is it normal for a corporal to do the patrols?**
A. Regular patrols, not often, but it can happen.
**Q. When does it happen?**
A. I guess random points throughout the day when he or she wants to. There is not really a set time.
**Q. So a corporal, if he wanted to, he could just do patrols?**
A. Yes.
**Q. No one is stopping him?**
A. No.
**Q. Have you ever been disciplined by the sheriff's office?**
A. No.
**Q. Are you aware of any complaints made**

Staib

against you for excessive force?

A. No.

Q. For sexual assault?

A. No.

Q. For racial discrimination?

A. No.

Q. Have you ever been the subject of an Internal Affairs investigation?

A. No.

Q. Have you ever been disciplined by the department for any reason, losing your ID, whatever it may be, even minor?

A. No.

Q. Have you ever been brought up on charges and specifications?

A. No.

Q. Have you ever been interviewed by Internal Affairs with respect to an investigation into a correction officer?

A. Not to my knowledge, no.

Q. Have you ever been transferred for cause?

A. I'm sorry, can you repeat that?

Q. Have you ever been transferred for

cause?

A. No.

Q. Have you ever received a negative performance evaluation?

A. No.

Q. Have you ever learned of correction officers fabricating evidence against inmates?

A. No.

Q. Have you ever learned of correction officers hiding evidence regarding allegations against them for the use of force?

A. No.

Q. Have you ever learned of correction officers manufacturing evidence against an inmate?

A. No.

Q. When a correction officer makes a false statement, it is a violation of good and accepted correction officer practices and procedures, true?

A. True.

Q. Have you ever heard of a correction officer falsely claiming that they did not physically assault an inmate?

Staib

A. Can you repeat that? Sorry.

**Q. Have you ever heard of a correction officer falsely claiming that they did not use force on an inmate?**

A. No.

**Q. If a correction officer lied about whether or not they used force on an inmate, that would be wrong?**

A. Yes.

**Q. That would be a violation of sheriff's policies and procedures?**

A. Yes.

**Q. And as far as you're aware of it could be considered a crime?**

A. Yes.

**Q. If a correction officer physically assaults an inmate without cause, that would be a deviation from Sheriff's Department, from sheriff office policies and procedures?**

A. Yes.

**Q. If a correction officer physically assaulted an inmate without cause, that would be cruel and unusual punishment?**

A. Yes.

Staib

**Q. A violation of human rights?**

A. Yes.

**Q. If a fellow correction officer witnessed another correction officer use unnecessary force against an inmate but did not report that incident that would be a violation of sheriff office policies and procedures?**

A. Yes.

**Q. Failure to do so could be considered a false statement?**

A. Yes.

MR. BRADLEY: I'm going just ask for a couple of minutes and then we're going to switch gears for the deposition, okay?

MS. LaGRECA: Sure.

(A short recess was taken.)

CONTINUED EXAMINATION BY MR. BRADLEY:

**Q. I'm sorry, I just left out one question, so can you please list all circumstances when an inmate is let out of his cell as an individual?**

A. If he's moving to another location or

Staib

if he is being called to go to a different unit for any reason such as maybe medical or fingerprints or something like that, a visit, maybe. That's pretty much it.

**Q. What about to go eat?**

A. They eat on the tier.

**Q. What about do they go out for rec?**

A. For rec, not as -- so with the new admit floor they don't.

**Q. How long is an inmate on the new admit floor typically?**

A. It's normally around three to five days.

**Q. Under what circumstances would an inmate stay at the new admit for past five days?**

A. Maybe if they are not medically cleared or if they refused, I guess, medical intake. That's pretty much it.

**Q. So during Covid time if an inmate rejected the vaccine, would he be forced to stay on the new admit floor?**

A. I'm not sure about the vaccine, but COVID definitely made new admits stay up there a little longer. It was probably around a week

Staib

per inmate at that time.

**Q. Why was it a delay at that time?**

A. If I had to guess it would be to make sure that new admits don't spread COVID, bringing it into the jail to other parts, they would keep them there for about a week.

**Q. So today you have an attorney with you?**

A. Yes.

**Q. Did you meet with an attorney to prepare for this examination?**

A. Yes.

**Q. Did you meet with attorney Liora for that?**

A. Yes.

**Q. When did you meet with her?**

A. Probably around two weeks ago.

**Q. Where did you meet with her?**

A. At the Nassau County jail.

**Q. How long was your meeting?**

A. Probably under an hour.

**Q. Who was present at the meeting?**

A. Just me and her.

**Q. Did you review any documents in**

**Staib**

**preparation for this examination?**

A. Documents, no.

**Q. I have a list of names, I'm going to ask if you know these people and your relationship with them, you may or may not know them.**

A. Okay.

**Q. One of them is Detective Nicholas Occhino with the Nassau County Police Department, do you know who that is?**

A. No.

**Q. Have you ever heard of an officer, a correction officer for the Sheriff's Department called Stussey or Hussey?**

A. Stussey, no. What was the other?

**Q. Hussey?**

A. Hussey, yes, there is an officer, yes, Hussey.

**Q. How do you know Officer Hussey?**

A. I work in the same platoon as himself, I guess we are on the same schedule.

**Q. Does he work in B2 also?**

A. No.

**Q. Where does he work?**

A. Currently in B1 A.

**Q. Have you ever seen him in B2?**

A. No, not as far as I know.

**Q. Is it normal for a correction officer to go to a different unit than what he's assigned?**

A. No.

**Q. So Officer Hussey, how often do you see him?**

A. Just at lineup once a day when I come in, it's like roll call.

**Q. Are you friendly with him?**

A. Friendly, yeah.

**Q. Do you hangout outside of work with him?**

A. No.

**Q. Do you know who correction officer James Staib is? Oh, that's you.**

A. Yes.

MR. BRADLEY: Off the record.

(Discussion off the record.)

**Q. Do you know who a correction officer Thomas Benson is?**

A. Yes.

Staib

Q. **Who is that?**
A. He was my partner for probably around two years. He's not anymore.
Q. **When did he stop being your partner?**
A. Probably around October, November of last year.
Q. **So October, November of 2022?**
A. Yes.
Q. **Why did he stop being your partner?**
A. He went to another housing area.
Q. **To your knowledge, was his transfer to another housing area involuntary or voluntary?**
A. Voluntary as far as I know.
Q. **Did he ever tell you why he wanted to move?**
A. No. My floor is very busy so, it's a little quieter where he went.
Q. **Do you consider yourself to be friends with Officer Benson?**
A. Yeah.
Q. **Do you hangout outside of work?**
A. No.
Q. **So when you left the academy was he first your partner?**

Staib

A. No.

**Q. Who was your first partner?**

A. I had two partners, Officer Wise and Officer Villatoro.

**Q. How long after the academy did Officer Benson become your partner?**

A. Probably around two years.

**Q. I'm saying how far after the academy did he become your partner?**

A. Probably about two years.

**Q. Oh, two years, okay. So you've been a correction officer for about four years, right?**

A. Yes.

**Q. With respect to this case, did Mr. Benson or Officer Benson ever talk to you about it?**

A. No, not really.

**Q. I mean, you said not really, so was anything mentioned about the case?**

A. I was out hurt when I guess they found out about this case, so he did tell me that you're probably going to have to -- you know, there is a case with my name involved. But other than that, no.

Staib

**Q. Do you remember when you were hurt?**

A. From December of last year to mid March.

**Q. Do you know who Corporal Patrick McCaffrey is?**

A. I do, he's now a sergeant, but I knew him as a corporal, yes.

**Q. How often did you see him?**

A. Maybe two or three times a week. He wasn't my direct corporal but he worked on one of the crews opposite me, so I would see him maybe two hours a day.

**Q. What do you mean by opposite of you?**

A. So, like, if I'm working mornings he would be the crew that would be relieving me or vice versa. There is a small overlap so I would have him for maybe two hours instead of my current corporal.

**Q. Let's say he worked an overtime shift, would you see him the whole day?**

A. Yeah. If he worked overtime on my floor, yes.

**Q. Are you friendly with him?**

A. Yes.

Staib

**Q. Do you hangout outside of work?**
A. No.
**Q. Did you ever talk to him about this case or did he ever talk to you about it?**
A. No.
**Q. He never mentioned it?**
A. No. I don't really see him often anymore.
**Q. So if there was an overlap and Corporal Patrick McCaffrey were there, would he be your superior officer?**
A. Yes.
**Q. Do you know who Robert Jeffrey Johnson is?**
A. No.
**Q. If I showed you a picture do you think it would refresh your recollection?**
A. It might. I see a lot of people, but I'll definitely take a look.
MR. BRADLEY: Okay. (Screen sharing.) I'm showing you what will be marked as Plaintiff's 5, it's Bates stamp Nassau County 361.
(Plaintiff's Exhibit 5,

Staib

Photograph Bates Stamp Nassau County
361, marked for identification.)

**Q. All right, Officer, I'm showing you which I am representing as a picture of Robert Jeffrey Johnson, it's Plaintiff's Exhibit 5. Do you recognize this person?**

A. No.

**Q. You've never seen this person before?**

A. Not to my knowledge, no.

MR. BRADLEY: (Screen sharing stopped.)

**Q. How many times have you heard the name Robert Jeffrey Johnson?**

A. Only recently since this started, that's it.

**Q. So this and maybe the time when Benson told you about it last year?**

A. He didn't tell me about, like, who it was, he didn't mention his name.

**Q. Are there any cameras in the B2 unit?**

A. No, I don't believe so.

**Q. What about in the building itself?**

A. Maybe in the rec yards. Outside definitely. I'm sure in visiting downstairs,

Staib

yes, but in my building itself, no, I don't believe so.

Q. **So in October 2021, during that time, were there COVID-19 protocols?**

A. Yeah, I believe so.

Q. **Do you remember them?**

A. Not really, just we held inmates on the tiers a little bit longer, they got COVID-swabbed by nurses somewhat frequently. That's pretty much it. Vaccine was offered to anybody that wanted it. That's pretty much it, I think.

Q. **But what if somebody on the tier had COVID, what would happen?**

A. They would probably be moved to, like, a separate tier to isolate them for a certain amount of time deemed by the nurses and medical staff and then that tier would probably be quarantined for probably around a week to make sure nobody else caught it.

Q. **When they would be quarantined for about a week or so, were they allowed to leave their cells?**

A. Their cells, yes.

Staib

**Q. What was the protocol if the tier was quarantined about letting inmates out of their cells?**

A. As far as I know they would have the same amount of time out as they currently have now. I don't think that really changes.

**Q. So were they allowed to be let out with other inmates or were they allowed to be let out one at a time?**

A. If they have no classification that let them out by themselves I believe they would be out with others.

**Q. What do you mean by classification?**

A. Unless they were, like, protective custody or administrative segregation or something like that. But if they are just normal general population I believe they would come out with others.

**Q. Even though the tier was being quarantined because of a COVID-19 positive?**

A. Yes. They would all be on the tier together.

**Q. Would they be permitted to leave the tier for visits if they were being quarantined?**

A. I don't think so, no.

**Q. Were they permitted to leave the tier at all if the tier was being quarantined?**

A. Maybe just to go to medical as far as I know but...

It would mostly just be medical.

**Q. Do you know if these COVID-19 protocols were ever reduced to writing or given to you in writing in any way?**

A. I don't believe so, no.

**Q. How did you learn about the COVID-19 protocols?**

A. Probably verbally from bosses and stuff.

**Q. I want to direct your attention to October 12, 2021. Do you recall that day?**

A. No.

**Q. Were you working that day?**

A. I believe so, yes.

**Q. Do you know what your tour would have been?**

A. No, I don't.

**Q. Typically what was your tour?**

A. It would either be 8:00 in the morning

Staib

to 4:00 P.M. or it would be 4:00 P.M. to midnight.

**Q. You don't have any independent recollection of what happened on October 12, 2021?**

A. No.

**Q. During that time, you would be working at the B2 unit, right?**

A. Yes.

**Q. Are there specific tiers that you think you would have been patrolling?**

A. Me and my partners always rotated everything, so I could have been assigned to anywhere that day.

**Q. Do you recall any incident that happened on October 12, 2021 involving any inmate?**

A. No.

**Q. So you don't remember anything at all about whether or not you worked on October 12, 2021 or if anything happened that was unusual on October 12, 2021?**

A. No.

MR. BRADLEY: (Screen sharing.)

Staib

I'm going to show you Plaintiff's 6. It's Bates stamp Nassau County 366 to 491.

(Plaintiff's Exhibit 6, Nassau County 366 to 491, marked for identification.)

**Q. I'm going to direct your attention to a specific page.**

A. Okay.

**Q. That page is on Nassau County 369. Do you see this document?**

A. It's very small, but yes, it looks like our lineup.

**Q. Have you seen a document like this before?**

A. Lineups, no.

**Q. You've never seen a document that looks like this?**

A. No.

**Q. Do you see your name on this document?**

A. I'm going to have to get really close to you, but I can definitely take a look.

MR. BRADLEY: (Enlarging.)

A. Yes, I see me.

Staib

**Q. It has your name next to a 75, right?**
A. Okay, yes.
**Q. And then it says B2?**
A. Yes.
**Q. What does that mean?**
A. That's the floor I work on.
**Q. Does this refresh your recollection as to what tour you may have been working on October 12, 2021?**
A. Yes, it would be 07:30 to 16:00. You can read it at the top.
**Q. What time is that in civilian terms?**
A. 7:30 in the morning until 4:00 P.M.
**Q. You see in the left corner it says Benson?**
A. Yes.
**Q. Who do you think that is?**
A. His name? I don't -- I can't read what that is in print.
**Q. Not in print. It says T. Benson, do you think that's Thomas Benson?**
A. Yes.
**Q. It also says B2?**
A. Yes.

Staib

Q. Do you think that based on this document that Thomas Benson was working with you at 07:30 to 16:00?

A. Yes.

Q. On October 12, 2021?

A. Yes.

Q. So below your name at 78, it says J. Villatoro, do you see that?

A. Yes.

Q. Who is that?

A. My current partner, but he was my partner then as well.

Q. Based on this document do you believe that J. Villatoro was working with you on October 12, 2021 on a tour from 7:30 to 16:00?

A. Yes.

Q. Does this document refresh your recollection at all about which tier you may have been patrolling that day?

A. No.

Q. So I'm going to scroll down, there is another name here at the bottom of the document at 53, I believe it says Minervini, do you know who that is?

Staib

A. Yes, he was my partner at the time.

**Q. Does this document refresh your recollection as to whether or not Minervini was working with you on October 12, 2021 at a tour of 7:30 to 16:00?**

A. Yes.

**Q. There is another name here. It's in handwriting in the overtime section at 3, do you see that?**

A. Yes.

**Q. What does that say?**

A. It looks like it says McCaffrey.

**Q. Yes. And it says B2, right?**

A. Yes.

**Q. So it says overtime.**

A. Okay.

**Q. Do you know does this document refresh your recollection as to whether or not Corporal McCaffrey was working with you on October 12, 2021 from your tour of 7:30 to 16:00?**

A. I'll trust the document, but off the top of my head I don't.

**Q. But we did speak earlier that there were instances where Corporal McCaffrey and**

**Staib**

**correct me if I'm wrong, did work overtime and overlapped with your tours, right?**

A. Yes, correct.

MR. BRADLEY: (Screen sharing stopped.)

**Q. I'm sorry, did I ask you about the cell census, did you know what that document was?**

A. No. You asked me, I think I said I didn't know.

MR. BRADLEY: (Screen sharing.) All right, I'm showing you Plaintiff's Exhibit 7, it's Bates stamp Nassau County 1156 to 1160.

(Plaintiff's Exhibit 7, Bates Stamp Nassau County 1156 to 1160, marked for identification.)

**Q. I can scroll down but I just want you to take a look at this. Do you recognize the document?**

A. The logbook page, yes.

**Q. Does this look like a copy of a logbook?**

A. Yes.

Staib

**Q. It looks like it was probably scanned from a book, right?**

A. Yes.

**Q. Just in general, if you look at the top you can see that it's, I guess, I mean, typewriter, I don't know, but it says Tour Change Count, right?**

A. Yes.

**Q. What does that mean?**

A. It's how many inmates are on those tiers.

**Q. And signature of oncoming officers, was does that mean?**

A. So at that tour -- it's the midnight tour, it's midnight to 8:00 A.M. It's the midnight officer who is assigned to that, who is taking over that post at midnight.

**Q. There is a signature there, can you make it out?**

A. I don't know the signature off the top of my head, but it's printed a little bit down it says staff member assigned.

**Q. Oh, you said it's printed a little bit down?**

Staib

A. Yes, it's the printed version of the signature.

**Q. That looks like a Gallagher?**

A. Yes, it does.

**Q. Then it says signature of off-going officers, what does that mean?**

A. The officer that would be leaving at midnight who is handing the post to the next one coming on.

**Q. And then the date is I'm assuming the date of this tour, right?**

A. Yes.

**Q. And then the tour is the tour, we know that.**

A. Yes.

**Q. What about Housing Unit/Post?**

A. So you have B2 which is the floor, B as in the building, second floor and C and D Blocks.

**Q. And then for staff member assigned, that would be the staff member assigned to B2 C and D Blocks?**

A. Yes, the same as the oncoming officer.

**Q. Would that person be responsible for**

**filling out the logbook?**

A. Yes.

**Q. Then is says Number of Keys, 5 what does that mean?**

A. So between the A and B officer and the C and D officer you have five keys that you share, you have two keys which are used for the patrols and you have three keys that are used for the lockbox, so you share them between.

**Q. What does Radio Alarm number mean?**

A. So the A and B, C and D each have their own radio that you carry on you whenever you do the patrol, so that's the number assigned to that radio.

**Q. And what about OC number?**

A. You sign for an OC at the beginning of your tour, in the main logbook it lists all the OCs and when you sign for one, the one that you have on your hip, on your belt, that's where the number goes.

**Q. The OC spray?**

A. Yes.

**Q. Then it says previous tour entries reviewed and security inspection performed and**

**there is a signature, what does that mean?**

A. So when you come onto a tour you have to review -- I do the last 24 hours but it's normally the tour before that you have to review just to make sure and if you have any questions you can ask that officer before he leaves. And a security inspection meaning all the cells are either locked, making sure that everybody is either put away if it's that time a day, all the doors are locked and that you have all the keys and OC that you need, that's what the security inspection is.

**Q. So this entry on Nassau County 1156 looks like it's for the tour from 1 to 800?**

A. Yes, it's midnight to 8:00 A.M.

MR. BRADLEY: (Scrolling.)

**Q. I can't even read this so I'm not going to torture you with that.**

A. Thank you.

**Q. So then there is another one of these stamped boxes, I mean is it a stamp that you guys have?**

A. Yes, it's a stamp, yes.

MR. BRADLEY: Off the record.

Staib

(Discussion off the record.)

MR. BRADLEY: (Scrolling.)

**Q. I'm looking at 1157, do you see that?**

A. Where are you seeing that?

**Q. You see that red lettering?**

A. Oh, okay.

**Q. What tour was this filled out, if you know?**

A. This is the 8:00 A.M. to 4:00 P.M. tour of the same day.

**Q. Do you know who the oncoming officer was for this one?**

A. I can't really make out that handwriting.

**Q. And off-going officer?**

A. The off-going looks like Gallagher who signed on-going for the previous stamp.

**Q. What time did you say you believed your tour was after you reviewed that document?**

A. It was the 8:00 A.M. to 4:00 P.M. tour.

**Q. You would have probably been listed on 1156 if you were doing the B2 D, C and D Blocks, right?**

Staib

A. That's midnight so it would have been the next stamp below you.

MR. BRADLEY: (Scrolling.)

A. It would have been that stamp right there would have been my tour.

**Q. So it doesn't look like you were in the B2 C, D Blocks on October 12, 2021, right?**

A. No.

**Q. In other words, it looks like it wasn't your responsibility to patrol those areas on October 12, 2021 during your tour?**

A. No.

MR. BRADLEY: (Scrolling.)

**Q. On October 12, 2021, do you know if you may have worked overtime that day?**

A. I'm not sure.

**Q. Is it possible?**

A. It's possible, yeah.

**Q. How often would you work overtime?**

A. I'd normally do about 24 hours worth a week, maybe a little more. So three to four days I would do doubles.

**Q. So 24 hours worth of overtime a week?**

A. A week.

Staib

**Q. Does it have to get approved a day or so before you do overtime or can it be given to you that day?**

A. It's always day of.

MR. BRADLEY: (Screen sharing.)

I'm going to show you another document, it's Plaintiff's Exhibit 8, it's similar.

(Plaintiff's Exhibit 8,Bates Stamp 1161 to 1165, marked for identification.)

**Q. It's similar to what you just looked at.**

A. Okay.

**Q. This one is Bates stamped 1161 to 1165. Does this look like the document that we just reviewed, similar?**

A. Similar, yes. Another logbook.

**Q. Yes, I'm looking at 1161, at the top of the stamp, what tour was this done?**

A. That is the midnight. So 00:01-08:00 is midnight to 8:00 A.M.

**Q. This was on October 12, '21?**

A. That's correct.

Staib

Q. And this logbook is for patrols that were being done at the B2 B, A and B Blocks?
A. Yes.
Q. It says staff member assigned, do you recognize that name?
A. It looks like Schiff. Yes, I know who he is.
MR. BRADLEY: (Scrolling.)
Q. I'm looking at 1162 and at the stamp. Who is the oncoming officer there, do you know?
A. I believe that's Minervini's signature.
Q. Who is the off-going officer?
A. That would be Schiff.
Q. This tour is the 8:00 A.M. to 4:00?
A. Yes, correct.
Q. So if you were not in the C and D patrols, your name does not appear to be on this document, right?
A. No.
Q. Is there any reason why it wouldn't be?
A. No, not really. I don't think so.
Q. Do you think that Minervini may have

Staib

**been your partner on October 12, 2021?**

A. Yes, he was my steady partner for about two years as well.

**Q. So do you think it could be possible that you and Minervini were patrolling B2 D, A and B Blocks on October 12, 2021?**

A. Can you repeat that, I'm sorry.

**Q. Do you think it could be possible that on October 12, 2021 you and Minervini were partners and responsible to patrol both the B2 A and B Blocks?**

A. There is only one of us responsible for A and B. It looks like it was him.

**Q. So we just looked at the logbook for C and D and we did not see your name for the logbook entry for your tour, right?**

A. Yes, correct.

**Q. Is there any reason why you may not be in the logbooks?**

A. I wasn't signing it. I was probably on either A Block or in the lobby doing the main book.

MR. BRADLEY: (Screen sharing.)

I'm going to show you, it's going to

Staib

be Plaintiff's 9, similar document again, it's Bates stamp Nassau County 1151 to 1155.

(Plaintiff's Exhibit 9, Bates Stamp Nassau County 1151 to 1155, marked for identification.)

**Q. Do you see that document?**

A. Yes.

**Q. So this also looks like a logbook, right?**

A. Yes, that's our main book stamp.

**Q. Can you just briefly discuss, again, I'm sorry if I missed this, what is the difference between the main book and the other books we just looked at?**

A. The other books, the patrol books are assigned to tiers. So you're responsible to the inmates on that tier. The office book which is what we are looking at now you have all the supplies that are for the floor as a whole, it tracks all of our OCs and the numbers, any equipment that we have and it keeps a record of which officers were on that floor that day.

MR. BRADLEY: (Scrolling.)

Staib

**Q. I want you to look at 1152.**
A. Okay.
**Q. If you can see -- you can't really see because it looks a little scratched out, but do you see the name what appears to be McCaffrey?**
A. Yes, I do.
**Q. Why is his name on here, do you know?**
A. Because the Taken By is the corporal that's signing for the turnover when they do their count. So that's the corporal for that tour.
**Q. So it looks like he was the corporal for the 8:00 A.M. to 4:00 tour?**
A. Correct.
**Q. That was on a Tuesday?**
A. Yes.
**Q. You see it's -- can you see me highlight this area?**
A. Yes.
**Q. Do you see that it's kind of scratched out and says CPL?**
A. Corporal, abbreviation for corporal.
**Q. What about the lettering that's kind of smudged before that?**

**Staib**

A. It says on duty for that and the two other ones below it.

**Q. So the ones below it is on duty?**

A. On duty.

**Q. On duty sergeant?**

A. No, on duty as the officers working the floor.

**Q. Below that does it say Villatoro do you know?**

A. Yes.

**Q. What about the one under that?**

A. I'm not sure what that signature is.

**Q. What floor are we talking about?**

A. This is B2.

**Q. Do you know who would fill this out?**

A. Looking at that day it looks like that was Officer Villatoro's signature, it definitely is not mine.

MR. BRADLEY: (Scrolling.)

**Q. You see your name on 1153?**

A. Yes.

**Q. It says at 11:20 Staib offered a meal at this time?**

A. Yes.

Staib

**Q. What does that mean?**

A. It's my turn for, like, our meal relief, it means I'm up to go eat and do what I have to do, we have 50 minutes.

**Q. It also says at 11:55 C.O. Benson on post?**

A. Yes.

**Q. Then it says C.O. Duroseau off post?**

A. Yes.

**Q. What does that mean?**

A. I'm sure if maybe -- that's around the time that if somebody took like a half a day sick that they would come in. So maybe Officer Benson took a half and came in at the second half of his shift from 12:00 to 4:00.

**Q. It does appear based on this document that you and Benson were working on the same day on October 12, 2021 and at the same time?**

A. Yes, it looks like it's only here in the afternoon part. Sorry, looking at that.

**Q. You're not sure, right, but you could have been doing patrols in the A Block?**

A. Yeah, I'm guessing it was the A Block.

**Q. Or in the main lobby?**

Staib

A. Definitely not the main lobby, that's not my signature.

**Q. So probably the A Block?**

A. Yes.

**Q. Do you see that there is a notation at 15:25?**

A. Yes.

**Q. And it says notified by staff that B2 D9 I/M Johnson and then there is a number?**

A. Yes.

**Q. Does B2 D9 refer to the block that he's in and the cell number?**

A. Yes, his location, cell location.

**Q. And I/M obviously refers to inmate?**

A. Inmate, yes.

**Q. That number is his inmate number?**

A. Yes CC number.

**Q. Claiming he has chest pains?**

A. Yes.

**Q. And then there is a signature there, do you know whose signature that is?**

A. No, I'm not sure. It's not mine.

**Q. So this is a main book?**

A. Yes.

Staib

**Q. Why is it that this book has a notation about checking up on a prisoner about a medical injury?**

A. That's a very important piece to have in here, especially to have it time stamped, so that's why -- all the important stuff goes directly in our main logbook, it's pretty much just like a big floor sheet.

**Q. At 15:30 there is another line here.**

A. Okay.

**Q. Do you see what that first word is?**

A. Looks like medical.

**Q. Medical on post to evaluate inmate Johnson, is that fair to say?**

A. Yes.

**Q. Then it looks like the next signature is Corporal McCaffrey?**

A. It could be, I'm not familiar too much with his signature.

**Q. If it says medical on post to evaluate --**

A. Okay.

**Q. -- what type of documents do you think would be created from that?**

Staib

A. I believe that's just all on the medical side. That means it could be, I doubt it's an injury to inmate. Injury to inmates are more, I guess, like, if they sprain an ankle or broken bone, it's not really chest pains, it's more of just call medical and get nurses down here to see what's going on type of thing.

**Q. So would it be fair to say that not every time when a nurse comes to go check on a prisoner that they are going to take them to medical?**

A. Yes, that's fair.

**Q. So sometimes they just checkup on them and say okay, we're going to leave now and leave you in the cell?**

A. Yes.

**Q. There is another line at 15:35 I believe, is it fair to say that that says medical off post inmate Johnson remained in his cell?**

A. Yes, that's fair.

**Q. So based on what we are looking at from 15:25 to 15:35 it appears that Mr. Johnson was complaining of chest pains, that medical**

**Staib**

**came to his cell but then later left and Johnson remained in his cell?**

A. Yes.

**Q. Is that normal for medical to come and leave the person in their cell after the inmate complained of medical issues?**

A. It depends on, I guess, how serious it is. That's all up to medical's discretion.

**Q. Based on your experience, is it normal, does that usually happen, how often does that happen?**

A. It can happen fairly often, but depends, each case is a little different.

**Q. Do you think that it's unusual to you that Mr. Johnson asked for medical but remained in his cell after medical left?**

A. Unusual, no.

**Q. We looked at Exhibit 8 and I'm going to just go back to it for a second.**

MR. BRADLEY: We're going to go back to Plaintiff's Exhibit 7.

(Screen sharing.)

**Q. Plaintiff's Exhibit 7 is 1156 to 1160. We looked at this before.**

Staib

A. Okay.

**Q. We were just looking at Plaintiff's Exhibit 9 at the 8:00 A.M. to 4:00 P.M. tour. So now we are looking at Plaintiff's Exhibit 7 and we're going to look again at the 8:00 A.M. to 4:00 P.M. tour on this logbook.**

A. Okay.

**Q. And that's it right there at 1157, right?**

A. Yes.

**Q. That's 8:00 A.M. to 4:00 P.M. tour?**

A. Yes, correct.

**Q. So we just read and correct me if I'm wrong, but you would agree with me that we just read that it appears based on the logbook on Plaintiff's Exhibit 9 that Robert Johnson was complaining of chest pains around 3:30 P.M. on October 12, 2021?**

A. Around 3:30? I need to look at the time, I thought it said 13:30, that would be 1:00 P.M.

MR. BRADLEY: (Screen sharing.)

**Q. Do you see that?**

A. The logbook, yes.

Staib

**Q. So this is --**

A. Oh, you're right, 3:30.

MR. BRADLEY: (Screen sharing.)

**Q. So looking back at 7. At 1157 of Plaintiff's Exhibit 7 this is the logbook entry for that 8:00 A.M. to 4:00 P.M. tour, right?**

A. Correct.

**Q. And now I'm scrolling down and I'm at 1158.**

A. Okay.

**Q. Do you see any notation around 3:00 P.M. to 3:30 P.M. of Robert Johnson here?**

A. No, it doesn't look like it.

**Q. But does it look like around 15:00 to 15:30 entries that the name Benson appears?**

A. Yeah, that looks like his signature.

**Q. Based on your experience, do you know why the main logbook that's at Plaintiff's Exhibit 9 would have an indication that Mr. Johnson requested medical but this individual logbook for the B2 D patrols does not?**

A. Patrol books are mostly just for basic patrols. The logbook contains everything, like

Staib

all the important stuff, like as far as if an inmate has an emergency that has to get seen by medical such as chest pains or anybody coming onto post such as medical to evaluate, that's all the main logbook's job.

MR. BRADLEY: Just a few more documents.

I'm going to show you Plaintiff's Exhibit 10 that's Nassau County Bates Number 1007. (Screen sharing.)

(Plaintiff's Exhibit 10, Nassau County Bates Number 1007, marked for identification.)

**Q. Did you ever see this document before?**

A. Yes.

**Q. What is it?**

A. It looks like a diagram of our tier system, how our cell blocks work.

**Q. Do you see in the middle that there is a space between the blocks?**

A. Yes.

**Q. Is that the lockbox area?**

A. Yes, correct.

Staib

**Q. And then the letters, those are the individual blocks, right?**

A. Yes.

**Q. If you look at the D Block --**

A. Yes.

**Q. -- do you see the Number 9?**

A. Yes.

**Q. What is that?**

A. It's the cell, the 9 cell.

**Q. Based on Plaintiff's Exhibit 9 Robert Jeffrey Johnson, Jr. was in B2 D9 on October 12, 2021?**

A. Yes.

**Q. And that cell appears to be in the middle of the block, right?**

A. Just about.

**Q. And you see in the middle there is another space outside of the rectangular box?**

A. Yes.

**Q. What is that?**

A. That looks like the B2 lobby where the main book is kept.

**Q. And the B2 lobby, is that where the medical staff would come in?**

**Staib**

A. No, medical staff would come -- you see there's, like, two lines in between, like, the B and C?

**Q. (Indicating?)**

A. Yes. That's a hallway going back that way and that's where medical is, they would come through that way.

**Q. In the lobby have you ever heard of what a bubble is?**

A. A bubble, yes, but not on that floor. There is no bubble.

**Q. There is no bubble on this floor?**

A. No.

**Q. What is a bubble?**

A. It's kind of like an enclosed glass box, I guess, that controls switches, an officer would control a switch to I guess electrically open doors, that's the best way to describe it.

**Q. Where is the bubble located in Nassau County jail?**

A. There's several, but they are mostly in random hallways that need certain doors to be electronically opened. There's maybe two in my building but none that close to that floor.

Staib

**Q. How many times a day in general does medical usually come to the blocks?**

A. It depend on the day, but with few admits there is always a lot of medical down there. It's pretty frequently.

**Q. Is the lockbox area in the middle, that's where you would open individual cells or cell blocks?**

A. Yes, the lockboxes are up against those walls.

MR. BRADLEY: (Screen sharing.)
I'm going to show you Plaintiff's Exhibit 11. This is Bates Number 659 to 671.

(Plaintiff's Exhibit 11, Bates Number 659 to 671, marked for identification.)

**Q. Do you recognize this photo?**

A. I don't know when it was taken but that's B2.

**Q. That's B2, is that the lockbox area that's past there?**

A. Past that first gate, yes.

**Q. You see there is a table with a book**

Staib

on it?
A. Yes.
Q. Is that the patrol book?
A. Yes.
Q. And there is another one right beside it?
A. Yes.
Q. I'm assuming that these are the patrol books for A, B, C and D Blocks, right?
A. Yes, correct.
Q. You see the fellow whose got his arms crossed?
A. I can't see his face, but yes.
Q. Do you recognize that person?
A. No.
MR. BRADLEY: (Scrolling.)
Q. 660 that's with the gate open, right?
A. Okay.
Q. Yes?
A. Yes.
MR. BRADLEY: (Scrolling.)
Q. You see those are the boxes, right, there is like a red --
A. Yes, that's the light on top, yes, the

Staib

boxes are those big things underneath.

**Q. When would that light go on?**

A. If every cell and the shower gate and the door are all closed.

**Q. So you see the fellow to the right that's right in front of B Block?**

A. Yes.

**Q. That's the doors to enter B Block?**

A. So you have two sets of doors, you have where you can see B Block written in blue above the door, that's the tier door where the inmates would come out of. And then when we go do our patrols there is another door right in front of where that officer is standing that we call the Guard Walk, that's how you go on your patrols and walk around but it looks the same, just bars in between.

MR. BRADLEY: (Scrolling.)

**Q. It's also fair to say that the A, B, C and D Block almost look identical, right?**

A. Yes, exactly the same.

**Q. So do you know which block this could be?**

A. I'm not sure.

Staib

**Q. But this appears to be -- it could be a block from A, B, C and D?**
A. Could be, yes.
**Q. And to the right beyond the gates that's the walk --**
A. Yes.
**Q. What's it called again?**
A. Guard Walk.
MR. BRADLEY: (Scrolling.)
**Q. 665, that's a cell, right?**
A. Yes.
**Q. That's generally everything that's contained within a cell?**
A. An empty cell, yes.
**Q. So it looks like a mattress?**
A. Yes.
**Q. Toilet?**
A. Yes.
**Q. Sink?**
A. Yes.
**Q. Mirror?**
A. Yes.
**Q. And it looks like a shelf built into the wall, right?**

**Staib**

A. Yes.

**Q. I see a vent?**

A. Yes.

**Q. Anything else?**

A. I see a newspaper on the toilet but that's about it.

MR. BRADLEY: (Scrolling.)

**Q. Do you see this?**

A. Yes.

**Q. This is the shower?**

A. Yes.

**Q. Where is this?**

A. On one of the four tiers.

**Q. And it's a communal shower I'm guessing, right?**

A. Yes.

**Q. It looks like only one person at a time can take a shower, right?**

A. Yes.

MR. BRADLEY: (Scrolling.)

**Q. So I'm looking at one of those photos, do you see it looks like there is a little rust here? (Indicating.)**

A. Yes.

Staib

**Q. It's in the center of the photo, gate, is that where inmates would stick their hands out for you to handcuff them?**

A. Yes.

**Q. And then you would usually, normal practice for you is you turn them around and they put their hands behind their back and you handcuff them that way?**

A. Yes.

MR. BRADLEY: Off the record.

(Discussion off the record.)

MR. BRADLEY: (Screen sharing stopped.)

**Q. Smoking, is smoking a problem in the jails?**

A. It depends on the floor. With B2 not really.

**Q. In your experience as a correction officer, has an inmate ever been smoking at B2?**

A. Yeah.

**Q. Usually in those cases how did you find out that an inmate was smoking?**

A. More than likely they have a smoke alarm on that -- behind that vent that you saw

Staib

in a cell, there is a smoke alarm that alerts our lobby and alerts the lobby beneath us, they could tell what cell it is. That's more than likely. That gets picked up faster than the smell.

MR. BRADLEY: I'm going to pullup Plaintiff's Exhibit 11 again.

(Screen sharing.)

**Q. We are looking at 665, do you see that alarm? Where would the alarm be? I'm not sure we see it in this picture.**

A. You won't be able to see it, it's behind that vent, that square vent right above the mirror, it's behind that, there is a pipe case that runs along and you could see behind the cells of I guess that would be C and D Block and there's smoke alarms for each cell behind there. But you can't see it from these pictures.

**Q. Do you know if there would be any records of a smoke alarm going off?**

A. I'm not sure.

MR. BRADLEY: (Screen sharing stopped.)

Staib

**Q. So you mentioned that smoking has happened at the B2 tier based on your experience, right?**

A. Yes.

**Q. Typically you would identify that somebody was smoking because an alarm went off?**

A. Yes.

**Q. If an alarm went off and you believe that there could be smoking going on on a tier, what would you do?**

A. I'd alert probably my crew that I'd be working with my partners and my corporal and then we'd probably then alert the sergeant.

**Q. What happens then?**

A. The sergeant would probably come down and decide if we should be calling our SERT Team, it's kind of like our version of SWAT. And now they kind of handle going down the tier if they need to, it's not really us anymore.

**Q. You said it was SERT Team?**

A. Yes, S-E-R-T.

**Q. What does that stand for?**

A. I have no idea.

**Q. Any times has there ever been a**

**Staib**

**situation where you all as correction officers handle that on your own as opposed calling SERT in order to identify who was smoking on a block?**

A. Maybe before I started, but not since I've been here.

**Q. Why do you say maybe before you started, you just don't know but it's possible?**

A. We only got like a full time SERT Team recently, maybe last three years or so.

**Q. SERT is new, it's three years?**

A. As a full time, like, always on duty team, yes, but it's been a thing for longer.

**Q. So in 2002 was it a full time duty thing?**

A. I'm not sure. It's probably around the time it started.

**Q. In October 2021 do you know whether or not the SERT Team was a full time team?**

A. I'm not sure.

**Q. So have you ever heard of your fellow correction officers in general, just a correction officer, handling identifying who was smoking on a tier?**

A. Identifying who was smoking, without

Staib

an alarm? No.

**Q. With an alarm.**

A. With an alarm? Yeah, but they tell you what -- we'll get a phone call and it will say smoke alarm in 9 cell or 8 cell or wherever.

**Q. So SERT is not coming, right? Let's say they don't come what do you do?**

A. It's up to the sergeant, it's not up to me.

**Q. Based on your experience what has been done when SERT doesn't come?**

A. They have to, that's who gets called.

**Q. But you know of situations before they became a full time team where it could have been handled by the sergeant, right?**

A. I told you when I started they were pretty much a full time thing, I never had to go down the tier to do anything like that.

**Q. In October 2021, do you know if there was any smoking going on by inmates in the B2 area?**

A. I'm not sure.

**Q. Do you think it's possible?**

A. Possible, yes.

Staib

**Q. If SERT was called, would any records be created from them being called to the B2 tier?**

A. I don't know what they would write on their end but it would probably would be in our logbook at some point. The main logbook.

**Q. In your entire four years as a correction officer, have you always been in B2?**

A. No.

**Q. How long have you been in B2 for?**

A. October will be three years.

**Q. In those three years how many instances of smoking, if you can approximate, has happened with inmates?**

A. Maybe a dozen, two dozen.

**Q. So it could be 12 to 24?**

A. Could be, yeah.

**Q. Each and every one of those times did SERT come to try to resolve that situation?**

A. As far as I know.

**Q. Do you know if any correction officer complained about the behavior of Robert Jeffrey Johnson in October 2021?**

A. No, I have no memory.

Staib

**Q. Would you characterize as smoking by inmates a big problem at Nassau County jails?**

A. Big problem, no.

**Q. But it is a problem?**

A. Yeah, it's a problem.

**Q. Is it tolerated at all or is it not tolerated in --**

A. Not tolerated.

**Q. Have you ever heard of an instance of an allegation by an inmate against a correction officer that a correction officer stuck a finger up the inmate's rectum?**

A. No.

**Q. Have you ever heard of an instance where a correction officer smuggled in contraband into the Nassau County jail?**

A. I believe there was something on the news somewhat recently about one, but other than that case, no.

**Q. Did you know that person?**

A. Worked with maybe once or twice but he was still fairly new.

**Q. Was he ever at the B2 tier?**

A. Not that I'm aware of. I believe his

Staib

steady post was on a different floor. He was not in my platoon.

MR. BRADLEY: All right, can you just give me a few minutes, I'm just going to review my notes.

(A short recess was taken.)

CONTINUED EXAMINATION BY MR. BRADLEY:

**Q. Just a few more questions. Are you aware if Officer Benson was interviewed by Internal Affairs with respect to the incident that occurred on October 12, 2021 involving Robert Jeffrey Johnson, Jr.?**

A. I'm not sure.

**Q. Are you aware that Officer Benson stated that there was smoking going on in the tier or in B2 D or on one of those blocks on B2 in October 2021?**

A. I'm not sure.

**Q. Do you know if Officer Benson ever stated or ever heard him state that there was smoking going on in the middle of the tier of B2 D Block?**

A. I'm not sure, no.

Staib

Q. From the main lobby, can you see the lockbox area?

A. Yes.

Q. And vice versa?

A. Yes.

Q. You have a clear view of the lockbox area from the main lobby?

A. You have those -- that gate, the bars separating you, but other than that, yes.

Q. If the bars are separating, do you have a good view or is it somewhat obscured?

A. Somewhat obscured.

Q. If somebody was screaming from the lockbox area do you think you can hear it from the main lobby?

A. Yes.

Q. If there was a scuffle in the lockbox area do you think you could hear it from the main lobby?

A. Yes.

Q. Were you ever contacted by an investigator Robert Pearce (phonetic)?

A. Not to my knowledge. I know who he is but not to my knowledge.

Staib

Q. Has he ever spoken to you about this incident?

A. I don't believe so, no.

Q. Are you aware of if Thomas Benson said that he remembered Robert Jeffrey Johnson, Jr. making complaints about chest pains?

A. No. I'm not sure.

Q. Do you know who an inmate Clifton Woods is?

A. No.

Q. Did you take any notes, handwritten notes, about this case or this deposition or anything like that?

A. No.

Q. Did you see anyone assault Robert Jeffrey Johnson, Jr. on October 12, 2021?

A. No.

Q. Did you see any correction officer use force on Robert Jeffrey Johnson, Jr. on October 12, 2021?

A. No.

Q. Do you recall if Robert Jeffrey Johnson, Jr. ever had a bruise to his face on or after October 12, 2021?

Staib

A. I don't recall.

**Q. Are you aware of any inmate on inmate altercations on October 12, 2021 at B2 D?**

A. No, I don't recall.

**Q. Do you think there could have been any?**

A. Could have.

**Q. How often do fights happen in B2?**

A. B2 not very often. Maybe a couple of times a year.

**Q. In your four years or -- you said three years at B2?**

A. Yeah, about three.

**Q. Have there ever been any instances in B2 where an inmate suffered a self-inflicted injury?**

A. Self-inflicted, yes.

**Q. What types of injuries did you see?**

A. I've had inmates try to hang up -- hang themselves. I've had inmates try to cut themselves. I've had inmates slamming their head off walls. That's probably it, mostly those three.

**Q. You talked about a head count, I**

**didn't ask you about that, what's the procedure for a head count?**

A. For a count, there's a couple of times throughout the day, the times are 6:00 A.M., 11:00 A.M., 3:00 P.M. and 10:00 P.M. and the corporal goes around, counts every inmate on each tier and then we would get a phone call from the housing officer who works downstairs in housing to verify that the count is correct and then I'm guessing that that's like a state reportable count. It's also written and entered into the logbook, the count.

**Q. An inmate on inmate altercation, would that be written into the logbook?**

A. Yes.

**Q. If there is an inmate on inmate altercation, would that usually happen in the common area on the tier?**

A. Yes.

**Q. If that does occur, how is that matter resolved by corrections?**

A. That's how we go through our use of force continuum. So first it would be to tell inmates to stop fighting using verbal commands.

Staib

If they refuse and keep fighting then the OC spray is used. And then if OC doesn't work then it would be soft hand techniques.

MR. BRADLEY: (Screen sharing.) Okay, just one last thing, I'm going to mark Plaintiff's Exhibit 12. It's Nassau County Bates stamp 268 to 276.

(Plaintiff's Exhibit 12, Nassau County Bates Stamp 268 to 276, marked for identification.)

**Q. Officer, do you see that picture?**

A. Yes.

**Q. Have you ever seen this picture before?**

A. No.

**Q. You don't recognize this person, right?**

A. No, I do not.

**Q. Is this person in a jail uniform?**

A. Except the top. He has the jail pants on.

**Q. And the jail pants are orange?**

A. Yes. As is the top.

MR. BRADLEY: (Screen sharing

Staib

stopped.)

All right, I have no further questions, thank you, Officer.

THE WITNESS: Thank you.

(Time noted: 12:48 P.M.)

JAMES TIMOTHY STAIB

Subscribed and sworn to before me
This day of , .

Notary Public

--------------------I N D E X--------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| JAMES TIMOTHY STAIB | MR. BRADLEY | 4 |

--------------------EXHIBITS--------------------

| PLAINTIFF'S | | FOR I.D. |
|---|---|---|
| 1 | Use of Force Policy Bates Stamp Nassau County 619 to 645 | 28 |
| 2 | Bates Stamp Nassau County 646 to 655 | 30 |
| 3 | Bates Stamp Nassau County 472 | 31 |
| 4 | Bates Stamp Nassau County 673 to 698 | 32 |
| 5 | Photograph Bates Stamp Nassau County 361 | 59 |
| 6 | Nassau County 366 to 491 | 64 |
| 7 | Bates Stamp Nassau County 1156 to 1160 | 68 |
| 8 | Bates Stamp 1161 to 1165 | 75 |
| 9 | Bates Stamp Nassau County 1151 to 1155 | 78 |
| 10 | Nassau County Bates Number 1007 | 88 |
| 11 | Bates Number 659 to 671 | 91 |
| 12 | Nassau County Bates Stamp 268 to 276 | 108 |

CERTIFICATION BY REPORTER

I, NANCY DIONISIO a Notary Public of the State of New York, do hereby certify:

That the testimony of JAMES TIMOTHY STAIB was held before me at the aforementioned time and place.

That said witness(s) was duly sworn before the commencement of the testimony; that the testimony was taken stenographically by me and then transcribed under my direction; that the parties were represented by Counsel as appears herein.

That the within transcript is a true record of the Examination Before Trial of said witness.

That I am not connected by blood or marriage with any of the parties. I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the Counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of June, 2023.

NANCY DIONISIO

A

**A.M** 1:15 69:16 72:16 73:10,21 75:23 76:16 79:14 86:4,6 86:12 87:7 107:5,6
**abbreviation** 79:23
**abide** 30:7
**able** 6:11 97:13
**above-entitled** 1:19
**above-mentio...** 1:20
**academy** 11:13 11:16,21,23 12:4,6,22 13:7 13:18 14:6,16 15:12 17:19,22 17:25 19:9,15 19:17 25:16 28:4 29:19,20 31:4 32:10 41:9,21 55:24 56:6,9
**accept** 9:21
**accepted** 18:10 48:20
**accurately** 8:22
**act** 33:15
**action** 1:19
**additional** 19:10
**address** 4:15 9:16
**administrative** 61:16
**admit** 51:10,11 51:16,22
**admits** 28:2 51:24 52:5 91:5
**Affairs** 47:9,19 103:12
**aforementioned** 111:7
**afternoon** 81:21
**against-** 1:7
**aggressive** 13:12
**ago** 52:18
**agree** 6:5,17,21 8:16 15:8 30:3 31:14 32:15 34:3,17 86:15
**AGREED** 3:2,6 3:10
**alarm** 71:11 96:25 97:2,11 97:11,22 98:7 98:9 100:2,3,4 100:6
**alarms** 24:9 97:18
**alert** 98:12,14
**alerts** 97:2,3
**allegation** 102:11
**allegations** 48:11
**allowed** 60:23 61:8,9
**altercation** 107:14,18
**altercations** 106:4
**alternate** 44:4
**amount** 60:18 61:6
**ankle** 84:5
**answer** 6:11 7:7 7:15,17,24 8:13 23:16
**answers** 7:13
**anticipate** 7:12
**antidiscrimin...** 14:25 15:7 25:5,12,18 32:8 35:24
**anybody** 60:12 88:4
**anymore** 55:4 58:9 98:20
**anyplace** 23:19
**appear** 76:19 81:17
**appears** 79:6 84:24 86:16 87:16 89:15 94:2 111:13
**appropriate** 17:17 21:21 23:9 26:12
**approved** 75:2
**approximate** 101:14
**approximately** 10:12
**area** 55:11,13 79:19 88:24 91:7,22 100:22 104:3,8,15,19 107:19
**areas** 27:23 74:11
**arms** 92:12
**asked** 68:10 85:16
**asking** 4:24 7:13
**assault** 15:4,5 47:4 48:25 105:16
**assaulted** 49:23
**assaults** 49:18
**assigned** 37:4,5 37:6 38:13 40:11 41:15 43:7,12 44:17 54:7 63:14 69:17,23 70:21 70:22 71:14 76:5 78:18
**assist** 44:13
**assume** 6:25
**assuming** 70:11 92:9
**attached** 21:17 22:16
**attended** 12:6
**attention** 62:16 64:8
**attorney** 2:10,11 52:8,11,14
**attorneys** 2:5 3:3
**authoritative** 30:4
**Avenue** 4:17 9:18
**average** 16:9,12
**avoid** 17:20
**aware** 5:16 22:3 22:4,7 27:16 46:25 49:14 102:25 103:11 103:16 105:5 106:3

B

**B** 4:6 28:7,8 40:20 43:13,18 43:19,20 70:18 71:6,12 76:3,3 77:7,12,14 90:4 92:10 93:7,9,11,20 94:3
**B1** 54:2
**B2** 27:25 43:14 43:15 53:23 54:3 59:21 63:9 65:4,24 67:14 70:18,22 73:24 74:8 76:3 77:6,11 80:15 82:9,12 87:22 89:12,22 89:24 91:21,22 96:17,20 98:3 100:21 101:3,9 101:11 102:24 103:18,18,23 106:4,9,10,13 106:16
**back** 20:3,7,11 21:9 22:9,10 22:11 24:9 85:20,22 87:5 90:6 96:8
**background** 10:6
**bars** 22:16 93:18 104:9,11
**based** 66:2,14 81:17 84:23 85:10 86:16 87:18 89:11 98:3 100:11
**basic** 87:24
**Bates** 28:18,22 30:13,15 31:21 31:23 32:22,24 58:23 59:2 64:3 68:14,16 75:16 78:3,5 88:11,14 91:14 91:16 108:8,10 110:7,9,10,11 110:12,14,15 110:16,17,18 110:19
**bed** 22:24
**began** 11:15
**beginning** 71:17
**begins** 16:18
**behalf** 9:21
**behavior** 13:12 101:23
**believe** 14:6,8 15:5 17:15 20:23 23:10 24:4,6,11 25:13 34:25 35:2,20 59:22 60:3,6 61:12 61:18 62:11,20 66:14,24 76:12 84:2,19 98:9 102:18,25 105:4
**believed** 73:19
**belt** 21:8,10,11 21:13,17 71:20
**beneath** 97:3
**Benson** 1:10 54:24 55:20 56:7,16,16 59:17 65:16,21 65:22 66:3 81:6,15,18

87:16 103:11 103:16,21 105:5
**best** 23:17 31:13 90:19
**Bethpage** 11:2
**beyond** 94:5
**big** 22:25 83:9 93:2 102:3,4
**bit** 30:20 32:4 60:9 69:22,24
**block** 37:4,6,7 40:22 41:8 44:17 77:22 81:23,24 82:4 82:12 89:5,16 93:7,9,11,21 93:23 94:3 97:17 99:4 103:24
**blocks** 40:12 70:20,23 73:24 74:8 76:3 77:7 77:12 88:20,22 89:3 91:3,9 92:10 103:18
**blood** 111:17
**blue** 93:11
**BMC** 1:6
**body** 21:3,8,10 21:13,15,17
**bone** 84:6
**book** 35:3 69:3 77:23 78:12,15 78:19 82:24 83:2 89:23 91:25 92:4
**booklet** 13:3
**books** 78:16,17 78:17 87:24 92:10
**bosses** 62:14
**bothering** 37:17
**bottom** 66:23
**box** 89:19 90:17
**boxes** 72:22 92:23 93:2
**boy** 6:2
**Bradley** 2:7 4:11 4:23 5:4 9:20 28:14 29:7 30:11,21 31:19 32:5,20 33:18 34:11,21 50:13 50:20 54:21 58:21 59:11 63:25 64:24 68:5,12 72:17 72:25 73:3 74:4,14 75:6 76:9 77:24 78:25 80:20 85:21 86:23 87:4 88:7 91:12 92:17,22 93:19 94:10 95:8,21 96:11 96:13 97:7,24 103:4,9 108:5 108:25 110:4
**break** 8:11,14
**briefly** 78:13
**bringing** 52:6
**broken** 84:6
**brought** 9:13 35:18 36:2 47:15
**bruise** 105:24
**bubble** 90:10,11 90:12,13,15,20
**building** 45:9,17 45:20 59:23 60:2 70:19 90:25
**buildings** 45:21
**built** 94:24
**bulletins** 14:11
**business** 9:16
**busy** 55:17

**C**

**C** 2:2 28:11,12 34:8 40:20 43:18,20,21 70:19,22 71:7 71:12 73:24 74:8 76:18 77:15 90:4 92:10 93:20 94:3 97:17
**C.O** 81:6,9
**call** 26:18,22 27:2 37:11,21 54:12 84:7 93:16 100:5 107:8
**called** 36:11 39:9 51:2 53:15 94:8 100:13 101:2,3
**calling** 98:17 99:3
**Calls** 23:14
**calm** 17:10
**cameras** 59:21
**captain** 46:3,4,6
**care** 12:13 14:15 18:14 26:12
**Carman** 4:17 9:18
**carry** 71:13
**case** 8:12 15:4 38:24 42:9 56:15,20,22,24 58:5 85:14 97:16 102:20 105:13
**cases** 96:22
**caught** 60:21
**cause** 24:14 47:23 48:2 49:18,23
**cavity** 24:16,19 24:22 25:2
**CC** 82:18
**cell** 22:12,14,23 24:9 28:10 37:8 39:4,5,6,9 39:12,14,19,21 50:24 68:8 82:13,14 84:16 84:21 85:2,3,6 85:17 88:20 89:10,10,15 91:9 93:4 94:11,14,15 97:2,4,18 100:6,6
**cells** 22:25 39:18 60:24,25 61:4 72:8 91:8 97:17
**census** 37:8 68:8
**center** 1:9 96:2
**certain** 5:12 34:5 37:16 60:17 90:23
**certification** 3:5 111:2
**certify** 111:5
**chain** 45:12
**chance** 8:2
**Change** 69:8
**changes** 38:24 61:7
**characterize** 16:25 102:2
**charges** 9:13 47:16
**check** 27:21 38:13 41:5 84:10
**checked** 38:15
**checking** 83:3
**checks** 27:18
**checkup** 84:14
**chest** 20:25 31:9 82:19 84:6,25 86:18 88:4 105:7
**circumstance** 15:16
**circumstances** 15:20,25 21:19 34:6 50:23 51:15
**civil** 1:22 9:7,10
**civilian** 15:17 16:10 65:13
**claiming** 31:9 36:16 48:24 49:4 82:19
**Class** 34:8
**classification** 61:11,14
**clean** 7:16
**clear** 104:7
**cleared** 51:18
**Clifton** 105:9
**close** 21:14 64:22 90:25
**closed** 13:17,19 13:20 93:5
**code** 16:9
**College** 10:8
**come** 26:22 37:23,24 38:20 38:23 45:9 54:11 61:19 72:3 81:14 85:5 89:25 90:2,7 91:3 93:13 98:16 100:8,12 101:20
**comes** 40:14 84:10
**coming** 70:10 88:4 100:7
**command** 45:13
**commands** 13:12,24 16:19 107:25
**commencement** 111:10
**common** 107:19
**communal** 95:15
**Community** 10:8,11
**complained** 26:17 85:7 101:23
**complaining** 26:15,19 84:25 86:18
**complains** 38:11
**complaints** 25:24,25 26:15 46:25 105:7

**comply** 31:15 32:16
**computers** 35:6
**conclusion** 23:15
**conduct** 12:10 16:9
**confrontations** 17:20
**Conklin** 2:6
**connected** 111:17
**consider** 55:19
**considered** 49:15 50:10
**contacted** 104:22
**contained** 30:8 31:16 32:17 94:14
**containing** 13:3
**contains** 87:25
**CONTINUED** 50:20 103:9
**continuum** 17:2 29:6 35:24 107:24
**contraband** 23:25 102:17
**control** 90:18
**controls** 90:17
**controversy** 111:20
**convicted** 10:2
**copy** 4:3 68:23
**core** 27:25
**corner** 65:15
**corporal** 1:9 43:24 44:12,22 45:13 46:9,17 57:5,8,11,19 58:11 67:19,25 79:9,11,13,23 79:23 83:18 98:13 107:7
**correct** 8:7 16:15 68:2,4 75:25 76:17 77:18 79:15 86:13,14 87:8 88:25 92:11 107:10
**correction** 8:2 12:8,11,14,17 15:21 16:8 18:11,14,16,18 18:21 19:19 30:5 36:20,24 38:18 47:20 48:7,10,14,18 48:20,23 49:3 49:7,17,22 50:4,5 53:14 54:5,18,23 56:13 96:19 99:2,22,23 101:9,22 102:11,12,16 105:19
**CORRECTI...** 1:8
**corrections** 9:14 11:22 14:16 16:2 107:22
**Counsel** 1:24 9:20 111:13,21
**count** 43:25 44:13,13 69:8 79:11 106:25 107:3,4,10,12 107:13
**counts** 107:7
**County** 1:8,8,9 1:11 2:10,10 5:2 10:16,23 11:6,12 13:4 28:19,22 30:14 30:16 31:22,24 32:23,25 52:20 53:10 58:24 59:2 64:3,6,11 68:15,17 72:14 78:3,6 88:11 88:14 90:21 102:3,17 108:8 108:10 110:8,9 110:10,11,12 110:13,14,16 110:17,19
**couple** 22:25 50:14 106:10 107:4
**course** 25:17
**court** 1:2 3:14 4:2 6:9 7:16
**courteously** 18:25
**courtesy** 26:25
**Covid** 51:20,24 52:5 60:15
**COVID-19** 60:5 61:21 62:8,12
**COVID-swab...** 60:10
**CPL** 79:22
**created** 39:22 83:25 101:3
**credits** 10:10
**crew** 57:16 98:12
**crews** 57:12
**crime** 10:3 49:15
**crossed** 92:13
**cruel** 49:24
**cuff** 22:18
**cuffing** 13:14
**current** 4:15 19:21 57:19 66:12
**currently** 10:15 54:2 61:6
**custody** 61:16
**cut** 106:21
**cutout** 41:24
**CV** 1:6

**D**

**D** 28:11,12 40:21 43:18,20 43:21 70:19,23 71:7,12 73:24 73:24 74:8 76:18 77:6,16 87:22 89:5 92:10 93:21 94:3 97:17 103:18,24 106:4 110:2
**D9** 82:10,12 89:12
**daily** 15:20,25 37:23,25
**date** 19:14 42:17 70:11,12
**dated** 41:13
**day** 36:19 43:7 43:22 44:4,9 44:20 45:10,25 46:15 54:11 57:13,21 62:17 62:19 63:15 66:20 72:10 73:11 74:16 75:2,4,5 78:24 80:17 81:13,18 91:2,4 107:5 109:12 111:23
**days** 51:14,16 74:23
**de-escalation** 17:7,11
**December** 57:3
**decide** 98:17
**decided** 39:21
**deemed** 60:18
**Defendant** 1:19 4:7 9:6
**Defendants** 1:12 2:11 5:11 28:18
**definitely** 29:22 30:25 32:12 51:24 58:20 59:25 64:23 80:18 82:2
**delay** 52:3
**deny** 27:5
**department** 1:9 10:17,24 11:6 11:12 13:5 14:20,22 17:14 18:8 19:7 22:3 25:6 34:24 36:6,10 47:12 49:19 53:11,14
**depend** 91:4
**depends** 85:8,14 96:17
**deposed** 8:25
**deposition** 1:18 3:11 5:19 6:4 7:23 50:16 105:13
**describe** 10:24 13:10 20:2 21:5 22:22 25:8 28:6 41:12 90:19
**Detective** 53:9
**deviation** 49:19
**diagram** 88:19
**difference** 78:15
**different** 51:2 54:6 85:14 103:2
**differently** 15:20,25
**Dionisio** 1:20 111:4,25
**direct** 57:11 62:16 64:8
**direction** 29:12 111:12
**directives** 31:16 32:16
**directly** 83:8 111:19
**disciplinary** 5:10
**discipline** 18:22 30:9 31:17 32:18
**disciplined** 15:9 46:22 47:11
**disclosed** 5:12 28:17
**discovery** 5:6,21
**discretion** 22:8 27:5 85:9
**discrimination**

47:6
**discuss** 78:13
**Discussion** 54:22 73:2 96:12
**DISTRICT** 1:2 1:2
**doctor** 37:19 38:8
**document** 28:25 30:19,23 32:3 32:9 33:3 64:12,15,18,21 66:3,14,18,23 67:3,18,22 68:8,21 73:20 75:8,17 76:20 78:2,8 81:17 88:16
**documents** 5:12 36:9 52:25 53:3 83:24 88:8
**doing** 43:17,23 44:10 73:24 77:22 81:23
**door** 39:4 93:5 93:12,12,14
**doors** 72:11 90:19,23 93:9 93:10
**doubles** 74:23
**doubt** 84:3
**downstairs** 59:25 107:9
**dozen** 101:16,16
**duly** 4:7 111:9
**Duroseau** 81:9
**duties** 45:7
**duty** 18:17 80:2 80:4,5,6,7 99:12,14

**E**

**E** 2:2,2 4:6 110:2
**earlier** 7:24 67:24
**Easier** 20:8
**East** 4:17 9:18 10:17
**EASTERN** 1:2
**eat** 51:6,7 81:4
**educational** 10:5
**effect** 3:12
**either** 26:10,16 36:16 37:16 38:8,24 39:10 39:17 62:25 72:9,10 77:22
**electrically** 90:18
**electronic** 39:22 40:3
**electronically** 90:24
**emergency** 13:21 15:12 88:3
**employ** 111:20
**employed** 10:15
**employee** 34:23
**employment** 10:25
**empty** 94:15
**enclosed** 90:16
**encounter** 15:17 15:21 16:2
**Enlarging** 64:24
**enter** 93:9
**entered** 107:12
**entire** 101:8
**entirely** 20:9
**entitled** 33:16
**entries** 71:24 87:16
**entry** 72:14 77:17 87:6
**equipment** 78:23
**errors** 8:8
**escalate** 17:17
**escalation** 17:6 17:12,13
**escort** 20:8
**especially** 83:6
**ESQ** 2:7,13
**evaluate** 83:14 83:22 88:5
**evaluation** 48:5
**event** 39:23
**everybody** 44:7 45:2,2 72:9
**everyday** 10:21
**evidence** 48:8,11 48:15
**exact** 19:14
**exactly** 93:22
**examination** 4:11 8:7 50:20 52:12 53:2 103:9 110:3 111:16
**examined** 4:9
**excessive** 18:2,4 18:7 29:11 47:2
**exhibit** 28:15,17 28:21 30:13,15 31:21,23 32:22 32:24 58:25 59:6 64:5 68:14,16 75:8 75:10 78:5 85:19,22,24 86:4,5,17 87:6 87:20 88:10,13 89:11 91:14,16 97:8 108:7,9
**EXHIBITS---...** 110:5
**expect** 16:4
**expected** 16:8
**experience** 10:13 85:10 87:18 96:19 98:4 100:11
**explain** 45:21
**extensive** 12:3
**extreme** 13:21

**F**

**fabricating** 48:8
**face** 92:14
105:24
**facing** 20:5
**failure** 18:20 30:7 31:15 32:15 50:10
**fair** 14:14,17 83:15 84:9,13 84:19,22 93:20
**fairly** 25:10 85:13 102:23
**false** 48:19 50:11
**falsely** 48:24 49:4
**familiar** 14:10 24:16 32:6,7 36:12 83:19
**far** 26:2 49:14 54:4 55:14 56:9 61:5 62:5 88:2 101:21
**Farmingdale** 2:6
**faster** 97:5
**Federal** 1:22
**feel** 26:10
**fellow** 18:17 50:4 92:12 93:6 99:21
**fighting** 107:25 108:2
**fights** 106:9
**files** 5:10
**filing** 3:4
**fill** 36:15 37:15 42:19 80:16
**filled** 73:8
**filling** 43:5 71:2
**fills** 38:3
**finally** 8:20
**find** 8:8 23:3 96:23
**finger** 102:12
**fingerprints** 51:4
**finish** 7:15
**finished** 10:7
**firearm** 14:4
**first** 4:7,19 11:5 29:17 31:2 55:25 56:3 83:12 91:24 107:24
**firstly** 6:7
**fist** 13:19,20
**five** 51:13,16 71:7
**floor** 27:22 33:8 35:7 40:13 44:23,25 45:3 45:9 51:10,12 51:22 55:17 57:23 65:7 70:18,19 78:21 78:24 80:8,14 83:9 90:11,13 90:25 96:17 103:2
**followed** 12:8
**follows** 4:9
**force** 3:12 13:8 13:11,19 14:23 15:6 16:18,25 17:23 18:2,4,4 18:7,17,21 28:20,22 29:6 29:9,11,11,12 30:4 35:24 36:23 47:2 48:12 49:5,8 50:6 105:20 107:24 110:7
**forced** 51:21
**form** 3:7 26:3 37:12,21 38:4
**format** 6:11
**forms** 27:2
**found** 56:21
**four** 28:7 56:13 74:22 95:14 101:8 106:12
**free** 23:18
**freedom** 20:16
**frequently** 60:10 91:6
**friendly** 54:13

54:14 57:24
**friends** 55:19
**front** 20:11,18 20:21,23,24 21:3,6,7,22 22:9 93:7,15
**full** 4:12 99:9,12 99:14,19 100:15,18
**further** 3:6,10 5:19 109:3

**G**

**Gallagher** 70:4 73:17
**games** 7:5
**gate** 91:24 92:18 93:4 96:2 104:9
**gates** 94:5
**gears** 50:15
**general** 61:18 69:5 91:2 99:22
**generally** 22:10 22:11 40:13 94:13
**give** 8:2 13:3 24:4,13 38:4 103:5
**given** 12:18,21 22:5 38:6 43:4 62:9 75:3
**glass** 90:16
**go** 6:4,9 22:13 35:19,23,23 38:13 39:14 42:2 45:13,23 51:2,6,8 54:6 62:5 81:4 84:10 85:20,21 93:3,13,16 100:18 107:23
**goes** 21:11 71:21 83:7 107:7
**going** 4:24 8:5 8:20 28:11,15 39:10 41:2,14 43:8 44:9,13 50:13,15 53:4 56:23 64:2,8 64:22 66:22 72:19 75:7 77:25,25 84:8 84:11,15 85:19 85:21 86:6 88:9 90:6 91:13 97:7,22 98:10,19 100:21 103:6 103:17,23 108:6
**good** 6:16 18:10 48:19 104:12
**gotten** 26:11
**grabbing** 13:16
**graduated** 11:13 19:14,17,20
**green** 40:10
**grievance** 26:3,5 26:7
**Guard** 93:16 94:9
**GUERCIO** 2:5 2:5
**guess** 7:8,9 12:25 20:8 21:14 26:5 28:16 33:15 36:18 37:19 39:8 41:16 42:5 45:20 46:7,14 51:18 52:4 53:22 56:21 69:6 84:5 85:8 90:17,18 97:17
**guessing** 81:24 95:16 107:11
**guy** 39:15
**guys** 72:23

**H**

**H** 4:6
**half** 11:4 81:13 81:15,16
**hallway** 28:9 39:17 90:6
**hallways** 90:23
**hand** 13:14,15 13:17,25 16:23 26:3 108:4 111:23
**handbook** 33:4 33:7,14 34:4 34:23
**handcuff** 19:24 19:25 20:6,11 20:17,21 21:7 21:21 22:8,10 96:4,9
**handcuffing** 21:6,25 22:6 22:13
**handcuffs** 20:4 21:14,16
**handed** 37:18
**handing** 70:9
**handle** 15:4 25:25 98:19 99:3
**handled** 100:16
**handles** 28:2
**handling** 99:23
**handout** 27:3
**hands** 20:3,15 20:24 22:15,17 96:3,8
**handwriting** 67:9 73:15
**handwritten** 105:12
**hang** 106:20,21
**hangout** 54:15 55:22 58:2
**happen** 43:10 46:12,13 60:15 85:11,12,13 106:9 107:18
**happened** 63:5 63:17,22 98:3 101:15
**happens** 38:7 40:14 42:9 98:15
**hard** 45:21
**hardcopy** 35:7
**head** 6:9,12 44:13 67:23 69:22 106:23 106:25 107:3
**heading** 44:19
**hear** 104:15,19
**heard** 6:25 48:23 49:3 53:13 59:13 90:9 99:21 102:10,15 103:22
**hearing** 9:12
**held** 1:14 60:8 111:7
**hereto** 3:4
**hereunto** 111:22
**hiding** 23:25 48:11
**high** 10:7
**higher** 16:9
**highlight** 79:19
**hip** 71:20
**hit** 20:14
**holding** 13:16
**home** 29:21 30:25 32:11
**hopefully** 6:5
**hospital** 27:7
**hour** 52:22
**hours** 57:13,18 72:4 74:21,24
**housing** 27:23 27:24 40:20,23 55:11,13 70:17 107:9,10
**huh-huh** 6:9,13
**human** 50:2
**humanely** 18:25
**hurt** 56:21 57:2
**Hussey** 53:15,17 53:18,19,20 54:9

**I**

**I.D** 110:6
**I/M** 82:10,15
**ID** 47:12
**idea** 98:24
**identical** 93:21
**identification** 28:23 30:17 31:25 33:2 59:3 64:7 68:18 75:12 78:7 88:15 91:18 108:11
**identified** 5:14
**identify** 98:6 99:4
**identifying** 99:23,25
**illegal** 23:25
**immediately** 36:18
**importance** 41:22,23,25
**important** 42:7 42:8 83:5,7 88:2
**in-service** 35:19 35:22
**inaccurate** 7:25
**incident** 4:25 36:24 50:7 63:16 103:12 105:3
**included** 5:13
**incomplete** 7:25
**independent** 63:4
**indicate** 42:20
**Indicating** 90:5 95:24
**indication** 87:20
**indicator** 24:10
**indirectly** 111:19
**individual** 39:5 39:6,14,18,21 40:11,16 50:24 87:22 89:3 91:8

**individually** 39:15
**information** 5:15 24:12 42:20,22,23
**initially** 38:11
**injured** 31:10
**injuries** 106:19
**injury** 36:11,16 36:25 83:4 84:4,4 106:17
**inmate** 13:8 16:12,14 19:24 21:21 22:9,13 23:2,6,9,18,22 24:14 26:15,17 26:19 27:12 31:8,9 33:4,7 33:13 36:11,16 36:25 37:5,15 37:20 38:3,10 38:16 44:24 48:16,25 49:5 49:8,18,23 50:6,23 51:11 51:16,20 52:2 63:18 82:15,16 82:17 83:14 84:4,20 85:6 88:3 96:20,23 102:11 105:9 106:3,3,16 107:7,14,14,17 107:17
**inmate's** 24:23 102:13
**inmates** 22:6 24:5 25:10 26:8 33:15 34:18 39:3,7 48:8 60:8 61:3 61:9 69:11 78:19 84:4 93:13 96:3 100:21 101:15 102:3 106:20 106:21,22 107:25
**inmates'** 21:25 27:6
**inspection** 71:25 72:8,13
**instance** 102:10 102:15
**instances** 67:25 101:14 106:15
**instructors** 13:2
**intake** 51:19
**interested** 111:18
**interim** 14:11
**internal** 26:4 47:9,19 103:12
**interviewed** 47:18 103:11
**investigate** 26:5
**investigated** 26:6
**investigation** 47:9,20
**investigator** 104:23
**involuntary** 55:13
**involved** 56:24
**involving** 24:23 63:17 103:13
**isolate** 60:17
**issues** 85:7
**items** 5:7

**J**

**J** 4:6 66:8,15
**jail** 5:2 10:17 14:5 39:11 52:6,20 90:21 102:17 108:20 108:21,23
**jails** 96:16 102:3
**James** 1:10,18 4:14,21 5:25 54:19 109:8 110:4 111:6
**JANE** 1:10
**Jeffrey** 1:3 4:23 58:14 59:6,14 89:12 101:23 103:14 105:6 105:17,20,23
**job** 42:5 88:6
**job's** 44:21
**John** 1:10,10 2:7 4:22
**Johnson** 1:3 4:24 16:14 58:14 59:6,14 82:10 83:15 84:20,24 85:2 85:16 86:17 87:13,21 89:12 101:24 103:14 105:6,17,20,24
**Jr** 1:3 4:24 89:12 103:14 105:6,17,20,24
**June** 1:15 11:17 19:16 111:23

**K**

**keep** 6:7,15 21:14 29:3 41:17 42:7 52:7 108:2
**keeping** 41:22 41:25
**keeps** 78:23
**kept** 89:23
**key** 28:9 39:14
**keyholes** 20:5
**keys** 71:4,7,8,9 72:11
**kind** 45:21 79:21,24 90:16 98:18,19
**knew** 57:7
**know** 6:20 7:7,9 7:25 10:10 11:15 14:8 24:17 25:10,20 26:2,10 27:18 29:21 31:7 33:23 34:9,14 37:8,11 38:7 38:25 40:6 53:5,7,11,20 54:4,18,23 55:14 56:23 57:5 58:14 61:5 62:6,8,21 66:24 67:18 68:8,11 69:7 69:21 70:14 73:9,12 74:15 76:7,11 79:8 80:10,16 82:22 87:18 91:20 93:23 97:21 99:8,18 100:14 100:20 101:5 101:21,22 102:21 103:21 104:24 105:9
**knowledge** 12:20 21:23 23:17 24:25 31:13 33:12 47:21 55:12 59:10 104:24 104:25

**L**

**LaGRECA** 2:13 4:2,4 5:22 9:23 23:14 50:17
**lawsuit** 9:7,10
**learn** 35:22 62:12
**learned** 14:15 48:7,10,14
**leather** 21:11
**leave** 60:23 61:24 62:3 84:15,15 85:6
**leaves** 72:7
**leaving** 70:8
**left** 50:21 55:24 65:15 85:2,17
**legal** 23:15
**Let's** 36:23 57:20 100:7
**lettering** 73:6 79:24
**letters** 89:2
**letting** 61:3
**Levittown** 11:3
**lied** 49:7
**lieutenant** 45:16 45:17,18,22 46:2
**light** 92:25 93:3
**line** 83:10 84:18
**linear** 28:7
**lines** 26:13 31:10 90:3
**lineup** 54:11 64:14
**Lineups** 64:17
**Liora** 52:14
**list** 50:22 53:4
**listed** 73:23
**lists** 71:18
**little** 27:3 30:20 32:4 51:25 55:18 60:9 69:22,24 74:22 79:5 85:14 95:23
**LLP** 2:5
**lobby** 77:22 81:25 82:2 89:22,24 90:9 97:3,3 104:2,8 104:16,20
**located** 90:20
**location** 26:9 50:25 82:14,14
**lockbox** 39:16 39:20 71:10 88:24 91:7,22 104:3,7,15,18
**lockboxes** 91:10
**locked** 72:9,11
**logbook** 5:14 40:6,8,15,16 40:20,21,22,25 41:10,18,22,25 42:7,11,16,19 42:22 43:5,6,8 44:4,7 68:22 68:24 71:2,18

75:19 76:2 77:15,17 78:10 83:8 86:7,16 86:25 87:6,19 87:22,25 101:7 101:7 107:13 107:15
**logbook's** 88:6
**logbooks** 77:20
**long** 11:23 51:11 52:21 56:6 101:11
**longer** 27:4 38:16 51:25 60:9 99:13
**look** 17:21 26:23 28:10 58:20 64:23 68:20,23 69:5 74:7 75:17 79:2 86:6,20 87:14 87:15 89:5 93:21
**looked** 75:13 77:15 78:16 85:19,25
**looking** 73:4 75:20 76:10 78:20 80:17 81:21 84:23 86:3,5 87:5 95:22 97:10
**looks** 29:5 32:6 64:13,19 67:13 69:2 70:4 72:15 73:17 74:10 76:7 77:14 78:10 79:5,13 80:17 81:20 83:13,17 87:17 88:19 89:22 93:17 94:16,24 95:18 95:23
**losing** 47:12
**lot** 35:18 40:10 41:2,6 58:19 91:5

**M**

**M** 4:6,6
**mail** 26:4
**main** 27:25 40:12,15 71:18 77:22 78:12,15 81:25 82:2,24 83:8 87:19 88:6 89:23 101:7 104:2,8 104:16,20
**making** 44:25 72:9 105:7
**mandated** 41:20
**manufacturing** 48:15
**March** 57:4
**mark** 28:16 108:7
**marked** 28:23 30:12,16 31:20 31:24 32:21,25 58:23 59:3 64:6 68:18 75:11 78:7 88:14 91:17 108:10
**marriage** 111:17
**materials** 12:18 12:19,21 14:7 14:11 22:6
**matter** 5:6 107:21 111:19
**mattress** 94:16
**McCaffrey** 1:9 57:6 58:11 67:13,20,25 79:6 83:18
**Meadow** 4:17 9:18 10:17
**meal** 44:18,18 80:23 81:3
**mean** 17:9 24:18 26:25 34:9 56:19 57:14 61:14 65:6 69:6,10,14 70:7 71:5,11 72:2,22 81:2 81:11
**meaning** 72:8
**means** 81:4 84:3
**medical** 26:12 26:18,22 27:10 27:12 36:18 38:17 41:2 51:3,18 60:18 62:5,7 83:4,13 83:14,21 84:3 84:7,12,20,25 85:5,7,16,17 87:21 88:4,5 89:25 90:2,7 91:3,5
**medical's** 85:9
**medically** 36:17 37:17 39:2 51:17
**medication** 37:16
**meet** 52:11,14 52:17,19
**meeting** 52:21 52:23
**member** 14:3 69:23 70:21,22 76:5
**memorandum** 14:12
**memory** 101:25
**mental** 40:19,22 41:4
**mention** 59:20
**mentioned** 16:18 29:14 56:20 58:7 98:2
**mid** 57:3
**middle** 88:21 89:16,18 91:7 103:23
**midnight** 63:3 69:15,16,17,18 70:9 72:16 74:2 75:22,23
**military** 10:13
**mind** 38:25
**mine** 80:19 82:23
**Mineola** 2:12
**Minervini** 66:24 67:4 76:25 77:6,10
**Minervini's** 76:12
**minimum** 14:15 17:23
**minor** 47:13
**minutes** 23:2 27:23 50:14 81:5 103:5
**mirror** 94:22 97:15
**missed** 78:14
**months** 11:25
**morning** 62:25 65:14
**mornings** 57:15
**move** 55:16
**moved** 60:16
**movement** 20:17
**moving** 39:10 50:25
**multiple** 36:19 37:23,24 39:18 45:10

**N**

**N** 2:2 110:2
**name** 4:12,19 5:23 16:16 42:23 56:24 59:13,20 64:21 65:2,19 66:8 66:23 67:8 76:6,19 77:16 79:6,8 80:21 87:16
**named** 5:10
**names** 26:9 53:4
**Nancy** 1:20 111:4,25
**Nassau** 1:8,8,9 1:11 2:10 5:2 10:8,10,16,23 11:6,12 13:4 28:18,22 30:14 30:16 31:22,24 32:23,25 52:20 53:10 58:24 59:2 64:3,5,11 68:14,17 72:14 78:3,6 88:10 88:13 90:20 102:3,17 108:8 108:9 110:8,9 110:10,11,12 110:13,14,16 110:17,19
**necessary** 17:23
**need** 8:11 24:8 36:17 37:16 39:11 41:5 72:12 86:20 90:23 98:20
**negative** 48:4
**never** 18:2 19:3 24:17 33:5 58:7 59:9 64:18 100:18
**new** 1:2,21 2:6 2:12 4:8,17 5:14 9:18 28:2 35:25 51:9,11 51:16,22,24 52:5 99:11 102:23 111:5
**news** 102:19
**newspaper** 95:6
**Nicholas** 53:9
**normal** 46:9 54:5 61:18 85:5,11 96:6
**normally** 24:10 37:3 45:25 51:13 72:5 74:21
**Notary** 1:21 3:12 4:8 109:14 111:4
**notation** 82:6

83:3 87:12
**noted** 109:6
**notes** 12:25
103:6 105:12
105:13
**Notice** 1:23
**notified** 82:9
**November** 55:6
55:8
**number** 30:14
71:4,11,14,16
71:21 82:10,13
82:17,17,18
88:11,14 89:7
91:14,17
110:17,18
**numbers** 78:22
**nurse** 37:18 38:5
38:6,19,21,23
84:10
**nurses** 26:22
27:3 37:22,24
60:10,18 84:7

**O**

**O** 4:6
**oath** 7:19,20
**Objection** 23:14
**objections** 3:7
**obscured** 104:12
104:13
**observation**
40:19,23 41:5
**obviously** 82:15
**OC** 13:13,24
16:21 35:23
71:16,17,22
72:12 108:2,3
**Occhino** 53:10
**occur** 107:21
**occurred** 4:25
103:13
**OCs** 71:19 78:22
**October** 5:2
16:14 55:6,8
60:4 62:17
63:5,17,21,23
65:10 66:6,16
67:5,20 74:8
74:12,15 75:24
77:2,7,10
81:19 86:19
89:12 99:18
100:20 101:12
101:24 103:13
103:19 105:17
105:20,25
106:4
**off-going** 70:6
73:16,17 76:14
**offered** 60:11
80:23
**office** 2:10 18:11
36:10 46:23
49:20 50:8
78:19
**officer** 1:9,10,10
4:19,22 5:23
6:3 8:24 9:14
9:24 12:8,11
12:14,18 14:16
15:21 16:2,8
18:14,16,18,21
19:19 21:6
26:5 28:8,12
28:24 30:5,18
32:2 33:20
36:24 37:4,6
38:12,15,18
41:8 43:20,20
44:3,16,18
45:5 47:20
48:18,20,24
49:4,7,17,22
50:4,5 53:13
53:14,18,20
54:5,9,18,23
55:20 56:4,5,6
56:13,16 58:12
59:4 69:17
70:8,24 71:6,7
72:7 73:12,16
76:11,14 80:18
81:14 90:17
93:15 96:20
99:23 101:9,22
102:12,12,16
103:11,16,21
105:19 107:9
108:12 109:4
**officers** 36:20
43:23 44:10,15
44:24 48:8,11
48:15 69:13
70:7 78:24
80:7 99:2,22
**Oh** 54:19 56:12
69:24 73:7
87:3
**okay** 5:3 6:5,6
6:13,14 7:2,3,5
7:6,10,11,18
8:3,4,9,10,14
8:15 23:7 34:2
34:16 43:8,9
45:2,11 50:16
53:8 56:12
58:21 64:10
65:3 67:17
73:7 75:15
79:3 83:11,23
84:15 86:2,8
87:11 92:19
108:6
**old** 9:24
**on-going** 73:18
**once** 35:20 38:6
45:25 54:11
102:22
**oncoming** 69:13
70:24 73:12
76:11
**ones** 80:3,4
**online** 25:17
**open** 13:17 39:4
39:17,21 90:19
91:8 92:18
**opened** 39:7
90:24
**opening** 22:17
**operating** 25:20
35:4 36:5
**opportunity** 8:6
**opposed** 99:3
**opposite** 57:12
57:14
**orange** 108:23
**order** 99:4
**ordering** 4:3
**orders** 14:11,12
**ordinary** 15:16
**organizations**
11:9
**outside** 39:16
54:15 55:22
58:2 59:24
89:19
**outstanding** 5:8
5:20
**overlap** 57:17
58:10
**overlapped** 68:3
**overtime** 57:20
57:22 67:9,16
68:2 74:16,20
74:24 75:3

**P**

**P** 2:2,2
**P.M** 63:2,2
65:14 73:10,21
86:4,7,12,18
86:22 87:7,13
87:13 107:6,6
109:6
**page** 34:12 64:9
64:11 68:22
110:3
**pages** 35:10
40:10
**pain** 26:16,20
38:12
**pains** 31:9 82:19
84:6,25 86:18
88:4 105:7
**pants** 108:21,23
**paper** 26:8
**part** 81:21
**parties** 3:4
111:13,18
**partner** 55:3,5
55:10,25 56:3
56:7,10 66:12
66:13 67:2
77:2,3
**partners** 56:4
63:13 77:11
98:13
**parts** 52:6
**pat** 23:2,18,22
24:5,14
**pat-down** 23:5,8
**Patrick** 1:9 57:5
58:11
**patrol** 41:14
71:14 74:11
77:11 78:17
87:24 92:4,9
**patrolling** 41:8
63:12 66:20
77:6
**patrols** 27:22
28:3,4 43:18
43:20,21,23
44:10,19 46:10
46:11,18 71:9
76:2,19 81:23
87:22,25 93:14
93:17
**Pearce** 104:23
**penalty** 34:19
**pending** 5:20
8:13
**people** 53:5
58:19
**performance**
48:5
**performed**
71:25
**permitted** 61:24
62:3
**person** 22:14
43:5 59:7,9
70:25 85:6
92:15 95:18
102:21 108:17
108:20
**personally** 42:6
**phone** 100:5
107:8

**phonetic** 104:23
**photo** 91:19 96:2
**Photograph** 59:2 110:12
**photos** 95:22
**physically** 48:25 49:17,22
**pick** 6:12
**picked** 97:5
**picture** 58:17 59:5 97:12 108:12,14
**pictures** 97:20
**piece** 26:8 83:5
**pipe** 97:15
**place** 1:20 111:8
**Plaintiff** 1:4 2:5 4:23 9:9
**Plaintiff's** 28:16 28:21 30:13,15 31:21,23 32:22 32:24 58:23,25 59:6 64:2,5 68:13,16 75:8 75:10 78:2,5 85:22,24 86:3 86:5,17 87:6 87:19 88:10,13 89:11 91:13,16 97:8 108:7,9 110:6
**platoon** 53:21 103:3
**play** 7:4
**please** 4:4,13,16 5:23 6:8,15 7:8 7:14,25 9:16 10:5,24 33:23 34:14 50:22
**plus** 43:24
**point** 8:5 42:14 101:7
**points** 46:14
**Police** 53:10
**policies** 13:4 14:19 15:7,8 18:7 19:7 21:24 25:2 30:8 31:15 32:16 49:12,20 50:8
**policy** 14:21 25:11 28:20,22 29:14,23 30:4 30:9 31:5,7,12 31:17 32:8,13 32:17 35:25 110:7
**polite** 24:24
**population** 61:18
**positioning** 22:2
**positive** 61:21
**possession** 22:2 23:11
**possible** 39:25 45:4 74:18,19 77:5,9 99:8 100:24,25
**post** 40:14 41:16 69:18 70:9 81:7,9 83:14 83:21 84:20 88:5 103:2
**PowerPoint** 25:9
**practice** 96:7
**practices** 12:7 12:17 18:11 48:20
**preparation** 53:2
**prepare** 15:12 15:16 52:12
**present** 44:15 45:3 52:23
**pretty** 36:2 51:5 51:19 60:11,12 83:8 91:6 100:18
**previous** 10:25 71:24 73:18
**previously** 5:15
**print** 65:20,21
**printed** 69:22,24 70:2
**Prior** 10:23
**prisoner** 19:4 20:21 22:12 25:23,25 26:14 83:3 84:11
**prisoners** 18:24 34:4
**probably** 7:12 13:2 25:9 27:4 37:19 38:19 40:10,25 41:5 42:3,13 51:25 52:18,22 55:3 55:6 56:8,11 56:23 60:16,19 60:20 62:14 69:2 73:23 77:21 82:4 98:12,14,16 99:16 101:6 106:23
**problem** 96:15 102:3,4,5,6
**problems** 45:24
**procedure** 1:22 14:21,23,25 15:3 25:12 26:24 107:2
**procedures** 12:7 12:17 13:4 14:19 18:8,11 19:7 21:25 25:2,21 30:8 31:16 32:17 35:5,25 36:5 48:21 49:12,20 50:8
**professional** 16:7 27:10
**progresses** 16:21
**prohibited** 17:13
**proof** 24:8
**proper** 12:7,10 12:16 25:2
**protective** 61:15
**protocol** 61:2
**protocols** 60:5 62:9,13
**provide** 35:3
**provided** 25:11 29:20 32:9 33:6 37:20
**Public** 1:21 3:12 4:8 109:14 111:4
**pull** 28:15
**pulling** 30:12
**pullup** 97:8
**punch** 13:22
**punishment** 49:24
**purpose** 15:11 15:15 21:13 33:13
**pursuant** 1:22 1:23
**put** 20:3,4 22:15 22:17 42:22 72:10 96:8

**Q**

**quarantined** 60:20,22 61:3 61:21,25 62:4
**question** 3:8 6:11,19,21 7:2 7:8,14,15,16 8:13 15:22 50:22
**questions** 4:25 7:13 8:18 72:6 103:10 109:4
**quicker** 27:4
**quieter** 55:18

**R**

**R** 2:2
**racial** 47:6
**radio** 71:11,13 71:15
**random** 46:14 90:23
**rank** 11:20 19:18,21
**read** 30:20 32:4 33:5,9,11,23 34:2,13 65:12 65:19 72:18 86:14,16
**reading** 33:25 34:15 35:2
**realize** 7:23
**really** 21:8 37:10 38:9 42:13 46:16 56:18,19 58:8 60:8 61:7 64:22 73:14 76:24 79:4 84:6 96:18 98:20
**reason** 8:21 23:10 42:3 44:17 45:11 47:12 51:3 76:22 77:19
**reasonable** 23:12,21,24 24:4,13,13
**reasons** 40:24
**rec** 51:8,9 59:24
**recall** 62:17 63:16 105:23 106:2,5
**receipt** 5:20
**receive** 12:3 19:10 30:23 31:2
**received** 14:7 19:23 22:19 25:14 48:4
**recess** 50:18 103:7
**recognize** 30:18 32:2 33:3 59:7 68:20 76:6 91:19 92:15 108:17
**recollection** 42:17 58:18 63:5 65:8

66:19 67:4,19
**record** 4:13,16 5:5,17,24 7:17 9:17 39:22,22 40:4 54:21,22 72:25 73:2 78:23 96:11,12 111:15
**records** 42:8 97:22 101:2
**recruit** 11:22
**rectangular** 89:19
**rectum** 102:13
**red** 73:6 92:24
**reduced** 62:9
**refer** 82:12
**refers** 82:15
**refresh** 42:16 58:18 65:8 66:18 67:3,18
**refuse** 38:20,21 108:2
**refused** 51:18
**regarding** 15:3 22:6 25:2,12 26:15 30:4 48:11
**Regular** 46:11
**rejected** 51:21
**relationship** 53:6
**relief** 44:18,18 81:4
**relieving** 57:16
**remain** 5:7
**remained** 84:20 85:3,16
**remember** 16:16 57:2 60:7 63:20
**remembered** 105:6
**repeat** 6:20 15:22 19:14 47:24 49:2 77:8
**rephrase** 6:21
**report** 18:17,20 36:11,12,14,15 37:2,8 50:7
**reportable** 107:12
**reporter** 4:2 6:9 7:16 111:2
**reports** 37:3 45:12,23
**represent** 4:23
**REPRESENT...** 1:11
**represented** 111:13
**representing** 59:5
**request** 27:6 37:11,21 38:4
**requested** 5:6 87:21
**requests** 27:12
**required** 33:11 35:16 36:3 41:17 42:25
**requires** 40:18
**reserve** 5:18
**reserved** 3:8
**resolve** 101:20
**resolved** 107:22
**respect** 18:25 47:19 56:15 103:12
**respectfully** 5:18
**respective** 3:3
**respond** 15:19 15:24
**responses** 6:8
**responsibilities** 44:21
**responsibility** 74:11
**responsible** 36:25 43:5,17 44:3,23,25 45:8,19,22 70:25 77:11,13 78:18
**rest** 41:7
**result** 18:21 30:9 31:17 32:18
**review** 8:6,7 31:3 35:16 42:9 52:25 72:4,5 103:6
**reviewed** 29:22 30:25 32:12 36:4 42:11,15 71:25 73:20 75:18
**right** 5:18 14:23 15:13 17:7 19:21 20:16,25 26:11 28:10 29:8 33:20 36:21 40:15 44:10 56:13 59:4 63:9 65:2 67:14 68:3,13 69:3,8 70:12 73:25 74:5,8 76:20 77:17 78:11 81:22 86:9,10 87:3,7 89:3,16 92:6 92:10,18,23 93:6,7,14,21 94:5,11,25 95:16,19 97:14 98:4 100:7,16 103:4 108:18 109:3
**rights** 50:2
**Robert** 1:3 4:23 58:14 59:5,14 86:17 87:13 89:11 101:23 103:14 104:23 105:6,16,20,23
**roll** 54:12
**room** 22:24
**rotated** 63:13
**route** 27:4
**Rule** 33:21 34:13
**rules** 1:22 6:4 8:16
**running** 45:11
**runs** 45:3 97:16
**rust** 95:23

**S**

**S** 2:2 4:6,6
**S-E-R-T** 98:22
**S-T-A-I-B** 5:25
**safer** 20:10
**saw** 96:25
**saying** 6:12 21:16 35:3 56:9
**says** 33:4 34:8 36:4 65:4,15 65:21,24 66:8 66:24 67:13,14 67:16 69:7,23 70:6 71:4,24 76:5 79:22 80:2,23 81:6,9 82:9 83:21 84:19
**scanned** 69:2
**schedule** 53:22
**Schiff** 76:7,15
**school** 10:7
**scratched** 79:5 79:21
**screaming** 104:14
**Screen** 28:14 30:11 31:19 32:20 34:21 58:21 59:11 63:25 68:5,12 75:6 77:24 85:23 86:23 87:4 88:11 91:12 96:13 97:9,24 108:5 108:25
**scroll** 66:22 68:19
**scrolling** 29:3,7 30:21 32:5 33:19 34:11 72:17 73:3 74:4,14 76:9 78:25 80:20 87:9 92:17,22 93:19 94:10 95:8,21
**scuffle** 104:18
**sealing** 3:4
**search** 22:23 23:2,3 24:22 24:23 34:5
**searches** 22:20 22:21 23:6,8 24:16,20 25:3
**second** 70:19 81:15 85:20
**section** 67:9
**security** 27:18 71:25 72:8,12
**see** 29:4 33:4,21 54:10 57:9,12 57:21 58:8,19 64:12,21,25 65:15 66:9 67:10 69:6 73:4,6 77:16 78:8 79:4,4,6 79:18,18,21 80:21 82:6 83:12 84:8 86:24 87:12 88:16,21 89:7 89:18 90:3 91:25 92:12,14 92:23 93:6,11 95:3,6,9,23 97:10,12,13,16 97:19 104:2 105:16,19 106:19 108:12
**seeing** 73:5
**seen** 28:24 29:15 29:17 35:8 37:19 38:8,17 40:3 54:3 59:9 64:15,18 88:3 108:14

**segregation** 61:16
**self-inflicted** 106:16,18
**semester** 10:8
**separate** 40:25 44:7 60:17
**separating** 104:10,11
**sergeant** 45:7,14 45:15,24 57:7 80:6 98:14,16 100:9,16
**serious** 85:8
**SERT** 14:3 98:17,21 99:3 99:9,11,19 100:7,12 101:2 101:20
**SERVANTS** 1:10
**set** 46:16 111:22
**sets** 93:10
**sexual** 15:4,5 47:4
**shake** 6:8
**shaking** 6:12
**share** 71:8,10
**sharing** 28:14 30:11 31:19 32:20 34:21 58:22 59:11 63:25 68:5,12 75:6 77:24 85:23 86:23 87:4 88:12 91:12 96:13 97:9,24 108:5 108:25
**sheet** 83:9
**shelf** 94:24
**sheriff** 46:8 49:20 50:8
**sheriff's** 10:16 10:24 11:6,12 13:5 14:19,22 17:14 18:8 19:6 22:2 25:6 34:24 36:5,9 36:10 46:23 49:11,19 53:14
**SHERIFF'S** 1:9
**shift** 57:20 81:16
**Shop** 11:3
**short** 50:18 103:7
**shoulders** 13:16
**show** 29:11 33:15 64:2 75:7 77:25 88:9 91:13
**showed** 58:17
**shower** 93:4 95:11,15,19
**showing** 31:20 32:21 58:22 59:4 68:13
**sick** 26:16,20 27:2 37:11,20 38:3,12 81:14
**side** 28:13 45:22 84:3
**sign** 36:3 42:23 71:17,19
**signature** 69:13 69:19,21 70:3 70:6 72:2 76:13 80:13,18 82:3,21,22 83:17,20 87:17
**signed** 3:11 73:18
**signing** 77:21 79:10
**similar** 75:9,13 75:18,19 78:2
**Sink** 94:20
**situation** 17:10 17:11,17 38:10 99:2 101:20
**situations** 15:13 100:14
**slamming** 106:22
**slot** 22:16
**small** 57:17 64:13
**smell** 24:11 97:6
**smoke** 24:3,9,12 96:24 97:2,18 97:22 100:6
**smoking** 34:18 96:15,15,20,23 98:2,7,10 99:4 99:24,25 100:21 101:14 102:2 103:17 103:23
**smooth** 45:3
**smudged** 79:25
**smuggled** 102:16
**soft** 13:13,15,25 16:23 108:4
**somebody** 20:8 20:17 40:14 43:7 60:14 81:13 98:7 104:14
**somewhat** 60:10 102:19 104:12 104:13
**SOPs** 34:25 35:4
**sorry** 15:23 19:13 41:24 47:24 49:2 50:21 68:7 77:8 78:14 81:21
**sort** 24:8
**space** 88:22 89:19
**speak** 67:24
**specific** 43:6 63:11 64:9
**specifications** 9:13 47:16
**spelled** 24:3
**spoken** 19:10 105:2
**sprain** 84:5
**spray** 13:13,25 16:21 35:23 71:22 108:3
**spread** 52:5
**square** 97:14
**staff** 60:19 69:23 70:21,22 76:5 82:9 89:25 90:2
**Staib** 1:10,18 4:14,22 5:1,25 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 54:19 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,23 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1,8 110:4 111:6
**stamp** 28:22 30:16 31:21,24 32:23,25 58:24 59:2 64:3 68:14,17 72:22 72:24 73:18 74:3,5 75:11 75:21 76:10 78:3,6,12 108:8,10 110:8 110:9,10,11,12 110:14,15,16 110:19
**stamped** 28:18 72:22 75:16 83:6
**stand** 98:23
**standard** 18:13 23:13 25:20 26:24 35:4 36:4
**standards** 12:13 14:15
**standing** 93:15
**start** 11:5 22:23
**started** 11:4,11 59:15 99:5,8 99:17 100:17
**starts** 13:11
**state** 1:21 4:8,15 4:19 5:17,23 9:16 10:5 41:19 103:22 107:11 111:4
**stated** 103:17,22
**statement** 5:5 48:19 50:11
**STATES** 1:2
**stay** 51:16,21,24
**steady** 77:3 103:2
**stenographica...** 111:11
**step** 13:13
**stick** 96:3
**STIPULATED** 3:2,6,10
**stipulations** 1:23
**stop** 11:3 13:13

55:5,10 107:25
**stopped** 34:22 59:12 68:6 96:14 97:25 109:2
**stopping** 46:20
**Street** 2:6,11
**strip** 34:5
**stuck** 102:12
**stuff** 13:17 62:15 83:7 88:2
**Stussey** 1:10 53:15,16
**subject** 34:5,19 47:8
**submit** 26:3
**subpoena** 9:21
**subscribed** 3:13 109:11
**suffered** 106:16
**superior** 45:5 58:12
**supplies** 78:21
**sure** 13:6 14:9 20:9 26:25 27:17 28:10 30:24 32:11 33:17 35:11,15 36:7 38:9 39:24 41:19,19 42:2,13 45:2 45:10 46:5 50:17 51:23 52:5 59:25 60:21 72:6,9 74:17 80:13 81:12,22 82:23 93:25 97:11,23 99:16,20 100:23 103:15 103:20,25 105:8
**suspicion** 23:12 23:22,24 24:5 24:13
**SWAT** 98:18
**switch** 50:15
90:18
**switches** 90:17
**sworn** 3:13 4:7 109:11 111:9
**system** 88:20

T

**T** 4:6,6,6 65:21
**table** 91:25
**take** 7:16,21 8:11,14 22:14 26:23 27:3 29:21 30:25 32:11 39:15 58:20 64:23 68:20 84:11 95:19 105:12
**taken** 1:21 7:20 27:6,12 36:18 50:18 79:9 91:20 103:7 111:11
**takes** 22:25
**talk** 23:5 25:23 36:8 56:16 58:4,5
**talked** 29:12 106:25
**talking** 6:10 20:24 40:4 80:14
**talks** 29:8
**taught** 12:7,10 12:13,16 13:18 15:19,24 16:4 16:7 17:22,25 18:6,24 19:3
**teach** 41:21
**team** 14:3 98:18 98:21 99:9,13 99:19,19 100:15
**techniques** 13:14,15,25 16:23 108:4
**tell** 6:24 7:8 55:15 56:22 59:19 97:4
100:4 107:24
**telling** 34:4,17
**terms** 65:13
**test** 29:25
**tested** 29:23 31:5,12 32:13
**testified** 4:9 9:3 9:12
**testify** 8:22
**testimony** 111:6 111:10,11
**thank** 4:22 8:24 72:20 109:4,5
**thing** 28:12 41:20 84:8 99:13,15 100:18 108:6
**things** 35:18,21 93:2
**think** 20:10 23:20 25:14 42:6,8,15 58:17 60:13 61:7 62:2 63:12 65:18,22 66:2 68:10 76:24,25 77:5 77:9 83:24 85:15 100:24 104:15,19 106:6
**Thomas** 1:9 54:24 65:22 66:3 105:5
**thought** 86:21
**threaten** 19:3
**three** 11:25 51:13 57:10 71:9 74:22 99:10,11 101:12,13 106:13,14,24
**thumbs** 20:4
**tier** 24:3,5,12 26:20 27:20,21 28:11 34:18 37:7 38:11,13 39:4,8,17
40:17,18 43:18 51:7 60:14,17 60:19 61:2,20 61:22,25 62:3 62:4 66:19 78:19 88:19 93:12 98:3,10 98:19 99:24 100:19 101:4 102:24 103:18 103:23 107:8 107:19
**tiers** 28:7 40:11 44:6 60:9 63:11 69:12 78:18 95:14
**time** 3:8 8:12 23:19 27:11 29:17 39:18 41:7,13 42:10 42:17 43:4,19 46:16 51:20 52:2,3 59:17 60:4,18 61:6 61:10 63:8 65:13 67:2 72:10 73:19 80:24 81:13,19 83:6 84:10 86:21 95:19 99:9,12,14,17 99:19 100:15 100:18 109:6 111:7
**times** 37:23,24 39:7 43:25 45:10 57:10 59:13 91:2 98:25 101:19 106:11 107:4,5
**Timothy** 1:18 4:14 5:25 109:8 110:4 111:6
**today** 8:22 10:18 43:8 52:8
**today's** 8:6
**toilet** 94:18 95:6
**told** 42:3 59:18 100:17
**tolerated** 18:2 102:7,8,9
**top** 65:12 67:23 69:6,21 75:20 92:25 108:21 108:24
**torture** 72:19
**tour** 62:21,24 65:9 66:16 67:5,21 69:7 69:15,16 70:12 70:14,14 71:18 71:24 72:3,5 72:15 73:8,11 73:20,22 74:6 74:12 75:21 76:16 77:17 79:12,14 86:4 86:7,12 87:7
**tours** 68:3
**tracks** 78:22
**train** 13:22 20:6
**trained** 13:7 14:18 17:4,6 17:16,19 20:20 21:20 24:19 25:5,24 26:14 27:11 28:3 39:2 41:9 42:25
**training** 12:3 13:10 15:11,15 19:11,23 20:2 21:5 22:19,22 25:8 27:15 28:6 35:19,22 41:12
**transcribed** 111:12
**transcript** 8:6,8 111:15
**transfer** 55:12
**transferred** 47:22,25
**treat** 18:24
**treating** 25:10

**treatment** 27:6 27:13 41:2
**trial** 3:9 7:21 111:16
**trick** 7:4
**true** 18:25 19:2 19:5 20:18,19 48:21,22 111:15
**trust** 67:22
**truthfully** 8:22
**try** 101:20 106:20,21
**trying** 5:8
**Tuesday** 79:16
**turn** 28:9 81:3 96:7
**turning** 33:18 34:12
**turnover** 79:10
**twice** 102:22
**two** 11:2 43:23 44:2,10 45:21 52:18 55:4 56:4,8,11,12 57:10,13,18 71:8 77:4 80:2 90:3,24 93:10 101:16
**type** 37:16 83:24 84:8
**types** 35:21 106:19
**typewriter** 69:7
**typical** 36:19 43:22 44:9
**typically** 38:17 51:12 62:24 98:6

**U**

**underneath** 93:2
**undersheriff** 46:8
**understand** 6:20 7:19
**understood** 5:22 6:25
**unexpected** 16:5
**uniform** 10:18 10:20 108:20
**unique** 36:9
**unit** 27:24 36:21 43:13 51:2 54:6 59:21 63:9
**Unit/Post** 70:17
**UNITED** 1:2
**unnecessary** 18:4 29:8 50:6
**unusual** 49:24 63:22 85:15,18
**use** 13:8,11,19 14:23 15:6 16:18 17:22 18:6,17,20 28:19,21 29:5 29:11 30:4 35:23 36:23 48:12 49:4 50:5 105:19 107:23 110:7
**usually** 27:3 85:11 91:3 96:6,22 107:18

**V**

**vaccine** 51:21,23 60:11
**vent** 95:3 96:25 97:14,14
**verbal** 6:8 13:11 13:24 16:19 29:12 107:25
**verbally** 62:14
**verify** 107:10
**versa** 57:17 104:5
**version** 70:2 98:18
**vice** 57:17 104:5
**VICTORIA** 2:13
**view** 104:7,12
**Villatoro** 56:5 66:9,15 80:9
**Villatoro's** 80:18
**violated** 15:7,10 26:11
**violation** 18:7 18:10,13 19:6 34:8,9 48:19 49:11 50:2,7
**visit** 51:4
**visiting** 59:25
**visits** 61:25
**voice** 6:16
**voluntary** 55:13 55:14
**volunteer** 11:8

**W**

**waist** 21:12
**waived** 3:5
**walk** 28:8 93:16 93:17 94:6,9
**wall** 94:25
**walls** 91:11 106:23
**want** 6:3 7:9 23:5 25:23 36:8 38:22 62:16 68:19 79:2
**wanted** 38:16,20 39:19 46:17 55:15 60:12
**wants** 46:15
**wasn't** 57:11 74:11 77:21
**way** 22:24 24:24 62:10 90:7,8 90:19 96:9
**we'll** 100:5
**we're** 50:14 84:15 85:21 86:6
**weapons** 14:2,4
**wear** 10:20
**wearing** 10:18
**week** 51:25 52:7 57:10 60:20,23 74:22,24,25
**weeks** 11:24 52:18
**went** 11:20 39:20 55:11,18 98:7,9
**West** 2:11
**WHEREOF** 111:22
**Wise** 56:4
**witness** 5:19 9:3 9:22 109:5 110:3 111:16 111:22
**witness(s)** 111:9
**witnessed** 50:5
**Woods** 105:10
**word** 83:12
**words** 17:9 39:13 74:10
**work** 10:20 22:24 36:20 53:21,23,25 54:15 55:22 58:2 65:7 68:2 74:20 88:20 108:3
**worked** 11:2 57:11,20,22 63:21 74:16 102:22
**working** 10:23 11:5,11 27:20 57:15 62:19 63:8 65:9 66:3 66:15 67:5,20 80:7 81:18 98:13
**works** 107:9
**worse** 17:11
**worth** 74:21,24
**wouldn't** 76:22
**wrists** 13:17
**write** 26:10 41:10 101:5
**writing** 26:9 27:15 36:25 62:9,10
**written** 12:18,19 12:21 14:7,10 21:24 22:5 29:25 40:13 42:8 93:11 107:12,15
**wrong** 36:17 38:25 49:9 68:2 86:15

**X**

**x** 1:3,13
**X----------------...** 110:2

**Y**

**Y** 4:6
**yards** 59:24
**yeah** 14:17,21 23:23 37:7 43:11 54:14 55:21 57:22 60:6 74:19 81:24 87:17 96:21 100:4 101:18 102:6 106:14
**year** 11:4,5 35:20 55:7 57:3 59:18 106:11
**yearly** 25:17 35:17
**years** 11:3 55:4 56:8,11,12,13 77:4 99:10,11 101:8,12,13 106:12,13
**yesterday** 5:13
**York** 1:2,21 2:6 2:12 4:8,18 9:19 111:5

**Z**

**Zoom** 1:14
**Zorn's** 11:2

**0**

**00:01-08:00**

75:22
**07:30** 65:11 66:4

**1**

**1** 28:17,21 72:15 110:7
**1-9** 1:10
**1:00** 86:22
**10** 88:10,13 110:17
**10:00** 107:6
**10:18** 1:15
**100** 4:17 9:18 35:12 40:10
**1007** 88:11,14 110:17
**108** 110:19
**11** 91:14,16 97:8 110:18
**11:00** 107:6
**11:20** 80:23
**11:55** 81:6
**11501** 2:12
**1151** 78:4,6 110:16
**1152** 79:2
**1153** 80:21
**1155** 78:4,6 110:16
**11554** 4:18
**1156** 68:15,17 72:14 73:24 85:24 110:14
**1157** 73:4 86:9 87:5
**1158** 87:10
**1160** 68:15,17 85:24 110:14
**1161** 75:11,16 75:20 110:15
**1162** 76:10
**1165** 75:11,17 110:15
**11735** 2:6
**12** 5:2 11:24 16:15 62:17 63:5,17,21,23 65:10 66:6,16 67:5,20 74:8 74:12,15 75:24 77:2,7,10 81:19 86:19 89:12 101:17 103:13 105:17 105:21,25 106:4 108:7,9 110:19
**12:00** 81:16
**12:48** 109:6
**13:30** 86:21
**15** 27:22
**15:00** 87:15
**15:25** 82:7 84:24
**15:30** 83:10 87:16
**15:35** 84:18,24
**16:00** 65:11 66:4 66:16 67:6,21
**17** 19:16
**17th** 11:17

**2**

**2** 30:13,15 110:9
**200** 35:14
**2002** 99:14
**2019** 11:7,12,18 19:16
**2021** 5:2 16:15 60:4 62:17 63:6,17,22,23 65:10 66:6,16 67:5,21 74:8 74:12,15 77:2 77:7,10 81:19 86:19 89:13 99:18 100:20 101:24 103:13 103:19 105:17 105:21,25 106:4
**2022** 55:8
**2023** 1:15 111:23
**20th** 111:23
**21** 75:24
**23-cv-00167** 1:6
**24** 72:4 74:21,24 101:17
**25** 9:25
**268** 108:8,10 110:19
**276** 108:8,10 110:19
**28** 110:7

**3**

**3** 31:21,23 67:9 110:10
**3:00** 87:12 107:6
**3:30** 86:18,20 87:3,13
**30** 27:23 110:9
**31** 110:10
**32** 110:11
**361** 58:24 59:3 110:12
**366** 64:3,6 110:13
**369** 64:11

**4**

**4** 32:22,24 110:4 110:11
**4:00** 63:2,2 65:14 73:10,21 76:16 79:14 81:16 86:4,7 86:12 87:7
**472** 31:22,24 110:10
**491** 64:4,6 110:13

**5**

**5** 58:23,25 59:6 71:4 110:12
**50** 81:5
**53** 66:24
**54** 33:21
**59** 110:12

**6**

**6** 64:2,5 110:13
**6:00** 107:5
**619** 28:19,23 110:8
**64** 34:13 110:13
**645** 28:19,23 110:8
**646** 30:14,16 110:9
**655** 30:14,16 110:9
**659** 91:14,17 110:18
**660** 92:18
**665** 94:11 97:10
**671** 91:15,17 110:18
**673** 32:23,25 110:11
**68** 110:14
**688** 33:19,20
**689** 34:12
**698** 32:23,25 110:11

**7**

**7** 68:14,16 85:22 85:24 86:5 87:5,6 110:14
**7:30** 65:14 66:16 67:6,21
**75** 65:2 110:15
**77** 2:6
**78** 66:8 110:16

**8**

**8** 1:15 75:8 85:19 100:6 110:15
**8,Bates** 75:10
**8:00** 62:25 69:16 72:16 73:10,21 75:23 76:16 79:14 86:4,6 86:12 87:7
**800** 72:15
**88** 110:17

**9**

**9** 78:2,5 86:4,17 87:20 89:7,10 89:11 100:6 110:16
**91** 110:18

# ERRATA SHEET

I, ______________________________, would like to make the following changes to my record:

| PAGE | LINE | CHANGE | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signed______________________________ Date______________________________

HILL REPORTING SERVICE, INC.