ORIGINAL



UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

-----------------------------------------X

ROBERT JEFFREY JOHNSON, JR.,

Plaintiff,

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JAMES STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOES 1-9 SERVANTS AND REPRESENTATIVES OF NASSAU,

Defendants.

-----------------------------------------X

Zoom Conference

July 11, 2023
10:00 a.m.

EXAMINATION BEFORE TRIAL OF DYLAN HUSSEY, a Nonparty Witness herein, taken by the Plaintiff, pursuant to Federal Rules of Testimony, held at the above-mentioned time and place, before Christina Schmidt, Notary Public of the State of New York.

A P P E A R A N C E S:

GUERCIO & GUERCIO, LLP
Attorneys for Plaintiff
77 Conklin Street
Farmingdale, New York 11735
BY: JOHN BRADLEY, ESQ.

COUNTY ATTORNEYS OFFICE FOR COUNTY OF NASSAU
Attorney for Defendants
1 West Street
Mineola, New York 11501
BY: BRIAN MCLAUGHLIN, ESQ.

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any notary public with the same force and effect as if signed and sworn to before the court.

* * *

D Y L A N H U S S E Y, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: State your name for the record, please.

THE WITNESS: Dylan Hussey.

THE COURT REPORTER: State your address, please.

THE WITNESS: 100 Carman Avenue, East Meadow.

EXAMINATION BY

MR. BRADLEY:

MR. BRADLEY: Officer Hussey, my name is John Bradley. I'm with the Law Firm of Guercio & Guercio, LLP. I represent Robert Jeffrey Johnson in this action. I'm going to be asking you some questions today pertaining to an incident that happened on October 12, 2021 and a little bit of questions about your background.

Could you please state your

name for the record again?

THE WITNESS: Dylan Hussey.

MR. BRADLEY: And please provide your business address.

THE WITNESS: 100 Carman Avenue, East Meadow.

MR. BRADLEY: Before we begin, I'm going to go over some rules of the deposition with you. I just ask if you could agree to them, okay?

THE WITNESS: Okay.

MR. BRADLEY: I ask that you keep your answers to my questions verbal because the court reporter is taking down everything that's being spoken about in a question/answer format which means that she can't take down responses such as uh-huh or the shaking or nodding of the head. Do you agree with that?

THE WITNESS: Yes.

MR. BRADLEY: Okay. Please keep your voice up and speak clearly so the court reporter can transcribe

the deposition accurately and she won't have to interrupt us.

If there's a question you don't understand, let me know and I'll repeat the question or rephrase it. Will you agree?

THE WITNESS: Okay.

MR. BRADLEY: All right. Unless you tell me otherwise, I will assume that you have understood the pertinent question, okay?

THE WITNESS: Yes.

MR. BRADLEY: If you do not know the answer to a question, please do not guess. Tell me that you don't know. I don't want you to guess at anything. I'm not trying to trick you during the deposition, okay?

THE WITNESS: Okay.

MR. BRADLEY: Please wait for me to finish my questions. You're probably going to anticipate the answers to some of my questions

before I finish asking it so just wait until I finish my question before you answer, okay?

THE WITNESS: Okay.

MR. BRADLEY: Do you understand that the oath you took to tell the truth was the same oath that you would take at a trial?

THE WITNESS: Yes.

MR. BRADLEY: If you realize at any time at this deposition that an earlier answer to a question was inaccurate or incomplete, let me know and I'll give you a chance to make the correction, okay?

THE WITNESS: Okay.

MR. BRADLEY: You will also have an opportunity to review the transcript of today's deposition. After you review it, you may correct any errors that you find in the transcript, okay?

THE WITNESS: Okay.

MR. BRADLEY: And finally, if

you need to take a break at any point, please let me know but if you're going to take a break, you have to answer my question that is pending before you do so, okay?

THE WITNESS: Okay.

Q Is there any reason at all that you cannot testify truthfully and accurately today?

A No.

Q Have you ever been deposed before?

A No.

Q You know that you're at a deposition now, right?

A Yes.

Q Okay. Have you ever testified as a witness before in court or otherwise?

A No.

Q Have you ever testified at a departmental trial against another correction officer?

A No.

Q Have you ever testified at an

Internal Affairs investigation?
A Yes.
Q How many times?
A I do not know.
Q All right. Were those times as a witness or a subject?
A Witness and I think a subject.
Q Can you estimate if it was more than five?
A I do not really remember.
Q Okay. Is it less than 20?
A Definitely less than 20, yes.
Q Less than 15?
A I would say so, yeah, probably around 10.
Q All right. Other than this case, have you ever been a plaintiff or defendant in a civil lawsuit?
A No.
Q How old are you, sir?
A I'm 32.
Q Have you ever been convicted of a crime?
A No.

Q I want to discuss your educational background. Can you please take me through that?
A I only went to high school and that was it after that. That's all of my education.
Q Do you have any military experience?
A No.
Q After graduating high school, what jobs did you have?
A I worked for Nassau County Carpentry Department. I worked for a roofing company, a sprinkler company, an oil company and yeah, that's it.
Q Okay. And those different jobs, did you leave those employers amicably?
A Yes. I just left to get a better job.
Q And that job was Nassau County Corrections?
A Yes.
Q All right. And so, you worked

for the Nassau County Sheriff's Office, right?

A Yes.

Q When did you first become hired?

A 2015.

Q And what position were you hired for?

A Correctional officer.

Q What was your rank?

A Just a regular CO.

Q First class?

A No, just CO. There's no first class.

Q Okay. Do you volunteer for any organizations?

A No.

Q All right. And is your current rank CO?

A Yes.

Q And when we say "CO," we mean correction officer?

A Yes.

Q Is there a correction officer

first class rank?

A No.

Q And your current rank is correction officer?

A Yes.

Q When you were first hired by the sheriff's department, were you required to attend the Sheriff's Department Correction Officer Academy?

A Yes.

Q And did you attend the academy?

A Yes.

Q How long was the academy?

A Three months, I believe.

Q And at the academy, did you receive extensive training?

A Yes.

Q When you went to the academy, you were taught proper procedures and practices to be followed by a correction officer, right?

A Yes.

Q You were taught the proper conduct of a correction officer?

A Yes.
Q You were taught the standards of care of a correction officer?
A Yes.
Q And you were provided with written policies and procedures while at the academy?
A Yes.
Q And among those, what were they?
A They were all different types of procedures just about how to -- custody care and control of inmates and how to perform my duties as a correction officer.
Q And among those materials, was there training on the use of force?
A Yes.
Q Do you recall what kind of in-person training you received at the academy with respect to training on the use of force?
MR. MCLAUGHLIN: Objection to form. He can answer if he's able.
A I do not recall.

Q Okay. What do you recall from the academy with respect to being trained on the use of force?

A I do not remember much. It was just the regular -- Just the force was regular force and stop as soon as the force was not to be used anymore.

Q Is one of the things you were taught at the academy the minimum force continuum?

A Yes, I believe.

Q And what is it?

MR. MCLAUGHLIN: Did you have a question after that? We couldn't hear that.

Q What is that?

A What is what?

MR. MCLAUGHLIN: The minimum force continuum.

A The minimum force continuum is just whatever force is complied with, which is verbal, loud commands to be first given. If an inmate does not comply with that, then if it takes it beyond that, then it's

cuffing and then just control holds and whenever the inmate stops, we stop, and that is it.

Q And based on your training and experience, not only at the academy but all training, were you ever taught that it's permissible to punch an inmate with a closed fist?

A Not unless I'm being threatened and something like that but, no, you're not supposed to, not unless I'm being attacked.

Q Okay. So you were trained on the policies and procedures of the sheriff's department, right?

A Yes.

Q And you understood that a violation of the policies and procedures by the sheriff's department by you could result in your discipline?

A Yes.

Q And with respect to your training at the academy and on-the-job training, you were trained about how to handle emergency situations?

A Yes.
Q And one purpose of your training is to prepare you for circumstances an ordinary civilian would not encounter?
A Yes.
Q You were taught how to respond differently to daily circumstances that a correction officer might encounter?
A Yes.
Q You were taught to expect the unexpected?
A Yes.
Q And you were taught that as a professional correction officer, you were expected to have a higher code of conduct than the average civilian?
A Yes.
Q The average inmate?
A Yes.
Q At the academy, you were taught the force continuum but you were also taught about escalation and de-escalation of force?
A Yes.
Q And what does that mean?

A As soon as the inmate becomes compliant, no more force is used.
Q Okay. Were you taught how to collect evidence at the academy?
A No.
Q Were you taught hand-to-hand combat at the academy?
A A little bit, yes.
Q What kind of things did you learn?
A Just control holds and pressure points.
Q What type of control holds?
A Just mostly like hand control holds and basically, that's about it and just pressure points.
Q Were you ever taught how to bring an inmate to the ground to handcuff them?
A How to bring an inmate to the ground and how to handcuff them?
Q Yes.
A No.
Q Were you ever taught how to

control an inmate on the ground in order to handcuff?

A No. You just cuff the inmate as soon as you get his arms.

Q What about the legs? Have you ever been in a situation where you had to control an inmate's legs?

A Yes.

Q How do you do that?

A You just grab the leg, put one shackle, hold the other one, grab the other leg and shackle that one.

Q Okay. Were you taught at the academy the psychology of confrontations with an inmate?

A Yes, I guess so.

Q What do you mean by that?

A Like the psychology of how to talk to an inmate?

Q Yeah.

A Just try to always de-escalate the situation. That was basically what we were taught.

Q And why were you taught to

de-escalate the situation?

A Because you don't want the situation to get into a use of force.

Q Right. Because you were taught that you must use a minimum necessary force?

A Yes.

Q And you were taught that the use of excessive force would not be tolerated?

A Yes.

Q And unnecessary force is excessive force?

A Yes.

Q And at the academy, you were told and taught about how to avoid confrontations with inmates?

A Excuse me. Can you repeat that?

Q You were taught at the academy how to avoid confrontations with inmates?

A Yes.

Q Okay. And use of excessive force by a correction officer, based on your training and experience, were you taught

that it is a violation of the sheriff's office policies and procedures?

A Yes.

MR. BRADLEY: I'm going to have this marked as Plaintiff's Exhibit 1. It's Nassau County 619-645. It's the "Use of Force Policy."

(Whereupon, Plaintiff's Exhibit 1 was marked for identification.)

MR. MCLAUGHLIN: Do you want me to bring it up on my computer or is it being brought up on the screen?

MR. BRADLEY: I am going to share it.

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 1.)

Q Officer, can you see that?

A Yes.

Q Have you ever seen this before?

A Yes.

Q When was the first time you saw this?

A I would say in the academy.

Q Okay. And at the academy, do they tell you to keep this booklet with you, these policies and procedures here?

A They don't tell us to keep it with us but I do, I believe, have it.

Q Were you tested on this policy?

A Yes, we were.

Q And is this the policy of Nassau County Sheriff's regarding use of force?

A Yes.

Q All right. And are discussions about the minimum force continuum and the escalation and de-escalation procedures and policies are contained in this policy, right?

A Yes.

Q And does that policy -- I can pull it back up. I just forgot to ask this question. Does it obligate a correction officer to prepare a written statement in the event of use of force by a correction officer on an inmate?

A After a use of force, yes.

Then you would fill out the paperwork.

Q And you're required to do so?

A Yes.

Q And were you taught that your failure to report the use of force by a correction officer other than yourself, it could result in discipline?

A Yes.

Q All right.

MR. BRADLEY: I'm pulling up Plaintiff's Exhibit 2. It's bates stamped Nassau County 546-655.

(Whereupon, Plaintiff's Exhibit 2 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 2.)

Q Sir, do you recognize this document?

A Injury report, yeah.

Q All right. Is this policies and procedures of the Nassau Country Sheriff's Department with respect to injury to inmate reports?

A Yes.
Q What is your understanding of your obligation to report injury to inmate reports to prepare them?
A You ask the inmate what injuries he has. You take down the injury and then alert your sergeant and then you also bring them to medical.
Q Did you receive any training with respect to discrimination, harassment or sexual harassment of inmates by correction officers?
A Yes.
Q All right. What kind of training did you receive?
A Just sexual harassment training and -- You said, what other type of training?
Q Discrimination, harassment and sexual harassment.
A Yes. Those classes are given, yes.
Q And were they given at the academy or are they also given on some sort

of basis at the academy?

A They're given at the academy and we have to do them, I believe, every year.

Q All right. So if a correction officer calls an inmate an N word, would that violate the policy?

A Sure, yes.

Q All right. If the correction officer states that he doesn't care about an inmate's N word child, would that violate the policy?

A Yes.

Q Do you know that if a correction officer places a finger inside an inmate's anus, does that violate the use of force policy?

A Yes.

Q Would that violate the discrimination and harassment policy?

A Yes.

MR. BRADLEY: Pulling up what we'll mark as Plaintiff's Exhibit 3. It's a one-page document. It's

marked Nassau County, bates stamped number 672.

(Whereupon, Plaintiff's Exhibit 3 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 3.)

Q Sir, do you recognize this document?

A Yes.

Q Okay. How do you recognize it?

A 'Cause it's our policies and procedures.

Q This is your policies and procedures with respect to non-discriminatory treatment, right?

A Yes.

Q And you were taught about this policy?

A Yes.

Q And does this policy set forth Nassau County Sheriff's Department policy regarding non-discriminatory treatment of inmates?

A Yes.
Q All right. So if you had witnessed a correction officer using racial slurs at an inmate, do you have a duty to report that?
A Yes.
Q Is it your understanding failure to report that would result in discipline?
A Yes.
Q If you did witness a correction officer using racial slurs against an inmate, who would you report those allegations to?
A I would go through the chain of command which would be the corporal and then the corporal would relay it to the sergeant. Then it would go to the lieutenant and then go on from there.
Q Where did you learn that information?
A The academy system, chain of command.
Q Have you ever reported

allegations of harassment or sexual harassment by a correction officer against an inmate?

A No.

Q Have you ever reported allegations of use of force by a correction officer against an inmate?

A No.

Q Okay. Have you ever received any training about how to conduct a strip or cavity search on an inmate?

A Strip search, yes; cavity, no.

Q What is the difference between a strip search and a cavity search?

A Well, a cavity search, I never learned about but a strip search is just, you have the inmate go down to -- You take each individual piece of clothing, have them take it off and hand it to you one-by-one. And then you have them hold their hands up, lift their tongue up, drop and squat and then you have them put their clothes back on.

Q Okay. In what circumstances

would you conduct a strip search?

A If you're searching down cells or something happened or a fight or an inmate coming in who has a felony charge, not a misdemeanor, it would be a strip search.

Q What if you found out that an inmate was smoking on the tier, would that warrant a strip search?

A That would be up to -- That would not be up to me. That would be up to the chain of command.

Q And what do you mean by "chain of command"?

A Well, if you catch someone smoking, you would tell the corporal and the corporal would take it up from there.

Q All right. So are you saying that the corporal would be in charge of determining whether a strip search would be warranted of an inmate?

A He would have to call the sergeant, I believe.

Q So you believe that the

corporal would have to notify the sergeant that a correction officer had reason to believe that inmate was smoking on a tier?

A Yeah.

Q In order to conduct a strip search?

A Strip search for smoking wouldn't require that. It would be other contraband. If it was just smoking, I wouldn't see a strip search being required but that's above my rank.

Q Okay. So it would be someone other than the correction officer who would determine whether a strip search would be warranted, right?

A Yes.

Q It would be someone above your rank which would include either the corporal or the sergeant?

A I believe, yes.

Q But you're not sure if it's the corporal or the sergeant?

A Correct.

Q You said you have never been

trained on how to do a cavity search, right?
A No.
Q Are cavity searches conducted in the jail?
A No.
Q You hold the title of correction officer, right?
A Yes.
Q What are your duties and responsibilities in that rank?
A Just custody, care and control of inmates.
Q All right. Do you know what the inmate handbook is?
A Yes.
Q And you've seen it before?
A Yes.
Q What is it?
A It's an inmate handbook of all their policies that they have and their rights of being incarcerated.
Q And are you provided with that handbook too?
A Yes.

Q Were you required to review the handbook?

A Yes.

Q Do you keep a handbook with you when you're on the job?

A There's usually a handbook on each floor.

MR. BRADLEY: I'm going to mark as Plaintiff's Exhibit 4 the inmate handbook. It is bates stamped Nassau County 673 to Nassau County 698.

(Whereupon, Plaintiff's Exhibit 4 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 4.)

Q Sir, do you recognize this document? I can go through it if you want.

A I kind of recognize it but, yes.

Q All right. Do you recognize it as the inmate handbook?

A Keep scrolling down.

Q All right. So it has, and I'm not putting words in your mouth, but it has the use of force policy I see here.
A Yes.
Q The sick call.
A The sick call, yes.
Q So you do recognize it?
A Yes.
Q It has the grievance procedure. It also has the disciplinary charges that can be brought against an inmate.
In your experience as a correction officer at the Nassau County jail, have you ever wrote an inmate up for smoking?
A I do not believe so.
Q Okay. So based on your training and experience, is it ever permissible for a correction officer to conduct a search of an inmate's cell if they believe the inmate was smoking?
A If he was smoking and you go through the chain of command, then, yes, you can search his cell.

Q A correction officer is permitted to do so?
A No. You have to go through the chain of command.
Q At any point, based on your training and experience, did the chain of command say you could go ahead and search the inmate's cell?
A If the chain of command says so, then yes.
Q Do you know what CERT team is?
A Yes.
Q What are they?
A The CERT team is a team that comes along when handling an emergency needs to happen or they need to go down and shake the tier down and commit a search.
Q What does CERT stand for?
A I do not know.
Q With the CERT team, do they normally work alongside correction officers or are they somewhere else?
A They are stationed somewhere else.

Q Are they stationed at Nassau County jail?
A Yes.
Q And typically, in a regular work day, would you have any interactions with the CERT Team?
A No, not unless they're coming to search your floor.
Q So would you say that it's not true that the CERT team is the only team permitted to conduct a cell search of an inmate accused of smoking?
A Yes.
Q You don't think that's true?
A I don't think -- Repeat that question.
Q Do you think that it's true that CERT is the only members of the Nassau County Correction Center that can conduct a search of an inmate's jail cell accused of smoking?
A My understanding is, if I go through the chain of commands, I could search the cell, the corporal could search

the cell and CERT could also be called to come up and search the cell.

Q Have you ever searched an inmate's cell for smoking?

A I do not believe so.

Q One more second with this.

So it says here on bates stamp 688, "You will be subject to frisk or pat searches and cell searches by staff members. Strip searches may occur on admission, will occur after the contact visits and when there is cause to believe he may possess contraband. If contraband is found, he will be subject to appropriate"...

Do you see that?

A Yes.

Q And are there any other circumstances where a strip search would be warranted other than the ones listed here?

A No.

Q All right.

MR. BRADLEY: I am pulling up what will be marked as Plaintiff's 5. It's Article 9 from the rules

and regulations of the Nassau County's Sheriff Office. It's bates stamped Number 3369 to Nassau County 3396.

(Whereupon, Plaintiff's Exhibit 5 was marked for identification.

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 5.)

Q Do you see this document? It's titled Security and Supervision of Inmates?
A Yes.
Q Have you ever seen this before?
A I believe so.
Q When do you think you saw this?
A During the academy.
Q Do you have a copy of this? Not with you today. I'm saying with you on your job.
A On the job, yes.
Q So I'm going to go down to Rule 4.4. It says, "Supervision of Inmates in Housing Areas." Do you see 4.4?
A Yes.

Q As part of your job duties, obviously, you have to supervise inmates, right?

A Yes.

Q Then it says here at 4.4 that inmates require constant observation. Do you agree with that?

A Yes.

Q It says, "Correction officers assigned to specifically designated cell blocks where inmates require constant supervision shall remain on those cell blocks at all times and constantly patrol making a personal visual observation of each inmate in the cell and surrounding area."

Were you trained on how to do that?

A Yes.

Q When you do an observation on a patrol, would you agree that one of the most important things you can do is personally observe each inmate?

A As you walk down the tier, yes.

Q And one of those things that

you're doing when you are observing each inmate is to determine whether they have any injuries to their face?

A Yes.

Q Or their body?

A Yes.

Q And you would also agree with me that conducting these types of patrols are so important that you're required to do this every 15 minutes?

A Every 15 minutes depending on where you are working.

Q What other places would you be working where that 15-minute requirement doesn't apply?

A Depending on which housing area. If you go to the satellite, then it's a regular general pop. dorm. That's every half hour, not unless you're working with the COTS. It's every 15 minutes. The workers are every half hour.

Q Okay. If you see in 4.3, it says, "In maintaining active supervision, officers shall station themselves in the

lockbox area."
A The lockbox area is just an area with each box that you can open and open up each cell and then that would be the lockbox area. Then you have the door to open up to let inmates come in and out.
Q Is this policy saying there needs to be a correction officer stationed in the lockbox area at all times?
A Yes.
Q Okay. And that's true?
A Yes.
Q All right. It says here, "At 15-minute intervals, they shall patrol their assigned cell blocks and make a personal, visual observation of each inmate," right?
A Yeah.
Q And that's like what we spoke about. Is that the one of the most important things you can do when conducting a patrol is to make a personal observation of each inmate?
A Yes.
Q All right. On each patrol, the

appropriate recording devices and it says in italics, punch stations shall be activated by the officer in the area.

What is a punch station?

A A punch station, basically, just looks like a keyhole where you stick your key and turn it to the right. This way, they know you walked down the tier.

Q Okay. Who's they?

A Correction officers or corporals or sergeants.

Q And when we say "the door," right, what door are we talking about, the tier door?

A Yes.

Q And there's a record created from every time you punch into a tier, right?

A Yes.

Q All right. If you open the individual cell of an inmate, would there be a record of that?

A I do not know.

Q All right. And the 30-minute,

were you also trained when you are doing patrols on a housing tier that you can suspend the 15-minute requirement and proceed to a 30-minute requirement for patrols if all inmates are locked in?

A The only time you are allowed to suspend a patrol is when you are doing a feeding.

Q Okay. So if you look at 4.6, it says, "Cell blocks other than those specially designated for constant observation, active supervision may be relaxed when inmates are locked in their cell at intervals not to exceed one half hour when inmates are locked in their cells."

Does this policy say that you don't have to do the 15-minute requirement?

A If it's constant supervision, then you have to.

Q But if it's not constant supervision, you can suspend the 15-minute requirement procedure to a 30-minute requirement?

A Well, you would suspend a 15-minute patrol only due to the feeding, as far as I know.

Q So when it says here, "In intervals not to exceed one half hour when inmates are locked in their cells," are you saying it could be true that you could go to a 30-minute patrol if inmates are locked in their cells?

A Certain housing areas are 30-minute patrols.

Q Okay. So you have patrolled D2A tier in the past?

A D2 or B2?

Q D2.

A D2, yes.

Q And you have been assigned to A tier, right, on that floor?

A Yes.

Q And that tier requires 15-minute patrols?

A 15-minute patrols, yes.

Q So if that cell block required 15-minute patrols, doesn't this policy also

say that you can suspend that 15 minutes if all inmates are locked in their cells and proceed to only half-hour patrols?

A Yes. But if you're talking about D2A block, when it was BMU, patrols were never suspended due to anything.

Q When I say "suspended," I just mean you can change it to a 30-minute patrol if all inmates are locked in their cell.

A No.

Q Are you saying you don't agree with that?

A At the time, that D2A block area, it was 15-minute patrols.

Q Okay. I'm going to go down to Rule 5. It says at 5.21, "Conducting security patrols, officers will be constantly alert and observing for fire hazards."

When it says "fire hazards," is it also referencing the fire alarms that could be going off in an inmate's cells?

A Okay.

Q Yes or no.

A Yes. It's not in each individual cell but, yes.

Q All right. Have you ever been in a situation where an inmate's fire alarm has gone off or a fire alarm in the actual housing tier?

A A fire alarm has gone off, yes.

Q And in those situations, what do you do when a fire alarm goes off?

A You check down each tier to see what's going on to see if there's any smoke or any fire.

Q Has there ever been a time where a fire alarm had went off and you went to the tier and smelt tobacco or marijuana?

A Yes.

Q And then, what would you do in that situation?

A I would go through my chain of command, let the corporal know that there's smoke on the tier and then proceed to whatever he would tell me to do.

Q Okay. Do you know if any record is created of an alarm going off in a

housing tier or an inmate's cell?
A No, I do not. That would be fire safety. It has nothing to do with me.
Q Okay. And who was fire safety?
A Fire safety is the ones that run the -- If any type of fire hazard or alarm goes off, they get alerted.
Q And where are they located?
A I do not know where they are located.
Q Are they located in the jail?
A Yes.
Q And do you know how they're notified?
A No.
Q All right. Do you see in 5.2 it says, "the control center"? What is the control center?
A What did you say, 5.2?
Q Yeah. If you look at the second sentence, it says, "the control center deputy tour command." What is the control center?
A I guess that would be the main

desk.

Q Okay. And who's at the main desk? Is there a corporal there?

A I believe it's the lieutenant's. It would be the three desk guys and then the lieutenant's.

Q And three desk guys is three COs?

A Yes.

Q All right. If you look down at 5.6, it says that if it is necessary to open and enter an inmate's cell in which an inmate is locked in, a minimum of two officers shall enter their cell.

So this policy is saying that if you wanted to extract or take an inmate out of his cell, you have to be accompanied by at least two officers but you probably would want more than that?

A At least two officers, yes.

Q All right. And in a situation where you're going to take an inmate out of his cell, it says here that every precaution shall be taken to prevent the inmate from

overpowering the officers. Security shall be maintained at the tier lockbox in the floor lobby.

So when you want to take an inmate out of the cell, are you notifying everybody on the floor in terms of correction officers and superiors?

A Yes.

Q And in that situation, what this policy is saying is that there needs to be a correction officer in the lockbox area and you must be accompanied by at least two correction officers when taking the person out of their cell and there has to be correction officers in the lobby area?

A Yes.

Q And in terms of correction officers in the lobby area, what exactly would they be doing in this situation?

A They would just be controlling the lockbox. They would be opening up their cell, shutting the shower gate and then opening the door to come out into the lobby.

Q Okay. And the cells can be

controlled from the control area?
A From the lockbox area, yes.
Q All right. I'm going to go down to Rule 6.9. It says, "When an inmate leaves his assigned housing area for any reason, the officer on duty in that housing area shall log the inmate out in the appropriate form."
When it says, "appropriate form," do you know what it means?
A Yes. There's a sheet that you have to log each inmate in and out of where they go, the activity sheet.
Q Is that also called the logbook?
A No. That is not the logbook. It's the activity sheet.
Q Where do you fill the activity sheet out?
A The activity sheet is a separate sheet from the logbook.
Q How do you get that sheet?
A It's located in the office.
Q Okay. And where's the office?

A The office is in the lobby area. That's behind -- I really don't know how to describe that to you. I would have to show that to you.

Q Okay. When it says, "When an inmate leaves his assigned housing area," what does that mean, when he leaves the actual floor?

A Yes, when he leaves the floor.

Q Okay. So if we look at Rule 8, at 8.9 it says, "Inmates shall be strip searched when there is reasonable belief in the presence of contraband and when"... and it lists several here. Is it your understanding that those are the only times you can conduct a strip search?

A Yes.

Q So if you go down a little bit, it says at 8.11, "Searches of housing areas shall be conducted on a frequent basis. Routine searches will be made with inmates present."

What does a routine search mean?

A It's just a regular routine search.

Q And how often do you do that?

A It all depends. It's different day-to-day.

Q Okay. And then, when it says, "Searches of housing areas shall be conducted on a frequent basis," do you know what that means?

A Yes. Frequent means it could be every day or a couple times a week.

Q And then 8.12 says that searches shall be conducted on a correctional center search shakedown report form. What is a shakedown report?

A A shakedown report form is just that everyone needs to log in who was there on the shakedown.

Q When you say, everyone that was there, that means correction officers?

A Yes.

Q And what is a shakedown?

A Shakedown is where you shake the whole entire tier down and get rid of

any contraband that you find and report it from there.

Q Is a shakedown form required to be created for a search on an individual's cell?

A Excuse me?

Q Is a shakedown report required to be created if you only search an individual's cell?

A No. That's just searching an inmate. I wouldn't consider that a shakedown.

Q Okay. Have you ever worked in the medical office of the jail?

A Very rarely.

Q Okay. Well get to that.

We're going to go down to Rule 13. It says, "Rule 13. Treatment and care of inmates. Upon admission to the correction center, all inmates shall be provided with an issue of personal healthcare items and division-issued clothing and bedding as follows." And it lists some essentials here. Do you see

that?

A Yes.

Q It also mentions hot showers, right?

A Yes.

Q All right. So these things, you know they need to be provided to the inmate, right?

A Yes.

Q Is it ever permissible for a correction officer to deprive an inmate of any of these items as a way of discipline?

A No.

Q All right. So if you look at 13.6, it says, "Inmates who have requested to see the doctor, sick call."

Do you know what a sick call is?

A Yes.

Q What is it?

A It's just a sick call sheet that an inmate is given to fill out whatever is wrong with him and it's handed to the nurse, signed by the nurse. She takes a

copy, gives him back one copy.

Q And who provides the inmate with a sick call?

A The nurse does.

Q So in the event that an inmate sends a sick call to the nurse, what happens next?

A They take it down, as far as I know, to the medical unit and I don't know what happens from there.

Q All right. When an inmate submits his sick call, is he required to remain in his cell until he receives medical treatment?

A No.

Q Do you know how long after an inmate submits a sick call that he's required to be transported or to receive medical attention?

A No.

Q Do you know what the name of the type of nurse that regularly gives or, in general, gives sick call request forms to inmates?

A Just a nurse, as far as I'm concerned or an RN.
Q So you mentioned that you very rarely worked in the medical unit of the jail, right?
A Yes.
Q What is it specifically called?
A Just med-trans or medical.
Q All right. So when you worked in medical, how many correction officers are typically assigned?
A I have no idea. I only worked there a handful of times.
Q When you worked there, what were your duties and responsibilities with respect to the medical unit?
A Just to go in to do sick calls for inmates is the only thing I've ever done.
Q Okay. Is there a superior officer that is also assigned to the medical unit at the same time?
A Like a corporal and a sergeant?
Q Yes.

A Yes.
Q Okay.
MR. BRADLEY: I'm going to pull up what will be marked as Plaintiff's 6. This is Article 10. It's titled, "Discipline of Inmates." It's Nassau County, bates number 3397-3408.
(Whereupon, Plaintiff's Exhibit 6 was marked for identification.)
(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 6.)
Q Officer, do you see this?
A Yes.
Q Have you ever seen this before?
A Yes.
Q And what is this?
A This would be the discipline of the inmates, inmate rules and regulations.
Q All right. So is the rules and regulation with respect to imposing discipline on inmates?
A Yes.

Q Of the Nassau County Sheriff's Department?

A Yes.

Q All right. So if you look at 9.3, do you see that?

A Yes.

Q Can you read that and let me know when you're done?

A Okay.

Q So as far as your understanding, the letters in 9.3 from A through I are the only circumstances that you may use physical force on an inmate?

A Yes.

MR. BRADLEY: Pulling up another one. It's Nassau County, bates number 3421-3460.

(Whereupon, screen share was enabled for parties to view the document.)

Q You see here it says, "Article 11. Arrest in Evidence"?

A Yes.

Q Have you ever been provided

with this policy?

A Have I ever been provided with it? Yes.

Q Okay. Was that at the academy?

A Yes.

Q Do you have a copy of it on the job?

A Yes.

Q All right. So if you see here, have you ever been trained on Rule 2?

A Okay.

Q Were you trained on how to collect evidence with respect to sex crimes at the jail?

A Not to my knowledge.

Q Okay. Did you ever receive any training at all with respect to sexual assault allegations by an inmate?

A Not really, to my knowledge.

Q Are you aware of what the procedure is in the event that an inmate complains of sexual assault while in the jail?

A Yes. You go through chain of

command.
Q And is the chain of command listed in Rule 2?
A Yeah. The Tour Commander Unit, yes, notified, yes.
Q It also says, "The Nassau County Police Department 3rd squad detectives shall be notified too."
A Yes.
Q Do you know whether an inmate must be arrested if found in possession of tobacco or marijuana or K2?
A I do not know.
Q All right. And are you familiar with COVID protocols that were in place following COVID that were in place in the jail?
A Yes.
Q Do you recall what COVID protocols existed in October, 2021?
A Not really. To my knowledge, no.
Q What is your understanding of the COVID protocols that were instituted at

the Nassau County jail?
A The COVID protocols were just wear a mask; every inmate had to wear a mask. It was basically just try to keep everything more contained, to my knowledge.
Q And do you know whether or not there was ever a COVID protocol requiring inmates to be locked in their cells for a certain amount of time per day?
A No, I do not know.
Q Typically, how long is an inmate allowed outside his cell?
A How long? It all depends on what happens throughout the day, day by day.
Q In a typical day, how long would an inmate be permitted to socialize and be outside his cell?
A On a typical day, like 8 to 11 which is the count. And then 11 to 12, they're locked in for the feeding. They come back at 1. And then 1 to 3, they do another count. Then you do the feeding at 4 and then they're allowed back out again at 6 to 10, however many hours those are.

Q All right. So you're not aware of any COVID protocol that required inmates to be locked in their cells 23 hours a day?

A No.

Q If an inmate on a tier tested positive for COVID, do you know what the procedure was?

A I kind of do. It was the whole tier was locked down. No one was to come in or out of a tier. Everything had to be done, medication, all had to be done cell side. Everything had to be done while they're contained.

Q And in that situation, would inmates be permitted to be on the housing tier socializing?

A No, as far as I know.

Q All right. If an inmate tested positive on the tier, what records would be created in such an event?

A That would all have to be through medical.

Q All right. If an inmate tested positive on a tier, would that information

go into a lockbox?
A Yes, I believe so.
Q And what would you write if an inmate tested positive for COVID? What would you write in the logbook?
A I would just write, inmate so and so tested positive for COVID on this date, notified by this doctor or this nurse.
Q So who would notify you that an inmate had tested positive for COVID?
A It would be a doctor or a nurse.
Q And what would they do with that inmate if he tested positive? Would they take him off the tier?
A No. Everybody, to my knowledge, stays contained in that area.
Q Okay. Are you familiar with sheriff's order?
A (No verbal response.)
Q Do you know what that is?
A The sheriff's order for what?
Q Hold on. I'll get it up.
MR. BRADLEY: I'm going to mark

this as Plaintiff's Exhibit 7. It's Nassau County, bates number 3409-3417. It's Article 12, titled "Communications."

(Whereupon, Plaintiff's Exhibit 7 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 7.)

Q Do you see this document?

A Yes.

Q Have you ever received this document before?

A Probably, I've seen this document but I don't remember it that well.

Q All right. If you look at Rule 2, it says, "Written Orders and Directives." It says at 2.1, "Sheriff's orders shall contain any matter necessary for the administration and operation of the Division of Correction and must bear the signature of the sheriff or his designee?"

What is your understanding of that?

A The sheriff has to give an order out. That's my understanding of that.

Q All right. And was the COVID-19 protocol, was that a sheriff's order?

A I believe it was the sheriff's order, yes, or a state order.

Q And if it was a sheriff's order, is it your understanding that would need to be in writing?

A Yes. It would have to be something that looks like this, yes.

Q All right. It has to bear the signature of the sheriff.

A Yes.

Q And then Number 2.2, "written orders and directives of designated unit." What's the difference between that and a sheriff's order?

A I guess -- I really don't know.

Q Okay. And you mentioned that the COVID-19 protocol could have came from the state. What do you mean by that?

A Meaning that they could have

come from the state.

Q Do you know who from the state it would have come from?

A I have no idea.

Q When you were told of the COVID-19 protocols, were you told that at lineup or were you also told that through writing?

A At lineup.

Q Okay. When you were told of the COVID-19 protocols at lineup, if you can remember, was your superior officer reading to you something in writing about COVID-19 protocols?

A From what I can remember, yes.

Q Do you know if any sheriff's orders are kept in Nassau County records for your later review if you are required to review it or want to?

A No.

Q No, they're not?

A I didn't hear that last question.

Q So let's say a sheriff's order

is issued during a calendar year. Do they keep those records at the jail in case you want to later review them?

A Yes, I believe so.

Q Do you know whether or not the COVID-19 protocols were posted or bulleted in any part of the jail for a correction officer's review or anyone's review?

A I do not recall.

MR. BRADLEY: Can we take a five-minute break?

(Whereupon, a short recess was taken.)

Q Just a couple more questions on training.

Were you ever trained on the use of handcuffs to handcuff an inmate?

A Yes.

Q And what type of training did you receive?

A Just basic training.

Q Were you always taught to handcuff an inmate from the back?

A No.

Q All right. So are you saying that you can handcuff an inmate from both the front and the back?
A Yes.
Q It's up to your discretion?
A No. It's not up to my discretion.
Q Whose discretion is it?
A It would be up to the chain of command or if he's an AS inmate or what type of inmate he is.
Q What's an AS inmate?
A It's an administrative segregation inmate. So he's not to be with anyone else and the procedure would be cuffed and body belted.
Q Okay. For a typical inmate, would you handcuff them from the back?
A For a typical inmate, no.
Q You always handcuff from the front for a typical inmate?
A It depends on how he was acting or what the protocol was or what I was told to do.

Q So if he was compliant, you would handcuff from the front?
A Yes.
Q And if he had a history of violence or acting out, you would handcuff from the back?
A Yes.
Q So what is your understanding of a correction officer's obligation when an inmate engages in self-harm?
A When an inmate tries to harm himself?
Q Yes.
A You stop it at any cost by either spraying him or going to cut him down if he's hanging himself up, any means to stop the harm from him hurting himself.
Q Okay. And if you did the security patrol of a housing tier and you suspected of an inmate of engaging in self-harm, what would you do?
A Immediately alert the corporal and go down the tier and take the inmate out, make sure he's not harming himself.

Q Okay. We went over policies and procedures with respect to conducting security patrols, right?

A Yes.

Q And one of the things we said was how important it is in conducting a security patrol to do a visual observation of each inmate.

A Yes.

Q Would you also agree that one of the reasons that you want to make a visual observation is to determine whether or not an inmate has engaged in self-harm?

A Yes.

Q What is your understanding regarding a correction officer's obligation when inmates are suspected of getting into a fight, a physical fight?

A If they get into a physical fight?

Q Yes.

A If I saw the fight or if I did not see the fight?

Q If you didn't see the fight.

A If I did not see the fight, I saw markings on their face, I would immediately go to my chain of command.

Q All right. Would you agree with me that one of the reasons why it's important to do a visual inspection of each inmate during a security patrol is to determine whether or not inmates have been fighting?

A Yes.

Q Do you know if a correction officer is ever obligated to prepare a written statement from an inmate regarding an incident of a fight?

A Prepare a statement?

Q Yes.

A If the inmate claims that he was in a fight or was assaulted, then you take a statement.

Q Do you know what policy exists with respect to that?

A No.

Q Is a correction officer ever obligated to get statements from witnesses,

such as surrounding inmates, of a physical fight between inmates or an instance of self-harm of an inmate?

A Correction officers are not responsible to take witness statements.

Q Okay. So you mentioned you have been the subject of an Internal Affairs investigation, right?

A Yes.

MR. BRADLEY: I'm going to mark this as Plaintiff's Exhibit 8.

(Whereupon, Plaintiff's Exhibit 8 was marked for identification.)

Q Have you ever been the subject of an Internal Affairs investigation with respect to allegations by an inmate of excessive force?

A Not that I can recall.

Q What about improper search?

A Not that I can recall.

Q What about racial discrimination?

A Not that I can recall.

Q What about sexual assault?

A Not that I can recall.
Q Okay.
MR. BRADLEY: For Plaintiff's Exhibit 8, it's Nassau County bates number 8695-8697.
(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 8.)
Q All right, Officer. Do you recognize this document?
A Can you scroll back up?
Q Yes.
A Yes.
Q Okay. Is that your signature on the bottom of the document above employee's signature?
A Yes.
Q And what is this document?
A This document was saying that I used time that I didn't have.
Q Okay. And were you disciplined as a result of this?
A Yes, I was.
Q Okay. And what happened?

A They took a step away from me.
Q And did you plead guilty?
A Yes, because they said there was no way to fight it.
Q Were you represented by counsel when you --
A Yes.
Q All right. And when you say, time that you didn't have, what do you mean by that?
A They said I didn't have holiday comp. days that I used to put in and personal days that I used over.
Q Okay. And are you saying what they were claiming is that you were using holiday time and personal time that you didn't have but they had paid you for?
A They did not pay me for so they disciplined me twice for that.
Q Do you dispute whether this is true or not?
A It is true to a certain extent, yes.
Q Did you intentionally use

holiday time and personal days?
A Knowingly, no.
Q How was it that you did not knowingly do that?
A Just lost track of my time. Our time sheets are not kept up to date so --
Q Okay. On the days alleged by the county and the sheriff's office of your use of holiday and personal days that you did not have, did you actually go to work on those days?
A No. I did not go to work on those days.
Q So what you are saying is, you thought you had additional days but you did not but you used them as though you had them?
A Well, they were approved and I was put in the books so --
MR. BRADLEY: I have a document. It's Nassau County, bates stamped numbers, it's 8698-8781. It's Internal Affairs investigation,

case number IAU-008-017 pulled up.

(Whereupon, Plaintiff's Exhibit 9 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 9.)

Q Officer, have you ever seen this before? It does not appear that you were charged with any conduct.

A I've never seen this before but --

Q Okay. So this case, based on my reading of the document, involved an inmate who received IV treatment on the housing tier. Do you recall something like that in 2017?

A Very little bit but, yes, I think so.

Q What do you remember about it?

A (No verbal response.)

Q So you did give a statement -- let me get you to there -- but based on you not reading this document, is there anything you remember based on your independent

Case 2:23-cv-00167-RER-JMW Document 49-26 Filed 08/12/24 Page 75 of 133 PageID #: 1834



recollection?

A No.

Q So I know you haven't seen the document but it appears that you had given an audio deposition taken by Internal Affairs. If you want to take a second to read it, it's mostly on this page.

A Okay.

Q All right. After reading that, does that refresh your recollection as to this incident?

A Very little.

Q All right. What do you remember?

A I just remember Joe Vaughn Smith having an IV going through the slot. That was basically it.

Q All right.

MR. BRADLEY: I'm pulling up Plaintiff's Exhibit 10. This is Nassau County, bates number 8782-8879. It's case number IAU-04816.

(Whereupon, Plaintiff's Exhibit

10 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 10.)

Q Do you recognize this document?

A No.

Q It appears that you were not subject to the charges or you may have been. I just don't see it here.

Do you remember being investigated with respect to an incident on June 9, 2016?

A No.

Q Okay. So you were interviewed with respect to this investigation. Your statement begins at 8796. It appears to be a summary of what you wrote on a use of force report. If you want to take a look at that, just let me know when you're done.

A Okay.

Q Does that refresh your recollection at all to this incident?

A Not really.

Q All right.

MR. BRADLEY: Pulling up Plaintiff's 11. It's Nassau County, bates number 8880-8892. It is case number IAU, number 04016, date of incident, June 9, 2016.

(Whereupon, Plaintiff's Exhibit 11 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 11.)

Q You don't recognize this document, do you?

A No.

Q And do you recall being investigated about an incident on June 9, 2016?

A No.

Q So there's a summary from the inmate here. Basically, what he alleged was that you were escorting him from E01E block to D02A block and he alleged that you had searched him and took his commissary from him; do you remember that?

A Very little but I did not

escort him from the E building so that is wrong.

Q What else do you remember?

A Very little. I just remember bringing him up the steps and he had, I think, contraband on him which was not allowed in the BMU.

Q So here is your statement at 8882. If you want to take a second to read that, let me know when you're done.

A Okay.

Q All right. Does that refresh your recollection to anything else?

A No.

Q All right. Do you remember what kind of contraband it was alleged he had?

A I think it was just commissary that you weren't allowed to have in BMU.

Q Do you remember, you just patted him down, you felt contraband and you removed it from him?

A I do not really recall.

Q Okay. How long have you been a

correction officer for?

A I'm in my ninth year.

Q When you first entered the academy after you graduated, where did you first get assigned in the Nassau County jail?

A I floated for a while. Then I became a steady on the BMU, D2.

Q How long have you been on D2 for?

A I believe I was on D2 -- I mean, this is not exact. I believe I was on D2 for maybe six and a half years.

Q And are you still there?

A No. I got moved. I went down to B1A and then I floated. Then B1A opened back up and I went back to B1A. B1A just closed. Now I'm in the B1C.

Q And what is B1A?

A B1A was just like a minimal housing area unit. Like, it wasn't -- It was like for midlevel inmates, so, like, midlevel classifications.

Q Okay. Give an example of

midlevel classification.
A Just like misdemeanors and stuff like that.
Q And when you were in D, were you primarily patrolling housing area A?
A When I worked in BMU, D2A block?
Q Yes.
A Yes.
Q Okay. What is D2A block?
A D2A block at that time was the BMU and cells 1 through 9 were BMU and the top floor was for Ad Segs.
Q What is BMU?
A The Behavioral Management Unit.
Q And Ad Seg is Administrative Segregation?
A Yes.
Q What type of inmates are in BMU?
A BMU are any type of the inmates that are assaulted from 1 through 9. It was any type of inmates that assaulted staff or kept getting into multiple fights.

Q Okay. You're represented by an attorney today, right?
A Yes.
Q Did you meet with your attorney to prepare for this examination?
A Yes, I guess so.
Q When was that?
A Today.
Q How long?
A 10 to 20 minutes.
Q Okay. Was it just you two?
A Yes.
Q Did you review any documents in preparation for the deposition?
A Not really. We just talked about why I was here.
Q Did you review any documents at all or you guys just talked?
A We just talked.
Q I'm going to just go through the names of certain people. I want to know if you heard of them, whether you know them etc.
Did you ever know of someone by

the name of Detective Nicholas Occhino of the Nassau County Police Department?

A No.

Q Do you know who the correction officer James Staib is?

A Yes.

Q How do you know him?

A Just through the jail.

Q Do you speak with him?

A Maybe just passing through in the hallway.

Q All right. Do you guys hang out outside of work?

A No.

Q Have you ever talked to him about this case?

A No.

Q Do you know where he works in Nassau County jail?

A I believe it's B2.

Q And have you ever saw James Staib on B2 before?

A Have I ever saw what?

Q Have you ever seen Correction

Officer James Staib in B2 before?

A In B2?

Q Yes.

A Passing through there, yes.

Q Why would you pass through B2?

A If I was patrolling or I was going to my next housing area.

Q Okay. So when you say "patrolling," have you ever been assigned to B2?

A Probably when I was floating or doing meals there.

Q What does a "floater" mean?

A Floating is when you do not have a steady position.

Q And if you didn't have a steady position, would your name appear in a logbook?

A Yes. My name would appear on the logbook to wherever I was assigned to.

Q Okay. But if you were a floater, you were technically not assigned anywhere, right?

A No. You were placed somewhere

but you would still have to sign on to the logbook.

Q Okay. You would sign on to the logbook before you were placed?

A Yes.

Q Have you ever been a floater and been assigned to B2?

A Not that I can really recall. Maybe in my earlier career, like maybe my first year, maybe.

Q So probably before October 2021?

A Oh yeah, yeah, definitely.

Q Okay. If you were a floater, what would you do that day? Would you go through a bunch or all of the tiers?

A No. If I was -- A floater just means I would be placed wherever they needed me.

Q What do you mean, that you're kind of like going around the jail, right?

A No. You would be placed -- Like if they needed me on B3 that day, I would be assigned to B3. If they needed me

on rec. that day, I would be assigned to rec. If they needed me on the west side that day, that's where I would work.

Q All right. So if you were a floater assigned to B2, your name would appear on the logbooks, right?

A Yes, because you have to sign on.

Q All right. Do you know who Correction Officer Thomas Benson is?

A Yes.

Q How do you know him?

A Through the jail.

Q Are you friends with him outside of work?

A No.

Q Are you friendly at work?

A No.

Q How often do you see him at work?

A Basically just at lineup.

Q At lineup?

A Yeah.

Q And you have seen Staib at

lineup too?

A Yes.

Q Did you talk to him about this case?

A No.

Q Did he ask you about the case?

A No.

Q Do you know who Corporal Patrick McCaffrey is? I think he's a sergeant, right?

A Yes.

Q Do you know him?

A Yes.

Q Do you hang out outside of work with him?

A No.

Q How often do you see him at work?

A Now, I almost never see him.

Q Okay. On October 12, 2021, prior to that, did you see him at the jail?

A Not that I can recall.

Q Okay. Did he ask you about this case?

A No.
Q Do you know who Nurse Obozo is?
A No.
Q You never heard of her?
A Nurse Obozo, no.
Q Do you know a nurse that fits the description of a small, Filipino Asian woman, older in age, slightly overweight, that's a nurse at the medical unit?
A No. I would have to see a face.
Q What about a Nurse Francis? Do you know who Nurse Francis is?
A Yes. I know who Nurse Francis is.
Q Who is she?
A She was my nurse when I worked on D2 for a while.
Q Okay. Her name is Sadika Francis?
A I do not know her first name.
Q Do you know what she looks like?
A Tall, dark skin. That's

basically it.

Q Is she Asian at all; do you know?

A No, I don't believe so.

Q Are you familiar with a person named Robert Johnson?

A Robert Johnson, no.

MR. BRADLEY: I'm pulling up Plaintiff's Exhibit 12. It's Nassau County 268-Nassau County 276.

(Whereupon, Plaintiff's Exhibit 12 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 12.)

Q Officer, do you see this person?

A Yes.

Q Do you recognize him?

A No.

Q You don't know this person, Robert Johnson?

A No.

MR. BRADLEY: I'm going to pull

up Plaintiff's Exhibit 13. It's Nassau County, bates number 369.

(Whereupon, Plaintiff's Exhibit 13 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 13.)

Q Do you see that in front of you?

A It's kind of blurry but, yeah.

Q Do you see where it says, security post assignments"?

A Yes.

Q Have you ever seen a document like this before?

A No.

Q Okay. Do you see your name on 40?

A Yes.

Q Can you see what's written there? I know it's really hard. Is it rover?

A I guess, rover or maybe rec.

Q What is rover?

A Rover would be where you patrol the stairways and any type of movements it would help assist on.

Q You said, "patrol stairways and any type of movements"?

A Yes. It would help during the rec. movements and patrol the stairways and the hallways, any places that like are blind spots where you really can't see.

Q Okay. And one of those hallways could be the lockbox area?

A No.

Q When you say "movements," do you also mean it could be any movements of an individual inmate?

A No, not of an individual inmate. It was basically for rec. movements.

Q Would you ever have rover help with the transport of an individual inmate?

A Of an individual inmate?

Q Yes.

A Not that I can recall, no.

Q Have you ever worked as a

rover?

A I have worked as a rover, not that many times, probably a handful.

Q Do you recall if you worked as a rover on October 12, 2021?

A No, I do not recall.

Q So you said "rover" and you said it could say something else but you can't really see it too well. What would the other thing be?

A It maybe looked like rec. D so like rec. D yard, maybe.

Q What does that mean?

A That would just be the D rec. yard. So I would have done rec. that day if that's what that says and that would just be in the D building, running rec. there.

Q In recreation?

A Yes.

Q When we say "rec.," is there like a yard the inmates would go?

A Yes, a D rec. yard. It's two split yards so, yes.

Q So they go outside?

A Yes.
Q Is there a logbook for that or for that post?
A Yes.
Q What's that logbook called?
A It's just the rec. logbook. That's it.
Q Rec. D logbook?
A Yes.
Q And what about if you were a rover? Would you have to sign in and out of the logbook?
A No, rover did not. It would just be on -- I assume this is a lineup sheet. It would just be on the lineup sheet.
Q Okay. Now, is the rec. D yard, is that post on the first floor of the jail?
A Excuse me?
Q Is the rec. D yard post, would that be on the first floor of the jail?
A No. It's on the second floor.
Q So there's an outside yard on the second floor?

A Yeah.

Q Can they see up to the sky or it's just --

A Yeah. They can see up to the sky.

Q So the rec. is on D2?

A The rec. is not on D2 but it's down the hallway from D2.

Q Okay.

MR. BRADLEY: Pulling up what is going to be marked as Plaintiff's Exhibit 14. It's an aerial photo of the jail.

(Whereupon, Plaintiff's Exhibit 14 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 14.)

Q Do you recognize this map or photo?

A Yes.

Q What is it?

A That would be a picture of the jail, I believe.

Q Okay. And would you say it's a fair and accurate representation of the jail?
A Yeah.
Q All right. So you see, it kind of looks like there's multiple crosses surrounding a larger building there; do you see that?
A Yeah.
Q What is that larger building?
A That larger building should be the E building.
Q All right. What is the E building?
A That's a satellite. That's just another -- It's just called the E building.
Q There's jails and tiers in there?
A The E building is not linear tiers like the B building. It's more like a bigger area.
Q Does it look more like a prison?

A They're both prisons. It's just a different setup. It's not linear tiers. It's more open.

Q Okay. Like bunks?

A Yeah, but they both have bunks, yes.

Q Okay. And so, are there individual cells in E building or is it different?

A Yeah. It's individual cells. It's just not linear tiers.

Q All right. You see the cross buildings that are beside each side of the E building?

A Okay.

Q There's two on each side; do you see that?

A Yes.

Q All right. So if you're looking at it, right, do you see on your left-hand side those tiers by Carman Avenue? Do you see that by those buildings?

A Yeah, the tiers, yes.

Q So is there A, B, C, D and E

building at the Nassau County jail?
A Yes.
Q Okay. So those two cross buildings that are connected to the E building by Carman Avenue, which number buildings are those?
A Which ones?
Q The two cross buildings by Carman Avenue.
A The two cross buildings. Those would be B, I believe, if I'm looking at it right.
Q Are they both B or A and B?
A No. One would be -- One is D building and one should be -- I think the other side is B building, if I'm looking at this right.
Q So B and D building are connected?
A B and D building are connected, yes. E building is completely separate.
Q Okay. So the connection between B and D building, can you see it in this photo?

A No. Not really, no.
Q Okay. So the connection between B and D building, what is it connected by, a door?
A No, by long hallways. It's one long hallway to a corridor. Then you turn down another long hallway and then you finally hit medical and D rec. yard and it's a long hallway down the D2.
Q So we have B and D. Those are the buildings closer to Carman Avenue that are to the left of the E building, right?
A Yes.
Q And then to the right is A?
A Yeah. A is not even used anymore but, yes.
Q A is not used at all?
A I believe it's just used for like movie shoots and stuff like that.
Q And what about C building?
A C building?
Q Yes.
A I don't know of a C building.
Q So the buildings that are to

the right of E, not the buildings on Carman Avenue, those two that appear to be connected to E building but might not be, what are those called?

A I have no idea.

Q And you said that B and D are not connected to the E building?

A No. The E building is a separate building.

MR. BRADLEY: I'm going to pull up what's going to be Plaintiff's Exhibit 15.

Q So do you know if there are any cameras in the D building?

A Are there any cameras in D building? Yes, in D2A block.

Q And does this camera record?

A To my knowledge, yes.

Q How many cameras are there in A block?

A I have no idea.

Q More than one?

A Yes.

Q All right. Do you know of only

one or how many do you know of?

A Downstairs, there was one in front of each cell and upstairs, they are just placed on each -- like down the tiers. I mean, not the tiers because it's a different setup and I think there was one overhead.

MR. BRADLEY: This is going to be Plaintiff's Exhibit 15. It's bates stamped 3464-3471, Nassau County.

(Whereupon, Plaintiff's Exhibit 15 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 15.)

Q Do you see these photos?

A Yes.

Q Do you recognize this one?

A This looks like the B2 lockbox area going down towards the D building.

Q And we're looking at Nassau County 3464.

So you are saying we're looking

from B2 into D2?

A No. You're not looking into D2. You're looking down the hallway. That would be the corridor. Then you have to make a left and another slight little left and go all the way down another long hallway to get to D2.

Q Okay. So if I walk straight past those gates, I would be walking in that direction?

A If you walk where? Basically, if like you see those white lines --

Q If I wanted to get to B2, would I have to walk straight outside these gates?

A If you wanted to get to -- Yeah. You would have to walk through this gate. You would have to walk this way if you wanted to get to B2.

MR. MCLAUGHLIN: Counsel, the witness was indicating towards himself.

MR. BRADLEY: Got it.

Q Do you see there looks like there's windows right there past the gate?

Do you know what that is?
A That's the corridor.
Q Is there an officer station there?
A No.
Q And these look like lockboxes here to the left and right.
A Yes.
Q Do you know what those lockboxes are for?
A Yes. That would be to open up cells and the shower gate.
Q Do you know what cells are here?
A That would be B and, I believe, that would be C on that side.
Q So B and C of which housing unit?
A To the left of me, that would be, I believe, B block and to the right of me, I think that would be C block or B2.
Q Okay. Is this the same picture with the gate closed?
A Yes.

Q And that's 3465, right, Nassau County 3465?
A Yes.
Q Then on Nassau County 3466, what are we looking at in this picture? Do you recognize it?
A This would be taken from the other direction facing D2 -- I mean, B2.
Q All right. So if I'm looking into this picture past the gate where these officers are, is that the lockbox area?
A Yes. Where those officers are, that is the lockbox area.
Q And in what situations would you be walking down this tier and into the lockbox area from where you were assigned in D2?
A If I was assigned on D2, I would not be in that area.
Q Ever?
A Not unless a body alarm was hit.
Q What is a body alarm?
A A body alarm is when an officer

needs assistance or it could also be for medical but if it was for medical, I would not respond -- or a multiple inmate fight.

Q And where is that button located in the lockbox area?

A It's not located in the lockbox area. That would be on the radio.

Q Okay. If an officer comes on the radio, is that given to all correction officers that are on duty that day?

A That goes throughout the whole jail.

Q So then it looks like at 3467, it's a similar picture, right?

A Yes.

Q And at 3468, it looks like the same picture?

A Yes.

Q And then we see two officers there, right?

A Yes.

Q Could those officers be there because they're assigned to be placed in the lockbox area?

A Yes.
Q And do you see that person with the all gray outfit?
A Yes.
Q Do you know what he's doing, if anything?
A It looks like he has the med. cart.
Q And is that uniform associated with the medical unit?
A They wear different types of scrubs so I guess. It could be what he wanted to wear that day.
Q Do you know if a nurse in the medical unit, do they have to do regular patrols themselves of the housing tiers?
A No.
Q What about when delivering medication? Do you know how often in the day they would do that?
A Whenever they need meds. They have their own schedule when they come.
Q All right. So we're looking at 3470. Do you know what this is of?

A Yes. This would be the turning point of if you were coming from B2 going down towards the D building.

Q And do you see that there's a camera in the top right side?

A Yes.

Q Have you ever seen that camera before?

A I believe I have seen that camera.

Q Okay. Do you know if that camera records?

A No.

Q You don't know if it does?

A I have no idea if it does.

MR BRADLEY: I'm going to mark Plaintiff's Exhibit 16. It's Nassau County bates number 1007.

(Whereupon, Plaintiff's Exhibit 16 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 16.)

Q Officer, do you see this

photomap?

A Yes.

Q Do you recognize it?

A This looks like a picture of D building.

Q Right, B2 floor?

A B2 format, yeah.

Q And you see that there's those two little lines that are in the middle of the lockbox, what appears to be the lockbox area?

A What two little lines?

Q It's right by B and C in the middle.

A Yes.

Q Do you know if that is the doorway that will get you to the D building where you would need to go through?

A The lines all the way at the top?

Q Yes.

A Yes.

Q So does it look like in the middle of the document, it looks like the

lockbox area, the B2 floor?

A Yes.

Q So if you wanted to come in from the D building into this lockbox area, you would be let in by a correction officer or do you have a key?

A Correction officer.

Q All right.

MR. BRADLEY: I'm going to show you what's Plaintiff's Exhibit 17. It's bates number 353-360.

(Whereupon, Plaintiff's Exhibit 17 was marked for identification.)

(Whereupon, screen share was enabled for parties to view Plaintiff's Exhibit 17.)

Q Do you see this document?

A Yes.

Q Have you ever seen a document like this before?

A Never.

Q Okay. Do you know if there's any cameras in the jail that you are aware of that doesn't record but does live feed?

A Not that I know of.

Q Do you know if there's any cameras in B2?

A Not that I know of.

Q And when you do patrols at the rec. D, would that be for your entire shift?

A If I was assigned to the rec. D yard that day, yes.

Q Do you know how long it takes to walk from A block to B2?

A I have no idea.

Q Would you say less than five minutes?

A Yeah, probably.

Q Maybe two?

A Yeah. I can't give you an accurate time.

MR. BRADLEY: Can we just take my last five-minute break and then we can get into the incident?

MR. MCLAUGHLIN: Sure.

MR. BRADLEY: Thank you.

(Whereupon, a short recess was taken.)

Q Just one quick question. If you were a floater, is one of the places that you would patrol the area between B2 and D building?

A That's not what a floater is. A floater is where you don't have a position so you're assigned to one.

Q Oh, I'm sorry, a rover, I mean.

A A rover, no. You would be patrolling the stairways and you would be helping out with any type of movements that happen, big movements like rec. movements.

Q Okay. So I know that the medical unit is in D building, right?

A Yes.

Q It's not too far away from the lockbox area on B2?

A It is not that close but --

Q So in order for a correction officer to get an inmate from B2 to D building, they would go through the gates in the lockbox area, right?

A Yes.

Q And then they would walk them

down those corridors to the medical unit D building?

A Yes.

Q So if you were a rover, would you be assisting with any of those transports?

A No. The rovers are supposed to be patrolling the stairways, the hallways and the rec. rooms.

Q Are there any situations where you would be required to pass through into B2 as part of your job?

A No. Not as a rover, no.

Q As any part of your job, any assignment that you ever had at the Nassau County jail?

A Any assignment I had? Not that I can recall.

Q So you've never passed through B2 as part of your job duties at Nassau County jail?

A I mean, I probably have passed through there.

Q And in what situation would you

pass through there?

A Maybe escorting an inmate to medical.

Q Okay. So October 12, 2021, do you recall that time?

A No.

Q Do you remember working on October 12, 2021 at Nassau County jail?

A No.

Q So you don't remember what your tour of duty was that day?

A No.

Q Was your tours typically the same at around October 2021?

A We constantly rotate from 8-4 to 4-12 every other week so --

Q So you could have or could not have worked. You just don't recall on October 12th?

A Yes.

Q Do you recall of an incident occurring on October 12, 2021 involving the use of force on an inmate in the B2 lockbox area?

A No.

Q Have you ever heard of allegations other than today of allegations being made against James Staib, Correction Officer Thomas Benson and Sergeant McCaffrey regarding use of force against an inmate named Robert Johnson?

A No.

Q You never heard about that prior to today?

A Correct.

Q You were never contacted by anyone from Internal Affairs with respect to an incident that happened on October 12, 2021?

A No.

Q Were you ever contacted by anyone from the District Attorney's Office regarding a complaint of use of force on an inmate occurring on October 12, 2021?

A No.

Q So you have been a correction officer since 2015?

A Yes.

Q So that's about seven years?

A Eight.

Q Eight years, okay.

Have you ever heard about an allegation by an inmate against a correction officer that a correction officer stuck a finger up an inmate's anus?

A No.

Q Okay. If I told you that an Internal Affairs investigator at Nassau County jail said that he heard of prior complaints of correction officers sticking fingers up inmate's anuses, would you dispute that information?

A Yeah. I've never heard of that before.

Q And what about if a nurse claimed that she heard of prior complaints? Would you believe that that wasn't true?

A Yeah, because I never heard of that being done.

Q What about a Nassau County detective?

A I never heard of that being

done by them either.
Q All right. Have you ever heard of correction officers fabricating evidence against inmates?
A No.
Q Have you ever learned of correction officers hiding evidence regarding allegations against them for use of force?
A No.
Q Have you ever learned of correction officers manufacturing evidence against an inmate?
A No.
Q Have you ever heard of a correction officer falsely claiming that they did not physically assault an inmate?
A Not that I know of.
Q If a correction officer lied about whether they physically assaulted an inmate, would that be wrong based on your training and experience?
A That would be wrong, yes.
Q That would be a violation of

sheriff's policies and procedures?
A Yes.
Q Based on your training and experience, could it be considered a crime?
A I guess so.
Q If a correction officer physically assaults an inmate without cause, that would be a deviation from sheriff's office policy and procedures?
A Yes.
Q That could be considered cruel and unusual punishment based upon your training and experience?
A Yes --
MR. MCLAUGHLIN: Objection to the form of the question. He can answer if he understands.
Q If a correction officer physically assaults an inmate without cause, that would be a violation of human rights?
MR. MCLAUGHLIN: Objection to the form of the question. He can answer if he understands.
You can answer.

THE WITNESS: I'm not going to answer.

MR. MCLAUGHLIN: You don't have an answer?

THE WITNESS: No. I don't have an answer.

Q You don't have an answer to that question? So is it your understanding that you can assault an inmate without cause?

A No. I still don't understand the question.

Q Based on your training and experience, would it be considered a violation of human rights for a correction officer to assault an inmate without cause?

MR. MCLAUGHLIN: Objection to the form of the question. It calls for legal interpretation but he can answer to the extent of his understanding.

A I would say yes, to my understanding.

Q All right. Based on your

training and experience, if a fellow correction officer witnessed another correction officer physically assault an inmate but did not report the incident, that would be a violation of sheriff's office policies and procedures?

A Yes.

Q Okay. And failure to do so could be considered a false statement?

A I guess so.

Q All right.

MR. BRADLEY: I don't have any further questions.

(Time noted: 1:05 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )
:ss
COUNTY OF NASSAU )

I, DYLAN HUSSEY, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of July 11, 2023; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________

DYLAN HUSSEY

Signed and subscribed to before me, this_________________day of______________________, 2023.

________________________________
Notary Public, State of New York

## INDEX

### INDEX TO TESTIMONY


| Witness | Examination By | Page |
|---|---|---|
| Dylan Hussey | Mr. Bradley | 4 |


### EXHIBITS


| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 1 | Use of Force Document | 20 |
| Exhibit 2 | Injury Report | 22 |
| Exhibit 3 | Document | 25 |
| Exhibit 4 | Inmate Handbook | 31 |
| Exhibit 5 | Rules and Regulations | 36 |
| Exhibit 6 | Discipline of Inmates | 55 |
| Exhibit 7 | Communication | 62 |
| Exhibit 8 | Document | 70 |
| Exhibit 9 | Internal Affairs | 74 |
| Exhibit 10 | Document | 75 |
| Exhibit 11 | Document | 77 |


(Continued on next page.)

**Exhibits**

| Plaintiff's | Description | Page |
|---|---|---|
| Exhibit 12 | Document | 88 |
| Exhibit 13 | Document | 89 |
| Exhibit 14 | Photo | 93 |
| Exhibit 15 | Photos | 99 |
| Exhibit 16 | Photo Map | 105 |
| Exhibit 17 | Document | 107 |

ERRATA SHEET
FEVOLA REPORTING & TRANSCRIPTION INC.
CASE NAME: ROBERT JEFFREY JOHNSON, JR., v COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JAMES STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOES 1-9 SERVANTS AND REPRESENTATIVES OF NASSAU
DATE OF DEPOSITION: July 11, 2023
WITNESS' NAME: DYLAN HUSSEY

PAGE/LINE(S)/ CHANGE REASON
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________
____/________/_________________________/_________________

___________________________

SUBSCRIBED AND SWORN TO
BEFORE ME THIS _____ DAY
OF ______________, 2023.

________________________________
NOTARY PUBLIC

CERTIFICATION

I, CHRISTINA SCHMIDT, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of August, 2023.

______________________________

CHRISTINA SCHMIDT

**0**

**04016** [1] - 77:5

**1**

**1** [9] - 2:8, 20:7, 20:10, 20:18, 59:22, 80:13, 80:23, 119:12
**1-9** [2] - 1:9, 121:5
**10** [8] - 9:16, 55:6, 59:25, 75:21, 76:2, 76:5, 81:11, 119:22
**100** [2] - 4:11, 5:6
**1007** [1] - 105:19
**105** [1] - 120:8
**107** [1] - 120:9
**10th** [1] - 122:16
**11** [10] - 1:14, 56:23, 59:19, 59:20, 77:3, 77:8, 77:11, 118:10, 119:23, 121:6
**11501** [1] - 2:8
**11735** [1] - 2:5
**12** [14] - 4:22, 59:20, 62:4, 86:21, 88:10, 88:13, 88:16, 91:6, 111:5, 111:9, 111:23, 112:15, 112:21, 120:4
**12th** [1] - 111:20
**13** [6] - 51:19, 89:2, 89:5, 89:8, 120:5
**13.6** [1] - 52:16
**14** [4] - 93:13, 93:16, 93:19, 120:6
**15** [10] - 9:14, 38:11, 38:12, 38:21, 43:2, 98:13, 99:10, 99:14, 99:17, 120:7
**15-minute** [10] - 38:15, 39:15, 41:4, 41:19, 41:23, 42:3, 42:22, 42:23, 42:25, 43:15
**16** [4] - 105:18, 105:21, 105:24, 120:8
**17** [4] - 107:11, 107:14, 107:17, 120:9
**1:00** [1] - 1:14
**1:05** [1] - 117:15

**2**

**2** [7] - 22:12, 22:15, 22:18, 57:11, 58:4, 62:18, 119:13
**2.1** [1] - 62:19
**2.2** [1] - 63:17
**20** [4] - 9:12, 9:13, 81:11, 119:12
**2015** [2] - 11:7, 112:24
**2016** [3] - 76:13, 77:6, 77:17
**2017** [1] - 74:17
**2021** [11] - 4:22, 58:21, 84:13, 86:21, 91:6, 111:5, 111:9, 111:15, 111:23, 112:16, 112:21
**2023** [6] - 1:14, 118:10, 118:21, 121:6, 121:24, 122:16
**22** [1] - 119:13
**23** [1] - 60:4
**25** [1] - 119:14
**268-Nassau** [1] - 88:11
**276** [1] - 88:11

**3**

**3** [5] - 24:24, 25:5, 25:8, 59:22, 119:14
**30-minute** [6] - 40:25, 41:5, 41:24, 42:9, 42:12, 43:9
**31** [1] - 119:15
**32** [1] - 9:22
**3369** [1] - 36:4
**3396** [1] - 36:5
**3397-3408** [1] - 55:9
**3409-3417** [1] - 62:4
**3421-3460** [1] - 56:18
**3464** [1] - 99:24
**3464-3471** [1] - 99:11
**3465** [2] - 102:2, 102:3
**3466** [1] - 102:5
**3467** [1] - 103:14
**3468** [1] - 103:17
**3470** [1] - 104:25
**353-360** [1] - 107:12
**36** [1] - 119:16
**369** [1] - 89:3
**3rd** [1] - 58:8

**4**

**4** [6] - 31:10, 31:15, 31:18, 59:23, 119:7, 119:15
**4-12** [1] - 111:17
**4.3** [1] - 38:23
**4.4** [3] - 36:23, 36:24, 37:6
**4.6** [1] - 41:10
**40** [1] - 89:19

**5**

**5** [5] - 35:25, 36:7, 36:10, 43:17, 119:16
**5.2** [2] - 45:17, 45:20
**5.21** [1] - 43:17
**5.6** [1] - 46:12
**546-655** [1] - 22:13
**55** [1] - 119:18

**6**

**6** [5] - 55:6, 55:11, 55:14, 59:24, 119:18
**6.9** [1] - 48:5
**619-645** [1] - 20:7
**62** [1] - 119:19
**672** [1] - 25:3
**673** [1] - 31:12
**688** [1] - 35:9
**698** [1] - 31:13

**7**

**7** [4] - 62:2, 62:7, 62:10, 119:19
**70** [1] - 119:20
**74** [1] - 119:21
**75** [1] - 119:22
**77** [2] - 2:4, 119:23

**8**

**8** [7] - 49:11, 59:19, 70:12, 70:14, 71:5, 71:9, 119:20
**8-4** [1] - 111:16
**8.11** [1] - 49:20
**8.12** [1] - 50:13
**8.9** [1] - 49:12
**8695-8697** [1] - 71:6
**8698-8781** [1] - 73:24
**8782-8879** [1] - 75:23
**8796** [1] - 76:17
**88** [1] - 120:4
**8880-8892** [1] - 77:4
**8882** [1] - 78:10
**89** [1] - 120:5

**9**

**9** [9] - 35:25, 74:4, 74:7, 76:13, 77:6, 77:16, 80:13, 80:23, 119:21
**9.3** [2] - 56:6, 56:12
**93** [1] - 120:6
**99** [1] - 120:7

**A**

**able** [1] - 13:24
**above-mentioned** [1] - 1:20
**Academy** [1] - 12:10
**academy** [25] - 12:12, 12:14, 12:16, 12:19, 13:8, 13:21, 14:3, 14:10, 15:6, 15:23, 16:21, 17:5, 17:8, 18:15, 19:15, 19:20, 20:25, 21:2, 23:25, 24:2, 24:3, 26:23, 36:17, 57:5, 79:5
**accompanied** [2] - 46:18, 47:13
**accurate** [2] - 94:3, 108:18
**accurately** [2] - 6:2, 8:9
**accused** [2] - 34:13, 34:21
**acting** [2] - 66:23, 67:6
**action** [2] - 4:19, 122:12
**activated** [1] - 40:3
**active** [2] - 38:24, 41:13
**activity** [4] - 48:14, 48:18, 48:19, 48:21
**actual** [2] - 44:6, 49:9
**Ad** [2] - 80:14, 80:17
**additional** [1] - 73:17
**address** [2] - 4:10, 5:5
**administration** [1] - 62:21
**Administrative** [1] - 80:17
**administrative** [1] - 66:14
**admission** [2] - 35:11, 51:20
**aerial** [1] - 93:13
**Affairs** [8] - 9:2, 70:8, 70:16, 73:25, 75:7, 112:14, 113:11, 119:21
**age** [1] - 87:9
**agree** [9] - 5:11, 5:21, 6:7, 37:8, 37:21, 38:8, 43:12, 68:11, 69:5
**AGREED** [3] - 3:3, 3:8, 3:12
**ahead** [1] - 33:8
**alarm** [10] - 44:5, 44:6, 44:8, 44:10, 44:15, 44:25, 45:8, 102:22, 102:24, 102:25
**alarms** [1] - 43:22
**alert** [3] - 23:8, 43:19, 67:23
**alerted** [1] - 45:8
**allegation** [1] - 113:6
**allegations** [8] - 26:15, 27:2, 27:7, 57:19, 70:17, 112:4, 114:9
**alleged** [4] - 73:9, 77:20, 77:22, 78:17
**allowed** [5] - 41:7, 59:13, 59:24, 78:8, 78:20
**almost** [1] - 86:20
**alongside** [1] - 33:22
**amicably** [1] - 10:19
**amount** [1] - 59:10
**AND** [8] - 1:9, 3:3, 3:8, 3:12, 121:5, 121:23
**answer** [13] - 6:15, 7:4, 7:13, 8:5, 13:24, 115:18, 115:24, 115:25, 116:3, 116:5, 116:7, 116:8, 116:21
**answers** [3] - 5:14, 6:25, 118:12
**anticipate** [1] - 6:24
**anus** [2] - 24:17, 113:8
**anuses** [1] - 113:14
**appear** [5] - 74:9, 83:18, 83:20, 85:7, 98:3
**apply** [1] - 38:16
**appropriate** [3] - 40:2, 48:9, 48:10
**appropriate".** [1] - 35:15
**approved** [1] - 73:20
**area** [39] - 37:16, 38:18, 39:2, 39:3, 39:4, 39:6, 39:10, 40:4, 43:15, 47:12, 47:16, 47:19, 48:2, 48:3, 48:6, 48:8, 49:3, 49:7, 61:18, 79:22, 80:6, 83:8, 90:12, 94:23, 99:22, 102:12, 102:14, 102:17, 102:20, 103:6, 103:8, 103:25, 106:12, 107:2, 107:5, 109:4, 109:18, 109:23, 111:25
**areas** [3] - 42:11, 49:20, 50:8
**Areas** [1] - 36:24

arms [1] - 18:5
Arrest [1] - 56:23
arrested [1] - 58:12
Article [4] - 35:25, 55:6, 56:22, 62:4
AS [2] - 66:11, 66:13
Asian [2] - 87:8, 88:3
assault [7] - 57:19, 57:23, 70:25, 114:18, 116:10, 116:17, 117:4
assaulted [4] - 69:19, 80:23, 80:24, 114:21
assaults [2] - 115:8, 115:20
assigned [20] - 37:11, 39:16, 42:18, 48:6, 49:7, 54:12, 54:22, 79:6, 83:10, 83:21, 83:23, 84:8, 84:25, 85:2, 85:6, 102:17, 102:19, 103:24, 108:8, 109:8
assignment [2] - 110:16, 110:18
assignments [1] - 89:13
assist [1] - 90:4
assistance [1] - 103:2
assisting [1] - 110:6
associated [1] - 104:10
assume [2] - 6:11, 92:15
attacked [1] - 15:12
attend [2] - 12:9, 12:12
attention [1] - 53:20
attorney [2] - 81:3, 81:5
Attorney [1] - 2:7
Attorney's [1] - 112:19
Attorneys [1] - 2:4
ATTORNEYS [1] - 2:7
audio [1] - 75:6
August [1] - 122:16
Avenue [7] - 4:12, 5:7, 95:22, 96:6, 96:10, 97:12, 98:3
average [2] - 16:17, 16:19
avoid [2] - 19:16, 19:21
aware [3] - 57:21, 60:2, 107:24

**B**

B1A [6] - 79:17, 79:18, 79:20, 79:21
B1C [1] - 79:19
B2 [27] - 42:15, 82:21, 82:23, 83:2, 83:3, 83:6, 83:11, 84:8, 85:6, 99:21, 100:2, 100:14, 100:19, 101:22, 102:9, 105:3, 106:7, 106:8, 107:2, 108:4, 108:11, 109:4, 109:18, 109:21, 110:13, 110:21, 111:24
B3 [2] - 84:24, 84:25
background [2] - 4:24, 10:3
based [12] - 15:5, 19:24, 32:18, 33:6, 74:13, 74:23, 74:25, 114:22, 115:4, 115:13, 116:14, 116:25
basic [1] - 65:22
basis [3] - 24:2, 49:21, 50:9
bates [16] - 22:12, 25:2, 31:11, 35:8, 36:3, 55:8, 56:18, 62:3, 71:5, 73:23, 75:22, 77:4, 89:3, 99:11, 105:19, 107:12
bear [2] - 62:22, 63:14
became [1] - 79:9
become [1] - 11:5
becomes [1] - 17:2
bedding [1] - 51:24
BEFORE [2] - 1:17, 121:23
begin [1] - 5:8
begins [1] - 76:17
Behavioral [1] - 80:16
behind [1] - 49:3
belief [1] - 49:13
belted [1] - 66:17
BENSON [2] - 1:8, 121:5
Benson [2] - 85:11, 112:6
beside [1] - 95:14
better [1] - 10:21
between [6] - 27:14, 63:19, 70:3, 96:24, 97:4, 109:4
beyond [1] - 14:25
big [1] - 109:13
bigger [1] - 94:23
bit [4] - 4:23, 17:9, 49:19, 74:18
blind [1] - 90:9
block [13] - 42:24, 43:6, 43:14, 77:21, 77:22, 80:8, 80:11, 80:12, 98:17, 98:21, 101:21, 101:22, 108:11
blocks [4] - 37:12, 37:14, 39:16, 41:11
blood [1] - 122:11
blurry [1] - 89:11
BMU [10] - 43:6, 78:8, 78:20, 79:9, 80:7, 80:13, 80:15, 80:21, 80:22
body [5] - 38:6, 66:17, 102:22, 102:24, 102:25
booklet [1] - 21:3
books [1] - 73:21
bottom [1] - 71:16
box [1] - 39:4
Bradley [2] - 4:16, 119:7
BRADLEY [40] - 2:5, 4:14, 4:15, 5:4, 5:8, 5:13, 5:23, 6:9, 6:14, 6:22, 7:6, 7:11, 7:18, 7:25, 20:5, 20:14, 22:11, 24:23, 31:9, 35:23, 55:4, 56:16, 61:25, 65:11, 70:11, 71:4, 73:22, 75:20, 77:2, 88:9, 88:25, 93:11, 98:11, 99:9, 100:23, 105:17, 107:10, 108:19, 108:23, 117:13
break [4] - 8:2, 8:4, 65:12, 108:20
BRIAN [1] - 2:9
bring [4] - 17:19, 17:21, 20:12, 23:9
bringing [1] - 78:6
brought [2] - 20:13, 32:12
building [40] - 78:2, 91:18, 94:8, 94:11, 94:12, 94:13, 94:15, 94:18, 94:21, 94:22, 95:9, 95:15, 96:2, 96:6, 96:16, 96:17, 96:19, 96:21, 96:22, 96:24, 97:4, 97:13, 97:21, 97:22, 97:24, 98:4, 98:8, 98:9, 98:10, 98:15, 98:17, 99:22, 105:4, 106:6, 106:18, 107:5, 109:5, 109:15, 109:22, 110:3
buildings [9] - 95:14, 95:23, 96:5, 96:7, 96:9, 96:11, 97:12, 97:25, 98:2
bulleted [1] - 65:7
bunch [1] - 84:17
bunks [2] - 95:5, 95:6
business [1] - 5:5
button [1] - 103:5
BY [3] - 2:5, 2:9, 4:13

**C**

calendar [1] - 65:2
camera [5] - 98:18, 105:6, 105:8, 105:11, 105:13
cameras [5] - 98:15, 98:16, 98:20, 107:24, 108:4
cannot [1] - 8:9
care [5] - 13:4, 13:14, 24:11, 30:12, 51:19
career [1] - 84:10
Carman [7] - 4:11, 5:6, 95:22, 96:6, 96:10, 97:12, 98:2
Carpentry [1] - 10:14
cart [1] - 104:9
case [10] - 9:18, 65:3, 74:2, 74:13, 75:23, 77:4, 82:17, 86:5, 86:7, 86:25
CASE [1] - 121:3
catch [1] - 28:16
cavity [6] - 27:12, 27:13, 27:15, 27:16, 30:2, 30:4
Cell [1] - 41:11
cell [35] - 32:21, 32:25, 33:9, 34:12, 34:21, 34:25, 35:2, 35:3, 35:5, 35:10, 37:11, 37:13, 37:16, 39:5, 39:16, 40:22, 41:15, 42:24, 43:10, 44:3, 45:2, 46:13, 46:15, 46:18, 46:24, 47:6, 47:15, 47:23, 51:6, 51:10, 53:14, 59:13, 59:18, 60:12, 99:4
cells [14] - 28:3, 41:17, 42:7, 42:10, 43:3, 43:23, 47:25, 59:9, 60:4, 80:13, 95:9, 95:11, 101:13, 101:14
Center [1] - 34:20
center [6] - 45:18, 45:19, 45:23, 45:24, 50:15, 51:21
CENTER [2] - 1:7, 121:4
CERT [8] - 33:12, 33:15, 33:19, 33:21, 34:7, 34:11, 34:19, 35:2
certain [4] - 42:11, 59:10, 72:23, 81:22
CERTIFICATION [1] - 122:2
certification [1] - 3:6
certify [3] - 118:7, 122:5, 122:10
chain [14] - 26:16, 26:23, 28:13, 28:14, 32:24, 33:5, 33:7, 33:10, 34:24, 44:20, 57:25, 58:3, 66:10, 69:4
chance [1] - 7:15
CHANGE [1] - 121:8
change [1] - 43:9
charge [2] - 28:5, 28:20
charged [1] - 74:10
charges [2] - 32:11, 76:9
check [1] - 44:11
child [1] - 24:12
CHRISTINA [2] - 122:3, 122:20
Christina [1] - 1:21
circumstances [5] - 16:4, 16:8, 27:25, 35:19, 56:13
civil [1] - 9:19
civilian [2] - 16:5, 16:17
claimed [1] - 113:19
claiming [2] - 72:16, 114:17
claims [1] - 69:18
class [3] - 11:13, 11:15, 12:2
classes [1] - 23:22
classification [1] - 80:2
classifications [1] - 79:24
clearly [1] - 5:24
close [1] - 109:19
closed [3] - 15:8, 79:19, 101:24
closer [1] - 97:12
clothes [1] - 27:23
clothing [2] - 27:19, 51:24
CO [4] - 11:12, 11:14, 11:20, 11:22

**code** [1] - 16:16
**collect** [2] - 17:5, 57:14
**combat** [1] - 17:8
**coming** [3] - 28:5, 34:8, 105:3
**command** [14] - 26:17, 26:24, 28:13, 28:15, 32:24, 33:5, 33:8, 33:10, 44:21, 45:23, 58:2, 58:3, 66:11, 69:4
**Commander** [1] - 58:5
**commands** [2] - 14:23, 34:24
**commissary** [2] - 77:23, 78:19
**commit** [1] - 33:18
**Communication** [1] - 119:19
**Communications** [1] - 62:5
**comp** [1] - 72:13
**company** [3] - 10:15, 10:16
**complains** [1] - 57:23
**complaint** [1] - 112:20
**complaints** [2] - 113:13, 113:19
**complete** [1] - 118:11
**completely** [1] - 96:22
**compliant** [2] - 17:3, 67:2
**complied** [1] - 14:22
**comply** [1] - 14:24
**computer** [1] - 20:12
**concerned** [1] - 54:3
**conduct** [10] - 12:25, 16:16, 27:11, 28:2, 29:6, 32:21, 34:12, 34:20, 49:17, 74:10
**conducted** [4] - 30:4, 49:21, 50:9, 50:14
**conducting** [4] - 38:9, 39:21, 68:3, 68:7
**Conducting** [1] - 43:17
**Conference** [1] - 1:12
**confrontations** [3] - 18:15, 19:17, 19:21
**Conklin** [1] - 2:4
**connected** [6] - 96:5, 96:20, 96:21, 97:5, 98:4, 98:8
**connection** [2] - 96:23, 97:3
**consider** [1] - 51:12
**considered** [4] - 115:5, 115:12, 116:15, 117:10
**constant** [5] - 37:7, 37:12, 41:12, 41:20, 41:22
**constantly** [3] - 37:14, 43:19, 111:16
**contact** [1] - 35:12
**contacted** [2] - 112:13, 112:18
**contain** [1] - 62:20
**contained** [4] - 21:16, 59:6, 60:14, 61:18
**Continued** [1] - 119:24
**continuum** [5] - 14:11, 14:20, 14:21, 16:22, 21:14
**contraband** [8] - 29:10, 35:14, 49:14, 51:2, 78:7, 78:17, 78:22
**control** [13] - 13:14, 15:2, 17:12, 17:14, 17:15, 18:2, 18:8, 30:12, 45:18, 45:19, 45:22, 45:24, 48:2
**controlled** [1] - 48:2
**controlling** [1] - 47:21
**convicted** [1] - 9:23
**copy** [4] - 36:18, 53:2, 57:7
**Corporal** [1] - 86:9
**corporal** [13] - 26:17, 26:18, 28:17, 28:18, 28:20, 29:2, 29:19, 29:23, 34:25, 44:21, 46:4, 54:24, 67:23
**CORPORAL** [2] - 1:8, 121:4
**corporals** [1] - 40:12
**correct** [5] - 7:21, 29:24, 112:12, 118:11, 118:13
**Correction** [7] - 12:10, 34:20, 37:10, 62:22, 82:25, 85:11, 112:5
**correction** [67] - 7:16, 8:23, 11:23, 11:25, 12:5, 12:21, 12:25, 13:4, 13:15, 16:9, 16:15, 19:24, 21:21, 21:23, 22:7, 23:13, 24:6, 24:10, 24:16, 26:4, 26:12, 27:3, 27:7, 29:3, 29:14, 30:8, 32:14, 32:20, 33:2, 33:22, 39:9, 40:11, 47:8, 47:12, 47:14, 47:16, 47:18, 50:21, 51:21, 52:12, 54:11, 65:8, 67:10, 68:17, 69:12, 69:24, 70:5, 79:2, 82:5, 103:10, 107:6, 107:8, 109:20, 112:23, 113:6, 113:7, 113:13, 114:4, 114:8, 114:13, 114:17, 114:20, 115:7, 115:19, 116:16, 117:3, 117:4
**correctional** [2] - 11:10, 50:15
**CORRECTIONAL** [2] - 1:7, 121:3
**Corrections** [1] - 10:23
**corridor** [3] - 97:7, 100:5, 101:3
**corridors** [1] - 110:2
**COs** [1] - 46:9
**cost** [1] - 67:15
**COTS** [1] - 38:21
**counsel** [2] - 3:4, 72:6
**Counsel** [1] - 100:20
**count** [2] - 59:20, 59:23
**Country** [1] - 22:23
**County** [42] - 10:13, 10:22, 11:2, 20:7, 21:10, 22:13, 25:2, 25:23, 31:12, 32:14, 34:3, 34:20, 36:4, 55:8, 56:2, 56:17, 58:8, 59:2, 62:3, 64:18, 71:5, 73:23, 75:22, 77:3, 79:6, 82:3, 82:20, 88:11, 89:3, 96:2, 99:12, 99:24, 102:3, 102:5, 105:19, 110:17, 110:22, 111:9, 113:12, 113:23
**county** [1] - 73:10
**COUNTY** [9] - 1:7, 1:7, 2:7, 118:5, 121:3, 121:4
**County's** [1] - 36:3
**couple** [2] - 50:12, 65:15
**court** [4] - 3:16, 5:15, 5:25, 8:19
**COURT** [3] - 1:2, 4:6, 4:9
**COVID** [11] - 58:16, 58:17, 58:20, 58:25, 59:3, 59:8, 60:3, 60:7, 61:5, 61:8, 61:11
**COVID-19** [6] - 63:5, 63:23, 64:7, 64:12, 64:14, 65:7
**created** [5] - 40:17, 44:25, 51:5, 51:9, 60:21
**crime** [2] - 9:24, 115:5
**crimes** [1] - 57:14
**cross** [4] - 95:13, 96:4, 96:9, 96:11
**crosses** [1] - 94:7
**cruel** [1] - 115:12
**cuff** [1] - 18:4
**cuffed** [1] - 66:17
**cuffing** [1] - 15:2
**current** [2] - 11:19, 12:4
**custody** [2] - 13:13, 30:12
**cut** [1] - 67:16


## D


**D02A** [1] - 77:22
**D2** [18] - 42:15, 42:16, 42:17, 79:9, 79:10, 79:12, 79:14, 87:19, 93:7, 93:8, 93:9, 97:10, 100:2, 100:4, 100:8, 102:9, 102:18, 102:19
**D2A** [7] - 42:14, 43:6, 43:14, 80:7, 80:11, 80:12, 98:17
**daily** [1] - 16:8
**dark** [1] - 87:25
**date** [3] - 61:9, 73:7, 77:5
**DATE** [1] - 121:6
**DAY** [1] - 121:23
**day-to-day** [1] - 50:6
**days** [8] - 72:13, 72:14, 73:2, 73:9, 73:11, 73:13, 73:15, 73:17
**de** [4] - 16:23, 18:22, 19:2, 21:15
**de-escalate** [2] - 18:22, 19:2
**de-escalation** [2] - 16:23, 21:15
**defendant** [1] - 9:19
**Defendants** [2] - 1:10, 2:7
**definitely** [2] - 9:13, 84:14
**delivering** [1] - 104:19
**Department** [7] - 10:14, 12:9, 22:24, 25:23, 56:3, 58:8, 82:3
**DEPARTMENT** [2] - 1:7, 121:4
**department** [3] - 12:8, 15:15, 15:19
**departmental** [1] - 8:22
**deposed** [1] - 8:12
**deposition** [11] - 3:6, 3:13, 5:10, 6:2, 6:19, 7:12, 7:20, 8:16, 75:6, 81:15, 118:9
**DEPOSITION** [1] - 121:6
**deprive** [1] - 52:12
**deputy** [1] - 45:23
**describe** [1] - 49:4
**description** [1] - 87:8
**Description** [2] - 119:11, 120:3
**designated** [3] - 37:11, 41:12, 63:18
**designee** [1] - 62:23
**desk** [4] - 46:2, 46:4, 46:6, 46:8
**Detective** [1] - 82:2
**detective** [1] - 113:24
**detectives** [1] - 58:9
**determine** [4] - 29:15, 38:3, 68:13, 69:9
**determining** [1] - 28:21
**deviation** [1] - 115:9
**devices** [1] - 40:2
**difference** [2] - 27:14, 63:19
**different** [7] - 10:17, 13:12, 50:5, 95:3, 95:10, 99:7, 104:12
**differently** [1] - 16:8
**direction** [2] - 100:11, 102:9
**directives** [1] - 63:18
**Directives** [1] - 62:18
**disciplinary** [1] - 32:11
**discipline** [6] - 15:20, 22:8, 26:10, 52:13, 55:20, 55:24
**Discipline** [2] - 55:7, 119:18
**disciplined** [2] - 71:22, 72:20
**discretion** [3] - 66:6, 66:8, 66:9
**discrimination** [4] - 23:11, 23:20, 24:21, 70:23
**discriminatory** [2] - 25:17, 25:24
**discuss** [1] - 10:2

discussions [1] - 21:13
dispute [2] - 72:21, 113:15
District [1] - 112:19
DISTRICT [2] - 1:2, 1:2
Division [1] - 62:21
division [1] - 51:23
division-issued [1] - 51:23
doctor [3] - 52:17, 61:9, 61:12
Document [8] - 119:12, 119:14, 119:20, 119:22, 119:23, 120:4, 120:5, 120:9
document [23] - 22:20, 24:25, 25:10, 31:20, 36:11, 56:21, 62:11, 62:14, 62:16, 71:11, 71:16, 71:19, 71:20, 73:23, 74:14, 74:24, 75:5, 76:6, 77:13, 89:15, 106:25, 107:18, 107:20
documents [2] - 81:14, 81:18
DOES [2] - 1:9, 121:5
done [10] - 54:20, 56:9, 60:12, 60:13, 76:20, 78:11, 91:16, 113:22, 114:2
door [6] - 39:6, 40:13, 40:14, 40:15, 47:24, 97:5
doorway [1] - 106:18
dorm [1] - 38:19
down [34] - 5:16, 5:19, 23:7, 27:18, 28:3, 31:25, 33:17, 33:18, 36:22, 37:24, 40:9, 43:16, 44:11, 46:11, 48:5, 49:19, 50:25, 51:18, 53:9, 60:10, 67:16, 67:24, 78:22, 79:16, 93:9, 97:8, 97:10, 99:5, 99:22, 100:4, 100:7, 102:16, 105:4, 110:2
downstairs [1] - 99:3
drop [1] - 27:22
due [2] - 42:3, 43:7
duly [2] - 4:3, 122:7
during [5] - 6:19, 36:17, 65:2, 69:8, 90:7
duties [5] - 13:15, 30:10, 37:2, 54:16, 110:21
duty [4] - 26:5, 48:7, 103:11, 111:12
Dylan [2] - 4:8, 119:7
DYLAN [4] - 1:17, 118:7, 118:18, 121:7
dylan [1] - 5:3

E

E01E [1] - 77:21
East [2] - 4:12, 5:7
EASTERN [1] - 1:2
education [1] - 10:7
educational [1] - 10:3
effect [1] - 3:15
eight [2] - 113:3, 113:4
either [4] - 29:19, 67:16, 114:2, 122:11
emergency [2] - 15:25, 33:16
employee's [1] - 71:17
employers [1] - 10:18
enabled [16] - 20:17, 22:17, 25:7, 31:17, 36:9, 55:13, 56:20, 62:9, 71:8, 74:6, 76:4, 77:10, 88:15, 89:7, 93:18, 99:16, 105:23, 107:16
encounter [2] - 16:5, 16:9
engaged [1] - 68:14
engages [1] - 67:11
engaging [1] - 67:21
enter [2] - 46:13, 46:15
entered [1] - 79:4
entire [2] - 50:25, 108:7
ERRATA [1] - 121:2
errors [1] - 7:22
escalate [2] - 18:22, 19:2
escalation [4] - 16:23, 21:15
escort [1] - 78:2
escorting [2] - 77:21, 111:3
ESQ [2] - 2:5, 2:9
essentials [1] - 51:25
estimate [1] - 9:9
etc [1] - 81:24
event [4] - 21:23, 53:6, 57:22, 60:21
evidence [5] - 17:5, 57:14, 114:4, 114:8, 114:13
Evidence [1] - 56:23
exact [1] - 79:13
exactly [1] - 47:19
Examination [1] - 119:6
examination [1] - 81:6
EXAMINATION [2] - 1:17, 4:13
examined [1] - 4:4
example [1] - 79:25
exceed [2] - 41:15, 42:6
except [1] - 3:9
excessive [4] - 19:9, 19:13, 19:23, 70:18
excuse [3] - 19:18, 51:7, 92:20
Exhibit [66] - 20:6, 20:9, 20:18, 22:12, 22:14, 22:18, 24:24, 25:4, 25:8, 31:10, 31:14, 31:18, 36:6, 36:10, 55:10, 55:14, 62:2, 62:6, 62:10, 70:12, 70:13, 71:5, 71:9, 74:3, 74:7, 75:21, 75:25, 76:5, 77:7, 77:11, 88:10, 88:12, 88:16, 89:2, 89:4, 89:8, 93:13, 93:15, 93:19, 98:13, 99:10, 99:13, 99:17, 105:18, 105:20, 105:24, 107:11, 107:13, 107:17, 119:12, 119:13, 119:14, 119:15, 119:16, 119:18, 119:19, 119:20, 119:21, 119:22, 119:23, 120:4, 120:5, 120:6, 120:7, 120:8, 120:9
EXHIBITS [1] - 119:9
Exhibits [1] - 120:2
existed [1] - 58:21
exists [1] - 69:21
expect [1] - 16:11
expected [1] - 16:16
experience [11] - 10:9, 15:6, 19:25, 32:13, 32:19, 33:7, 114:23, 115:5, 115:14, 116:15, 117:2
extensive [1] - 12:17
extent [2] - 72:23, 116:21
extract [1] - 46:17

F

fabricating [1] - 114:4
face [3] - 38:4, 69:3, 87:12
facing [1] - 102:9
failure [3] - 22:6, 26:9, 117:9
fair [1] - 94:3
false [1] - 117:10
falsely [1] - 114:17
familiar [3] - 58:16, 61:19, 88:6
far [6] - 42:4, 53:9, 54:2, 56:11, 60:18, 109:17
Farmingdale [1] - 2:5
Federal [1] - 1:19
FEDERAL [1] - 3:2
feed [1] - 107:25
feeding [4] - 41:9, 42:3, 59:21, 59:23
fellow [1] - 117:2
felony [1] - 28:5
felt [1] - 78:22
FEVOLA [1] - 121:2
fight [13] - 28:4, 68:19, 68:21, 68:23, 68:24, 68:25, 69:2, 69:15, 69:19, 70:3, 72:5, 103:4
fighting [1] - 69:10
fights [1] - 80:25
filing [1] - 3:5
Filipino [1] - 87:8
fill [3] - 22:2, 48:19, 52:23
finally [2] - 7:25, 97:9
finger [2] - 24:16, 113:8
fingers [1] - 113:14
finish [3] - 6:23, 7:2, 7:3
fire [13] - 43:19, 43:21, 43:22, 44:5, 44:6, 44:8, 44:10, 44:13, 44:15, 45:4, 45:5, 45:6, 45:7
Firm [1] - 4:17
first [14] - 4:3, 11:5, 11:13, 11:14, 12:2, 12:7, 14:23, 20:23, 79:4, 79:6, 84:11, 87:22, 92:19, 92:22
fist [1] - 15:9
fits [1] - 87:7
five [4] - 9:10, 65:12, 108:13, 108:20
five-minute [2] - 65:12, 108:20
floated [2] - 79:8, 79:17
floater [9] - 83:14, 83:23, 84:7, 84:15, 84:18, 85:6, 109:3, 109:6, 109:7
floating [2] - 83:12, 83:15
floor [14] - 31:8, 34:9, 42:19, 47:4, 47:7, 49:9, 49:10, 80:14, 92:19, 92:22, 92:23, 92:25, 106:7, 107:2
followed [1] - 12:21
following [1] - 58:17
follows [2] - 4:5, 51:24
FOR [1] - 2:7
Force [2] - 20:8, 119:12
force [35] - 3:14, 13:17, 13:22, 14:4, 14:6, 14:7, 14:10, 14:20, 14:21, 14:22, 16:22, 16:23, 17:3, 19:4, 19:6, 19:9, 19:12, 19:13, 19:24, 21:11, 21:14, 21:23, 21:25, 22:6, 24:18, 27:7, 32:4, 56:14, 70:18, 76:19, 111:24, 112:7, 112:20, 114:10
forgot [1] - 21:20
form [10] - 3:9, 13:24, 48:9, 48:11, 50:16, 50:17, 51:4, 115:17, 115:23, 116:19
format [2] - 5:18, 106:8
forms [1] - 53:24
forth [2] - 25:22, 122:7
Francis [4] - 87:13, 87:14, 87:15, 87:21
frequent [3] - 49:21, 50:9, 50:11
friendly [1] - 85:18
friends [1] - 85:15
frisk [1] - 35:9
front [5] - 66:4, 66:22, 67:3, 89:9, 99:4
FURTHER [2] - 3:8, 3:12

G

gate [6] - 47:23, 100:18, 100:25, 101:13, 101:24, 102:11
gates [3] - 100:10,

100:15, 109:22
general [2] - 38:19, 53:24
given [10] - 14:23, 23:22, 23:24, 23:25, 24:3, 52:23, 75:5, 103:10, 118:13, 122:9
grab [2] - 18:11, 18:12
graduated [1] - 79:5
graduating [1] - 10:11
gray [1] - 104:4
grievance [1] - 32:10
ground [3] - 17:19, 17:22, 18:2
Guercio [2] - 4:17
GUERCIO [2] - 2:3
guess [10] - 6:16, 6:18, 18:17, 45:25, 63:21, 81:7, 89:24, 104:13, 115:6, 117:11
guilty [1] - 72:3
guys [4] - 46:7, 46:8, 81:19, 82:13

H

half [6] - 38:20, 38:22, 41:15, 42:6, 43:4, 79:14
half-hour [1] - 43:4
hallway [7] - 82:12, 93:9, 97:7, 97:8, 97:10, 100:4, 100:7
hallways [4] - 90:9, 90:12, 97:6, 110:9
hand [6] - 17:7, 17:15, 27:20, 95:22, 122:16
hand-to-hand [1] - 17:7
Handbook [1] - 119:15
handbook [6] - 30:15, 30:20, 30:24, 31:3, 31:5, 31:7, 31:11, 31:24
handcuff [10] - 17:19, 17:22, 18:3, 65:18, 65:24, 66:3, 66:19, 66:21, 67:3, 67:6
handcuffs [1] - 65:18
handed [1] - 52:24
handful [2] - 54:14, 91:4
handle [1] - 15:25
handling [1] - 33:16
hands [1] - 27:21
hang [2] - 82:13, 86:15
hanging [1] - 67:17
harassment [8] - 23:11, 23:12, 23:17, 23:20, 23:21, 24:21, 27:2, 27:3
hard [1] - 89:22
harm [6] - 67:11, 67:12, 67:18, 67:22, 68:14, 70:4
harming [1] - 67:25
hazard [1] - 45:7
hazards [2] - 43:20, 43:21
head [1] - 5:21
healthcare [1] - 51:23
hear [2] - 14:16, 64:23
heard [12] - 81:23, 87:5, 112:3, 112:10, 113:5, 113:12, 113:16, 113:19, 113:21, 113:25, 114:3, 114:16
held [1] - 1:20
help [3] - 90:4, 90:7, 90:20
helping [1] - 109:12
HEREBY [1] - 3:3
hereby [3] - 3:7, 118:7, 122:4
herein [1] - 1:18
hereinbefore [1] - 122:6
hereto [1] - 3:5
hereunto [1] - 122:15
hiding [1] - 114:8
high [2] - 10:5, 10:11
higher [1] - 16:16
himself [5] - 67:13, 67:17, 67:18, 67:25, 100:22
hired [3] - 11:6, 11:9, 12:7
history [1] - 67:5
hit [2] - 97:9, 102:23
hold [4] - 18:12, 27:21, 30:7, 61:24
holds [4] - 15:2, 17:12, 17:14, 17:16
holiday [4] - 72:12, 72:17, 73:2, 73:11
hot [1] - 52:4
hour [5] - 38:20, 38:22, 41:16, 42:6, 43:4
hours [2] - 59:25, 60:4
Housing [1] - 36:24
housing [18] - 38:17, 41:3, 42:11, 44:7, 45:2, 48:6, 48:7, 49:7, 49:20, 50:8,
60:16, 67:20, 74:16, 79:22, 80:6, 83:8, 101:18, 104:17
human [2] - 115:21, 116:16
hurting [1] - 67:18
HUSSEY [4] - 1:18, 118:7, 118:18, 121:7
Hussey [4] - 4:8, 4:15, 5:3, 119:7

I

IAU [1] - 77:5
IAU-008-017 [1] - 74:2
IAU-04816 [1] - 75:24
idea [6] - 54:13, 64:5, 98:6, 98:22, 105:16, 108:12
identification [17] - 20:10, 22:15, 25:5, 31:15, 36:7, 55:11, 62:7, 70:14, 74:4, 76:2, 77:8, 88:13, 89:5, 93:16, 99:14, 105:21, 107:14
immediately [2] - 67:23, 69:4
important [5] - 37:22, 38:10, 39:21, 68:7, 69:7
imposing [1] - 55:23
improper [1] - 70:20
IN [1] - 122:15
in-person [1] - 13:20
inaccurate [1] - 7:14
INC [1] - 121:2
incarcerated [1] - 30:22
incident [11] - 4:21, 69:15, 75:12, 76:12, 76:23, 77:6, 77:16, 108:21, 111:22, 112:15, 117:5
include [1] - 29:19
incomplete [1] - 7:14
independent [1] - 74:25
INDEX [2] - 119:2, 119:4
indicating [1] - 100:21
individual [9] - 27:19, 40:22, 44:3, 90:16, 90:17, 90:21, 90:22, 95:9, 95:11
individual's [2] - 51:5, 51:10
information [3] - 26:22, 60:25, 113:15
injuries [2] - 23:7,
38:4
Injury [1] - 119:13
injury [4] - 22:21, 22:24, 23:4, 23:7
Inmate [1] - 119:15
inmate [114] - 14:24, 15:3, 15:8, 16:19, 17:2, 17:19, 17:21, 18:2, 18:4, 18:16, 18:20, 21:24, 22:25, 23:4, 23:6, 24:7, 26:5, 26:14, 27:4, 27:8, 27:12, 27:18, 28:5, 28:9, 28:22, 29:4, 30:15, 30:20, 31:10, 31:24, 32:12, 32:15, 32:22, 34:13, 37:16, 37:23, 38:3, 39:17, 39:23, 40:22, 46:14, 46:17, 46:23, 46:25, 47:6, 48:5, 48:8, 48:13, 49:7, 51:12, 52:9, 52:12, 52:23, 53:3, 53:6, 53:12, 53:18, 55:21, 56:14, 57:19, 57:22, 58:11, 59:4, 59:13, 59:17, 60:6, 60:19, 60:24, 61:5, 61:7, 61:11, 61:15, 65:18, 65:24, 66:3, 66:11, 66:12, 66:13, 66:15, 66:18, 66:20, 66:22, 67:11, 67:12, 67:21, 67:24, 68:9, 68:14, 69:8, 69:14, 69:18, 70:4, 70:17, 74:15, 77:20, 90:16, 90:18, 90:21, 90:22, 103:4, 109:21, 111:3, 111:24, 112:7, 112:21, 113:6, 114:14, 114:18, 114:22, 115:8, 115:20, 116:10, 116:17, 117:5
inmate's [13] - 18:8, 24:12, 24:17, 32:21, 33:9, 34:21, 35:5, 43:23, 44:5, 45:2, 46:13, 113:8, 113:14
inmates [38] - 13:14, 19:17, 19:21, 23:12, 25:25, 30:13, 37:3, 37:7, 37:12, 39:7, 41:6, 41:14, 41:16, 42:7, 42:9, 43:3, 43:10, 49:22, 51:20, 51:21, 53:25, 54:19, 55:21, 55:24, 59:9,
60:3, 60:16, 68:18, 69:9, 70:2, 70:3, 79:23, 80:20, 80:22, 80:24, 91:22, 114:5, 119:18
Inmates [5] - 36:12, 36:23, 49:12, 52:16, 55:8
inside [1] - 24:16
inspection [1] - 69:7
instance [1] - 70:3
instituted [1] - 58:25
intentionally [1] - 72:25
interactions [1] - 34:6
interested [1] - 122:13
Internal [6] - 9:2, 70:8, 70:16, 73:25, 75:6, 112:14, 113:11, 119:21
interpretation [1] - 116:20
interrupt [1] - 6:3
intervals [3] - 39:15, 41:15, 42:6
interviewed [1] - 76:15
investigated [2] - 76:12, 77:16
investigation [5] - 9:2, 70:9, 70:16, 73:25, 76:16
investigator [1] - 113:11
involved [1] - 74:14
involving [1] - 111:23
IS [3] - 3:3, 3:8, 3:12
issue [1] - 51:22
issued [2] - 51:23, 65:2
IT [3] - 3:3, 3:8, 3:12
italics [1] - 40:3
items [2] - 51:23, 52:13
IV [2] - 74:15, 75:17

J

jail [31] - 30:5, 32:15, 34:3, 34:21, 45:12, 51:15, 54:6, 57:15, 57:24, 58:18, 59:2, 65:3, 65:8, 79:7, 82:9, 82:20, 84:22, 85:14, 86:22, 92:19, 92:22, 93:14, 93:25, 94:4, 96:2, 103:13, 107:24, 110:17, 110:22, 111:9, 113:12

jails [1] - 94:19
JAMES [2] - 1:8, 121:5
James [4] - 82:6, 82:22, 83:2, 112:5
JANE [2] - 1:9, 121:5
Jeffrey [1] - 4:18
JEFFREY [2] - 1:3, 121:3
job [11] - 10:21, 10:22, 15:23, 31:6, 36:20, 36:21, 37:2, 57:8, 110:13, 110:15, 110:21
jobs [2] - 10:12, 10:18
Joe [1] - 75:16
JOHN [5] - 1:8, 1:9, 2:5, 121:5, 121:5
John [1] - 4:16
JOHNSON [2] - 1:3, 121:3
Johnson [5] - 4:19, 88:7, 88:8, 88:23, 112:8
JR [2] - 1:3, 121:3
july [1] - 121:6
July [2] - 1:14, 118:10
June [3] - 76:13, 77:6, 77:16

K

K2 [1] - 58:13
keep [8] - 5:14, 5:24, 21:3, 21:5, 31:5, 31:25, 59:5, 65:3
kept [3] - 64:18, 73:7, 80:25
key [2] - 40:8, 107:7
keyhole [1] - 40:7
kind [9] - 13:19, 17:10, 23:15, 31:21, 60:9, 78:17, 84:22, 89:11, 94:6
knowingly [2] - 73:3, 73:5
knowledge [6] - 57:16, 57:20, 58:22, 59:6, 61:18, 98:19

L

larger [3] - 94:8, 94:11, 94:12
last [2] - 64:23, 108:20
Law [1] - 4:17
lawsuit [1] - 9:19
learn [2] - 17:11, 26:21
learned [3] - 27:17, 114:7, 114:12
least [3] - 46:19, 46:21, 47:13
leave [1] - 10:18
leaves [4] - 48:6, 49:7, 49:8, 49:10
left [7] - 10:20, 95:22, 97:13, 100:6, 101:8, 101:20
left-hand [1] - 95:22
leg [2] - 18:11, 18:13
legal [1] - 116:20
legs [2] - 18:6, 18:8
less [4] - 9:12, 9:13, 9:14, 108:13
letters [1] - 56:12
lied [1] - 114:20
lieutenant [1] - 26:19
lieutenant's [2] - 46:6, 46:7
lift [1] - 27:22
linear [3] - 94:21, 95:3, 95:12
lines [4] - 100:13, 106:10, 106:13, 106:20
lineup [8] - 64:8, 64:10, 64:12, 85:22, 85:23, 86:2, 92:15, 92:16
listed [2] - 35:20, 58:4
lists [2] - 49:15, 51:25
live [1] - 107:25
LLP [2] - 2:3, 4:18
lobby [5] - 47:4, 47:16, 47:19, 47:24, 49:2
located [6] - 45:9, 45:11, 45:12, 48:24, 103:6, 103:7
lockbox [24] - 39:2, 39:3, 39:6, 39:10, 47:3, 47:12, 47:22, 48:3, 61:2, 90:12, 99:21, 102:12, 102:14, 102:17, 103:6, 103:7, 103:25, 106:11, 107:2, 107:5, 109:18, 109:23, 111:24
lockboxes [2] - 101:7, 101:11
locked [12] - 41:6, 41:14, 41:16, 42:7, 42:9, 43:3, 43:10, 46:14, 59:9, 59:21, 60:4, 60:10
log [3] - 48:8, 48:13, 50:18
logbook [13] - 48:16, 48:17, 48:22, 61:6, 83:19, 83:21, 84:3, 84:5, 92:3, 92:6, 92:7, 92:9, 92:13
logbooks [1] - 85:7
look [11] - 41:10, 45:21, 46:11, 49:11, 52:15, 56:5, 62:17, 76:19, 94:24, 101:7, 106:24
looked [1] - 91:12
looking [10] - 95:21, 96:12, 96:17, 99:23, 99:25, 100:3, 100:4, 102:6, 102:10, 104:24
looks [11] - 40:7, 63:13, 87:23, 94:7, 99:21, 100:24, 103:14, 103:17, 104:8, 106:5, 106:25
lost [1] - 73:6
loud [1] - 14:23

M

main [2] - 45:25, 46:3
maintained [1] - 47:3
maintaining [1] - 38:24
Management [1] - 80:16
manufacturing [1] - 114:13
Map [1] - 120:8
map [1] - 93:20
marijuana [2] - 44:16, 58:13
mark [5] - 24:24, 31:9, 61:25, 70:11, 105:17
marked [22] - 20:6, 20:10, 22:15, 25:2, 25:5, 31:15, 35:24, 36:7, 55:5, 55:11, 62:7, 70:14, 74:4, 76:2, 77:8, 88:13, 89:5, 93:12, 93:16, 99:14, 105:21, 107:14
markings [1] - 69:3
marriage [1] - 122:11
mask [2] - 59:4, 59:5
materials [1] - 13:16
matter [2] - 62:20, 122:14
McCaffrey [2] - 86:10, 112:6
MCCAFFREY [2] - 1:8, 121:4
MCLAUGHLIN [11] - 2:9, 13:23, 14:14, 14:19, 20:11, 100:20, 108:22, 115:16, 115:22, 116:4, 116:18
ME [1] - 121:23
Meadow [2] - 4:12, 5:7
meals [1] - 83:13
mean [18] - 11:22, 16:25, 18:18, 28:14, 43:9, 49:8, 49:25, 63:24, 72:10, 79:13, 83:14, 84:21, 90:15, 91:14, 99:6, 102:9, 109:9, 110:23
meaning [1] - 63:25
means [7] - 5:18, 48:11, 50:10, 50:11, 50:21, 67:17, 84:19
med [2] - 54:9, 104:8
med-trans [1] - 54:9
medical [20] - 23:9, 51:15, 53:10, 53:14, 53:20, 54:5, 54:9, 54:11, 54:17, 54:22, 60:23, 87:10, 97:9, 103:3, 104:11, 104:16, 109:15, 110:2, 111:4
medication [2] - 60:12, 104:20
meds [1] - 104:22
meet [1] - 81:5
members [2] - 34:19, 35:10
mentioned [4] - 1:20, 54:4, 63:22, 70:7
mentions [1] - 52:4
middle [3] - 106:10, 106:15, 106:25
midlevel [3] - 79:23, 79:24, 80:2
might [2] - 16:9, 98:4
military [1] - 10:8
Mineola [1] - 2:8
minimal [1] - 79:21
minimum [6] - 14:10, 14:19, 14:21, 19:6, 21:14, 46:14
minute [2] - 65:12, 108:20
minutes [6] - 38:11, 38:12, 38:21, 43:2, 81:11, 108:14
misdemeanor [1] - 28:6
misdemeanors [1] - 80:3
months [1] - 12:15
most [2] - 37:21, 39:20
mostly [2] - 17:15, 75:8
mouth [1] - 32:3
moved [1] - 79:16
movements [9] - 90:3, 90:6, 90:8, 90:14, 90:15, 90:19, 109:12, 109:13
movie [1] - 97:20
MR [49] - 4:14, 4:15, 5:4, 5:8, 5:13, 5:23, 6:9, 6:14, 6:22, 7:6, 7:11, 7:18, 7:25, 13:23, 14:14, 14:19, 20:5, 20:11, 20:14, 22:11, 24:23, 31:9, 35:23, 55:4, 56:16, 61:25, 65:11, 70:11, 71:4, 73:22, 75:20, 77:2, 88:9, 88:25, 93:11, 98:11, 99:9, 100:20, 100:23, 105:17, 107:10, 108:19, 108:22, 108:23, 115:16, 115:22, 116:4, 116:18, 117:13
multiple [3] - 80:25, 94:7, 103:4
must [4] - 19:6, 47:13, 58:12, 62:22

N

name [11] - 4:7, 4:16, 5:2, 53:22, 82:2, 83:18, 83:20, 85:6, 87:20, 87:22, 89:18
NAME [2] - 121:3, 121:7
named [2] - 88:7, 112:8
names [1] - 81:22
NASSAU [10] - 1:7, 1:7, 1:9, 2:7, 118:5, 121:3, 121:4, 121:6
Nassau [43] - 10:13, 10:22, 11:2, 20:7, 21:10, 22:13, 22:23, 25:2, 25:23, 31:12, 32:14, 34:2, 34:19, 36:2, 36:4, 55:8, 56:2, 56:17, 58:7, 59:2, 62:3, 64:18, 71:5, 73:23, 75:22, 77:3, 79:6, 82:3, 82:20, 88:10, 89:3, 96:2, 99:11, 99:23, 102:2, 102:5,

105:18, 110:16, 110:21, 111:9, 113:11, 113:23
**necessary** [3] - 19:6, 46:12, 62:20
**need** [6] - 8:2, 33:17, 52:8, 63:11, 104:22, 106:19
**needed** [4] - 84:19, 84:24, 84:25, 85:3
**needs** [5] - 33:16, 39:9, 47:11, 50:18, 103:2
**never** [13] - 27:16, 29:25, 43:7, 74:11, 86:20, 87:5, 107:22, 110:20, 112:10, 112:13, 113:16, 113:21, 113:25
**NEW** [2] - 1:2, 118:4
**New** [6] - 1:22, 2:5, 2:8, 4:4, 118:23, 122:4
**next** [3] - 53:8, 83:8, 119:24
**Nicholas** [1] - 82:2
**ninth** [1] - 79:3
**non** [2] - 25:17, 25:24
**non-discriminatory** [2] - 25:17, 25:24
**Nonparty** [1] - 1:18
**normally** [1] - 33:22
**notary** [1] - 3:14
**Notary** [4] - 1:21, 4:3, 118:23, 122:3
**NOTARY** [1] - 121:25
**noted** [1] - 117:15
**nothing** [1] - 45:4
**notified** [4] - 45:15, 58:6, 58:9, 61:9
**notify** [2] - 29:2, 61:10
**notifying** [1] - 47:6
**Number** [2] - 36:4, 63:17
**number** [15] - 25:3, 55:9, 56:18, 62:3, 71:6, 74:2, 75:22, 75:23, 77:4, 77:5, 89:3, 96:6, 105:19, 107:12
**numbers** [1] - 73:24
**Nurse** [4] - 87:3, 87:13, 87:14, 87:15
**nurse** [14] - 52:25, 53:5, 53:7, 53:23, 54:2, 61:9, 61:13, 87:6, 87:7, 87:10, 87:18, 104:15, 113:18

**O**

**oath** [3] - 7:7, 7:8, 118:9
**objection** [4] - 13:23, 115:16, 115:22, 116:18
**objections** [1] - 3:9
**obligate** [1] - 21:21
**obligated** [2] - 69:13, 69:25
**obligation** [3] - 23:4, 67:10, 68:17
**Obozo** [2] - 87:3, 87:6
**observation** [8] - 37:7, 37:15, 37:20, 39:17, 39:22, 41:13, 68:8, 68:13
**observe** [1] - 37:23
**observing** [2] - 38:2, 43:19
**obviously** [1] - 37:3
**Occhino** [1] - 82:2
**occur** [2] - 35:11, 35:12
**occurring** [2] - 111:23, 112:21
**October** [12] - 4:22, 58:21, 84:13, 86:21, 91:6, 111:5, 111:9, 111:15, 111:20, 111:23, 112:15, 112:21
**OF** [11] - 1:2, 1:7, 1:9, 1:17, 2:7, 118:4, 118:5, 121:3, 121:6, 121:6, 121:24
**OFFICE** [1] - 2:7
**office** [8] - 20:3, 48:24, 48:25, 49:2, 51:15, 73:10, 115:10, 117:6
**Office** [3] - 11:2, 36:3, 112:19
**OFFICER** [6] - 1:8, 1:8, 121:4, 121:5
**Officer** [6] - 4:15, 12:10, 71:10, 83:2, 85:11, 112:6
**officer** [60] - 8:23, 11:10, 11:23, 11:25, 12:5, 12:22, 12:25, 13:4, 13:15, 16:9, 16:15, 19:24, 20:19, 21:22, 21:24, 22:7, 24:7, 24:11, 24:16, 26:4, 26:13, 27:3, 27:8, 29:3, 29:14, 30:8, 32:14, 32:20, 33:2, 39:9, 40:4, 47:12, 48:7, 52:12, 54:22, 55:15, 64:13, 69:13, 69:24, 74:8, 79:2, 82:6, 88:17, 101:4, 102:25, 103:9, 105:25, 107:6, 107:8, 109:21, 112:24, 113:7, 114:17, 114:20, 115:7, 115:19, 116:17, 117:3, 117:4
**officer's** [3] - 65:9, 67:10, 68:17
**officers** [26] - 23:13, 33:22, 37:10, 38:25, 40:11, 43:18, 46:15, 46:19, 46:21, 47:2, 47:8, 47:14, 47:16, 47:19, 50:21, 54:11, 70:5, 102:12, 102:13, 103:11, 103:20, 103:23, 113:13, 114:4, 114:8, 114:13
**often** [4] - 50:4, 85:20, 86:18, 104:20
**oil** [1] - 10:15
**old** [1] - 9:21
**older** [1] - 87:9
**on-the-job** [1] - 15:23
**One** [1] - 96:15
**one** [32] - 14:9, 16:3, 18:11, 18:12, 18:13, 24:25, 27:20, 35:7, 37:21, 37:25, 39:20, 41:15, 42:6, 53:2, 56:17, 60:10, 68:6, 68:11, 69:6, 90:11, 96:15, 96:16, 97:6, 98:23, 99:2, 99:3, 99:7, 99:20, 109:2, 109:3, 109:8
**one-by-one** [1] - 27:20
**one-page** [1] - 24:25
**ones** [3] - 35:20, 45:6, 96:8
**open** [7] - 39:4, 39:5, 39:7, 40:21, 46:12, 95:4, 101:12
**opened** [1] - 79:17
**opening** [2] - 47:22, 47:24
**operation** [1] - 62:21
**opportunity** [1] - 7:19
**order** [12] - 18:2, 29:6, 61:20, 61:23, 63:3, 63:6, 63:8, 63:10, 63:20, 64:25, 109:20
**Orders** [1] - 62:18
**orders** [3] - 62:19, 63:18, 64:18
**ordinary** [1] - 16:5
**organizations** [1] - 11:17
**otherwise** [2] - 6:10, 8:19
**outcome** [1] - 122:14
**outfit** [1] - 104:4
**outside** [8] - 59:13, 59:18, 82:14, 85:16, 86:15, 91:25, 92:24, 100:15
**overhead** [1] - 99:8
**overpowering** [1] - 47:2
**overweight** [1] - 87:9
**own** [1] - 104:23

**P**

**p.m** [2] - 1:14, 117:15
**Page** [3] - 119:6, 119:11, 120:3
**page** [3] - 24:25, 75:8, 119:24
**PAGE/LINE(S** [1] - 121:8
**paid** [1] - 72:18
**paperwork** [1] - 22:2
**part** [5] - 37:2, 65:8, 110:13, 110:15, 110:21
**parties** [20] - 3:4, 20:17, 22:17, 25:7, 31:17, 36:9, 55:13, 56:20, 62:9, 71:8, 74:6, 76:4, 77:10, 88:15, 89:7, 93:18, 99:16, 105:23, 107:16, 122:11
**pass** [3] - 83:6, 110:12, 111:2
**passed** [2] - 110:20, 110:23
**passing** [2] - 82:11, 83:5
**past** [4] - 42:14, 100:10, 100:25, 102:11
**pat** [1] - 35:9
**Patrick** [1] - 86:10
**PATRICK** [2] - 1:8, 121:4
**patrol** [16] - 37:14, 37:21, 39:15, 39:22, 39:25, 41:8, 42:3, 42:9, 43:9, 67:20, 68:8, 69:8, 90:2, 90:5, 90:8, 109:4
**patrolled** [1] - 42:13
**patrolling** [5] - 80:6, 83:7, 83:10, 109:11, 110:9
**patrols** [14] - 38:9, 41:3, 41:6, 42:12, 42:22, 42:23, 42:25, 43:4, 43:6, 43:15, 43:18, 68:4, 104:17, 108:6
**patted** [1] - 78:22
**pay** [1] - 72:19
**pending** [1] - 8:6
**people** [1] - 81:22
**per** [1] - 59:10
**perform** [1] - 13:15
**permissible** [3] - 15:8, 32:20, 52:11
**permitted** [4] - 33:3, 34:12, 59:17, 60:16
**person** [6] - 13:20, 47:14, 88:6, 88:18, 88:22, 104:3
**personal** [8] - 37:15, 39:16, 39:22, 51:22, 72:14, 72:17, 73:2, 73:11
**personally** [1] - 37:22
**pertaining** [1] - 4:21
**pertinent** [1] - 6:12
**photo** [3] - 93:13, 93:21, 96:25
**Photo** [2] - 120:6, 120:8
**photomap** [1] - 106:2
**photos** [1] - 99:18
**Photos** [1] - 120:7
**physical** [4] - 56:14, 68:19, 68:20, 70:2
**physically** [5] - 114:18, 114:21, 115:8, 115:20, 117:4
**picture** [7] - 93:24, 101:23, 102:6, 102:11, 103:15, 103:18, 106:5
**piece** [1] - 27:19
**place** [3] - 1:21, 58:17
**placed** [6] - 83:25, 84:5, 84:19, 84:23, 99:5, 103:24
**places** [4] - 24:16, 38:14, 90:9, 109:3
**plaintiff** [1] - 9:18
**Plaintiff** [3] - 1:5, 1:19, 2:4
**Plaintiff's** [54] - 20:6, 20:9, 20:18, 22:12, 22:14, 22:18, 24:24, 25:4, 25:8, 31:10,

31:14, 31:18, 35:24, 36:6, 36:10, 55:6, 55:10, 55:14, 62:2, 62:6, 62:10, 70:12, 70:13, 71:4, 71:9, 74:3, 74:7, 75:21, 75:25, 76:5, 77:3, 77:7, 77:11, 88:10, 88:12, 88:16, 89:2, 89:4, 89:8, 93:12, 93:15, 93:19, 98:12, 99:10, 99:13, 99:17, 105:18, 105:20, 105:24, 107:11, 107:13, 107:17, 119:11, 120:3
**plead** [1] - 72:3
**point** [3] - 8:3, 33:6, 105:3
**points** [2] - 17:13, 17:17
**Police** [2] - 58:8, 82:3
**policies** [13] - 13:7, 15:14, 15:18, 20:3, 21:4, 21:16, 22:22, 25:13, 25:15, 30:21, 68:2, 115:2, 117:7
**Policy** [1] - 20:8
**policy** [20] - 21:7, 21:9, 21:16, 21:19, 24:8, 24:13, 24:18, 24:21, 25:20, 25:22, 25:23, 32:4, 39:8, 41:18, 42:25, 46:16, 47:11, 57:2, 69:21, 115:10
**pop** [1] - 38:19
**position** [4] - 11:8, 83:16, 83:18, 109:7
**positive** [7] - 60:7, 60:20, 60:25, 61:5, 61:8, 61:11, 61:15
**possess** [1] - 35:13
**possession** [1] - 58:12
**post** [4] - 89:13, 92:4, 92:19, 92:21
**posted** [1] - 65:7
**practices** [1] - 12:21
**precaution** [1] - 46:24
**preparation** [1] - 81:15
**prepare** [6] - 16:4, 21:22, 23:5, 69:13, 69:16, 81:6
**presence** [1] - 49:14
**present** [1] - 49:23
**pressure** [2] - 17:12, 17:17
**prevent** [1] - 46:25
**primarily** [1] - 80:6
**prison** [1] - 94:25
**prisons** [1] - 95:2
**procedure** [5] - 32:10, 41:24, 57:22, 60:8, 66:16
**procedures** [15] - 12:20, 13:7, 13:13, 15:14, 15:18, 20:3, 21:4, 21:15, 22:23, 25:14, 25:16, 68:3, 115:2, 115:10, 117:7
**proceed** [3] - 41:5, 43:4, 44:22
**professional** [1] - 16:15
**proper** [2] - 12:20, 12:24
**protocol** [5] - 59:8, 60:3, 63:5, 63:23, 66:24
**protocols** [8] - 58:16, 58:21, 58:25, 59:3, 64:7, 64:12, 64:15, 65:7
**provide** [1] - 5:5
**provided** [6] - 13:6, 30:23, 51:22, 52:8, 56:25, 57:3
**provides** [1] - 53:3
**psychology** [2] - 18:15, 18:19
**PUBLIC** [1] - 121:25
**public** [1] - 3:14
**Public** [4] - 1:22, 4:3, 118:23, 122:4
**pull** [4] - 21:20, 55:4, 88:25, 98:11
**pulled** [1] - 74:2
**pulling** [8] - 22:11, 24:23, 35:23, 56:16, 75:20, 77:2, 88:9, 93:11
**punch** [5] - 15:8, 40:3, 40:5, 40:6, 40:18
**punishment** [1] - 115:13
**purpose** [1] - 16:3
**pursuant** [1] - 1:19
**put** [4] - 18:11, 27:23, 72:13, 73:21
**putting** [1] - 32:3

## Q

**question/answer** [1] - 5:17
**questions** [7] - 4:20, 4:23, 5:14, 6:23, 6:25, 65:15, 117:14
**quick** [1] - 109:2

## R

**racial** [3] - 26:4, 26:13, 70:22
**radio** [2] - 103:8, 103:10
**rank** [7] - 11:11, 11:20, 12:2, 12:4, 29:12, 29:19, 30:11
**rarely** [2] - 51:16, 54:5
**read** [4] - 56:8, 75:8, 78:10, 118:8
**reading** [4] - 64:13, 74:14, 74:24, 75:10
**realize** [1] - 7:11
**really** [13] - 9:11, 49:3, 57:20, 58:22, 63:21, 76:24, 78:24, 81:16, 84:9, 89:22, 90:10, 91:10, 97:2
**REASON** [1] - 121:8
**reason** [3] - 8:8, 29:3, 48:7
**reasonable** [1] - 49:13
**reasons** [2] - 68:12, 69:6
**rec** [23] - 85:2, 85:3, 89:24, 90:8, 90:18, 91:12, 91:13, 91:15, 91:16, 91:18, 91:21, 91:23, 92:7, 92:9, 92:18, 92:21, 93:7, 93:8, 97:9, 108:7, 108:8, 109:13, 110:10
**receive** [6] - 12:17, 23:10, 23:16, 53:19, 57:17, 65:21
**received** [4] - 13:20, 27:10, 62:13, 74:15
**receives** [1] - 53:14
**recess** [2] - 65:13, 108:24
**recognize** [15] - 22:19, 25:9, 25:12, 31:19, 31:21, 31:23, 32:8, 71:11, 76:6, 77:12, 88:20, 93:20, 99:20, 102:7, 106:4
**recollection** [4] - 75:2, 75:11, 76:23, 78:14
**record** [10] - 4:7, 5:2, 40:17, 40:23, 44:25, 98:18, 107:25, 118:11, 118:13, 122:8
**recording** [1] - 40:2
**records** [4] - 60:20, 64:18, 65:3, 105:13
**recreation** [1] - 91:19
**referencing** [1] - 43:22
**refresh** [3] - 75:11, 76:22, 78:13
**regarding** [7] - 21:10, 25:24, 68:17, 69:14, 112:7, 112:20, 114:9
**regular** [7] - 11:12, 14:6, 14:7, 34:5, 38:19, 50:2, 104:16
**regularly** [1] - 53:23
**regulation** [1] - 55:23
**regulations** [2] - 36:2, 55:21
**Regulations** [1] - 119:17
**related** [1] - 122:10
**relaxed** [1] - 41:14
**relay** [1] - 26:18
**remain** [2] - 37:13, 53:14
**remember** [17] - 9:11, 14:5, 62:16, 64:13, 64:16, 74:20, 74:25, 75:15, 75:16, 76:11, 77:24, 78:4, 78:5, 78:16, 78:21, 111:8, 111:11
**removed** [1] - 78:23
**Repeat** [1] - 34:16
**repeat** [2] - 6:6, 19:18
**rephrase** [1] - 6:6
**Report** [1] - 119:13
**report** [13] - 22:6, 22:21, 23:4, 26:6, 26:9, 26:14, 50:15, 50:16, 50:17, 51:2, 51:8, 76:19, 117:5
**reported** [2] - 26:25, 27:6
**reporter** [2] - 5:15, 5:25
**REPORTER** [2] - 4:6, 4:9
**REPORTING** [1] - 121:2
**reports** [2] - 22:25, 23:5
**represent** [1] - 4:18
**representation** [1] - 94:3
**REPRESENTATIVES** [2] - 1:9, 121:6
**represented** [2] - 72:6, 81:2
**request** [1] - 53:24
**requested** [1] - 52:16
**require** [3] - 29:9, 37:7, 37:12
**required** [13] - 12:8, 22:3, 29:11, 31:2, 38:10, 42:24, 51:4, 51:8, 53:13, 53:19, 60:3, 64:19, 110:12
**requirement** [6] - 38:15, 41:4, 41:5, 41:19, 41:24, 41:25
**requires** [1] - 42:21
**requiring** [1] - 59:8
**reserved** [1] - 3:10
**respect** [16] - 13:21, 14:3, 15:22, 22:24, 23:11, 25:16, 54:17, 55:23, 57:14, 57:18, 68:3, 69:22, 70:17, 76:12, 76:16, 112:14
**respective** [1] - 3:4
**respond** [2] - 16:7, 103:4
**response** [2] - 61:21, 74:21
**responses** [1] - 5:19
**responsibilities** [2] - 30:11, 54:16
**responsible** [1] - 70:6
**result** [4] - 15:19, 22:8, 26:9, 71:23
**review** [10] - 7:19, 7:21, 31:2, 64:19, 64:20, 65:4, 65:9, 81:14, 81:18
**rid** [1] - 50:25
**rights** [3] - 30:22, 115:21, 116:16
**RN** [1] - 54:3
**robert** [1] - 88:8
**ROBERT** [2] - 1:3, 121:3
**Robert** [4] - 4:18, 88:7, 88:23, 112:8
**roofing** [1] - 10:15
**rooms** [1] - 110:10
**rotate** [1] - 111:16
**routine** [3] - 49:22, 49:24, 50:2
**rover** [15] - 89:23, 89:24, 89:25, 90:2, 90:20, 91:2, 91:3, 91:6, 91:8, 92:12, 92:14, 109:9, 109:10, 110:5, 110:14
**rovers** [1] - 110:8
**Rule** [9] - 36:22, 43:17, 48:5, 49:11, 51:18, 51:19, 57:11, 58:4, 62:17
**Rules** [2] - 1:19, 119:16

rules [4] - 5:9, 35:25, 55:21, 55:22
run [1] - 45:7
running [1] - 91:18

S

Sadika [1] - 87:20
safety [3] - 45:4, 45:5, 45:6
satellite [2] - 38:18, 94:16
saw [6] - 20:23, 36:16, 68:23, 69:3, 82:22, 82:24
schedule [1] - 104:23
SCHMIDT [2] - 122:3, 122:20
Schmidt [1] - 1:21
school [2] - 10:5, 10:11
screen [19] - 20:13, 20:16, 22:16, 25:6, 31:16, 36:8, 55:12, 56:19, 62:8, 71:7, 74:5, 76:3, 77:9, 88:14, 89:6, 93:17, 99:15, 105:22, 107:15
scroll [1] - 71:12
scrolling [1] - 31:25
scrubs [1] - 104:13
sealing [1] - 3:5
search [33] - 27:12, 27:13, 27:15, 27:16, 27:17, 28:2, 28:7, 28:10, 28:21, 29:7, 29:8, 29:11, 29:15, 30:2, 32:21, 32:25, 33:8, 33:18, 34:9, 34:12, 34:21, 34:25, 35:3, 35:19, 49:17, 49:24, 50:3, 50:15, 51:5, 51:9, 70:20
searched [3] - 35:4, 49:13, 77:23
searches [6] - 30:4, 35:10, 35:11, 49:22, 50:14
Searches [2] - 49:20, 50:8
searching [2] - 28:3, 51:11
second [6] - 35:7, 45:22, 75:7, 78:10, 92:23, 92:25
security [7] - 43:18, 47:2, 67:20, 68:4, 68:8, 69:8, 89:13
Security [1] - 36:12
see [51] - 20:19, 29:11, 32:4, 35:16, 36:11, 36:24, 38:23, 44:11, 44:12, 45:17, 51:25, 52:17, 55:15, 56:6, 56:22, 57:10, 62:11, 68:24, 68:25, 69:2, 76:10, 85:20, 86:18, 86:20, 86:22, 87:11, 88:17, 89:9, 89:12, 89:18, 89:21, 90:10, 91:10, 93:3, 93:5, 94:6, 94:9, 95:13, 95:18, 95:21, 95:23, 96:24, 99:18, 100:13, 100:24, 103:20, 104:3, 105:5, 105:25, 106:9, 107:18
Seg [1] - 80:17
segregation [1] - 66:15
Segregation [1] - 80:18
Segs [1] - 80:14
self [4] - 67:11, 67:22, 68:14, 70:4
self-harm [4] - 67:11, 67:22, 68:14, 70:4
sends [1] - 53:7
sentence [1] - 45:22
separate [3] - 48:22, 96:22, 98:10
sergeant [8] - 23:8, 26:18, 28:24, 29:2, 29:20, 29:23, 54:24, 86:11
Sergeant [1] - 112:6
sergeants [1] - 40:12
SERVANTS [2] - 1:9, 121:5
set [3] - 25:22, 122:7, 122:16
setup [2] - 95:3, 99:7
seven [1] - 113:2
several [1] - 49:15
sex [1] - 57:14
sexual [7] - 23:12, 23:17, 23:21, 27:2, 57:18, 57:23, 70:25
shackle [2] - 18:12, 18:13
shake [2] - 33:17, 50:24
shakedown [9] - 50:15, 50:16, 50:17, 50:19, 50:23, 50:24, 51:4, 51:8, 51:13
shaking [1] - 5:20
shall [17] - 3:6, 3:10, 37:13, 38:25, 39:15, 40:3, 46:15, 46:25, 47:2, 48:8, 49:12, 49:21, 50:8, 50:14, 51:21, 58:9, 62:19
share [19] - 20:15, 20:16, 22:16, 25:6, 31:16, 36:8, 55:12, 56:19, 62:8, 71:7, 74:5, 76:3, 77:9, 88:14, 89:6, 93:17, 99:15, 105:22, 107:15
SHEET [1] - 121:2
sheet [10] - 48:12, 48:14, 48:18, 48:20, 48:21, 48:22, 48:23, 52:22, 92:16, 92:17
sheets [1] - 73:7
sheriff [3] - 62:23, 63:2, 63:15
Sheriff [1] - 36:3
SHERIFF'S [2] - 1:7, 121:4
Sheriff's [7] - 11:2, 12:9, 21:10, 22:24, 25:23, 56:2, 62:19
sheriff's [16] - 12:8, 15:14, 15:19, 20:2, 61:20, 61:23, 63:5, 63:7, 63:9, 63:20, 64:17, 64:25, 73:10, 115:2, 115:9, 117:6
shift [1] - 108:7
shoots [1] - 97:20
short [2] - 65:13, 108:24
show [2] - 49:5, 107:10
shower [2] - 47:23, 101:13
showers [1] - 52:4
shutting [1] - 47:23
sick [11] - 32:6, 32:7, 52:17, 52:18, 52:22, 53:4, 53:7, 53:13, 53:18, 53:24, 54:18
side [8] - 60:13, 85:3, 95:14, 95:17, 95:22, 96:17, 101:17, 105:6
sign [4] - 84:2, 84:4, 85:8, 92:12
signature [4] - 62:22, 63:15, 71:15, 71:17
Signed [1] - 118:20
signed [3] - 3:13, 3:15, 52:25
similar [1] - 103:15
situation [11] - 18:7, 18:23, 19:2, 19:4, 44:5, 44:19, 46:22, 47:10, 47:20, 60:15, 110:25
situations [4] - 15:25, 44:9, 102:15, 110:11
six [1] - 79:14
skin [1] - 87:25
sky [2] - 93:3, 93:6
slight [1] - 100:6
slightly [1] - 87:9
slot [1] - 75:17
slurs [2] - 26:5, 26:13
small [1] - 87:8
smelt [1] - 44:16
Smith [1] - 75:17
smoke [2] - 44:12, 44:22
smoking [11] - 28:9, 28:17, 29:4, 29:8, 29:10, 32:16, 32:22, 32:23, 34:13, 34:22, 35:5
socialize [1] - 59:17
socializing [1] - 60:17
someone [4] - 28:16, 29:13, 29:18, 81:25
somewhere [3] - 33:23, 33:24, 83:25
soon [3] - 14:7, 17:2, 18:5
sorry [1] - 109:9
sort [1] - 23:25
specially [1] - 41:12
specifically [2] - 37:11, 54:8
split [1] - 91:24
spoken [1] - 5:17
spots [1] - 90:10
spraying [1] - 67:16
sprinkler [1] - 10:15
squad [1] - 58:8
squat [1] - 27:22
ss [1] - 118:4
staff [2] - 35:10, 80:24
STAIB [2] - 1:8, 121:5
Staib [5] - 82:6, 82:23, 83:2, 85:25, 112:5
stairways [5] - 90:3, 90:5, 90:8, 109:11, 110:9
stamp [1] - 35:8
stamped [6] - 22:13, 25:2, 31:11, 36:4, 73:24, 99:11
stand [1] - 33:19
standards [1] - 13:3
STATE [1] - 118:4
State [5] - 1:22, 4:4, 4:6, 118:23, 122:4
state [6] - 4:9, 4:25, 63:8, 63:24, 64:2, 64:3
statement [8] - 21:22, 69:14, 69:16, 69:20, 74:22, 76:17, 78:9, 117:10
statements [2] - 69:25, 70:6
states [1] - 24:11
STATES [1] - 1:2
station [4] - 38:25, 40:5, 40:6, 101:4
stationed [3] - 33:24, 34:2, 39:9
stations [1] - 40:3
stays [1] - 61:18
steady [3] - 79:9, 83:16, 83:17
step [1] - 72:2
steps [1] - 78:6
stick [1] - 40:7
sticking [1] - 113:13
still [3] - 79:15, 84:2, 116:12
STIPULATED [3] - 3:3, 3:8, 3:12
STIPULATIONS [1] - 3:2
stop [4] - 14:7, 15:3, 67:15, 67:18
stops [1] - 15:3
straight [2] - 100:9, 100:15
Street [2] - 2:4, 2:8
strip [16] - 27:11, 27:13, 27:15, 27:17, 28:2, 28:6, 28:10, 28:21, 29:6, 29:8, 29:11, 29:15, 35:11, 35:19, 49:12, 49:17
stuck [1] - 113:7
stuff [2] - 80:4, 97:20
STUSSEY [2] - 1:9, 121:5
subject [7] - 9:7, 9:8, 35:9, 35:15, 70:8, 70:15, 76:9
submits [2] - 53:13, 53:18
subscribed [1] - 118:20
SUBSCRIBED [1] - 121:23
summary [2] - 76:18, 77:19
superior [2] - 54:21, 64:13
superiors [1] - 47:8
supervise [1] - 37:3

Supervision [2] - 36:12, 36:23
supervision [5] - 37:13, 38:24, 41:13, 41:20, 41:23
supposed [2] - 15:12, 110:8
surrounding [3] - 37:16, 70:2, 94:8
suspected [2] - 67:21, 68:18
suspend [5] - 41:4, 41:8, 41:23, 42:2, 43:2
suspended [2] - 43:7, 43:8
SWORN [1] - 121:23
sworn [3] - 3:15, 4:3, 122:7
system [1] - 26:23

**T**

tall [1] - 87:25
taught [25] - 12:20, 12:24, 13:3, 14:10, 15:7, 16:7, 16:11, 16:14, 16:21, 16:22, 17:4, 17:7, 17:18, 17:25, 18:14, 18:24, 18:25, 19:5, 19:8, 19:16, 19:20, 19:25, 22:5, 25:19, 65:23
Team [1] - 34:7
team [6] - 33:12, 33:15, 33:21, 34:11
technically [1] - 83:23
terms [2] - 47:7, 47:18
tested [8] - 21:7, 60:6, 60:19, 60:24, 61:5, 61:8, 61:11, 61:15
testified [4] - 4:5, 8:18, 8:21, 8:25
testify [1] - 8:9
Testimony [1] - 1:20
testimony [4] - 118:9, 118:12, 122:6, 122:9
TESTIMONY [1] - 119:4
THAT [3] - 122:6, 122:8, 122:13
THE [18] - 4:6, 4:8, 4:9, 4:11, 5:3, 5:6, 5:12, 5:22, 6:8, 6:13, 6:21, 7:5, 7:10, 7:17, 7:24, 8:7, 116:2, 116:6
themselves [2] - 38:25, 104:17
THIS [1] - 121:23
this_______________ ____day [1] - 118:20
Thomas [2] - 85:11, 112:6
THOMAS [2] - 1:8, 121:4
threatened [1] - 15:10
three [4] - 12:15, 46:6, 46:8
throughout [2] - 59:15, 103:12
tier [29] - 28:9, 29:4, 33:18, 37:24, 40:9, 40:15, 40:18, 41:3, 42:14, 42:19, 42:21, 44:7, 44:11, 44:16, 44:22, 45:2, 47:3, 50:25, 60:6, 60:10, 60:11, 60:17, 60:20, 60:25, 61:16, 67:20, 67:24, 74:16, 102:16
tiers [10] - 84:17, 94:19, 94:22, 95:4, 95:12, 95:22, 95:24, 99:5, 99:6, 104:17
title [1] - 30:7
titled [3] - 36:12, 55:7, 62:4
TO [2] - 119:4, 121:23
tobacco [2] - 44:16, 58:13
today [7] - 4:21, 8:10, 36:19, 81:3, 81:9, 112:4, 112:11
today's [1] - 7:20
tolerated [1] - 19:10
tongue [1] - 27:22
took [3] - 7:7, 72:2, 77:23
top [3] - 80:14, 105:6, 106:21
Tour [1] - 58:5
tour [2] - 45:23, 111:12
tours [1] - 111:14
towards [3] - 99:22, 100:21, 105:4
track [1] - 73:6
trained [9] - 14:3, 15:13, 15:24, 30:2, 37:17, 41:2, 57:11, 57:13, 65:17
training [26] - 12:17, 13:17, 13:20, 13:21, 15:5, 15:7, 15:23, 15:24, 16:4, 19:25, 23:10, 23:16, 23:17, 23:19, 27:11, 32:19, 33:7, 57:18, 65:16, 65:20, 65:22, 114:23, 115:4, 115:14, 116:14, 117:2
trans [1] - 54:9
transcribe [1] - 5:25
transcript [5] - 7:20, 7:23, 118:8, 118:10, 122:8
TRANSCRIPTION [1] - 121:2
transport [1] - 90:21
transported [1] - 53:19
transports [1] - 110:7
treatment [4] - 25:17, 25:24, 53:15, 74:15
Treatment [1] - 51:19
TRIAL [1] - 1:17
trial [3] - 3:11, 7:9, 8:22
trick [1] - 6:19
tries [1] - 67:12
true [11] - 34:11, 34:15, 34:18, 39:12, 42:8, 72:22, 72:23, 113:20, 118:11, 118:13, 122:8
truth [1] - 7:8
truthfully [1] - 8:9
try [2] - 18:22, 59:5
trying [1] - 6:18
turn [2] - 40:8, 97:7
turning [1] - 105:2
twice [1] - 72:20
two [15] - 46:14, 46:19, 46:21, 47:13, 81:12, 91:23, 95:17, 96:4, 96:9, 96:11, 98:3, 103:20, 106:10, 106:13, 108:16
type [12] - 17:14, 23:18, 45:7, 53:23, 65:20, 66:11, 80:20, 80:22, 80:24, 90:3, 90:6, 109:12
types [3] - 13:12, 38:9, 104:12
typical [5] - 59:16, 59:19, 66:18, 66:20, 66:22
typically [4] - 34:5, 54:12, 59:12, 111:14

**U**

under [1] - 118:9
understood [2] - 6:11, 15:17
unexpected [1] - 16:12
uniform [1] - 104:10
Unit [2] - 58:5, 80:16
unit [12] - 53:10, 54:5, 54:17, 54:23, 63:18, 79:22, 87:10, 101:19, 104:11, 104:16, 109:15, 110:2
UNITED [1] - 1:2
unless [6] - 6:10, 15:10, 15:12, 34:8, 38:20, 102:22
unnecessary [1] - 19:12
unusual [1] - 115:13
up [41] - 5:24, 20:12, 20:13, 21:20, 22:11, 24:23, 27:21, 27:22, 28:11, 28:12, 28:18, 32:15, 35:3, 35:23, 39:5, 39:7, 47:22, 55:5, 56:16, 61:24, 66:6, 66:7, 66:10, 67:17, 71:12, 73:7, 74:2, 75:20, 77:2, 78:6, 79:18, 88:9, 89:2, 93:3, 93:5, 93:11, 98:12, 101:12, 113:8, 113:14
upstairs [1] - 99:4

**V**

Vaughn [1] - 75:16
verbal [4] - 5:15, 14:23, 61:21, 74:21
view [18] - 20:17, 22:17, 25:7, 31:17, 36:9, 55:13, 56:20, 62:9, 71:8, 74:6, 76:4, 77:10, 88:15, 89:7, 93:18, 99:16, 105:23, 107:16
violate [4] - 24:8, 24:12, 24:17, 24:20
violation [6] - 15:18, 20:2, 114:25, 115:21, 116:16, 117:6
violence [1] - 67:6
visits [1] - 35:12
visual [5] - 37:15, 39:17, 68:8, 68:13, 69:7
voice [1] - 5:24
volunteer [1] - 11:16

**W**

wait [2] - 6:22, 7:3
waived [1] - 3:7
walk [8] - 37:24, 100:9, 100:12, 100:15, 100:17, 100:18, 108:11, 109:25
walked [1] - 40:9
walking [2] - 100:10, 102:16
warrant [1] - 28:10
warranted [3] - 28:22, 29:16, 35:20
wear [4] - 59:4, 104:12, 104:14
week [2] - 50:12, 111:17
West [1] - 2:8
west [1] - 85:3
when".. [1] - 49:14
WHEREOF [1] - 122:15
white [1] - 100:13
whole [3] - 50:25, 60:9, 103:12
windows [1] - 100:25
Witness [2] - 1:18, 119:6
witness [8] - 8:19, 9:7, 9:8, 26:12, 70:6, 100:21, 122:6, 122:9
WITNESS [17] - 4:8, 4:11, 5:3, 5:6, 5:12, 5:22, 6:8, 6:13, 6:21, 7:5, 7:10, 7:17, 7:24, 8:7, 116:2, 116:6, 122:15
WITNESS' [1] - 121:7
witnessed [2] - 26:4, 117:3
witnesses [1] - 69:25
woman [1] - 87:9
word [2] - 24:7, 24:12
words [1] - 32:3
workers [1] - 38:22
works [1] - 82:19
write [3] - 61:4, 61:6, 61:7
writing [3] - 63:11, 64:9, 64:14
Written [1] - 62:18
written [5] - 13:7, 21:22, 63:17, 69:14, 89:21
wrote [2] - 32:15, 76:18

## Y


**yard** [9] - 91:13, 91:16, 91:22, 91:23, 92:18, 92:21, 92:24, 97:9, 108:9
**yards** [1] - 91:24
**year** [4] - 24:5, 65:2, 79:3, 84:11
**years** [3] - 79:14, 113:2, 113:4
**YORK** [2] - 1:2, 118:4
**York** [6] - 1:22, 2:5, 2:8, 4:4, 118:23, 122:4
**yourself** [1] - 22:7


## Z


**Zoom** [1] - 1:12