UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

ROBERT JEFFREY JOHNSON, JR.,

Plaintiff,

-against-

ORIGINAL

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, CORPORAL PATRICK MCCAFFREY, OFFICER THOMAS BENSON, OFFICER JAMES STAIB, OFFICER "JOHN" STUSSEY, JANE AND JOHN DOES 1-9 SERVANTS AND REPRESENTATIVES OF THE COUNTY OF NASSAU,

Defendants.

-----------------------------------------X

Held Via Zoom

June 6, 2023
10:40 a.m.

DEPOSITION of ROBERT PIERCE, a Non-Party Witness herein, taken by the Plaintiff, pursuant to Article 31 of the Civil Practice Law and Rules of Testimony and Subpoena, held at the above-mentioned time and place, before a Notary Public of the State of New York.

A P P E A R A N C E S :

GUERCIO & GUERCIO, LLP
Attorney for the Plaintiff
77 Conklin Street
Farmingdale, New York 11735

ORIGINAL

BY: JOHN BRADLEY, ESQ.

NASSAU COUNTY ATTORNEY'S OFFICE
Attorneys for the Defendants
One West Street
Mineola, New York 11504

BY: LIORA M. BEN-SOREK, ESQ.

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by the attorneys for the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to, the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby.

The filing of the original of this deposition is waived.

IT IS FURTHER STIPULATED, that a copy of this examination shall be furnished to the attorney for the witness being examined without charge.

R O B E R T P I E R C E, after having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

BY THE REPORTER:

**Q. State your name for the record, please.**

A. Corporal Robert Pierce.

**Q. State your address, please.**

A. 100 Carmen Avenue, East Meadow, New York 11554.

MR. BRADLEY: Before we get started, I just want to make a statement on the record.

We requested disciplinary files for the named defendants. We haven't received them. We're waiting for an affidavit regarding the photos of the B2-D2, which is cell one, front and back views.

I believe that those are the main items. Because they haven't been disclosed yet, I'm going to reserve the right to a further

- R. PIERCE -

deposition of this witness.

MS. BEN-SOREK: We'll take that under advisement.

We have been told that we have searched all places. We're going to search with Investigator Pierce and search his database for any disciplinary records regarding Officers Benson and McCaffrey.

We did send you the affidavit about the pictures yesterday.

MR. BRADLEY: Okay.

MS. BEN-SOREK: I think it's Bates stamp 1050, I believe.

MR. BRADLEY: I understand the disciplinary records. I received personnel files for the three named defendants, but I haven't received any grievance packages or investigative files for all the individual investigations that are listed on their internal affairs and disciplinary records.

MS. BEN-SOREK: We'll make a

search for that.

Lastly, on the photos of D1 looking forward into the cell and out of the cell, we'll make a request for that, as well.

MR. BRADLEY: Perfect.

With that said, I think we can get started.

EXAMINATION BY
MR. BRADLEY:

**Q. Sir, can you please state your name?**

A. Robert Pierce.

**Q. Mr. Pierce, I represent the plaintiff, Robert Jeffery Johnson, Jr. in this case. I'm going to ask you some questions with respect to an investigation that you conducted regarding a complaint by Mr. Johnson against defendants Corporal Patrick McCaffrey and Correction Officer Thomas Benson.**

A. Okay.

**Q. Before we begin, I want to just have you agree to some rules of the**

- R. PIERCE -

deposition.

First rule is I just ask that you agree to keep your responses to my questions verbal. Don't shake your head or say uh-huh or make any gestures. Just please answer in a verbal manner.

Number two is please keep your voice up so everyone can hear you, including the court reporter. She's taking down a transcript of today's proceedings.

Third, if you don't understand my question, can you please agree to let me know and I will try to rephrase the question to the best of my ability. Unless you tell me otherwise, I'm going to assume that you have understood and heard my question. Do you agree with that?

A. I do.

Q. If you don't know the answer to a question, please do not guess. Tell me that you don't know. I don't want you to guess at anything, okay?

A. You got it.

Q. You may anticipate the answers

to some of my questions before I finish my question. I just ask that you allow me to finish my question before you give a full answer. Okay?

A. Okay.

Q. Do you understand that you have taken an oath to tell the truth today?

A. Yes, I do.

Q. Do you understand that even though you're not in a courtroom, the oath you took today is the same oath you would take as a witness if this case were at trial.

A. I do.

Q. If you realize during the deposition that an answer that you have given was inaccurate or incomplete, please let me know and I'll give you the chance to make a correction. Agreed?

A. Agreed.

Q. You may also review a copy of this transcript. After you review, you may make any changes to any errors that you find in the transcript. Okay?

A. Okay.

- R. PIERCE -

**Q. If you do need to take a break at any point, please let me know. Before you take a break, please answer my question before you decide to take a break. Okay?**

A. Okay.

**Q. Are we in agreement of these rules?**

A. Yes.

**Q. Do you understand all of them?**

A. Yes.

**Q. Do you have any questions?**

A. No.

**Q. Is there any reason at all that you cannot testify truthfully and accurately today?**

A. No.

**Q. Have you ever been deposed before?**

A. Yes.

**Q. How many times?**

A. Twice.

**Q. When was the first time you were deposed?**

A. 2007. I think the other one

- R. PIERCE -

was around that time, as well.

**Q. What was the nature of the first one?**

A. It was a staff -- they produced contraband into the facility.

**Q. Was that a civil case?**

A. No.

**Q. It was a criminal case?**

A. Criminal case.

**Q. Was that a case brought by the Nassau County District Attorney or some other district attorney?**

A. The Nassau County District Attorney.

**Q. And you were a witness to the case?**

A. Yes.

**Q. Why were you a witness?**

A. I assisted in the investigation. In the recovery of the contraband.

**Q. Do you know what the outcome of that case was?**

A. It did not make it to trial. I'm not aware of what the plea bargain or

- R. PIERCE -

anything was.

**Q. You said you assisted with the investigation. In what capacity?**

A. It actually happened on Christmas Eve. I was called in from home. We responded to the correctional center and we took possession of the contraband that was found and then we interviewed staff members.

**Q. Where did this take place?**

A. In the D2 clinic. The hospital section of the jail.

**Q. The jail we're talking about is Nassau County --**

A. Nassau County Jail. Yes.

**Q. What was your job title back then?**

A. Back then, I was an investigator.

**Q. The other case that you spoke about, what was the nature of that case?**

A. It was a bias complaint against one of my supervisors that I was a witness to.

**Q. What type of bias?**

- R. PIERCE -

A. It was racial discrimination.
I just want to correct the year. I believe that was closer to 2010.

**Q. What race was your supervisor?**

A. He was Caucasian.

**Q. What about the complainant?**

A. He was African American.

**Q. And you were deposed in that case?**

A. I testified at a federal court. I don't recall if I was deposed prior to that.

**Q. Was it a civil trial?**

A. Yes.

**Q. For money damages?**

A. Yes.

**Q. Do you know what the outcome of the case was?**

A. I do not. I believe -- I know there was separate parts of the issue that was going on. I was just a party to it. Just the bias part of it. I'm not aware what the outcome was.

**Q. Were you a named defendant?**

A. I was not a defendant, no.

**Q. Outside of depositions, have you ever testified in any other capacity in a criminal trial?**

A. No.

**Q. At a criminal investigation?**

A. No.

**Q. Have you ever been a plaintiff in a civil case?**

A. No.

**Q. Have you ever been a defendant in a civil lawsuit?**

A. No.

**Q. Have you ever testified at a hearing where charges and specifications were brought against a correction officer?**

A. Sorry, can you repeat that?

**Q. Have you ever testified at a proceeding where charges and specifications were brought against a correction officer?**

A. I have testified at an arbitration hearing.

**Q. How many times have you testified at those types of hearings?**

- R. PIERCE -

A. Actual testimony, just once.

**Q. When was that?**

A. I'm not a hundred percent sure of the year, but it was probably at least ten years ago.

**Q. In what capacity did you testify?**

A. I was a county witness because I was the investigator on the case.

**Q. This arbitration hearing was in Nassau County?**

A. Yes.

**Q. It was while you were working for the Nassau County Sheriff's Office?**

A. Yes.

**Q. And the hearing was brought against a sheriff's office employee?**

A. Yes.

**Q. Do you remember who those employees were?**

A. Officer Frank Povaromo (phonetic) was the target, but he has since retired.

**Q. Anyone else?**

- R. PIERCE -

A. Officer Patrick McCaffrey was a witness. He's a sergeant now.

**Q. You mentioned you testified at that proceeding?**

A. I did.

**Q. Do you know what the outcome of the proceeding was?**

A. I do not. It was a disciplinary proceeding.

**Q. Have you ever testified in any other disciplinary proceedings?**

A. No.

**Q. Have you ever been the subject of a disciplinary proceeding?**

A. No.

**Q. Have you been the subject of a disciplinary complaint?**

A. No.

**Q. Can you please state your business address?**

A. 100 Carmen Avenue, East Meadow, New York 11554.

MR. BRADLEY: Counsel, would you agree to accept the subpoena on

- R. PIERCE -

his behalf?

Ms. BEN-SOREK: Yes.

**Q. What is your job title now, sir?**

A. I'm an investigator corporal.

**Q. How old are you currently?**

A. Forty-six.

**Q. Have you ever been convicted of a crime?**

A. No.

**Q. Can you please describe your educational background?**

A. Associate's degree with credits towards a bachelor's degree in criminal justice.

**Q. When did you receive your associate's degree?**

A. 1998.

**Q. How many credits do you have towards a bachelor's degree?**

A. I was 11 credits short from completing it. I'm not sure of the actual number.

**Q. Do you have any military service?**

- R. PIERCE -

A. No.

**Q. Are you currently employed?**

A. Yes.

**Q. By who?**

A. Nassau County Sheriff's Department.

**Q. Where were you employed prior to working at Nassau County Sheriff's Department?**

A. Nassau BOCES.

**Q. In what capacity did you work at Nassau BOCES?**

A. I was a teacher's aide.

**Q. What does BOCES stand for?**

A. Board of Collaborative Education Services. It was with down syndrome and autistic children.

**Q. When did you start working for Nassau BOCES?**

A. March 10, 2000.

**Q. How long did you --**

A. I'm sorry, did you say BOCES?

**Q. Yes.**

A. I'm sorry. That was the

sheriff's department.

1997. I'm not sure of the month.

**Q. How long did you work for Nassau BOCES?**

A. Approximately, two years and change.

**Q. What were your reasons for leaving?**

A. I got accepted into the sheriff's department academy.

**Q. How old were you when you started working for Nassau BOCES, approximately?**

A. Twenty.

**Q. Prior to working at Nassau BOCES, did you have any previous employment?**

A. Yes. I worked at King Kullen.

**Q. How old were you when you worked there?**

A. Seventeen.

**Q. Any of those jobs prior to Nassau BOCES, did any of them have anything**

- R. PIERCE -

to do with law enforcement?
A. No.
Q. Do you currently volunteer for any organizations?
A. No.
Q. We talked about your current employment is with the Nassau County Sheriff's Department. When did you first become employed by the sheriff's department?
A. March 10, 2000.
Q. And your current rank is investigator corporal?
A. Yes.
Q. When did you attain that rank?
A. October 24th of 2022.
Q. What was your previous rank?
A. Investigator.
Q. When did you become an investigator?
A. September '07, around that time.
Q. What was your rank prior to investigator?
A. Correction officer.
Q. When did you receive the rank

- R. PIERCE -

of correction officer?

A. When I graduated the academy, which was July 3rd. I want to say it was the first week in July of 2000.

Q. I'm going to through the academy but I'm just going to make a note because we're going to talk about the investigator position. I just want to let you know where I'm going.

Let's talk about the academy. When you were first hired by the sheriff's department, you were required to attend the sheriff's department correction officer academy?

A. Yes.

Q. Is that what it's called?

A. Yes. Correction officer academy. Sheriff's department academy.

Q. And you attended the academy?

A. Yes.

Q. How long was the academy?

A. Approximately, four months, maybe a little less.

Q. Is it longer or shorter for

- R. PIERCE -

certain correction officers?

A. No. It's the same for everybody.

Q. Did you receive extensive training?

A. Yes.

Q. When you attended the academy, you were taught proper procedures and practices to be followed by a correction officer?

A. Yes.

Q. When you attended the academy, you were taught policies by the sheriff's department?

A. Yes.

Q. You were taught proper conduct of a correction officer?

A. Yes.

Q. You were taught the standards of care of a correction officer?

A. Yes.

Q. When you were taught proper procedures and practices of a corrections officer, were you given any written

**materials at the academy?**

A. I don't recall.

**Q. Were you trained at the academy on the use of force of an inmate?**

A. Yes.

**Q. What type of training did you receive?**

A. Handcuffing techniques, different types of force that were used, restraining an inmate, defensive tactics.

**Q. Were you given any written materials on these trainings?**

A. I don't recall. It was a long time ago.

**Q. So for training at the academy for use of force, do you know how much you were trained for that?**

A. I don't remember.

MS. BEN-SOREK: Objection to form.

You can answer.

**Q. Do you remember how long the training for use of force was?**

A. I don't remember.

- R. PIERCE -

**Q. Were you ever given any bulletins, orders, interim orders, and memos at the sheriff's department regarding policies and procedures?**

A. Yes.

**Q. All those different items, written materials, bulletins, orders, and interim orders and memos, they set forth the minimum standards of care that a correction officer must follow, true?**

A. True.

**Q. The bulletins, orders, and interim orders and memos are authoritative to a correction officer?**

A. Correct.

**Q. And the policies and procedures distributed to corrections officers by the Nassau County Sheriff's Department is authoritative?**

A. Yes.

**Q. If you violate the policies and procedures of the sheriff's department you could be disciplined?**

A. Yes.

- R. PIERCE -

Q. One purpose of your training at the academy is to prepare you for emergency situations?

A. Yes.

Q. One purpose of your training at the academy is to prepare you for circumstances an ordinary civilian would not encounter?

A. Yes.

Q. You were taught how to respond differently to daily circumstances that a correction officer might encounter?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. You were taught to expect the unexpected?

A. Yes.

Q. And you were taught as a professional correction officer that you were expected to have a higher code of conduct then the average civilian?

A. Yes.

Q. The average inmate?

- R. PIERCE -

A. Yes.

Q. Robert Johnson was an inmate?

A. Yes.

Q. He's currently a civilian. Do you know that?

A. I do not.

Q. At the academy, you were taught about escalation and deescalation of force?

A. Yes.

Q. Were you trained about the force continuum?

A. Yes.

Q. Can you describe that?

MS. BEN-SOREK: Objection. He's not a policy witness. He's not a 30(b)(6) witness. He can describe what his recollection is and what his understanding is.

MR. BRADLEY: Okay.

Q. You can answer.

A. The use of force continuum is an escalation -- if I recall the policy, an escalation of show of force to OC to what the next step might be or steps to take to

deescalating use of force, or even using force. Verbal techniques. Things like that.

**Q. Would you agree that based on your recollection that probably one of the first steps in the force continuum is to use your words?**

**MS. BEN-SOREK: Objection to form.**

**You can answer.**

A. Every situation could be different, but if something could be deescalated using words, I would agree with that.

**Q. At the academy, did you receive training on how to collect evidence?**

A. Yes.

**Q. Do you remember that training?**

A. I do not remember the exact training, no.

**Q. At the academy, were you taught to identify possible witnesses to incidents?**

A. I don't recall.

**Q. Were you trained how to**

**- R. PIERCE -**

**question and speak with possible witnesses at the academy?**

A. I don't recall.

**Q. Were you taught to collect evidence of a crime?**

A. Yes.

**Q. Do you remember what that training was?**

A. I can only recall how to fill out an evidence bag.

**Q. Can you talk about that?**

A. Depending on what the evidence was received and whether it be contraband or whatnot, the bag would -- you put your name, what it was, who it was found on, and then it would be the chain of custody after that point.

**Q. So it would fair to say you learned how to secure evidence?**

A. Correct.

**Q. You're familiar with the chain of custody?**

A. I am familiar with the chain of custody.

- R. PIERCE -

Q. And I'm sure you're familiar with the chain of custody because you're an investigator now, right?
A. Yes.
Q. Were you taught at the academy how to conduct an investigation?
A. No.
Q. Were you taught at the academy to use hand-to-hand combat?
MS. BEN-SOREK: Objection to form.
A. Yes.
Q. Based on your recollection, were you taught the psychology of confrontations at the academy?
A. I don't recall that.
Q. Based on your recollection, were you taught at the academy to avoid confrontations?
A. I don't recall that.
Q. At the academy, and based on your recollection, were you taught that you must use minimum necessary force?
A. Yes.
Q. At the academy, and based on

- R. PIERCE -

your recollection, were you taught that excessive force will not be tolerated?

A. Absolutely. Yes.

Q. And that unnecessary force is excessive force?

A. Yes.

Q. You were taught that the use of excessive force is a violation of the policies and procedures of the sheriff's department?

A. Yes.

Q. It is a violation of good and accepted correction officer practices and procedures?

A. Yes.

Q. It's a violation of the standard of care for a correction officer?

A. Yes.

Q. At the academy, you mentioned you learned about chain of custody?

A. Right. Yes.

Q. Were you taught that physical evidence could be crucial in an investigation?

A. I don't recall.

- R. PIERCE -

**Q. Were you taught anything at the academy about forensic evidence?**

A. I don't believe so. No.

**Q. Were you taught at the academy to properly safeguard physical evidence?**

A. I don't want to guess, so I'm going to say, I don't recall.

**Q. Were you trained about DNA evidence at the academy?**

A. No.

**Q. Were you trained about fingerprint evidence at the academy?**

A. No.

**Q. At the academy, were you taught to treat prisoners courteously, humanly, and with respect?**

A. Yes.

**Q. At the academy, were you taught to not threaten prisoners?**

A. Yes.

**Q. You would agree that threatening a prisoner would be a violation of the sheriff's office's policies and procedures?**

- R. PIERCE -

MS. BEN-SOREK: Objection to form.
You can answer.

A. Yes.

Q. After the academy, did you receive any additional training?

A. I received training when I went into the internal affairs unit. Investigative training.

Q. From the time after you become a correction officer, is there additional training that is provided to correction officers?

A. Yes. We do in-service yearly.

Q. What is in-service training?

A. We do CPR, weapons training. Pretty much just -- use of force, report writing. It's like a brush-up every year.

Q. You mentioned that you received additional training when you entered the internal affairs Unit?

A. Yes.

Q. And you entered the internal affairs unit when you became an investigator?

**- R. PIERCE -**

A. Yes.

**Q. In order to become an investigator, was there anything that you needed to do as far as gaining that title?**

A. Well, when you enter the internal affairs unit, at first you go in as an officer, and once you complete the appropriate training, then you're deemed investigator.

**Q. Do you have to take a test or do you just apply?**

A. It was like a posting. They would post the unit and you put in the -- it's kind of like similar to a resume on why you believe you would be the best fit for the unit.

**Q. How many times did you apply for the unit?**

A. Once.

**Q. Why did you want to join the unit?**

A. I always enjoyed using my mind and trying to figure things out. I figured it would be a change from sitting on the

tiers in the housing areas.

**Q. So you go in as a correction officer, and then once you successfully complete the training, then you become an investigator?**

A. Yes.

**Q. Can you describe that training?**

A. It was a two-week training course hosted by the New York Police Department Internal Affairs Bureau. They would go over different investigative techniques and how they conduct investigations in the police department. We would take bits and pieces of that and use it for the corrections center.

**Q. You said the New York City Police Department offers the two-week training?**

A. Yes. Strictly Internal Affairs.

**Q. Where did you have to go for that, 1 Police Plaza?**

A. No. We went to the internal affairs headquarters. I think it was on

- R. PIERCE -

Hudson Street in Manhattan. I'm not a hundred percent sure if it's Hudson Street, but it's somewhere near there.

**Q. The two-week training, are we talking that was ten business days?**

A. Ten business days.

**Q. Do you recall specifics as to what they trained you on?**

A. Interviews, interrogations, statements, taking statements. Things of that nature.

**Q. Did they talk to you about how to conduct an investigation?**

A. Yes.

**Q. Did they train you about how to identify possible witnesses?**

A. Yes.

**Q. Can you describe that?**

A. The PD is a little different than what we do at the jail because if it happened on the streets, they were dealing with a different environment than by us. But depending on where the crime happened, you go house to house, or if there's a

crowd there, you interview the people there.

**Q. Did they teach you the importance of identifying potential witnesses?**

A. Yes.

**Q. Did they teach you that it's important to obtain statements from potential witnesses?**

A. Yes.

**Q. Did they train you that it is important to obtain a statement from a potential witness as soon as possible?**

A. Yes.

**Q. Why is that?**

A. So they don't forget what happened. Jogging their memory.

**Q. Memories can fade, correct?**

A. Correct.

**Q. Did they train you about how to collect evidence?**

A. Yes.

**Q. Did they discuss with you the importance of collecting evidence?**

- R. PIERCE -

A. Yes.

Q. Did they discuss with you that it's important to collect evidence as soon as possible?

A. Yes.

Q. Why is that?

A. Because things get lost.

Q. Or destroyed?

A. Or destroyed.

Q. Did they discuss with you the consequences of evidence that is being lost or destroyed?

A. Yes.

Q. What are those consequences?

A. That it can either destroy a case or make a case.

Q. Do they also, by that same line, talk to you about the importance of obtaining statements from witnesses?

A. Yes.

Q. Because the failure to identify witnesses as soon as possible can hurt the investigation?

A. Yes.

- R. PIERCE -

**Q. So they did not train you on anything specific relating to investigation complaints of inmates, right?**

A. No, not at the PD. No.

**Q. Was anything else that we didn't discuss taught at the NYPD training?**

A. I'm sure there was, but it was a long time ago. I don't recall the entire training.

MR. BRADLEY: Can we take a minute bathroom break?

MS. BEN-SOREK: Sure.

(Whereupon, a recess took place.)

**Q. Just a couple more questions about the NYPD training.**

**Did you receive any training from them about how to investigate a complaint about racial discrimination?**

A. Yes.

**Q. Can you describe that training?**

A. It was more PD related, like racial profiling and stuff like that. I mean, that can happen at the jail, but... It was more about racial profiling, stop

and frisking. Things like that.

**Q. During that training, did you receive any training about how to investigate a complaint of sexual assault?**

A. I don't recall.

**Q. During this two-week training, did you receive any written materials?**

A. Yes.

**Q. Do you have them?**

A. I may.

MR. BRADLEY: I call for production of them.

THE WITNESS: I wouldn't even know where they would be, to be honest with you, even if I have them still.

MR. BRADLEY: I would appreciate if you can take a look for me.

THE WITNESS: Sure.

MR. BRADLEY: I'm going to call for production of them.

**Q. As far as the written material goes, do you remember what was explained inside of them?**

- R. PIERCE -

A. I don't remember. I just remember us getting handouts.

**Q. At this two-week training, were you ever trained about bias that an investigator can have in an investigation?**

**MS. BEN-SOREK: Objection. Asked and answered. You can answer.**

**Q. Outside of racial bias, I am talking about you as an investigator. Were you trained about potential bias that could occur?**

A. I don't remember exactly. I'm being honest. It was a long time ago. And I understand that that occurs, of course.

**Q. You understand that that occurs?**

A. It can occur.

**Q. Why can it occur?**

A. A person might have worked with this inmate before or -- things like that.

**Q. When you say "a person might have worked," the investigator may have investigated a complaint of an inmate before?**

- R. PIERCE -

A. No. I'm saying all of us worked in security at one point. Maybe we had a bad experience with that person. That's all I can really tell you.

**Q. Do you still work security as an investigator?**

A. No.

**Q. Was there an emergency at your job today?**

A. No. It was on the way here.

**Q. Was it personal?**

A. No.

MS. BEN-SOREK: By counsel, we were getting information as it was coming in. You don't need to ask it further.

**Q. So you don't work security at all as an investigator, right?**

A. No. Not since 2006.

**Q. It's not, like, we need a guy on this tier today?**

A. No.

**Q. Outside of the two-week training, do you receive any additional**

**training as an investigator?**

A. I took an interviewing interrogation course. I can't remember if it was Westchester PD or Rockland County PD, around the same time, but I really don't recall much of what occurred there. I'm currently taking the DCJS investigation course.

**Q. What is DCJS?**

A. Department of Criminal Justice Services.

**Q. Is this an online course, or something else?**

A. No. It's in person. It has been on the weekends.

**Q. Where does it take place?**

A. At Nassau County Police Academy.

**Q. Were you required to sign up for this course?**

A. No.

**Q. Were you recommended to sign up for the course?**

A. Yes.

- R. PIERCE -

**Q. Who recommended it?**

A. My lieutenant recommended that all of us go.

**Q. How long is the training for?**

A. It's three weekends, 7:00 a.m. to 7:00 p.m. Saturdays and Sundays.

**Q. How far are you in right now?**

A. We have two days left.

**Q. Three days left?**

A. Two days.

**Q. So far, what have you learned?**

A. It's basic criminal investigations. They go over -- it runs the gamut from fire scenes, death scenes. It's nothing in particular. It's just the Department of Criminal Justice Services outline, I guess you can call it.

**Q. When was the first class held?**

A. Can I look at my calendar?

**Q. Sure.**

A. It was May 20th and 21st, June 3rd and 4th, and then this coming Saturday and Sunday, June 10th and 11th.

**Q. So this training isn't anything**

**specific related to the investigation of inmate complaints?**

A. No.

**Q. Anything specific about complaints by members of service against other members of service?**

A. It might be this coming weekend, but so far they haven't.

**Q. Any other trainings that we didn't discuss?**

A. No.

**Q. No yearly trainings as an investigator?**

A. No. Just the yearly basic in-service that every staff member receives.

**Q. Is there a yearly training about use of force?**

A. No.

**Q. As an investigator, what are your duties and responsibilities?**

A. We take inmate complaints. We take staff-on-staff complaints. A majority of it we deal with inmate complaints, use of force complaints, staff misconduct

- R. PIERCE -

complaints.

Q. What do you do with those complaints? You investigate them, right?

A. Correct.

Q. Did you receive any in-house training about how to investigate these complaints?

A. It's more, like, on-the-job training.

Q. So you're relying on the last guy that was in line to train you?

A. Yes.

Q. Other than the two-week course, there has never been any training about how to conduct an investigation of an inmate complaint or a staff-on-staff complaint at Nassau County Sheriff's Department?

MS. BEN-SOREK: Objection.

You can answer.

A. Not that I'm aware of. No.

Q. As an investigator, you take complaints and you investigate them, correct?

A. Yes.

- R. PIERCE -

**Q. Are there, that you're aware of, sheriff department written policies or procedures regarding the duties and responsibilities of an investigator?**

A. I believe there is a Sheriff Bureau of Investigations SOP.

**Q. What is an SOP?**

A. Standard Operating Procedure.

**Q. Do you know what this SOP states?**

A. I don't have it in front of me, so I would have to say, no.

**Q. You're saying that there is a Sheriff's Department Standard Operating Procedure that applies to investigators?**

A. I believe it's of what we would investigate. I don't recall the entire SOP.

**Q. It's an SOP that says that these are the types of things that an investigator will investigate?**

A. I believe it's more of an SOP that's distributed around the department saying what SBI, short for Sheriff Bureau

of Investigation, what investigations they would conduct.

**Q. It's kind of like your authority, correct?**

A. Correct.

MR. BRADLEY: I'm going to call for production of the Sheriff's Department SOP.

MS. BEN-SOREK: Take it under advisement.

**Q. I didn't ask this. I should ask this.**

**The investigator, is it in a particular unit, is it in an internal affairs unit?**

A. We have several investigative units. Internal Affairs, which I'm a member. Criminal investigations, which deals with inmate-on-inmate fights, contraband retrieval, gang intelligence unit, medical investigations unit. It's all under the umbrella of the Sheriff's Bureau of Investigations.

**Q. So the Sheriff's Bureau of**

- R. PIERCE -

Investigations have all these little individual units, these four that you mentioned?

A. Yes.

Q. And you're assigned specifically to Internal Affairs?

A. Yes.

Q. Have you been in internal affairs your whole career?

A. No. Since 2006.

Q. Prior to 2006, you were a corrections officer, though, right?

A. Yes.

Q. You never worked in criminal investigation, gang intelligence, or --

A. No. Strictly security officer inside the jail.

Q. You testified that you received on-the-job training about how to conduct investigations as an investigator in the internal affairs unit?

A. Yes.

Q. Did that on-the-job training teach you how to collect evidence?

- R. PIERCE -

A. I mean -- I would say yes.

**Q. You would say yes?**

A. Yes.

**Q. Do you have any hesitation about whether or not you received any on-the-job training about how to collect evidence?**

A. I know I've collected evidence before. I don't recall who taught me that.

**Q. So you may not have been taught that?**

A. I may not have. I don't know a hundred percent.

**Q. So your ability to collect evidence, you used your training from the academy?**

A. I don't recall.

**Q. Did you rely on your training from the two-week NYPD training?**

A. No. I would say I relied on other people in the unit that showed me how to do it.

**Q. And maybe your instincts?**

A. True.

**Q. This on-the-job training, did it teach you how to identify possible witnesses?**

A. Yes.

**Q. Did this on-the-job training teach the importance of identifying possible witnesses?**

A. Yes.

**Q. Did this on-the-job training teach you how to question and speak with possible witnesses?**

A. Yes.

**Q. Did the on-the-job training teach you how to secure evidence?**

A. Yes.

**Q. Did the on-the-job training teach you the importance of securing evidence?**

A. Yes.

**Q. Did the on-the-job training teach you how to question potential witnesses and complainants and subjects?**

A. Yes.

**Q. Yes to all three?**

A. Yes to all three.
Q. Did this on-the-job training teach you that physical evidence could be crucial to your investigation?
A. Yes.
Q. Did it teach you that the identification of potential witnesses could be crucial to your investigation?
A. Yes.
Q. Did it teach you the importance of securing a statement from potential witnesses as soon as possible?
A. Yes.
Q. Did it teach you the importance of securing physical evidence in your investigation as soon as possible?
A. Yes.
Q. Did your on-the-job training include any training about the collection of forensic evidence?
A. Forensic evidence meaning?
Q. Meaning DNA or fingerprints.
A. No.
Q. Did your on-the-job training

- R. PIERCE -

teach you how to review and secure video footage from surveillance cameras?

A. No.

Q. Did your on-the-job training teach you that you should take photographs of where an incident allegedly occurred?

A. No.

Q. Did the on-the-job training teach you how you take photographs of an inmate's alleged injuries?

A. Yes.

Q. What is the importance of documenting an inmate's injuries?

A. If it's consistent with the inmate's statements.

Q. Did you ever receive on-the-job training about identifying physical injuries on an inmate?

A. No. Other than -- no.

Q. I'm not talking about this investigation. I'm talking about in general now.

Can you explain to me in a typical case of a complaint by an inmate

**the steps that you would take beginning from the first to the last of an investigation?**

**MS. BEN-SOREK: Objection.**

**You can answer.**

A. We would get the complaint from -- we have an inmate hotline that it can come from, the grievance unit that it can come from, sometimes it comes from inmate's family members. We would take the complaint. We would interview the inmate depending on if it was an internal affairs issue. Sometimes it's not. Sometimes it's a grievance issue.

If it was an internal affairs issue, then we would take photographs of the inmate, have them sign a medical release form.

**Q. I'm going to stop you right there.**

**What is the difference between a grievance and a complaint?**

A. A grievance is more, my food was cold or the heat doesn't work. That's

the thing with a grievance issue that the grievance unit would handle. Sometimes they may call us thinking that's what we do, so we would refer that to the appropriate unit.

**Q. How do they know about the hotline? Are the inmates distributed an inmate handbook?**

A. Yes. It is in the handbook.

**Q. So the complaint comes in. It could come in through the hotline, a family member. And then you mentioned that you get authorization for medical records?**

A. Yes.

**Q. Describe that process.**

A. If the inmate is alleging assault, he would have either already been previously sent to medical or we would have sent him to medical. The medical release gives us authorization to review medical records concerning the incident.

**Q. Would you typically review the medical records first or would you speak with the inmate first?**

- R. PIERCE -

A. No. We would speak with the inmate.

**Q. When you speak with the inmate first, is that usually a recorded conversation, or is it just an initial interview?**

A. No. It's recorded.

**Q. How quickly are interviews of inmates typically done?**

A. Depending on the situation, they're usually done -- depending on what time of day it happened, it's either that same day or the following.

**Q. If you get a complaint at 3:00 in the morning, would you get a call to come in from your home to get investigate the complaint?**

A. Depending on the severity of it, we would, yes.

**Q. You mentioned you get medical records. You would probably speak with the inmate first before review of the records, right?**

A. We would definitely speak to

the inmate first.

**Q. After you do that, what do you do?**

A. Sometimes it may take a while to get the medical records, so we would submit that to medical, the request, and then we would interview staff members, see if there were any other witnesses that we haven't interviewed.

After interviewing the staff members, we would draw a conclusion up in a narration to our case, which we would then submit to the supervisor. If he signed off on it, it would then be submitted to the captain for his final sign-off.

**Q. How quickly would you interview a correction officer?**

A. Usually, that would be the last thing that we would do until all the information is gathered.

**Q. Why is it the last thing that you do?**

A. So we can get our questioning set. Sometimes if it's a use of force

- R. PIERCE -

package, it takes time to get that package.

**Q. What is a use of force package?**

A. When there is a use of force at the facility, officers are required to write reports on the incident.

**Q. Typically, how long should they take to write that report?**

A. The reports? The reports are pretty much written immediately or soon thereafter depending on if the officer got injured. Then it's submitted to the sergeant, who then submits it to the lieutenant, who then submits it to the captain, and then we would eventually get a copy of it.

**Q. You get a copy of it after it has gone through all those levels?**

A. Yes.

**Q. And typically, how long could that take?**

A. It could take a month. It could take six months.

**Q. Do you typically interview potential inmates in every case?**

- R. PIERCE -

A. I'm sorry? The complainants?

**Q. Witnesses. Potential witnesses.**

A. Not in every case, no.

**Q. In what case would you try to identify potential inmate witnesses?**

A. If it happened in an open housing area where there's 52 inmates in, like, a pod setting. If it happened somewhere in the middle of that when all the inmates were out, then we would interview witnesses. Or if it happened on a tier, then we would interview witnesses.

**Q. Tell me if I'm wrong. A complaint comes in. It can come in from different methods, right?**

A. Yes.

**Q. The first thing you would likely do in any investigation is to interview the complainant inmate?**

A. Yes.

**Q. The next thing that you would do is that if the inmate reported a physical injury, you would request medical**

**records from the facility?**

A. Yes.

**Q. The next thing you do is you would interview potential witnesses --**

A. I'm sorry. Prior to that, we would also take photographs.

**Q. Take photographs of the inmate's injuries?**

A. Yes.

**Q. Would you take photographs of where the incident occurred?**

A. Depending on -- we usually don't do that, no.

**Q. Would you ever go to the scene of where the incident occurred to retrieve any physical evidence?**

A. No.

**Q. Blood evidence?**

A. No.

**Q. Is anybody responsible for photographing a scene?**

A. On the internal affairs side, no. I don't know if there is someone in the other units that do.

- R. PIERCE -

**Q. Outside of the internal affairs side?**

A. I don't know. We do not have, like, a crime scene unit or crime scene photos. We do not have a unit that does that.

We have an identification unit that if there was blood or anything else like that, they would be called to take photos of that. But I'm not aware of how they do that.

**Q. The identification unit, is that in the internal affairs Unit?**

A. No. It's the identification unit at the jail. They do inmate photos and things like that. If there's any incident at the jail, they go and respond and photograph.

**Q. Do you think that it would be important to ever go to where a complainant said an incident happened as part of your investigation?**

**MS. BEN-SOREK: Objection to form.**

- R. PIERCE -

A. I mean, we do go. Depending if we're doing a canvass, we do go there, but other than that, no.

**Q. You don't think it's important?**

A. I mean, I know the layout of the jail.

**Q. What if there was blood on the floor? I'm sure there's some of your investigations that you've conducted that an inmate, whether it was substantiated or not, was bleeding, right?**

A. Yes.

**Q. Significant blood?**

A. Yes.

**Q. Do you feel like it would be important to photograph that evidence?**

A. Well, the issue is that we usually don't get notified at the time of the incident. So by the time the inmate makes a complaint, it could be a day later, two days later, three days later, and that stuff is gone already anyway.

**Q. If there was blood and stuff on the floor, does anyone come in to preserve**

- R. PIERCE -

**that evidence, or do they just mop it up?**

A. I can't speak to that. If it's a documented use of force, I believe that they would take photos of it. I've seen photos of blood.

**Q. I'm going to go back.**

**A complaint comes in. It could come in from different methods, right?**

A. Yes.

**Q. One of the first things you do is you interview the complainant inmate?**

A. Yes.

**Q. That's recorded?**

A. Yes.

**Q. Typically, the next thing you do is ask for his medical records?**

A. That all takes place at the same time, the interview, the medical records, and then the photographs.

**Q. The next thing you do in a use of force complaint is you would await the use of force package?**

A. Yes.

**Q. And the use of force package**

goes through many different levels on the correction officer side?

A. Yes.

Q. And you need to await that package in order to interview the subject correction officers?

A. Yes.

Q. When we say "subject," we mean that they are alleged by the inmate to have committed a use of force?

A. Yes.

Q. After you interview the correction officers, you review the file at that point?

A. Yes.

Q. And you draft up a report?

A. Yes.

Q. When you do this investigation, is it typically done by yourself or with somebody else?

A. We don't interview people by ourselves. There's like a primary investigator and then if we need help doing anything else, we just grab somebody else.

- R. PIERCE -

**Q. So you draft up the report, right?**

A. Yes.

**Q. Do you then send it to your superior?**

A. Yes.

**Q. Who is that?**

A. Today it's Lieutenant Curatolo.

**Q. In a typical investigation, you as an investigator, who would you require to submit the report to?**

A. Whoever my supervisor was at the time.

**Q. These investigations that are done of inmate complaints, is there a timeline that must be followed to complete the investigation? In other words, is there a number of days?**

A. There's not a number of days that I'm aware of, but we need to complete it earlier than a year, or we cannot -- if we do find a case sustained, we cannot instill any disciplinary charges against the staff member.

- R. PIERCE -

**Q. So for claims by inmates over one year, you can't initiate an investigation?**

A. We can initiate an investigation, but the staff member can't be penalized upon our findings. Departmentally penalized.

**Q. So when you submit your report to your superior, what does your superior do with it?**

A. He would read the report, review it, sign off on it, then it would go to his superior.

**Q. What is the job title of the superior that you submit to?**

A. It's been a corporal. It's been a sergeant. It's been a lieutenant.

**Q. When that person submits it the next person, who is that title?**

A. Typically, a captain.

**Q. Does the captain submit it to anybody?**

A. No. The captain is the final sign-off.

- R. PIERCE -

**Q. When you're investigating one of these complaints against a correction officer, are you ever contacted by the union?**

A. I mean, we contact the union to set up interviews, but that's pretty much it.

MR. BRADLEY: I just need a couple of minutes. I'm sorry.

(Whereupon, a recess took place.)

**Q. When you conduct an investigation, you want to conduct a full investigation?**

A. Yes.

**Q. One that is fair?**

A. Yes.

**Q. One that is thorough?**

A. Yes.

**Q. One that is complete?**

A. Yes.

**Q. Because doing other than a fair investigation would not be okay?**

A. That's true.

**Q. An incomplete investigation is not a good investigation?**

- R. PIERCE -

A. No.

Q. An investigation that is less than thorough, you wouldn't want to do that?

A. No.

Q. Because it's important to do a full, fair, thorough, and complete investigation?

MS. BEN-SOREK: Objection. Asked and answered. You can answer.

A. Absolutely.

Q. We talked about that it's important to gain witness statements and to identify potential witnesses.

Typically, how long is an inmate housed at Nassau County Correctional Facility?

A. It could anywhere from a day to several years.

Q. Several years because they're awaiting trial?

A. Yes.

Q. Based on your experience, are

- R. PIERCE -

most inmates released prior to a year?

MS. BEN-SOREK: Objection to form.

You can answer.

A. A lot of them are. I don't know an exact number.

Q. Would you say that a majority are?

A. I would say a majority, yes.

Q. So when a complaint is made and there could be potential inmate witnesses, you would agree that it's important to gain those statements as soon as possible, right?

A. Yes.

Q. Because you know how difficult it is for an inmate to provide a statement?

MS. BEN-SOREK: Objection to form.

A. There's multiple ways that they can log their complaint.

Q. Based on your training and experience, do inmates typically give statements?

A. Yes.

- R. PIERCE -

**Q. Is it difficult for you --**

A. I'm sorry. Can you repeat that?

**Q. Based on your training and experience, is it difficult to obtain a statement from a potential inmate witness?**

A. No.

**Q. Do most inmate witnesses come forward?**

A. I would not say most. Half, maybe.

**Q. Has there ever been an instance where a potential inmate witness refused to provide you with a statement?**

A. Yes.

**Q. In circumstances where inmates have left the facility, have you ever attempted to contact a former inmate to obtain a statement?**

A. Yes.

**Q. In those circumstances, do they typically provide you with a statement?**

**MS. BEN-SOREK: Objection.**

**You can answer.**

- R. PIERCE -

A. Some do. Some don't.

**Q. It's difficult to obtain statements, right?**

**MS. BEN-SOREK: Objection.**

A. At times it can be if they left the facility. Yes.

**Q. Especially if they left the facility?**

A. Yes.

**Q. You would agree that it's important to interview a corrections officer regarding their version of events of an incident as soon as possible?**

A. No.

MS. BEN-SOREK: Objection to form.

You can answer.

A. No.

**Q. You don't think it's important?**

A. To interview them immediately?

**Q. As soon as possible.**

A. In my experience, we have to gather the information first and then interview them once we have all the

information available.

Q. But you would agree that correction officers are human beings, right?

A. Yes.

Q. And you testified earlier that it's important to obtain statements from witnesses as soon as possible because memories can fade?

A. Yes.

Q. And just like civilians, a correction officer's memory can fade?

A. Yes.

Q. So you would agree with me that it's important to obtain a statement from a correction officer regarding their version of events as soon as possible?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. Because a correction officer's memory can fade?

MS. BEN-SOREK: Objection.

Asked and answered.

- R. PIERCE -

You can answer.

A. Yes.

Q. And you want the freshest version from the correction officer as possible for your investigation?

A. Yes.

Q. If you learn that there were potential witnesses in an investigation and you did not interview them, would you consider that investigation to be less than complete?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. Less than full?

A. Yes.

Q. Unfair?

A. Yes.

Q. Less than thorough?

A. Yes.

Q. And that wouldn't be okay?

A. No.

Q. If you were aware or learned that there could be potential evidence of

- R. PIERCE -

an incident, but that you did not obtain it, your investigation would be less than complete?

A. Yes.

Q. Less than fair?

A. Yes.

Q. Less than thorough?

A. Yes.

Q. Less than full?

A. Yes.

Q. And that would not be okay?

A. No.

Q. That's not what you would want?

A. No.

Q. Based on your experience, have you ever learned of a correction officer fabricating evidence against an inmate?

A. No.

Q. Based on your experience, have you ever learned of a correction officer hiding evidence regarding allegations of use of force?

A. I don't understand the question.

Q. Based on your experience, have

- R. PIERCE -

you ever learned that a correction officer failed to report a use of force against an inmate?

A. No.

Q. Have you ever learned of a correction officer manufacturing evidence against an inmate?

A. No.

Q. When a correction officer makes a false statement, it is a violation of good and accepted correction officer practices and procedures, true?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. Have you ever heard of a correction officer falsely claiming that they did not physically assault an inmate?

A. No.

Q. Based on your training and experience, especially as an investigator, if a correction officer lied about whether they physically assaulted an inmate, that would be wrong?

- R. PIERCE -

A. Yes.

Q. That would be a violation of Nassau County Sheriff's policies and procedures?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. It could be a crime?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. If a correction officer physically assaults an inmate without cause, that would be a deviation from sheriff's office policies and procedures based on your training and experience?

A. Yes.

Q. Based on your training and experience, if a correction officer physically assaults an inmate without cause, that could be cruel and unusual punishment?

MS. BEN-SOREK: Objection.

It's a legal conclusion.

- R. PIERCE -

Q. Based on your training and experience, if a correction officer physically assaults an inmate without cause, that could be a violation of the inmate's human rights?

MS. BEN-SOREK: Objection. Calls for a legal conclusion.

Q. If a fellow correction officer witnessed another correction officer physically assaulting an inmate but did not report the incident, that would be a violation of sheriff office policies and procedures, correct?

A. Yes.

Q. Failing to do so could be considered a false statement?

A. Yes.

Q. And you've investigated complaints against correction officers for those allegations?

A. Yes.

Q. Based on your training and experience as an investigator, how many complaints of use of force have you

**investigated?**

A. Hundreds.

**Q. Based on your training and experience as an investigator, how many complaints did you investigate of claims that a correction officer failed to report the use of force?**

A. Zero.

**Q. You have an attorney here with you, right?**

A. Yes.

**Q. But you're not a defendant?**

A. No.

**Q. Did you meet with this attorney prior to the examination today?**

A. Yes.

**Q. When was that?**

A. Two weeks ago, maybe.

**Q. Was it a meeting?**

A. I wouldn't really call it a meeting. Just letting me know that I was coming here.

**Q. Was it a phone conversation, or something else?**

**- R. PIERCE -**

A. No. We met in person.

**Q. How long was the conversation?**

A. 20 minutes, half hour.

**Q. During those 20 minutes to half hour, did you discuss this case?**

A. We went over it. Showed me my reports and everything that was part of my case file.

**Q. Was anyone present during your meeting with the attorney?**

A. No.

**Q. Did you meet and talk with anyone else prior to your attorney about this deposition?**

A. No.

**Q. Nobody at work?**

A. I was just informed that I was going to be deposed, but it was just a phone call.

**Q. Typically, how are you informed that you are going to be deposed?**

A. That's usually the way. Either be notified by our legal unit to reach out to whichever attorney was representing us

and they would just tell me where to go and what day to be there.

**Q. Did you review any documents in preparation for this examination?**

A. I did. I reviewed my case file.

**Q. Is that called an internal affairs unit file?**

A. Yes.

**Q. Do you have a specific name for it?**

A. We just call it a case, and it has a number.

**Q. When you reviewed your case file, did it refresh your memory as to your investigation?**

A. Yes.

**Q. Did you review any other documents outside of that file?**

A. Just the audio recordings.

**Q. The audio recordings of who?**

A. Mr. Johnson, Officer McCaffrey, and Officer Benson.

**Q. Those recordings, were they**

- R. PIERCE -

done as part of your investigation?

A. Yes.

Q. Were those recordings a recording of you interviewing Johnson, McCaffrey, and Benson?

A. Yes.

Q. I'm going to you ask if you know a few of these people.

Do you know who Detective Nicholas Occhino is?

A. No.

Q. I'll give you the spelling of the last name. It's O-C-C-H-I-N-O. Detective Nicholas Occhino, do you know who that is?

MS. BEN-SORER: I believe it's pronounced Occhino.

A. Yes.

Q. How do you know him?

A. He works for the sex crimes unit, Nassau County Police.

Q. How many times have you met him?

MS. BEN-SOREK: Ever?

MR. BRADLEY: Ever. Yes.

A. Twice, maybe. Three times.

**Q. Are you friends with him?**

A. No.

**Q. You don't hang out outside of work with him?**

A. No.

**Q. Do you know who Correction Officer Stussey is, S-T-U-S-S-E-Y?**

A. I do not.

**Q. Those two or three times that you spoke with the detective, do you remember what those times were about?**

A. They were definitely all related to inmate complaints that had alleged sexual issues occur to them.

**Q. How many times, based on your experience as an investigator, have you investigated allegations by an inmate or sexual assault by a correction officer?**

A. Four, five.

**Q. Did any of those complaints involve an allegation that an officer stuck their finger up the inmate's rectum?**

- R. PIERCE -

A. Yes.

**Q. All five or four?**

A. All five.

**Q. All of them?**

A. Yes.

**Q. Those four or five, when did they occur?**

A. I would say 2021, 2023. Within the last couple of years.

**Q. Are you saying that there was a cluster in the last couple of years?**

A. Yes.

**Q. What do you think the earliest date was?**

A. Maybe 2019.

**Q. Where did they occur?**

A. Various places. No one place in general.

**Q. Did it ever occur in the B unit?**

A. What unit?

**Q. B unit.**

**MS. BEN-SOREK: B building?**

**Q. B building.**

A. No. I believe they were in the

satellite building.

**Q. But you're not sure?**

A. I'm not a hundred percent sure. There might have been others that I personally didn't investigate. I'm only speaking about the ones that I investigated.

**Q. Based on other people that you work with, have you ever learned any more allegations that a correction officer stuck a finger up an inmate's rectum?**

A. I mean, we all kind of help each other out with the cases, so some of those cases might not have been assigned to me but I assisted. But I think that's about the approximate number combined.

**Q. So it could be more than five?**

A. It could be.

**Q. Could it be more than ten?**

A. No.

**Q. Less than ten?**

A. Less than ten.

**Q. So less than ten since 2019?**

A. Yes.

**Q. Those four or five complaints**

- R. PIERCE -

that you personally investigated, were any of them substantiated?

A. No.

Q. In those four or five complaints that you investigated, did you collect any physical evidence?

A. No.

Q. Did you take any photographs of the scene where the inmate alleged that it occurred?

A. No.

Q. Do you know if any of those four or five inmates had a rape kit done to them?

A. I do not know. We send them to the hospital. I believe the hospital policy is to notify SVU and I'm not a hundred percent sure what they do.

Q. Based on your training and experience, how many complaints of racial discrimination by an inmate against a correction officer have you investigated?

A. I couldn't give you a definite number, but there's been a couple.

**Q. More than ten?**

A. I would say more than ten.

**Q. More than 20?**

A. No.

**Q. Less than 20?**

A. Less than 20.

**Q. Between ten and 20?**

A. That's a fair number. Yes.

**Q. I know that there's a policy that discusses what you can investigate as an investigator in the internal affairs unit, right? We spoke about that?**

A. Yes.

**Q. So some of the things that you investigate is, obviously, use of force allegations by an inmate?**

A. Yes.

**Q. Allegations of racial discrimination?**

A. Yes.

**Q. Those allegations of racial discrimination, if an inmate said that this correction officer called me the N word, would that be something you investigate?**

- R. PIERCE -

A. Yes.

**Q. One of the other things that you investigate is allegations of sexual assault by an inmate, right?**

A. Yes.

**Q. Do you know who Officer Stussey is?**

A. I do not.

**Q. You never heard of anyone that works for Nassau County Sheriff's with that name or a similar name?**

A. Similar, but not the same. No.

**Q. What do you mean by "similar"?**

A. I know there was a Hussey. I don't know if he's employed there still or the name just sounded familiar.

**Q. Why does it sound familiar?**

A. I just remember hearing the name before, or reading reports that might have been written by him.

**Q. Have you ever investigated him?**

A. I don't recall.

**Q. Do you know where he worked?**

A. No.

**Q. Did you know him personally?**

**- R. PIERCE -**

A. No.

**Q. Do you know Correction Officer James Staib is?**

A. Yes.

**Q. How do you know him?**

A. Just from him working at the jail.

**Q. The unit that you work in, you work in the internal affairs unit, right?**

A. Yes.

**Q. Where is that office located?**

A. We are in A building.

**Q. So when you're going to work in A building, sometimes you see corrections officers coming in and out of the building?**

A. Yes -- coming in and out of A building?

**Q. Yes.**

A. Is that what the question was?

**Q. Yes.**

A. No. Well, whoever is assigned to that building.

**Q. So you have seen James Staib working?**

A. Yes.

- R. PIERCE -

**Q. Where did you see him?**
A. If I went to a floor to pick up things or walking through the building to get stuff.
**Q. Are you friendly with him?**
A. I don't think I've ever said two words to him.
**Q. Did you ever investigate him?**
A. No.
**Q. Do you know who Correction Officer Thomas Benson is?**
A. Yes.
**Q. How do you know him?**
A. From working at the jail.
**Q. How often do you see him?**
A. Not often at all.
**Q. How many times do you think you have seen him?**
A. I have seen him a lot. Our office isn't technically inside the jail, so I don't have contact with him really.
**Q. Have you spoken with him before?**
A. Yes. Sure.

- R. PIERCE -

**Q. Are you friendly with him?**
A. Yes.
**Q. Do you hang out outside of work?**
A. No.
**Q. How often do you speak with him?**
A. If I happen to bump into him, I'll say hello, but that's pretty much it.
**Q. Do you ever discuss matters with him outside of work?**
A. No.
**Q. Mets, Yankees?**
A. No. Just, how are the kids? Things like that.
**Q. You know he has kids?**
A. Yes.
**Q. Is he your neighbor? Does he live near you?**
A. I don't know where he lives.
**Q. How long have you known him for?**
A. Since he started the job. I don't know exactly what year that was, but I've seen him around.
**Q. How often do you talk?**
A. Not often at all. If I just

happen to be in the building doing something and I bump into him, I'll say hello. That's pretty much it.

**Q. But you do know that he has kids?**

A. Uh-huh.

**Q. Yes?**

A. Yes.

**Q. Is he married?**

A. I don't know.

**Q. Do you know where he lives?**

A. I don't.

**Q. Do you know what kind of car he drives?**

A. I don't.

**Q. You did an investigation of him for this case, right?**

A. Yes.

**Q. Prior that investigation, did you know him?**

A. Yes.

**Q. And you spoke with him before this investigation, right?**

A. Yes.

Q. Do you know who Corporal Patrick McCaffrey is?

A. Yes.

Q. How do you know him?

A. Again, from working at the jail.

Q. How often do you see him?

A. I haven't seen him in years.

Q. Let me go back one second.

After the investigation of Robert Jeffery Johnson's complaint, did you ever see Thomas Benson again?

A. I don't recall.

Q. Did you ever speak with him after the investigation?

A. No. I don't recall.

Q. No, or you don't recall?

A. I don't recall.

Q. So McCaffrey, you haven't spoke with him in years, but you have spoke with him?

A. In passing, yes.

Q. Do you know anything about his personal life?

A. No.

- R. PIERCE -

**Q. Would you say you're more friendly with Benson than McCaffrey?**

A. I wouldn't call it even friendly. It's cordial.

**Q. Do you know more about Benson's personal life than you do McCaffrey?**

A. No.

**Q. Does McCaffrey have children?**

A. That, I don't know.

**Q. You investigated Patrick McCaffrey with respect to Robert Jeffery Johnson's complaint?**

A. Yes.

**Q. After that investigation, did you ever speak with McCaffrey again?**

A. I did. I saw him at the promotion when he got promoted. I said, "Congratulations."

**Q. Did you say anything else to him?**

A. No.

**Q. Did you talk about the case?**

A. No.

**Q. Did you ever hang out outside**

**of work with Corporal Patrick McCaffrey?**

A. No.

**Q. And you have investigated him before?**

A. Yes.

MR. BRADLEY: I have to take another break. Just give me one second.

(Whereupon, a recess took place.)

**Q. How many times have you investigated Corporal McCaffrey?**

A. I don't know an exact number, but maybe three. Two or three.

**Q. Do you recall investigating Corporal McCaffrey for an incident that occurred in 2009?**

A. Yes.

**Q. Do you know what the nature of the complaint was?**

A. I believe it was an inmate that alleged extensive force by staff. He wasn't the target.

**Q. But was Corporal McCaffrey investigated?**

A. Yes.

**Q. Based on your independent recollection, do you recall anything else about the facts of that case?**

A. I remember I closed it sustained. I believe the inmate may have had a shoe print on his back. I don't recall the specifics of it.

**Q. Did you sustain something against Corporal McCaffrey?**

A. No. His partner was the target. But he being a witness, yes, it was sustained.

**Q. But was an allegation of some misconduct sustained against Corporal McCaffrey?**

A. Yes.

**Q. What was it based on your independent recollection?**

A. I don't recall the exact violation.

**Q. Mr. Pierce, can you see this?**

**MS. BEN-SOREK: Is that Exhibit 1?**

MR. BRADLEY: This is

- R. PIERCE -

Plaintiff's Exhibit 1. It's Bates stamped NC656 to 658.

MS. BEN-SOREK: I have a hard copy.

**Q. Mr. Pierce, I'm just going to focus on the page where it says Bates stamped 657 in the bottom right. It's the second page.**

A. Yes. I do recall that.

**Q. You recall this?**

A. Yes.

**Q. Did you write this?**

A. I don't think so.

**Q. What is this document?**

A. It's a Notice of Personnel Action.

**Q. What does that mean?**

A. When a staff member violates one of our rules and regulations, they receive one of these with a penalty attached.

**Q. So this would be issued after you determined that the allegations against the correction officer was substantiated?**

- R. PIERCE -

A. Yes.

**Q. Who recommends the penalty?**

A. The commanding officer of the internal affairs unit.

**Q. Do you ever recommend a penalty?**

A. No.

**Q. In the top right corner, it says, "SBI-004-10." What is that number?**

A. That's our recordkeeping number. That would be the fourth note given out in the year 2010.

**Q. SBI is Special Bureau of Investigations?**

A. Yes. Sheriff's Bureau of Investigations.

**Q. If you look at part one at nature of complaint, it says, "Violation of NCSD." What is NCSD?**

A. Nassau County Sheriff's Department.

**Q. Nassau County Sheriff's Department Rules and Regulations?**

A. Yes.

**Q. And I believe it says Article**

**- R. PIERCE -**

**13, Rule 2.**

A. Yes.

**Q. What is that?**

A. That's an excerpt from our -- for lack of a better word -- handbook.

**Q. You have a handbook?**

A. It's called Rules and Regulations Handbook.

MR. BRADLEY: I'm going to call for production of the Rules and Regulations Handbook.

MS. BEN-SOREK: Take it under advisement.

I haven't seen it, but I would assume that it covers more than the issues you want. We can discuss off the record possibly getting you a table of contents or an index and only those relevant portions.

**Q. Mr. Pierce, do you know what Article 13, Rule 2.2 is?**

A. Yes.

**Q. What is it?**

A. Conduct unbecoming.

- R. PIERCE -

**Q. Article 12, Rule 3.9, do you know what is?**

A. That one, I don't.

**Q. Would that also be contained in this handbook that we spoke about?**

A. Yes.

**Q. SOPCD, what does that mean?**

A. Standard Operating Procedures. I have no idea what "CD" means.

**Q. Do you know what SOPCD 04-02-04SEC3 is?**

A. I don't.

**Q. Subsection J, do you know what that is?**

A. No.

**Q. What about ADPCD02-05-10, Section M?**

A. No.

**Q. You don't know what that is?**

A. I don't know.

**Q. If you look at the date, there's two dates. Do you know what the relevance of both of those dates are?**

A. No.

- R. PIERCE -

Q. Do you think that the date, January 15, 2010, could be the date that he was interviewed by your office?

MS. BEN-SOREK: Objection. If he knows.

A. I don't know. I don't recall what date I interviewed him.

Q. Do you know if the incident underlying this investigation occurred on November 11, 2009?

A. I don't recall.

Q. If you look at the bottom, it says, "Department action $500. Loss of leave entitlement. Five days of" -- does that say "vacation leave"?

A. Yes.

Q. Was that imposed on Corporal McCaffrey, to your knowledge?

A. I don't know.

MS. BEN-SOREK: For the record, I think you said $500 imposed. I'm reading $100, unless we're reading different parts.

MR. BRADLEY: I see $100.

- R. PIERCE -

**Q. The supervisor's signature, do you recognize that signature?**

A. Yes.

**Q. Who is that?**

A. Sergeant Thomas Scieta (phonetic).

**Q. Who is he?**

A. He was the commanding officer of internal affairs at the time.

**Q. Is that why he signed off on this?**

A. Yes.

**Q. Because he has to sign off on this in order to give a penalty to a correction officer?**

A. He has to sign off on it and then somebody else has to agree with it, I guess.

**Q. It says, "Department head or representative." Do you see that signature?**

A. Yes.

**Q. Who is that, do you know?**

A. That was Jerome Fitzpatrick. He was the deputy sheriff chief at the

- R. PIERCE -

time.

**Q. Do you know why he signed off on this?**

A. I believe that the person signing that section has to be out of our collective bargaining agreement. They cannot be a union member, as far as I was told.

**Q. So you're not a union member?**

A. I am. The second section.

**Q. If you look at the details, can you please read them? Let me know when you're done.**

A. (Complying.)

Okay.

**Q. Does that refresh your recollection as to this incident?**

A. Yes.

**Q. Were you the lead investigator for this incident?**

A. Yes.

**Q. Did you investigate this incident with anyone else?**

A. I would have had a partner. I

don't recall who it was.

Q. So if you look at the details, it says, "McCaffrey provided inaccurate or incomplete information during the internal affairs interview."

Was that interview conducted by you?

A. Yes.

Q. And you determined that he gave inaccurate information?

A. Yes.

Q. And incomplete information?

A. Yes.

Q. What was that based on, do you recall?

A. I don't. I only recall that it was a use of force. I don't recall the specifics of the case.

Q. The supervisor's signature, who was that again?

A. Sergent Thomas Scieta.

Q. Mr. Scieta, he has to agree with your determination, right?

A. Yes.

- R. PIERCE -

**Q. And he agreed here?**
A. Yes.
**Q. Would he have conducted his own investigation, or it was just you?**
A. No. Just me.
**Q. Did you prepare an investigation report for the case?**
A. Yes.
MR. BRADLEY: I call for production of the investigation report for this case.
**Q. Do you still have a copy in your possession?**
A. It should be in our filing cabinets. In my personal possession? No.
MR. BRADLEY: I'm going to demand a copy.
MS. BEN-SOREK: Take it under advisement.
**Q. You mentioned that you did testify at a department trial for this incident, right?**
A. Yes.
**Q. Or for this investigation of**

- R. PIERCE -

your claim?
A. Yes.
Q. Were you required to testify as to the steps you took of this investigation?
A. I don't recall.
Q. Do you recall ever being questioned about the steps you took during the investigation?
A. I don't recall.
Q. Do you recall ever being questioned about the conclusion that you reached with respect to the investigation?
A. No. I don't recall.
Q. With respect to this incident, do you recall if you interviewed any inmate witnesses?
A. I believe I did.
Q. Do you know how many?
A. I don't.
Q. Would you say it was more than ten?
A. Probably.
Q. More than 20?
A. I don't recall the specific

incident, but I would say at least ten or more.

**Q. Do you recall if you obtained any written statements from those inmates?**

A. I believe at the time we were still handwriting them. I don't recall if we interviewed or -- we recorded or took handwritten ones. I don't recall which one it was.

**Q. If you took a handwritten interview and transcribed that handwriting, would you require the inmate to sign on that?**

A. Yes.

**Q. Do they get it notarized or just sign?**

A. They just sign it.

**Q. I'm pulling up Plaintiff's Exhibit 2. It's a 12-page document.**

**Mr. Pierce, have you ever seen this before?**

A. Yes.

**Q. When did you see it?**

A. This particular one?

- R. PIERCE -

**Q. Yes.**

A. No.

**Q. Never seen it?**

A. No.

**Q. Can you do me a favor and please read that and let me know when you are done.**

A. (Complying.)

Okay.

**Q. Does this document refresh your recollection as to an incident or a complaint that you investigated that took place on November 11, 2009?**

A. Somewhat, yes.

**Q. At this time, McCaffrey was the subject of this investigation, right?**

A. No. Palaromo (phonetic) was.

**Q. But he was investigated?**

A. Yes.

**Q. And he was charged?**

A. Yes.

**Q. And you investigated that charge?**

A. Yes.

**Q. You substantiated that charge?**
A. Yes.
**Q. And at this time, he was an officer?**
A. Yes.
**Q. He was not a corporal?**
A. No.
**Q. And you mentioned that you saw him at a graduation ceremony?**
A. It was not so much a ceremony.
**Q. Was he promoted to corporal at that time?**
A. Sergeant.
**Q. And he since has been promoted to corporal, right?**
A. No. Corporal first, then sergeant.
**Q. You mentioned that this does refresh your recollection as to this incident somewhat, right?**
A. Yes.
**Q. You investigated Corporal McCaffrey for failure to report a use of force and unnecessary force?**

A. Yes.

Q. And you determined that he provided inaccurate and incomplete information during the internal affairs interview regarding an inmate complaint?

A. Yes.

Q. You testified at this proceeding?

A. Yes.

Q. And you were questioned about the steps that you took regarding your investigation?

A. It appears so, yes.

Q. You were questioned about the people you interviewed?

A. Yes.

Q. How many people you interviewed?

A. Yes.

Q. Whether you obtained statements from those people?

A. Yes.

Q. Photographs you took?

A. Yes.

Q. Medical records you reviewed?

A. Yes.

Q. Interviews of Correction Officer McCaffrey?

A. Yes.

Q. And any other correction officers?

A. Yes.

Q. Based on those things that you investigated and you gathered and you reviewed, you determined that Officer McCaffrey made a false statement?

A. Yes.

Q. Sitting here today, do you believe that he did make false statements?

A. Yes.

Q. So you do believe that this decision by this arbitrator is incorrect?

A. Yes.

Q. Did you read the part of this decision where it states that 35 inmate witnesses were interviewed?

A. Yes.

Q. Did you personally interview 35 inmate witnesses?

A. I don't recall.

- R. PIERCE -

Q. You obtained statements from some of them, right?

A. Yes.

Q. Would you agree with me that you based your conclusion that Corporal McCaffrey made a false statement in that he failed to report inappropriate force in violation of sheriff's office policy and procedures based on the medical evidence and photos of a bruise on an inmate that you reviewed, inmate statements that they observed an officer kick the inmate, and the statement by an additional inmate that heard the inmate yell "ouch"?

MS. BEN-SOREK: Objection to form.

You can answer.

A. Yes.

Q. After this incident, did you ever speak with Corporal McCaffrey?

A. No.

Q. Have you ever seen him after this?

A. Yes.

- R. PIERCE -

**Q. You saw him at the ceremony?**

A. I've seen him around the jail. Yes.

**Q. We're going to switch gears.**

**I want to direct your attention to October 2021. Do you recall being contacted regarding a complaint made by Robert Jeffery Johnson against Corporal McCaffrey and Correction Officer Benson?**

A. I do.

**Q. Do you recall the exact date when you were contacted?**

A. I do not.

**Q. Do you know who you were contacted by?**

A. I believe my lieutenant at the time informed me that we needed to go speak to him.

**Q. Were you told anything else by your lieutenant?**

A. Just that he was assaulted by staff and claimed that he was sexually assaulted.

**Q. Did you have a reaction when**

**you were told that?**
A. No.
**Q. Who was your lieutenant?**
A. Lieutenant Kreutz.
**Q. Is that the last name?**
A. Yes. K-R-E-U-T-Z.
**Q. Do you know the first name?**
A. Joseph.
**Q. His title is lieutenant rank?**
A. Yes.
**Q. Is he currently your superior?**
A. No. He's currently retired.
**Q. When did he retire?**
A. Two years ago, a year and a half ago.
**Q. Who is your superior now?**
A. Lieutenant Curatolo.
**Q. Can you spell the last name?**
A. C-U-R-A-T-O-L-O.
**Q. I have to go back one second.**
**Your current title is investigator corporal, right?**
A. Yes.
**Q. When were you promoted to**

**corporal?**

A. October 24, 2022.

**Q. With that role, did you assume new and different job responsibilities as from investigator?**

A. Yes.

**Q. What were they?**

A. Supervisory capacity.

**Q. Who do you supervise?**

A. I supervise another corporal and two other investigators.

**Q. Specifically, what are your supervisory duties?**

A. I triage cases that come in and out, assist in setting up interviews with staff members and inmates. I also do casework myself. Attendance. Stuff like that.

**Q. What do you mean by "triage cases"?**

A. When cases come in, complaints come in, I hand them out to whatever officer is up -- investigator, I mean.

**Q. Did you have to do anything in**

order to be promoted to corporal?

A. Civil service test.

Q. Over the course of your career have you ever received any awards or anything like that?

A. No.

Q. Any condemnations?

A. No.

Q. Are there awards and condemnations given at the Nassau County Sheriff's Office?

A. Yes.

Q. The internal affairs unit, currently how many people make up that unit?

A. Currently, there's five.

Q. At the time of this incident in October of 2021, how many were there?

A. I don't recall, but it was more than five.

Q. Less than ten?

A. Yes.

Q. That less than ten people, what is the makeup? What is the chain of

- R. PIERCE -

command there?

A. Typically, it would be a commanding officer, a deputy commanding officer, either a deputy undersheriff that we're assigned or a captain, and then however many number of investigators depending on how many we have at the time.

Q. Let's go back.

You were contacted by Lieutenant Kreutz about a complaint made against Corporal McCaffrey and CO Benson in October of 2021, right?

A. Yes.

Q. And you were aware that the complaint involved a use of force and sexual assault?

A. Yes.

Q. Based on the complaints that were happening at this time, how many other complaints other than this one did you have knowledge of a correction officer allegedly putting a finger up an inmate's rectum?

A. I would be comfortable saying three.

**Q. When this came in, was this the fourth?**

A. I don't know if that was the fourth. They all happened around the same time.

**Q. When this one came in, did you find it odd?**

**MS. BEN-SOREK: Objection.**

**If you understand it, you can answer. If you understand what the term "odd" means.**

A. I mean, I find it odd that somebody would stick a finger in an inmate's rectum.

**Q. Agreed. But my question is: Did you find it out of the ordinary that there was a cluster of at least three complaints at the time that this complaint from Robert Jeffrey Johnson came in?**

A. No.

**Q. Why not?**

A. It happens every couple of years.

**Q. So it happened prior to 2019?**

- R. PIERCE -

A. It might have. I can't give you the specific date. We've had complaints over the years where the inmates allege that.

**Q. How long have you been employed with the sheriff's office?**

A. 23 years.

**Q. In those 23 years, you have knowledge that there has been more than ten complaints that a correction officer stuck a finger up an inmate's rectum?**

A. I wouldn't say more than ten, but I would say around maybe that number.

**Q. But from 2019 to today, you testified there might have been at least ten?**

A. I don't recall it happening prior to that very much, but there was a time when it was prevalent.

**Q. Is it still your testimony that at the time Robert Jeffrey Johnson's complaint came in, that you did not find it out of the ordinary that this was the third or fourth complaint made of a correction**

**officer sticking a finger up an inmate's rectum?**

A. That's correct.

**Q. When you received the complaint, what did you do next?**

A. I believe Lieutenant Kreutz arranged to have him brought to the law library so we could interview him. Myself and Lieutenant Kreutz went to the law library to interview him where I interviewed him and obtained photographs and had him sign a release form.

**Q. You personally took the photographs?**

A. Yes.

**Q. This interview was recorded?**

A. Yes.

**Q. And Lieutenant Kreutz was present?**

A. Yes.

**Q. Do you recall, based on your independent recollection, what Robert Jeffrey Johnson's version of events were?**

A. He had stated that the officers

- R. PIERCE -

had thought somebody on the tier was smoking and that they thought it was him. That they went down the tier, handcuffed him, and brought him out into the lock box area where he was questioned, and an officer then punched him in the face, he fell to the floor where he was repeatedly kicked and punched in the face and about his body.

He then said he was laying on his stomach and an officer then pulled down his pants and put a glove on and inserted a partial finger in his rectum.

**Q. That allegation by Mr. Johnson that someone -- was he on his stomach?**

A. That's what he said.

**Q. And that his pants were pulled down and a correction officer stuck a partial finger up his rectum, right?**

A. Yes.

**Q. Based on those previous ten complaints that you're aware of of a correction officer sticking a finger up someone's rectum, did that involve a**

- R. PIERCE -

**similar story?**

A. No.

**Q. Do you remember what other allegations were made in those ten complaints about a finger being stuck up an inmate's rectum?**

A. I want to say that they're pretty much all involved with a use of force or -- I think two times an inmate was caught with contraband and made the allegation.

**Q. So the complaints were similar to Robert Jeffrey Johnson, right?**

A. Yes. I would say that's fair.

**Q. So you interviewed Robert Jeffrey Johnson, obtained photographs, and then you obtained a release to obtain his medical records?**

A. Yes. I believe he was in route to the medical center after we spoke to him.

**Q. What did you do next?**

A. He went to the hospital, and then I then submitted the -- I believe it's the next day I submitted the release form

- R. PIERCE -

to the medical center or our medical records bureau, and then I waited for the medical records to be given.

**Q. Does the Nassau County Sheriff's Department have any specific form that should be filled out that involves an unusual occurrence?**

A. I believe there is -- that, I can't attest to. I don't know.

**Q. Were you specifically told that you were assigned to investigate this complaint?**

A. I think I might have been the only one there that day.

**Q. So if you're the only investigator there that day, the job is on you?**

A. Pretty much. Yes.

**Q. Do you recall what time of the day Robert Jeffrey Johnson said this happened?**

A. I don't.

**Q. Do you recall where he claimed it happened?**

A. On B2, which is the new admit floor.

**Q. Do you remember specifically where on B2?**

A. He said the lock box area.

**Q. What is the lock box area?**

A. The lock box area -- there's four tiers on each floor, so the lock box controls the individual cells. It's like a lock box. You open it and it has cell numbers on there and you turn which cell you want open. When the inmates come off tier, that's where they would go first before they went out the lobby.

MS. BEN-SOREK: Would it be fair to say that it's a corridor?

THE WITNESS: Corridor would be fair, yes.

**Q. Can you please list everyone that was involved and participated in this investigation?**

A. It was myself, Lieutenant Kreutz that day, and I don't recall who I did the staff interviews with.

- R. PIERCE -

**Q. But you did do staff interviews with someone?**

A. Yes.

**Q. Were you given any instructions by anyone as to how to conduct this specific investigation?**

A. No.

**Q. Where did we leave off? We said that you were waiting for medical records, right?**

A. Yes.

**Q. While you were waiting for medical records, did you take any other steps with respect to the investigation?**

A. I looked to see if there were any reports generated, which there was not. Then I waited for the medical records. I reviewed the medical records. I spoke to the SVU unit to see if they had performed a rape kit at the hospital, in which they told me they did not because the officer allegedly had a glove on.

Once I received that information, the next step was I

interviewed Officer McCaffrey and Officer Benson.

**Q. When you say the "SVU unit," that's the Special Victims Unit for the Nassau County Police Department?**

A. Yes.

**Q. Why does the SVU unit investigate this complaint of sexual assault?**

A. It is my belief, or my understanding, that the medical center is obligated to notify them of any sexual complaints that they have.

**Q. Do you recall when you got the use of force package in this specific case?**

A. I don't recall there being one.

**Q. You mentioned a use of force package. Would that be the use of force report?**

A. If there was an actual documented use of force, the staff member is required to write a report. This was not a documented use of force.

**Q. Typical cases, there may be a**

- R. PIERCE -

**delay in interviewing a correction officer while you wait for the use of force package, right?**

A. Yes.

**Q. Is there any reason why there would be a delay in you interviewing a correction officer?**

**MS. BEN-SOREK: Objection.**

**You can answer.**

A. Other than platoon scheduling, union availability, no. We all have many cases that we're working on simultaneously.

**Q. You said, union availability?**

A. Yes.

**Q. What does that mean?**

A. Staff members have to have a union representative present when we interview them.

**Q. What was the other incident you mentioned?**

A. Officers are in different platoons, so they work different days. Depending on if they work 4:00 to 12:00, 8:00 to 4:00, midnights. It's not

- R. PIERCE -

always -- it all really depends on the union availability.

**Q. So you're saying it really just depends on union availability and your awaiting of the use of force package?**

A. Yes. Or if the District Attorney is involved at all.

**Q. Was the District Attorney involved in this case?**

A. I believe they were after the fact.

**Q. They were involved after you rendered a decision?**

A. Yes.

**Q. Did they ever contact you?**

A. I believe they requested a copy of my case file. That was pretty much it.

**Q. Did you send it to them?**

A. Yes.

**Q. Did a District Attorney ever interview you personally?**

A. No.

**Q. Are you aware if a District Attorney interviewed anybody with respect**

- R. PIERCE -

to this case?

A. I am not aware.

Q. Did you request any documents other than medical records in this case?

A. No.

Q. Do you know how long your interview with Robert Jeffrey Johnson was?

A. No.

Q. Was it more than five minutes?

A. Sounds right.

Q. More than ten minutes?

A. I don't think it was more than ten minutes.

Q. So around ten minutes?

A. Around ten minutes.

Q. During that interview, did you keep any handwritten notes?

A. No.

Q. Did you ever go to the lock box area to investigate Robert Jeffrey Johnson's complaint?

A. No.

Q. Why not?

A. I didn't feel it necessary.

- R. PIERCE -

**Q. Did you feel it was necessary to take any pictures of the lock box area?**

A. No.

**Q. Why not?**

A. I did not feel it was pertinent to the case.

**Q. Do you recall where plaintiff was housed on that date?**

A. No.

**Q. Did you determine if there was any potential inmate witnesses?**

A. During that time, because of the COVID protocol and the fact that it happened in the lock box area, there would have been no witnesses.

**Q. So you made no effort to speak with any inmates that were housed near or around Robert Jeffrey Johnson?**

A. No.

**Q. You mentioned COVID protocols. What is that?**

A. I believe at the time inmates were only allowed out for a certain amount of time during the day by themselves. And

I believe the tier that he was on at the time was on quarantine where nobody could leave the tier other than a medical emergency?

**Q. Why not?**

A. Because of COVID. If they were on quarantine, somebody on that tier would have had COVID.

**Q. Were these COVID-19 protocols in writing?**

A. That, I don't know.

**Q. You don't know?**

A. I don't know.

**Q. Other than Officer Benson and Corporal McCaffrey, did you identify or search if there were any other correction officer witnesses?**

A. I believe Officer -- there might have been other officers assigned to the floor, but when he had stated in his deposition that the officer -- he mentioned Officer Benson, and that when he went down the tier, he would have went down with the corporal, which would have been Corporal

- R. PIERCE -

McCaffrey, and that's why I interviewed him.

**Q. What do you mean, he went down the tier?**

A. They were saying -- according to Mr. Johnson's statement, he said they came down the tier to handcuff him.

**Q. It's not normal that for you, as an investigator, to interview any potential correction officers that were assigned to that area on that date?**

A. Depending on the allegations, we do, yes.

**Q. So why in this case did you not interview any correction officers that were assigned in and around this area that day?**

A. Because the allegations that Mr. Johnson had alleged were inconsistent with the medical findings and photographs that I had obtained.

**Q. We'll get there in a second.**

**Did you make any attempt to collect any evidence at all in the case?**

A. No.

**Q. You mentioned that Robert**

- R. PIERCE -

Jeffrey Johnson stated that someone had a glove -- a correction officer had a glove when he allegedly put a finger up his rectum. Did you determine if there were any gloves in any garbage cans or anything like that?

A. I did not.

Q. Did you make any attempt to do so?

A. No.

Q. Did you make any attempt to identify if this incident may have been captured on video surveillance?

A. There is no video surveillance.

Q. There is no video surveillance at all?

A. No.

Q. Not in the building at all?

A. No.

Q. Do you know why that is?

A. I do not.

Q. Do you find that odd?

MS. BEN-SOREK: Objection.

You can answer.

A. I mean, they haven't been there

- R. PIERCE -

since I started, so it's normal to me.

**Q. I showed you Plaintiff's Exhibit 2. I'll pull it up again.**

**In this case, this incident happened on November 11, 2009, right?**

A. Yes.

**Q. In this case, Corporal McCaffrey told you that he did not witness a correction officer use force on an inmate?**

A. Yes.

**Q. And you interviewed Corporal McCaffrey in this case involving Robert Johnson?**

A. Yes.

**Q. And he told you that no incident occurred?**

A. Yes.

**Q. So would you agree with me that these two incidents are somewhat similar?**

A. No.

**Q. Why not?**

A. The allegations are different.

**Q. Would you agree to Corporal McCaffrey's position that there was no use**

of force ever committed on the inmate?

MS. BEN-SOREK: Objection to form.

You can answer.

A. I'm sorry, can you repeat that?

Q. Would you agree with me that both of these cases share a similarity because Corporal McCaffrey stated that he did not witness any use of force by a correction officer on an inmate?

A. Yes.

Q. In this case, do you recall interviewing at least 30 inmate witnesses?

A. I don't recall the amount that I interviewed. No.

Q. But you would say it was above ten?

A. According to the paperwork, yes.

Q. What is the reason why you didn't interview any potential, or attempt to identify any potential inmate witnesses in the case involving Robert Jeffrey Johnson?

A. Because it didn't happen in an

- R. PIERCE -

open housing area, or it did not happen on the tier. If it would have, I would have interviewed witnesses.

**Q. According to Robert Jeffrey Johnson, do you recall that he claimed that he was taken out of his cell by Officer Benson and Corporal McCaffrey?**

A. Yes.

**Q. And he gave you a specific time that that happened?**

A. I don't recall the exact time.

**Q. But he did give a time?**

A. I don't recall.

**Q. Do you recall if the tier that he was on was occupied by other inmates?**

A. Yes, it was.

**Q. At that time, they were on COVID protocols?**

A. Yes.

**Q. If they had COVID-19 protocols, an inmate was allowed out of his cell for a half hour a day?**

A. That's correct.

**Q. By himself?**

- R. PIERCE -

A. As far as -- I'm not a hundred percent sure on that, but I think it was a half hour a day. Yes, by themselves.

**Q. So if he was out, the other inmates have to be in their cells, right?**

A. Yes.

**Q. Based on the fact that there was COVID-19 protocols, an inmate would have been let out of his cell at least one time that day?**

A. I don't know if it's the same for a tier that's on quarantine.

**Q. If Robert Jeffrey Johnson was let out of his cell by Corporal Benson and McCaffrey and there were other inmates on the tier, it could be possible that other inmates saw McCaffrey and Benson take Robert Jeffrey Johnson out of his cell on that date?**

A. Yes.

**Q. And that could have corroborated part of his version of events, right?**

A. Yes.

**Q. But you made no effort to do**

**that?**

A. I did not.

**Q. Do you recall when you interviewed Corporal McCaffrey?**

A. I don't recall the exact date. I don't think it was very far after this incident occurred.

**Q. Would you say more than a month?**

A. More than a month. Yes.

**Q. More than two months?**

A. I would say two to three months.

**Q. You don't think that a two- to three-month delay in interviewing a correction officer is a long time?**

**MS. BEN-SOREK: Objection.**

**You can answer.**

A. I don't in this instance because I did not believe that due to my experience that the allegation was consistent with -- the amount of force that Mr. Johnson says was used on him was consistent with the injuries that he received.

**Q. My question is, do you believe**

that in an approximate two-month delay in interviewing a correction officer with respect to an interview of a complaint is a long time?

A. No.

MS. BEN-SOREK: Objection.

You can answer.

A. No.

Q. Do you think in a two-month delay that memories could fade?

A. Yes.

Q. So you don't think that there's any harm in waiting two months to interview a correction officer?

MS. BEN-SOREK: Objection.

You can answer.

A. Unfortunately, it's hard to do them immediately.

Q. My question is: You don't think that there's any harm at all in waiting two months to interview a correction officer?

MS. BEN-SOREK: Objection.

You can answer.

- R. PIERCE -

A. Yes.

**Q. There is harm?**

A. Yes.

**Q. When you interviewed Corporal McCaffrey, who was present?**

A. Aside from myself, Corporal McCaffrey, and the union representative. I don't recall who I did the interview with.

**Q. Do you recall how long the interview was?**

A. Probably five minutes, maybe a little less.

**Q. So it took more than two months, would you agree, to interview Corporal McCaffrey for a less-than-five-minute interview?**

A. Yes.

**Q. Did you take any handwritten notes with respect to the interview with Corporal McCaffrey?**

A. No.

**Q. Can you explain why there was a two-month delay in your interview of Corporal McCaffrey?**

- R. PIERCE -

A. Other than having other cases to work, availability of people, there is no other answer.

**Q. When did you interview Correction Officer Benson?**

A. I believe it was around the same time.

**Q. Approximately, two months after the complaint was made by Robert Johnson?**

A. Yes.

**Q. Who was present during your interview with Correction Officer Benson?**

A. I don't recall.

**Q. Do you know how long your interview with Correction Officer Benson was for?**

A. Approximately, five minutes or so.

**Q. Did you keep any handwritten notes with your interview with Correction Officer Benson?**

A. No.

**Q. Can you explain why there was a delay in two months in your interview of Correction Officer Benson?**

- R. PIERCE -

A. No.

Q. So you waited two months for a five-minute interview of Correction Officer Benson with respect to the complaint by Robert Johnson?

MS. BEN-SOREK: Objection to form.

A. Yes.

Q. Have you ever had a situation where you are permitted to interview a subject correction officer regarding an inmate complaint over the phone?

A. No.

Q. Is that permissible or not permissible?

A. I don't know.

Q. Did you speak with Correction Officer Benson or Corporal McCaffrey's union representatives prior to their interviews?

A. Other than telling them that they had an allegation against them and we needed to interview them, no.

Q. Do you recall the specific date

**of incident by Robert Johnson?**

A. I don't.

**Q. What was your conclusion with respect to the investigation?**

A. I closed it not sustained.

MR. BRADLEY: Off the record.

(Whereupon, a discussion was held off the record.)

(Whereupon, a recess took place.)

**Q. Mr. Pierce, when you received the complaint of a sexual assault that Robert Johnson claimed, when you initially received the complaint, did you believe that it was not true?**

A. Anything can be possible.

**Q. But did you have a feeling that you didn't think it was true?**

A. Yes.

**Q. Why?**

A. The other ones that I've investigated were not sustained. Sometimes they just make things up when they don't get their way.

**Q. But you would agree with me**

that as an investigator, it's important for you to keep an open mind?

MS. BEN-SOREK: Objection to form.

You can answer.

A. Yes, but it doesn't mean it affected my case work.

Q. But you would agree that it's important for you to keep an open mind, is my question.

A. Yes.

Q. And to be fair?

A. Yes.

Q. To be fair to the inmate?

A. Yes.

Q. And the correction officer?

A. Yes.

Q. You would agree that your failure to keep an open mind could result in an inadequate investigation?

A. Yes.

Q. And your failure to be fair could result in the wrong result?

A. Yes.

- R. PIERCE -

Q. When you received the complaint from Robert Johnson that the officers used force on him, did you believe or not believe that complaint when it first came in?

A. I believed that it was possible use of force.

Q. Did you believe that it was more likely than not?

A. No.

Q. I'm showing you what is going to be marked as Plaintiff's Exhibit 3.

A. Okay.

Q. It's Bates stamped Nassau County 366 to 491.

You said you reviewed this, right?

A. Yes.

Q. This is your investigation file?

A. Yes.

Q. It's your entire investigation file?

A. Yes.

Q. Did you prepare this document?

- R. PIERCE -

A. Yes.

**Q. Do you know where this document is stored?**

A. Yes.

**Q. Who is responsible for storing this document?**

A. Anybody in the unit puts it away.

**Q. Where is it stored?**

A. It's stored in a locked file cabinet.

**Q. Where?**

A. Outside of my office.

**Q. Why is it locked?**

A. There's confidential material in it.

**Q. Is this document made in the regular course of the sheriff's department business?**

A. This particular -- the first page?

**Q. The entire document.**

A. Yes.

**Q. This is your investigation file?**

- R. PIERCE -

A. Yes.

Q. And it's the regular practice of the sheriff's office to make this record?

A. Yes.

Q. Was it made at or near the time of the transaction or occurrence recorded therein within a reasonable time thereafter?

A. Yes.

Q. And you compiled and put this information into the file?

A. Yes.

Q. I want to look at Bates stamp 367, the second page.

A. Okay.

Q. Is that your handwriting?

A. Yes.

Q. You wrote this?

A. Yes.

Q. The first page on 366, you notice it's highlighted?

A. Yes.

Q. Did you do that?

- R. PIERCE -

A. No.

**Q. Who did that?**

A. There's a highlight on our -- on the form itself on our computer, it's highlighted.

**Q. Do you see these signatures on Bates 367?**

A. Yes.

**Q. What is the signature for SBI investigator?**

A. That's me.

**Q. That's your signature?**

A. Yes.

**Q. It says, "Reviewed by SBI commanding officer." Who is that signature?**

A. At the time, that was Corporal Condell.

**Q. Why did he sign this?**

A. She.

**Q. She.**

A. She was the commanding officer at the time.

**Q. Can we get a first name for her?**

- R. PIERCE -

A. Michelle.

**Q. The last signature here it says, "SBI captain." Who is that?**

A. That would be Captain Donohue.

**Q. Can you spell Donohue?**

A. D-O-N-O-H-U-E.

**Q. First name?**

A. Daniel.

**Q. Why did he sign this?**

A. Because he is the captain of SBI, so he's the final sign-off.

**Q. Did you ever have a situation where your commanding officer never agreed with your result?**

A. No.

**Q. So every time you wrote a report, they've always agreed with your result?**

A. I mean, it would be kicked back for grammatical errors or to add certain things.

**Q. But with respect to your findings, they've never taken an alternate view?**

- R. PIERCE -

A. Not that I can recall. No.

Q. If you look at 368, is that your handwriting?

A. Yes.

Q. Everything in here you prepared, there's not a dispute about that, right?

A. No.

Q. There are some medical records in here, right?

A. Yes.

Q. That's the stuff that you ordered and was given to you, right?

A. Yes.

Q. So 368 is your handwriting?

A. Yes.

Q. It says, "Date of incident October 11, 2021." Do you see that?

A. Yes.

Q. Is that an error?

A. It's possibly an error.

Q. As you sit here today, do you now know that this incident occurred on October 12, 2021, alleged incident?

- R. PIERCE -

A. I do now, yes.

**Q. Do you see where it says under "complaint," can you read that handwriting?**

A. Yes.

**Q. Please read it out loud.**

A. "Inmate Robert Johnson, CC number 2021001706 alleges he was assaulted and a CO inserted a finger in his rectum on 10/11/21."

**Q. What's the CC number?**

A. That's the inmate identification number.

**Q. Going down where it says "Action performed," what does that mean?**

A. That means that task that we performed.

**Q. What about the date?**

A. That's the date that we did this.

**Q. You see the first date?**

A. Yes.

**Q. What does that say?**

A. "10/12/21 received complaint from Lieutenant Kreutz. Responded to E-Law

- R. PIERCE -

Library. Audio deposition obtained. Photographs obtained. ARMR obtained. Sergeant Giron 3-4022 of NCPD SVU notified of inmate's allegations."

**Q. What is ARMR?**

A. Authorization for release of medical records.

**Q. Sergeant Giron, he's with the Nassau County Police Department?**

A. Yes. With the Special Victims Unit.

**Q. Does it say who notified them?**

A. No.

**Q. The next entry, can you read that with the date?**

A. "10/13/21. As per Sergeant Giron NCPD SVU, a rape kit was not conducted due to Inmate Johnson stating that the COs had gloves on."

**Q. Please read the next entry.**

A. "12/15/21. Audio deposition obtained from PO Thomas Benson."

**Q. Read the next one, please.**

A. "12/17/21. Audio deposition

- R. PIERCE -

obtained from Corporal Patrick McCaffrey. Case submitted for closure."

**Q. Do you see at the bottom it says "continued, yes or no"? Does that mean whether there's an additional page?**

A. Yes.

**Q. Are there any additional pages for this?**

A. No.

**Q. Looking at Bates number 369, do you see that document?**

A. Yes.

**Q. What is this document?**

A. That would be a staff lineup sheet.

**Q. What is a staff lineup sheet?**

A. It's where all the officers in the platoon are assigned to for that tour.

**Q. What is a tour?**

A. A tour is their tour of duty. They work 8:00 to 4:00, 4:00 to 12:00, midnight to 8:00.

**Q. It says the date in the top left corner. What is the significance of**

**that?**

A. That's the date that this lineup is for.

**Q. Did you pull this line up?**

A. Yes.

**Q. You requested it?**

A. I went in and obtained it from the control desk.

**Q. You see that there's certain entries here that look to be highlighted?**

A. Yes.

**Q. Who did that?**

A. I did.

**Q. Why did you do that?**

A. That was the staff that was assigned to B2 on that date where the incident happened.

**Q. You highlighted "Correction Officer Benson"?**

A. Yes.

**Q. Do you see that there is handwriting next to his name?**

A. Yes.

**Q. Did you do that?**

- R. PIERCE -

A. No.

Q. Do you see what it says? It says "sick."

A. Yes. It says, "Half sick 8 to 12."

Q. What does that mean?

A. It means he took a half sick day from the first half of the day.

Q. You see "Minerverni" at the bottom, right?

A. Yes.

Q. You highlighted that?

A. Yes.

Q. And you highlighted "J. Staib"?

A. Yes.

Q. And you highlighted "Vilatoro"?

A. Yes.

Q. And you highlighted "McCaffrey"?

A. Yes.

Q. Are these the officers that you identified as part of your investigation as being working in the B2 area on October 12, 2021 at the date and time --

A. Yes.

Q. -- that Robert Jeffrey Johnson

- R. PIERCE -

**claimed that the incident occurred?**

A. Yes.

**Q. If you look, it says in the overtime section Corporal McCaffrey. Why is he in the overtime category?**

A. He was on an overtime shift.

**Q. How do you get an overtime shift?**

A. I think there's a book that they put their name. If a post is open, they call and ask them if they want to work.

**Q. You see in the top right it says "Platoon 6"?**

A. Yes.

**Q. What does that mean?**

A. We have four platoons. Platoon 4, 5, and 6. This particular date, Platoon 6 was on 8:00 to 4:00. So Corporal McCaffrey would have been working overtime. He would have either been assigned Platoon 4 or 5, depending on who was on that day.

**Q. How many hours did McCaffrey work on that day? Do you know from this document?**

- R. PIERCE -

A. According to this document, it would have been eight.

**Q. It appears that you highlighted five correction officers, right?**

A. Yes.

**Q. But you only interviewed Benson and McCaffrey, right?**

A. Yes.

**Q. You never interviewed Staib?**

A. No.

**Q. Vilatoro?**

A. No.

**Q. Or Miniverni?**

A. No.

**Q. But you did identify as part of your investigation that they were working in the B2 area on the date and time Robert Jeffery Johnson claims that this incident occurred?**

A. Yes.

**Q. What is the security post assignment? I'm sorry if I missed that.**

A. It's like a roster of where they're assigned to for the day.

- R. PIERCE -

**Q. Do you know what a security check is?**

A. A security check?

**Q. Yes.**

A. No.

**Q. Did you identify Correction Officer Vilatoro as a potential witness?**

A. I identified him as being assigned to the floor, so yes.

**Q. Did you identify Correction Officer James Staib as being a potential witness?**

A. Yes.

**Q. Did you identify Correction Officer Miniverni as a potential witness?**

A. Yes.

**Q. I'm going to scroll down. I'm going to focus your attention on Bates stamp 477 to 481. It's in the back. It's the case narrative.**

A. Okay.

**Q. Did you review 477 to 491?**

A. Yes.

**Q. You see on 477 it states "case**

narrative." What does that mean?
A. That's just our report.
Q. So is this the final report that you would prepare?
A. Yes.
Q. And you prepared this report?
A. Yes.
Q. Did anybody assist you in preparing this report?
A. No.
Q. Do you have any drafts of this report?
A. No.
Q. So this is the final one?
A. This is the only one. Yes.
Q. The superiors that we talked about on the first page of the document, they reviewed your narrative?
A. They would have reviewed the whole case file?
Q. This entire document?
A. Yes.
Q. So they relied on you in either affirming or disaffirming their determination?

A. Yes.

**Q. Do you know if your superiors actually reviewed this file?**

A. I do not know.

**Q. On 366 it says "Reviewed by Deputy Undersheriff" and it's not signed. Do you know why it's not signed?**

A. We didn't have a deputy undersheriff at the time.

**Q. Is the deputy undersheriff supposed to sign off on this?**

A. If there is a deputy undersheriff that has command of Internal Affairs, yes.

**Q. So a deputy undersheriff didn't have command of internal affairs at this time?**

A. I don't believe we had any deputy undersheriffs at that time, or if we did, we did not have one assigned to Internal Affairs.

**Q. Going back to 482, the photos. Do you recognize the photos?**

A. I do.

- R. PIERCE -

**Q. Did you take them?**
A. Yes.
**Q. Do you know when you took them?**
A. I took them the day I interviewed him, I believe. Yes, the day that I interviewed him.
**Q. Looking at 482, you don't dispute that that's a bruise, right?**
A. No.
MS. BEN-SOREK: Can you identify where on the photo?
MR. BRADLEY: There's a bruise on the left side of his cheek below the eye.
**Q. Do you identify that bruise to be circular in nature somewhat?**
A. It appears circular, yes.
**Q. Based on your training and experience, when you saw the bruise, did you believe that it was consistent with a strike to the face?**
A. No.
**Q. Why not?**
A. Due to the circular nature, it

appeared more of a -- I didn't see any swelling and the amount of times he said he was kicked and punched in the face, he would have had more severe injuries than that.

**Q. I just want to focus on the bruise to the left side of the face below the eye on the cheek.**

A. Okay.

**Q. You did not believe that this was from a hand strike?**

A. I did not, no.

**Q. Or any other type of physical strike?**

A. No.

**Q. What did you do believe it was from?**

**MS. BEN-SOREK: Objection.**

**You can answer.**

A. I did not know what it was, but in my experience, it did not appear to be from a closed fist or a kick.

**Q. I want you to look at 484. Do you see that photo?**

- R. PIERCE -

A. Yes.

Q. Is it your testimony that you don't observe any swelling to the left side of his face below the eye on the check?

A. I do not see any swelling.

Q. Does there appear to be trauma to the left side of his face?

A. Yes.

Q. Looking at 490, do you observe that there's any swelling to the left side of Mr. Johnson's face below the eye on the cheek?

A. It does appear to be slight swelling in this photo, yes.

Q. So is it your testimony that you observed, based on your training and experience, a bruise accompanied by swelling that is indicative of a physical strike?

MS. BEN-SOREK: Objection.

You can answer.

A. It's consistent with something. Not necessarily a strike.

Q. But it could be consistent with

a punch?

A. Yes.

Q. It could be consistent with a hand strike, right?

A. Could be, yes.

Q. Foot strike?

MS. BEN-SOREK: Objection.

Q. Yes or no?

MS. BEN-SOREK: You can answer.

A. Can you repeat it?

Q. It could be consistent with a foot strike?

A. I don't believe so, no.

Q. Obviously, a hand strike?

A. Possible, yes.

Q. It's possible?

A. Yes.

Q. Looking at 491, do you notice if there's any redness to the back of his neck?

A. I don't see any redness. No.

Q. As you sit here today and you've reviewed the photographs of Robert Jeffrey Johnson's left side below the eye,

the bruising to his cheek, and you just testified to the swelling, do you think that it could be possible that this injury was sustained by a hand or punch to the face?

MS. BEN-SOREK: Objection. Speculation.

You can answer.

A. Possible.

Q. Do you recall if Robert Johnson claimed that he suffered any alleged strikes to the lower half of his body?

A. I don't recall that. No.

Q. Did you take any photographs of Mr. Johnson's lower half of the body?

A. No.

Q. Did you have a chance to read your summary of the audio deposition of Robert Johnson?

A. I did. Yes.

Q. And the summaries of the audio depositions contained on the case narrative for Officer Thomas Benson and Corporal McCaffrey?

- R. PIERCE -

A. Yes.

Q. I want to talk about your interview with Officer Thomas Benson.

Do you remember asking Correction Officer Benson if he had any issues with Inmate Johnson while he was housed in Correction Officer Benson's housing area?

A. I don't recall asking him that.

Q. Do you recall if Correction Officer Benson told you that he didn't have any problems with Johnson, he was just mad about being quarantined?

A. Yes, I do recall that.

Q. Is that statement somewhere summarized in the summary of the audio deposition of Thomas Benson?

A. No.

Q. Why not?

A. Because that is in sum and substance. It is not the word-for-word interview.

Q. Did you believe that it was relevant that Johnson was mad about being

- R. PIERCE -

quarantined?

A. It is relevant, yes.

Q. Why?

A. Anybody would be mad about being quarantined.

Q. Do you think that it was relevant for your investigation?

A. No.

Q. Why not?

A. I just didn't think it was relevant.

Q. Do you recall asking Correction Officer Benson during your interview, "Did you have any issues with him smoking on the tier?"

A. I don't recall.

Q. Do you remember if Correction Officer Benson ever told you, "We couldn't pinpoint who was smoking on the tier. It was from a multitude of inmates, but we could never pinpoint the one guy"?

A. I don't recall. No.

Q. Do you know if anything like that is summarized in the audio deposition

- R. PIERCE -

of Thomas Benson?

A. Does not appear to be. No.

Q. Do you believe that that fact, if you recall it being told to you would be relevant to your investigation?

A. No.

Q. Why not?

A. It's hard to pinpoint who is smoking because we don't have a firsthand view.

Q. Right. But Robert Johnson claimed that there was an issue potentially on the tier about smoking, right?

A. Yes.

Q. As you're sitting here right now, do you remember if Correction Officer Benson ever told you that he told you there was an issue with smoking going on on the tier?

A. Yes.

Q. He told you that?

A. Yes.

Q. That corroborated part of Robert Johnson's version, right?

- R. PIERCE -

A. Yes.

Q. Do you recall Correction Officer Benson saying that he believed it was coming from the middle of the tier?

A. I don't recall his exact words. No.

Q. Do you believe that that could be relevant to your investigation?

A. Yes.

Q. But it's not summarized in this case narrative for the audio deposition of Thomas Benson?

A. No.

Q. It's not mentioned at all?

A. No.

Q. Do you ever recall Correction Officer Benson saying that smoking came from the middle of the tier. That was it. And I think even before they quarantined, the smoking stopped.

A. I don't recall that. No.

Q. Is that included in the audio deposition summary on your case narrative?

A. No.

- R. PIERCE -

**Q. Did you ever come to learn where plaintiff was housed on that tier?**

A. I believe it was in 9 cell.

**Q. 9 would have been in the middle of the tier, correct?**

A. Yes.

**Q. Do you think that that fact would have been relevant to your investigation?**

A. Yes.

**Q. But it was not included in this case narrative?**

A. No, it was not.

**Q. Do you recall that Correction Officer Benson told you that was COVID-19 protocols on the date of the incident?**

A. I do recall him saying that, yes.

**Q. Do you know if an inmate would have been allowed out for a half an hour if there were COVID-19 protocols?**

A. I believe that was the procedure, but I'm not a hundred percent sure.

- R. PIERCE -

**Q. Based on what you can remember, if they were allowed out a half hour, it was only one inmate at a time?**

A. From what I remember, yes. In the B building, I believe that's what the protocol was.

**Q. So in the B building, where would they go? They would just go right outside the cell in that corridor area?**

A. Yes. They would be able to go up and down the tier, take a shower, make a phone call.

**Q. Do you know how often a correction officer should be checking on inmates on the tier?**

A. In the B building, it's every 15 minutes.

**Q. Would that be documented anywhere?**

A. Yes.

**Q. What would it be documented in?**

A. It would be in a patrol logbook.

**Q. Did you obtain the patrol logbook in this case?**

- R. PIERCE -

A. I don't recall that I did.

MR. BRADLEY: I'm going to call for production of the patrol logbook for October 12, 2021.

MS. BEN-SOREK: I believe you have it. I don't have access to my computer here, but I think you have the logbook entries.

MR. BRADLEY: I looked for it. I couldn't find it.

I'm going to call for production on the record. We can talk about it later.

**Q. Do you recall that Robert Johnson complained that either Correction Officer Benson of Corporal McCaffrey made several racial statements regarding his African American background?**

A. Yes.

**Q. Was Benson and McCaffrey investigated for those statements?**

A. Yes.

**Q. Did you make a conclusion about whether or not those statements occurred?**

A. Yes.
Q. What were they?
A. Not sustained.
Q. On 480, it begins your conclusion. Did anywhere in your conclusion say anything about claims of racial discrimination?
A. No.
Q. We did identify on the sheet -- was it the security check sheet?
A. Yes.
Q. And you highlighted that there were various --
A. The lineup sheet?
Q. The lineup sheet.
A. Yes.
Q. You identified and highlighted that there was various correction officers that were working on the date and time of the alleged incident as claimed by Robert Johnson?
A. Yes.
Q. And Robert Johnson claimed that there was various racial slurs being yelled

- R. PIERCE -

at him in the lock box area?

A. Yes.

Q. Do you think that it could be possible that a correction officer working in that area could have heard those statements?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

Q. But you didn't interview anyone else other than Benson and McCaffrey as far as correction officers go?

A. No.

Q. So you unsubstantiated the claim of physical assault, right?

A. Yes.

Q. You never unsubstantiated a claim about racial discrimination?

MS. BEN-SOREK: Objection.

You can answer.

A. Well, I closed the whole case not sustained, so the racial slurs would have been included in that.

Q. But it's your position that

- R. PIERCE -

this incident as claimed just never happened?

A. Yes.

Q. And you concluded that McCaffrey and Benson never had this type of interaction with Robert Johnson at all?

A. Yes.

Q. In your conclusion, it states on the bottom of 480 that "This investigation was unable to ascertain how or when this injury occurred. Although he did have a minor injury, it's not consistent with the amount of force that he alleged was used on him."

So you did confirm that he had an injury, right?

A. Yes.

Q. That was corroborated and substantiated by photographic evidence that was taken on the same day he alleged it happened?

A. Yes.

Q. He claimed he was punched to the left side of the face?

- R. PIERCE -

MS. BEN-SOREK: Objection to the prior question.

I don't think it was established that photographs were taken on the same day the incident allegedly occurred.

Q. Do you recall when you took the photos?

A. From the looks of where the photos are taken, I believe it's the day that I interviewed him.

Q. You interviewed him on October 12th?

A. Yes.

Q. And Robert Jeffrey Johnson claims that the incident occurred on October 12th?

A. It happened the night before, but he didn't make the complaint until he went to medical.

Q. But he claims that this happened on October 12th, right?

A. Yes.

Q. So you're saying you took the photos on October 13th?

- R. PIERCE -

A. I believe we spoke to him on the 13th. That's what the time stamp on the photos say.

**Q. So the photos would have been taken on the 13th, you believe?**

A. Yes.

**Q. What you have is you found that he had a bruise to the left side of his face at least a day after he claimed this happened?**

A. Yes.

**Q. He claimed that he was punched to the left of the face?**

A. Yes.

**Q. You testified that it could be possible that that bruise was from a physical strike to the face?**

A. Yes.

**Q. And you have medical records that substantiate the injury?**

A. Yes.

**Q. But you reached a conclusion that because of the amount of force that he alleged was used, that this couldn't have**

happened?

A. Yes.

Q. But you do still think that something could have happened even though all you identified was a bruise to the left side of the face?

MS. BEN-SOREK: Objection.

You can answer.

A. It's possible. Yes.

Q. And the only reason why you didn't sustain this was because of the amount of force alleged by Robert Jeffrey Johnson was not believable to you?

MS. BEN-SOREK: Objection.

You can answer.

A. Yes.

MR. BRADLEY: Off the record.

(Whereupon, a discussion was held off the record.)

Q. Is there a procedure to be followed if an inmate alleges sexual assault by a correction officer, an internal procedure, from the sheriff's department?

- R. PIERCE -

A. I don't believe there is one in place, no.

**Q. Do you know who reported the alleged sexual assault to the Nassau County Police Department in this case?**

A. I don't recall exactly who. No.

**Q. Do you ever recall speaking with a Detective Okeno with regards to Robert Jeffrey Johnson's allegation that he was sexually assaulted?**

A. I don't know.

**Q. I'm showing you what will be marked as Plaintiff's Exhibit 4. It's Bates numbers 705 to 721.**

**Did you have a chance to review these pictures?**

A. No.

**Q. Can you please take a few moments and review them and let me know when you're done.**

A. Okay (complying).

Okay.

**Q. Did you recognize the photos?**

A. Yes.

- R. PIERCE -

**Q. What are they?**
A. It's the pictures of B2-D block.
**Q. Did you ever enter this tier before?**
A. Not since I have been in Internal Affairs.
**Q. Has it changed much since that time?**
A. I'm sorry?
**Q. Has it changed much since the last time you visited?**
A. Not at all.
**Q. Does the door still look like that?**
A. It does.
**Q. Do you see that on 711?**
A. Yes.
**Q. That's cell number 9, right?**
A. Yes.
**Q. What are we looking at in this picture? What is going on? What view is this?**
A. That would be looking down towards the tier.

- R. PIERCE -

**Q. If an inmate was out on COVID-19 protocols that was housed in this tier, would they really just be allowed to walk the tier here?**

A. Pretty much. Yes.

**Q. On 713, what are we looking at here?**

A. That looks like it's looking outward towards the exit.

**Q. What leads out of that exit?**

A. There's a shower area, a shower door, and then the tier door.

**Q. Is outside the tier door the lock box area?**

A. Yes.

**Q. Do you see the left side of the gates it looks to be a corridor, hallway?**

A. Outside the gates?

**Q. Yes.**

A. The bars?

**Q. Right.**

A. Yes.

**Q. What is that?**

A. That's the guard walk.

- R. PIERCE -

Q. Are there any cameras in that area?

A. No.

Q. You mentioned that a correction officer does checks every 15 minutes?

A. Yes.

Q. Would they do the checks in the guard walk?

A. Yes.

Q. Do you see 717? What are we looking at here?

A. That is looking in from the tier door.

Q. Is that door usually locked?

A. It always locked.

Q. 718, what is this?

A. That's the shower.

Q. I'm showing you Plaintiff's Exhibit 5, which will be marked as an exhibit. It's Bates stamp 659 to 671.

Do you see 659?

A. Yes.

Q. What is this a picture of?

A. That is the gate that leads to

- R. PIERCE -

the lock box area from the lobby.

**Q. What is in the lobby?**

A. The officers' control station, the elevators, stairwells.

**Q. Have you ever heard anything referred to as the bubble?**

A. Yes.

**Q. What is the bubble?**

A. That's the control area.

**Q. Is the bubble located in the lobby?**

A. Yes.

**Q. What does the bubble look like?**

A. It's pretty much an office with a door that could lock with bars on it and computers, bathrooms.

**Q. Can you see into it from the lobby or are there windows that allow you to see in?**

A. There is a window, but you can't see into it.

**Q. Is there usually a correction officer stationed in there at all times?**

A. Yes.

- R. PIERCE -

**Q. Does 661 depict the lock box area?**

A. Yes.

**Q. Did you come to learn that is where Robert Johnson claimed that this incident occurred?**

A. Yes.

**Q. You notice that there are two tables and chairs here on 659?**

A. Yes.

**Q. What is that?**

A. That's where the patrol books are.

**Q. That's where the recording of the checks are done?**

A. Yes.

**Q. Showing you Plaintiff's Exhibit 6, do you recognize this document?**

A. Yes.

**Q. What is it?**

A. It's a schematic of the tiers.

**Q. Have you seen this before?**

A. I have seen similar housing area ones. They're pretty much all the same.

- R. PIERCE -

Q. Did you come to learn that on the date of the incident as claimed by Robert Johnson that he was housed in the D tier?

A. Yes.

Q. And cell number 9?

A. Yes.

Q. Looking at this document, do you see that cell number?

A. Yes.

Q. Where does it appear to be located in relation to the other cells?

A. About in the middle.

Q. I'm showing you Plaintiff's Exhibit 7.

MR. BRADLEY: The exhibit that was Plaintiff's 6 was Bates number 1007.

I'm now showing the witness what is Plaintiff's Exhibit 7. That is Bates stamped number Nassau County 353 to 360.

Q. Did you ever take a look at these?

- R. PIERCE -

A. I have not.

**Q. Can you take a look at them and let me know when you're done?**

A. (Complying.)

Okay.

**Q. Do you recognize these documents?**

A. Yes.

**Q. What are they?**

A. It says, "Cell Census Tier."

**Q. Looking at 355 in the top right corner, it says "Date 3/30/23." What does that mean?**

A. That's the date that it was printed.

**Q. As well as the time, right?**

A. Yes.

**Q. It says, "User ID Krueger."**

A. That's who printed it.

**Q. Top left?**

A. Yes.

**Q. Was that your supervisor that you testified to?**

A. No.

**Q. The one that retired?**

- R. PIERCE -

A. No.

**Q. Who was that?**

A. Kreutz.

**Q. Who is Krueger?**

A. He assists with the legal unit.

**Q. It says, "Location." What does that mean?**

A. That's the housing area.

**Q. Is 355 of the D tier?**

A. It's B building, second floor, D tier.

**Q. What is the shift?**

A. That would be -- the corporals start at 6:00, so it would have been 0600 to 1600 shift.

**Q. Do you recall that when you investigated Benson and McCaffrey that you determined that they were present at the time and date alleged by Robert Jeffrey Johnson?**

A. Yes.

**Q. So if you look here, do you see Robert Jeffrey Johnson's name?**

A. Yes.

**Q. Where does it say he was located?**

A. B building. B2-D9.

**Q. It says, "Current location."**

A. "In-cell."

**Q. What does that mean?**

A. It would either say "in-cell" or "discharge." It just means he's at the jail.

**Q. How often are these reports generated? Is it made every tour or every shift?**

A. They are generated every tour.

**Q. What is the ICN number?**

A. That is the -- it's another type of inmate identification number. The ICN number would have been the first time that the inmate was incarcerated at the jail. They get a new CC number every time they're here, but the ICN number never changes.

**Q. The CC number is also an inmate identification number?**

A. Yes.

- R. PIERCE -

**Q. Looking at this document, 355, Robert Johnson was surrounded by other inmates on the tier, right?**

A. Yes.

**Q. And there were over ten inmates there?**

A. Yes.

**Q. What time does this mean he was in his cell?**

A. I'm not really sure. I don't know.

**Q. Do you see the time in the middle of the page? What is the significance of that?**

A. It has something to do with the way you print it. I'm not a hundred percent sure what that time means.

**Q. We have another one on 355. Do you know why there would be two on the same date on October 12, 2021?**

A. It looks like one was for the morning tour and one was for the night tour.

**Q. Which one was this for?**

- R. PIERCE -

A. That would be for the 4:00 to 12:00, the night tour.

**Q. We have another one on 356. It's on the same date, October 12, 2021, right?**

A. Yes.

**Q. Which is this one for?**

A. That would be the midnight tour.

**Q. Robert Johnson's name isn't mentioned here?**

A. No.

**Q. Do you know why that is?**

A. He must have been moved off the tier.

**Q. At the time this happened, this would have been after the incident that he claimed, right, the time?**

A. Yes.

**Q. We have another one on 358. This one has a different location, right?**

A. Yes.

**Q. Do you see the name Clifton D. Woods?**

- R. PIERCE -

A. Yes.

Q. Do you recognize that name?

A. No.

Q. Do you recall that when you interviewed Robert Johnson, did he ever tell you that there was a witness to the incident?

A. I don't recall.

Q. Did he ever identify to you that there was a witness named Clifton Woods?

A. I don't recall him saying that.

Q. Do you think it's possible that he did tell you that?

MS. BEN-SOREK: Objection.

Anything is possible.

Speculation.

You can answer.

A. Possible. Sure.

Q. But you don't recall whether or not he told you --

A. No. I don't.

Q. I'm just going to finish the question.

**- R. PIERCE -**

**Do you recall whether or not he told you that Clifton Woods was a witness to the incident?**

A. I don't recall. No.

MR. BRADLEY: Can I have five minutes just to review and see if I have anything else.

MS. BEN-SOREK: Sure.

(Whereupon, a recess took place.)

**Q. I have one final point.**

**Is there a unit in the sheriff's department that is responsible for collecting evidence outside of the internal affairs unit?**

A. I know the gang unit collects evidence. Criminal investigations collects evidence that's case specific. I don't know exactly what they get.

**Q. Was anyone else responsible for collecting any evidence with respect to the investigation of this complaint?**

A. No.

**Q. Did you know if Robert Johnson was from New York City?**

- R. PIERCE -

A. I have no idea.

**Q. Did anyone mention that to you?**

A. No.

**Q. Do you know if there was any evidence at all that there was smoking going on on the tier at around the time that Robert Johnson complained of an incident?**

A. I do not know.

**Q. Would there be any records made as a result of any complaint or allegation that there was smoking going on on the tier?**

A. If somebody would have been caught smoking, they would have received a disciplinary report.

**Q. Are you aware if anyone received a disciplinary report at or near the time of October 12, 2021 on the D tier for smoking?**

A. I am not, no.

**Q. If an officer believed that they identified an individual was smoking on the tier, do they have an obligation to**

**report that?**

A. Yes.

**Q. What type of documents would be made from that report?**

A. There would be a disciplinary report. There would be a notation in the logbook that the individual was observed smoking.

**Q. How frequent, based on your experience, are inmates smoking on the tier?**

A. All the time.

MR. BRADLEY: I have no further questions.

MS. BEN-SOREK: I just have one follow-up.

EXAMINATION BY

MS. BEN-SOREK:

**Q. Earlier you testified that you did not receive any on-the-job training regarding securing surveillance, photographs, or video. Is there any reason that you're aware of?**

A. Because there is no

- R. PIERCE -

surveillance video.

MS. BEN-SOREK: I have nothing further.

MR. BRADLEY: Mr. Pierce, thank you so much. I appreciate you coming out and taking the time to speak with us today.

THE WITNESS: No problem. Thank you.

(Time noted: 2:35 p.m.)

(Whereupon, Plaintiff's Exhibits 1-7 were marked for identification.)

ROBERT PIERCE

Subscribed and sworn to before me
this _____ day of __________, 2023

NOTARY PUBLIC

- R. PIERCE -

# I N D E X

WITNESS

Robert Pierce


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Bradley | 6 |
| Ms. Ben-Sorek | 191 |


## INDEX TO EXHIBITS


| PLAINTIFF's | | PAGE |
|---|---|---|
| 1 | Notice of Personnel Action | 193 |
| 2 | Decision | 193 |
| 3 | Case Closeout | 193 |
| 4,5 | Photographs | 193 |
| 6 | Schematic of jail | 193 |
| 7 | Cell Censuses | 193 |


## INDEX TO REQUESTS


| | PAGE |
|---|---|
| Written materials provided during two-week training | 38 |
| Sheriff's Department SOP | 46 |
| Rules and Regulations Handbook | 96 |
| Investigation report | 102 |

- R. PIERCE -

CERTIFICATION

I, LAURA PINTO, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of June 2023.

Laura Pinto

LAURA PINTO

## A

**a.m** 1:15 42:6
**ability** 7:15 48:15
**able** 168:11
**above-mentio...** 1:21
**Absolutely** 29:4 66:13
**academy** 18:12 20:3,7,11,15 20:19,19,20,22 21:8,13 22:2,4 22:16 24:3,7 25:8 26:16,22 27:3 28:6,9,15 28:18,21,25 29:20 30:3,5 30:10,13,15,19 31:5 41:19 48:17
**accept** 15:25
**accepted** 18:11 29:14 73:12
**access** 169:7
**accompanied** 160:18
**accurately** 9:16
**action** 3:13 94:17 98:14 148:15 193:12 194:17
**actual** 14:2 16:22 123:21
**add** 146:21
**addition** 3:9
**additional** 31:6 31:11,20 40:25 109:14 150:6,8
**address** 4:10 15:21
**admit** 121:2
**ADPCD02-05-...** 97:17
**advisement** 5:4 46:11 96:14 102:20
**affairs** 5:23 31:8 31:21,24 32:7 33:11,21,25 46:16,18 47:7 47:10,22 52:13 52:16 58:23 59:2,14 78:9 84:12 86:9 95:5 99:9 101:6 107:5 113:14 157:15 157:17,22 177:7 189:15
**affidavit** 4:19 5:11
**affirming** 156:25
**African** 12:8 169:19
**against-** 1:6
**ago** 14:6 22:15 37:9 39:15 76:19 111:15 111:16
**agree** 6:25 7:4 7:13,18 15:25 26:5,14 30:22 67:13 69:11 70:3,15 99:17 101:23 109:5 131:19,24 132:7 137:15 140:25 141:9 141:19
**agreed** 3:3 8:19 8:20 102:2 115:16 146:14 146:18
**agreement** 9:7 100:7
**aide** 17:14
**allegation** 80:24 93:15 118:15 119:12 135:20 139:23 176:10 190:12
**allegations** 72:22 75:21 80:20 82:10 84:17,19,22 85:4 94:24 119:5 129:12 129:17 131:23 149:5
**allege** 116:5
**alleged** 51:11 62:10 80:17 83:10 92:22 129:18 147:25 162:12 170:21 172:15,21 174:25 175:13 176:5 184:20
**allegedly** 51:7 114:22 122:23 130:4 173:7
**alleges** 148:8 175:22
**alleging** 53:17
**allow** 8:3 180:19
**allowed** 127:24 133:22 167:21 168:3 178:4
**alternate** 146:24
**American** 12:8 169:19
**amount** 127:24 132:15 135:21 159:3 172:14 174:24 175:13
**answer** 7:7,20 8:5,16 9:4 22:22 24:15 25:21 26:11 31:3 39:9 44:20 52:6 66:12 67:5 68:25 69:18 70:20 71:2,14 73:15 74:7,11 109:18 115:11 124:10 130:24 132:5 135:17 136:8,17,25 138:4 141:6 159:20 160:22 161:10 162:9 171:9,21 175:9 175:16 188:19
**answered** 39:8 66:11 70:25
**answers** 7:25
**anticipate** 7:25
**anybody** 58:21 64:23 125:25 143:8 156:9 164:5
**anyway** 60:23
**appear** 159:22 160:7,14 165:3 182:12
**appeared** 159:2
**appears** 107:13 154:4 158:18
**applies** 45:16
**apply** 32:12,18
**appreciate** 38:18 192:6
**appropriate** 32:9 53:6
**approximate** 82:16 136:2
**approximately** 18:7,15 20:23 138:9,18
**arbitration** 13:23 14:11
**arbitrator** 108:17
**area** 57:9 118:6 121:6,7,8 126:21 127:3 127:15 129:11 129:16 133:2 152:22 154:18 163:9 168:10 171:2,6 178:12 178:15 179:3 180:2,10 181:2 181:24 184:9
**areas** 33:2
**ARMR** 149:3,6
**arranged** 117:8
**Article** 1:19 95:25 96:22 97:2
**ascertain** 172:11
**Aside** 137:7
**Asked** 39:8 66:11 70:25
**asking** 163:5,10 164:13
**assault** 38:5 53:18 73:19 80:21 85:5 114:17 123:10 140:12 171:16 175:23 176:5
**assaulted** 73:24 110:22,24 148:8 176:11
**assaulting** 75:11
**assaults** 74:14 74:21 75:4
**assigned** 47:6 82:14 86:21 114:6 120:12 128:20 129:11 129:16 150:19 151:17 153:21 154:25 155:10 157:21
**assignment** 154:23
**assist** 112:16 156:9
**assisted** 10:20 11:3 82:15
**assists** 184:6
**associate's** 16:13 16:17
**assume** 7:16 96:16 112:4
**attached** 94:22
**attain** 19:15
**attempt** 129:22 130:9,11 132:21
**attempted** 68:19
**attend** 20:13
**Attendance** 112:18

**attended** 20:20 21:8,13
**attention** 110:6 155:19
**attest** 120:10
**attorney** 2:4 3:24 10:12,13 10:15 76:10,15 77:11,14,25 125:8,9,21,25
**ATTORNEY'S** 2:9
**attorneys** 2:9 3:3
**audio** 78:21,22 149:2,22,25 162:19,22 163:17 164:25 166:12,23
**authoritative** 23:14,20
**authority** 46:5
**authorization** 53:14,21 149:7
**autistic** 17:18
**availability** 124:12,14 125:3,5 138:3
**available** 70:2
**Avenue** 4:11 15:22
**average** 24:23 24:25
**avoid** 28:18
**await** 61:22 62:5
**awaiting** 66:23 125:6
**awards** 113:5,10
**aware** 10:25 12:23 44:21 45:2 59:11 63:21 71:24 114:15 118:23 125:24 126:3 190:18 191:24

**B**

**B** 4:2 81:20,22 81:23,24 168:6 168:8,17 184:11 185:4
**B2** 121:2,5 151:17 152:22 154:18
**B2-D** 177:3
**B2-D2** 4:20
**B2-D9** 185:4
**bachelor's** 16:14 16:20
**back** 4:21 11:17 11:19 61:7 90:9 93:8 111:21 114:9 146:20 155:20 157:23 161:20
**background** 16:12 169:19
**bad** 40:4
**bag** 27:11,15
**bar** 3:12
**bargain** 10:25
**bargaining** 100:7
**bars** 178:21 180:16
**based** 26:5 28:13,17,21,25 66:25 67:22 68:5 72:16,20 72:25 73:21 74:17,19 75:2 75:23 76:4 80:18 82:8 83:20 93:3,19 101:15 108:8 109:6,10 114:19 117:22 118:22 134:8 158:19 160:17 168:2 191:10
**basic** 42:13 43:15
**Bates** 5:15 94:2 94:7 142:15 144:15 145:8 150:11 155:19 176:15 179:21 182:18,22
**bathroom** 37:12
**bathrooms** 180:17
**beginning** 52:2
**begins** 170:5
**begun** 3:16
**behalf** 16:2
**beings** 70:4
**belief** 123:11
**believable** 175:14
**believe** 4:22 5:15 12:4,20 30:4 32:16 45:6,17,23 61:4 79:17 81:25 83:17 92:21 93:7 95:25 100:5 103:18 104:6 108:14,16 110:17 117:7 119:20,24 120:9 125:11 125:17 127:23 128:2,19 135:19,25 138:7 140:14 142:4,5,9 157:19 158:6 158:21 159:11 159:17 161:14 163:24 165:4 166:8 167:4,23 168:6 169:6 173:11 174:2,6 176:2
**believed** 142:7 166:4 190:23
**Ben-Sorek** 2:11 5:3,14,25 16:3 22:20 24:14 25:15 26:9 28:11 31:2 37:13 39:7 40:14 44:19 46:10 52:5 59:24 66:10 67:3,18 68:24 69:5,16 70:19 70:24 71:13 73:14 74:6,10 74:24 75:7 79:25 81:23 93:24 94:4 96:13 98:5,21 102:19 109:16 115:9 121:16 124:9 130:23 132:3 135:16 136:7,16,24 139:7 141:4 158:11 159:19 160:21 161:8 161:10 162:7 169:6 171:8,20 173:2 175:8,15 188:16 189:9 191:16,19 192:3 193:8
**BEN-SORER** 79:17
**Benson** 1:8 5:10 6:22 78:24 79:6 87:12 90:12 91:3 110:10 114:12 123:3 128:15 128:23 133:8 134:15,18 138:6,13,16,21 138:25 139:5 139:19 149:23 151:20 154:7 162:24 163:4,6 163:12,18 164:14,19 165:2,18 166:4 166:13,18 167:16 169:17 169:21 171:12 172:6 184:18
**Benson's** 91:6 163:8
**best** 7:15 32:16
**better** 96:6
**bias** 11:22,25 12:23 39:5,10 39:12
**bits** 33:15
**bleeding** 60:12
**block** 177:3
**blood** 58:19 59:9 60:8,14,24 61:6 194:16
**Board** 17:16
**BOCES** 17:11 17:13,15,20,23 18:6,14,18,25
**body** 118:10 162:13,16
**book** 153:9
**books** 181:12
**bottom** 94:8 98:13 150:4 152:10 172:10
**box** 118:5 121:6 121:7,8,9,11 126:20 127:3 127:15 171:2 178:15 180:2 181:2
**Bradley** 2:7 4:13 5:13,16 6:7,11 15:24 25:20 37:11 38:12,18 38:21 46:7 65:8 80:2 92:7 93:25 96:10 98:25 102:10 102:17 140:7 158:13 169:3 169:10 175:18 182:17 189:6 191:14 192:5 193:7
**break** 9:2,4,5 37:12 92:8
**brought** 10:11 13:17,21 14:17 117:8 118:5
**bruise** 109:11

158:9,13,16,20 159:8 160:18 174:9,17 175:6
**bruising** 162:2
**brush-up** 31:18
**bubble** 180:7,9 180:11,14
**building** 81:23 81:24 82:2 86:12,14,15,17 86:22 87:4 89:2 130:18 168:6,8,17 184:11 185:4
**bulletins** 23:3,8 23:13
**bump** 88:7 89:3
**bureau** 33:11 45:7,25 46:24 46:25 95:13,15 120:3
**business** 15:21 34:6,7 143:20

**C**

**C** 2:2 4:2
**C-U-R-A-T-O...** 111:20
**C.P.L.R** 3:5,20
**cabinet** 143:12
**cabinets** 102:16
**calendar** 42:20
**call** 38:12,21 42:18 46:7 53:4 54:16 76:21 77:20 78:13 91:4 96:10 102:10 153:11 168:13 169:3,12
**called** 11:6 20:17 59:10 78:8 84:24 96:8
**Calls** 75:8
**cameras** 51:3 179:2
**cans** 130:6
**canvass** 60:3
**capacity** 11:4 13:4 14:7 17:12 112:9
**captain** 55:16 56:15 64:21,22 64:24 114:6 146:4,5,11
**captured** 130:13
**car** 89:14
**care** 21:21 23:10 29:18
**career** 47:10 113:4
**Carmen** 4:11 15:22
**case** 6:17 8:13 10:7,9,10,11 10:17,23 11:20 11:21 12:10,19 13:10 14:10 36:17,17 51:25 55:13 56:25 57:5,6 63:23 77:6,9 78:6,13 78:15 89:18 91:23 93:5 101:19 102:8 102:12 123:16 125:10,18 126:2,5 127:7 129:14,23 131:5,8,13 132:13,23 141:8 150:3 155:21,25 156:21 162:23 166:12,24 167:13 168:25 171:22 176:6 189:18 193:14
**cases** 82:13,14 112:15,21,22 123:25 124:13 132:8 138:2
**casework** 112:18
**category** 153:6
**Caucasian** 12:6
**caught** 119:11 190:16
**cause** 74:15,22 75:5
**CC** 148:7,11 185:20,23
**CD** 97:10
**cell** 4:20 6:4,5 121:11,12 133:7,22 134:10,15,19 167:4 168:10 177:19 182:7 182:10 183:10 186:10 193:17
**cells** 121:10 134:6 182:13
**Census** 183:10
**Censuses** 193:17
**center** 1:7 11:7 33:16 119:21 120:2 123:12
**ceremony** 106:10,11 110:2
**certain** 21:2 127:24 146:21 151:10
**CERTIFICA...** 194:2
**certify** 194:8,15
**chain** 27:17,22 27:24 28:3 29:21 113:25
**chairs** 181:9
**chance** 8:18 162:18 176:16
**change** 18:8 32:25
**changed** 177:8 177:11
**changes** 8:23 185:22
**charge** 3:25 105:24 106:2
**charged** 105:21
**charges** 13:16 13:20 63:24
**check** 155:3,4 160:5 170:11
**checking** 168:15
**checks** 179:6,8 181:15
**cheek** 158:14 159:9 160:13 162:2
**chief** 99:25
**children** 17:18 91:9
**Christmas** 11:6
**circular** 158:17 158:18,25
**circumstances** 24:8,12 68:17 68:22
**City** 33:17 189:25
**civil** 1:20 10:7 12:14 13:10,13 113:3
**civilian** 24:8,23 25:5
**civilians** 70:12
**claim** 103:2 171:16,19
**claimed** 110:23 120:24 133:6 140:13 153:2 162:12 165:13 170:21,24 172:2,24 174:10,13 181:5 182:3 187:19
**claiming** 73:18
**claims** 64:2 76:6 154:19 170:7 173:16,21
**class** 42:19
**Clifton** 187:24 188:11 189:3
**clinic** 11:12
**closed** 93:6 140:6 159:23 171:22
**Closeout** 193:14
**closer** 12:4
**closure** 150:3
**cluster** 81:12 115:18
**code** 24:22
**cold** 52:25
**Collaborative** 17:16
**collect** 26:17 27:5 35:22 36:4 47:25 48:7,15 83:7 129:23
**collected** 48:9
**collecting** 35:25 189:14,21
**collection** 50:20
**collective** 100:7
**collects** 189:16 189:18
**combat** 28:10
**combined** 82:16
**come** 52:9,10 53:12 54:17 57:16 60:25 61:9 68:9 112:15,22,23 121:13 167:2 181:4 182:2
**comes** 52:10 53:11 57:16 61:8
**comfortable** 114:24
**coming** 40:16 42:23 43:8 76:23 86:15,16 166:5 192:6
**command** 114:2 157:14,17
**commanding** 95:4 99:8 114:4,4 145:16 145:23 146:14
**committed** 62:11 132:2
**compiled** 144:12

**complainant** 12:7 57:21 59:21 61:12
**complainants** 49:23 57:2
**complained** 169:16 190:8
**complaint** 6:19 11:22 15:18 37:19 38:5 39:24 44:17,17 51:25 52:7,12 52:23 53:11 54:15,18 57:16 60:21 61:8,22 67:11,21 90:11 91:13 92:20 95:18 105:13 107:6 110:8 114:11,16 115:19 116:23 116:25 117:6 120:13 123:9 126:22 136:4 138:10 139:5 139:13 140:12 140:14 142:2,5 148:4,24 173:19 189:22 190:12
**complaints** 37:4 43:3,6,22,23 43:24,25 44:2 44:4,8,23 63:16 65:3 75:20,25 76:6 80:16,23 82:25 83:6,21 112:22 114:19,21 115:19 116:4 116:11 118:23 119:6,13 123:14
**complete** 32:8 33:5 63:17,21 65:19 66:8 71:12 72:4
**completing** 16:22
**complying** 100:15 105:9 176:22 183:5
**computer** 145:5 169:8
**computers** 180:17
**concerning** 53:22
**concluded** 172:5
**conclusion** 55:12 74:25 75:8 103:12 109:6 140:4 169:24 170:6,7 172:9 174:23
**Condell** 145:19
**condemnations** 113:8,11
**conduct** 3:6 21:17 24:23 28:7 33:13 34:14 44:16 46:3 47:20 65:11,12 96:25 122:6
**conducted** 6:19 60:10 101:7 102:4 149:19
**confidential** 143:16
**confirm** 172:16
**confrontations** 28:15,19
**Congratulatio...** 91:19
**Conklin** 2:5
**consequences** 36:12,15
**consider** 71:11
**considered** 75:17
**consistent** 51:15 135:21,23 158:21 160:23 160:25 161:4 161:12 172:14
**contact** 65:6 68:19 87:22 125:16
**contacted** 65:4 110:8,13,16 114:10
**contained** 97:5 162:23
**contents** 96:19
**continued** 150:5
**continuum** 25:12,22 26:7
**contraband** 10:6 10:21 11:8 27:14 46:21 119:11
**control** 151:9 180:4,10
**controlled** 3:20
**controls** 121:10
**conversation** 54:6 76:24 77:3
**convicted** 16:8
**copy** 3:23 8:21 56:16,17 94:5 102:13,18 125:17
**cordial** 91:5
**corner** 95:8 150:25 183:12
**corporal** 1:8 4:9 6:20 16:5 19:13 64:17 90:2 92:2,12 92:16,24 93:11 93:16 98:18 106:7,12,16,17 106:23 109:6 109:21 110:9 111:23 112:2 112:11 113:2 114:12 128:16 128:25,25 131:8,12,24 132:9 133:8 134:15 135:5 137:5,7,16,21 137:25 139:19 145:18 150:2 153:5,19 162:24 169:17
**corporals** 184:14
**correct** 12:3 23:16 27:21 35:19,20 44:5 44:24 46:5,6 75:14 117:4 133:24 167:6
**correction** 6:21 8:19 13:17,21 19:24 20:2,14 20:18 21:2,10 21:18,21 23:11 23:15 24:13,21 29:14,18 31:11 31:12 33:3 55:18 62:3,7 62:14 65:3 70:4,13,17,22 71:5 72:17,21 73:2,7,10,12 73:18,23 74:13 74:20 75:3,9 75:10,20 76:7 80:9,21 82:10 83:23 84:24 86:3 87:11 94:25 99:15 108:2,5 110:10 114:22 116:11 116:25 118:19 118:24 124:2,8 128:17 129:10 129:15 130:3 131:10 132:11 135:15 136:3 136:15,23 138:6,13,16,20 138:25 139:4 139:12,18 141:17 151:19 154:5 155:7,11 155:15 163:6,8 163:11 164:13 164:18 165:17 166:3,17 167:15 168:15 169:16 170:19 171:5,13 175:23 179:5 180:23
**correctional** 1:7 11:7 66:18
**corrections** 21:24 23:18 33:16 47:13 69:12 86:14
**corridor** 121:17 121:18 168:10 178:18
**corroborated** 134:22 165:24 172:19
**COs** 149:20
**counsel** 3:18 15:24 40:14
**county** 1:7,7,7 1:10 2:9 10:12 10:14 11:15,16 14:9,12,15 17:6,9 19:8 23:19 41:5,18 44:18 66:18 74:4 79:22 85:10 95:20,22 113:11 120:5 123:6 142:16 149:10 176:5 182:22
**couple** 37:15 65:9 81:10,12 83:25 115:23
**course** 33:10 39:16 41:4,9 41:13,21,24 44:14 113:4 143:19
**court** 1:2 7:10 12:11
**courteously** 30:16
**courtroom** 8:11

**covers** 96:16
**COVID** 127:14 127:21 128:7,9 133:19
**COVID-19** 128:10 133:21 134:9 167:16 167:22 178:3
**CPR** 31:16
**credits** 16:13,19 16:21
**crime** 16:9 27:6 34:24 59:5,5 74:9
**crimes** 79:21
**criminal** 10:9,10 13:5,7 16:14 41:11 42:13,17 46:19 47:15 189:17
**crowd** 35:2
**crucial** 29:24 50:5,9
**cruel** 74:22
**Curatolo** 63:9 111:18
**current** 19:7,12 111:22 185:5
**currently** 16:6 17:3 19:4 25:5 41:8 111:12,13 113:15,17
**custody** 27:17 27:23,25 28:3 29:21

**D**

**D** 182:4 184:10 184:12 187:24 190:20 193:2
**D-O-N-O-H-U...** 146:7
**D1** 6:3
**D2** 11:12
**daily** 24:12
**damages** 12:16
**Daniel** 146:9
**database** 5:8
**date** 81:15 97:22 98:2,3,8 110:12 116:3 127:9 129:11 134:20 135:6 139:25 147:18 148:18,19,21 149:16 150:24 151:3,17 152:23 153:18 154:18 167:17 170:20 182:3 183:12,14 184:20 186:21 187:5
**dates** 97:23,24
**day** 54:13,14 60:21 66:20 78:3 119:25 120:15,17,21 121:24 127:25 129:16 133:23 134:4,11 152:8 152:8 153:22 153:24 154:25 158:5,6 172:21 173:6,11 174:10 192:21 194:21
**days** 34:6,7 42:9 42:10,11 60:22 60:22 63:19,20 98:15 124:23
**DCJS** 41:8,10
**deal** 43:24
**dealing** 34:22
**deals** 46:20
**death** 42:15
**decide** 9:5
**decision** 108:17 108:20 125:14 193:13
**deemed** 3:18 32:9
**deescalated** 26:14
**deescalating** 26:2
**deescalation** 25:9
**defendant** 12:25 13:2,12 76:13
**defendants** 1:11 2:9 4:17 5:19 6:20
**defensive** 22:11
**definite** 83:24
**definitely** 54:25 80:15
**degree** 16:13,14 16:17,20
**delay** 124:2,7 135:14 136:2 136:11 137:24 138:24
**demand** 102:18
**department** 1:8 17:7,10 18:2 18:12 19:9,10 20:13,14,19 21:15 23:4,19 23:23 29:11 33:11,14,18 41:11 42:17 44:18 45:3,15 45:24 46:9 95:21,23 98:14 99:19 102:22 120:6 123:6 143:19 149:10 175:25 176:6 189:13 193:22
**Departmentally** 64:8
**depending** 27:13 34:24 52:13 54:11,12 54:19 56:11 58:13 60:2 114:8 124:24 129:12 153:22
**depends** 125:2,5
**depict** 181:2
**deposed** 9:18,24 12:9,12 77:19 77:22
**deposition** 1:17 3:14,18,21 5:2 7:2 8:16 77:15 128:22 149:2 149:22,25 162:19 163:18 164:25 166:12 166:24
**depositions** 3:6 13:3 162:23
**deputy** 99:25 114:4,5 157:7 157:9,11,13,16 157:20
**describe** 16:11 25:14,18 33:8 34:19 37:21 53:16
**desk** 151:9
**destroy** 36:16
**destroyed** 36:9 36:10,13
**details** 100:12 101:3
**detective** 79:10 79:15 80:13 176:9
**determination** 101:24 156:25
**determine** 127:11 130:5
**determined** 94:24 101:10 107:3 108:10 184:19
**deviation** 74:15
**difference** 52:22
**different** 22:10 23:7 26:13 33:12 34:20,23 57:17 61:9 62:2 98:24 112:5 124:22 124:23 131:23 187:22
**differently** 24:12
**difficult** 67:16
68:2,6 69:3
**direct** 110:6
**disaffirming** 156:25
**discharge** 185:9
**disciplinary** 4:16 5:9,17,24 15:10,12,15,18 63:24 190:17 190:19 191:6
**disciplined** 23:24
**disclosed** 4:24
**discrimination** 12:2 37:19 83:22 84:20,23 170:8 171:19
**discuss** 35:24 36:3,11 37:7 43:11 77:6 88:9 96:17
**discusses** 84:11
**discussion** 140:8 175:19
**dispute** 147:7 158:9
**distributed** 23:18 45:24 53:8
**district** 1:2,2 10:12,13,14 125:7,9,21,24
**DNA** 30:9 50:23
**document** 94:15 104:20 105:11 142:25 143:3,7 143:18,23 150:12,14 153:25 154:2 156:18,22 181:18 182:9 186:2
**documented** 61:4 123:22,24 168:19,22
**documenting** 51:14
**documents** 78:4

78:20 126:4 183:7 191:4
**doing** 60:3 62:24 65:21 89:2
**Donohue** 146:5 146:6
**door** 177:14 178:13,13,14 179:14,15 180:16
**draft** 62:17 63:2
**drafts** 156:12
**draw** 55:12
**drives** 89:15
**due** 135:19 149:19 158:25
**duly** 4:3 194:10
**duties** 43:21 45:4 112:14
**duty** 150:21

E

**E** 2:2,2 4:2,2,2 193:2
**E-Law** 148:25
**earlier** 63:22 70:7 191:20
**earliest** 81:14
**East** 4:11 15:22
**EASTERN** 1:2
**Education** 17:17
**educational** 16:12
**effort** 127:17 134:25
**eight** 154:3
**either** 36:16 53:18 54:13 77:23 114:5 153:21 156:24 169:16 185:8 194:16
**elevators** 180:5
**emergency** 24:3 40:9 128:5
**employed** 17:3,8 19:10 85:15 116:6
**employee** 14:18
**employees** 14:21
**employment** 18:19 19:8
**encounter** 24:9 24:13
**enforcement** 19:2
**enjoyed** 32:23
**enter** 32:6 177:4
**entered** 31:20 31:23
**entire** 37:9 45:18 142:22 143:23 156:22
**entitlement** 98:15
**entries** 151:11 169:9
**entry** 149:15,21
**environment** 34:23
**error** 147:21,22
**errors** 8:23 146:21
**escalation** 25:9 25:23,24
**especially** 69:8 73:22
**ESQ** 2:7,11
**established** 173:5
**Eve** 11:6
**events** 69:13 70:18 117:24 134:23
**eventually** 56:15
**everybody** 21:4
**evidence** 26:17 27:6,11,13,20 29:24 30:3,6 30:10,13 35:22 35:25 36:4,12 47:25 48:8,9 48:16 49:15,19 50:4,16,21,22 58:17,19 60:17 61:2 71:25
72:18,22 73:7 83:7 109:10 129:23 172:20 189:14,17,18 189:21 190:6
**exact** 26:20 67:7 92:13 93:21 110:12 133:12 135:6 166:6
**exactly** 39:14 88:22 176:7 189:19
**examination** 3:9 3:11,16,24 6:10 76:16 78:5 191:18 193:6
**examined** 3:15 3:25 4:5
**excerpt** 96:5
**excessive** 29:3,6 29:9
**exhibit** 93:24 94:2 104:20 131:4 142:13 176:14 179:20 179:21 181:17 182:16,17,21
**Exhibits** 192:13 193:10
**exit** 178:10,11
**expect** 24:17
**expected** 24:22
**experience** 40:4 66:25 67:23 68:6 69:23 72:16,20,25 73:22 74:17,20 75:3,24 76:5 80:19 83:21 135:20 158:20 159:22 160:18 191:11
**explain** 51:24 137:23 138:23
**explained** 38:24
**extensive** 21:5 92:22
**eye** 158:15 159:9 160:5,12 161:25

F

**fabricating** 72:18
**face** 118:7,9 158:22 159:4,8 160:5,8,12 162:6 172:25 174:10,14,18 175:7
**facility** 10:6 56:5 58:2 66:19 68:18 69:7,9
**fact** 125:12 127:14 134:8 165:4 167:8
**facts** 93:5
**fade** 35:19 70:10 70:13,23 136:11
**failed** 73:3 76:7 109:8
**Failing** 75:16
**failure** 3:10,17 36:22 106:24 141:20,23
**fair** 27:19 65:15 65:21 66:8 72:6 84:9 119:15 121:17 121:19 141:13 141:15,23
**false** 73:11 75:17 108:11 108:14 109:7
**falsely** 73:18
**familiar** 27:22 27:24 28:2 85:16,17
**family** 52:11 53:12
**far** 32:5 38:23 42:8,12 43:9 100:8 134:2
135:7 171:12
**Farmingdale** 2:5
**favor** 105:6
**federal** 12:11
**feel** 60:16 126:25 127:2,6
**feeling** 140:17
**fell** 118:8
**fellow** 75:9
**fights** 46:20
**figure** 32:24
**figured** 32:24
**file** 62:14 77:9 78:7,9,16,20 125:18 142:20 142:23 143:11 143:25 144:13 156:21 157:4
**files** 4:16 5:18 5:21
**filing** 3:21 102:15
**fill** 27:10
**filled** 120:7
**final** 55:16 64:24 146:12 156:4,15 189:11
**find** 8:24 63:23 115:8,13,17 116:23 130:22 169:11
**findings** 64:7 129:19 146:24
**finger** 80:25 82:11 114:23 115:14 116:12 117:2 118:14 118:20,24 119:6 130:4 148:9
**fingerprint** 30:13
**fingerprints** 50:23
**finish** 8:2,4 188:24

**fire** 42:15
**first** 4:3 7:3 9:23 10:4 19:9 20:5 20:12 26:7 32:7 42:19 52:3 53:24,25 54:5,23 55:2 57:19 61:11 69:24 106:17 111:8 121:14 142:5 143:21 144:22 145:25 146:8 148:21 152:8 156:18 185:18
**firsthand** 165:10
**fist** 159:23
**fit** 32:16
**Fitzpatrick** 99:24
**five** 80:22 81:3,4 81:7 82:17,25 83:5,14 98:15 113:17,21 126:10 137:12 138:18 154:5 189:6
**five-minute** 139:4
**floor** 60:9,25 87:3 118:8 121:3,9 128:21 155:10 184:11
**focus** 94:7 155:19 159:7
**follow** 23:11
**follow-up** 191:17
**followed** 21:10 63:17 175:22
**following** 54:14
**follows** 4:5
**food** 52:24
**foot** 161:7,13
**footage** 51:3
**force** 22:5,10,17 22:24 25:9,12 25:22,24 26:2 26:3,7 28:23 29:3,5,6,9 31:17 43:18,25 55:25 56:3,4 61:4,22,23,25 62:11 72:23 73:3 75:25 76:8 84:16 92:22 101:18 106:25,25 109:8 114:16 119:10 123:16 123:18,19,22 123:24 124:3 125:6 131:10 132:2,10 135:21 142:4,8 172:14 174:24 175:13
**forensic** 30:3 50:21,22
**forget** 35:17
**form** 3:8 22:21 26:10 28:11 31:2 52:19 59:25 67:4,19 69:17 109:17 117:13 119:25 120:6 132:4 139:8 141:5 145:5
**former** 68:19
**forth** 23:9 194:10
**Forty-six** 16:7
**forward** 6:4 68:10
**found** 11:9 27:16 174:8
**four** 20:23 47:3 80:22 81:3,7 82:25 83:5,14 121:9 153:17
**fourth** 95:11 115:3,5 116:25
**Frank** 14:22
**frequent** 191:10
**freshest** 71:4
**friendly** 87:6 88:2 91:3,5
**friends** 80:4
**frisking** 38:2
**front** 4:20 45:12
**full** 8:4 65:12 66:8 71:16 72:10
**furnished** 3:24
**further** 3:23 4:25 40:17 191:14 192:4 194:15

**G**

**gain** 66:15 67:13
**gaining** 32:5
**gamut** 42:15
**gang** 46:21 47:16 189:16
**garbage** 130:6
**gate** 179:25
**gates** 178:18,19
**gather** 69:24
**gathered** 55:21 108:9
**gears** 110:5
**general** 51:23 81:19
**generated** 122:17 185:12 185:14
**gestures** 7:6
**getting** 39:3 40:15 96:18
**Giron** 149:4,9 149:18
**give** 8:4,18 67:23 79:13 83:24 92:8 99:14 116:2 133:13
**given** 8:17 21:25 22:12 23:2 95:12 113:11 120:4 122:5 147:14 194:13
**gives** 53:21
**glove** 118:13 122:23 130:3,3
**gloves** 130:6 149:20
**go** 32:7 33:3,12 33:22 34:25 42:4,14 58:15 59:18,21 60:2 60:3 61:7 64:13 78:2 90:9 110:18 111:21 114:9 121:14 126:20 168:9,9,11 171:13
**goes** 38:24 62:2
**going** 4:24 5:6 6:17 7:16 12:22 20:6,7,8 20:10 30:8 38:21 46:7 52:20 61:7 77:19,22 79:8 86:13 94:6 96:10 102:17 110:5 142:12 148:14 155:18 155:19 157:23 165:19 169:3 169:12 177:22 188:24 190:7 190:13
**good** 29:13 65:25 73:12
**grab** 62:25
**graduated** 20:3
**graduation** 106:10
**grammatical** 146:21
**grievance** 5:20 52:9,15,23,24 53:2,3
**guard** 178:25 179:9
**GUERCIO** 2:4 2:4
**guess** 7:21,23 30:7 42:18 99:18
**guy** 40:21 44:12 164:22

**H**

**half** 68:11 77:4 77:5 111:16 133:23 134:4 152:5,7,8 162:13,16 167:21 168:3
**hallway** 178:18
**hand** 112:23 159:12 161:5 161:15 162:5 194:21
**hand-to-hand** 28:10
**handbook** 53:9 53:10 96:6,7,9 96:12 97:6 193:23
**handcuff** 129:7
**handcuffed** 118:4
**Handcuffing** 22:9
**handle** 53:3
**handouts** 39:3
**handwriting** 104:7,12 144:18 147:4 147:16 148:4 151:23
**handwritten** 104:9,11 126:18 137:19 138:19
**hang** 80:6 88:4 91:25
**happen** 37:24 88:7 89:2 132:25 133:2
**happened** 11:5 34:22,24 35:18 54:13 57:8,10

57:13 59:22 115:5,25 120:22,25 127:15 131:6 133:11 151:18 172:3,22 173:18,22 174:11 175:2,5 187:17
**happening** 114:20 116:18
**happens** 115:23
**hard** 94:4 136:18 165:9
**harm** 136:14,21 137:3
**head** 7:5 99:19
**headquarters** 33:25
**hear** 7:9
**heard** 7:17 73:17 85:9 109:15 171:6 180:6
**hearing** 13:16 13:23 14:11,17 85:18
**hearings** 13:25
**heat** 52:25
**held** 1:13,21 42:19 140:9 175:20
**hello** 88:8 89:4
**help** 62:24 82:12
**hereinbefore** 194:10
**hereto** 3:4
**hereunto** 194:20
**hesitation** 48:5
**hiding** 72:22
**higher** 24:22
**highlight** 145:4
**highlighted** 144:23 145:6 151:11,19 152:12,14,16 152:18 154:4 170:13,18
**hired** 20:12
**home** 11:6 54:17
**honest** 38:16 39:15
**hospital** 11:12 83:17,17 119:23 122:21
**hosted** 33:10
**hotline** 52:8 53:8,12
**hour** 77:4,6 133:23 134:4 167:21 168:3
**hours** 153:23
**house** 34:25,25
**housed** 66:18 127:9,18 163:8 167:3 178:3 182:4
**housing** 33:2 57:9 133:2 163:9 181:23 184:9
**Hudson** 34:2,3
**human** 70:4 75:6
**humanly** 30:16
**hundred** 14:4 34:3 48:14 82:4 83:19 134:2 167:24 186:17
**Hundreds** 76:3
**hurt** 36:23
**Hussey** 85:14

**I**

**ICN** 185:15,18 185:21
**ID** 183:18
**idea** 97:10 190:2
**identification** 50:8 59:8,13 59:15 148:12 185:17,24 192:14
**identified** 152:21 155:9 170:18 175:6 190:24
**identify** 26:23 34:17 36:22 49:3 57:7 66:16 128:16 130:12 132:22 154:16 155:7 155:11,15 158:12,16 170:10 188:10
**identifying** 35:5 49:7 51:18
**immediately** 56:10 69:21 136:19
**importance** 35:5 35:25 36:19 49:7,18 50:11 50:15 51:13
**important** 35:9 35:13 36:4 59:21 60:5,17 66:7,15 67:13 69:12,20 70:8 70:16 141:2,10
**imposed** 98:18 98:22
**in-cell** 185:6,8
**in-house** 44:6
**in-service** 31:14 31:15 43:16
**inaccurate** 8:17 101:4,11 107:4
**inadequate** 141:21
**inappropriate** 109:8
**incarcerated** 185:19
**incident** 51:7 53:22 56:6 58:12,16 59:18 59:22 60:20 69:14 72:2 75:12 92:16 98:9 100:18,21 100:24 102:23 103:15 104:2 105:12 106:21 109:20 113:18 124:20 130:12 131:5,17 135:8 140:2 147:18 147:24,25 151:18 153:2 154:19 167:17 170:21 172:2 173:6,16 181:6 182:3 187:18 188:8 189:4 190:9
**incidents** 26:23 131:20
**include** 50:20
**included** 166:23 167:12 171:24
**including** 3:7 7:10
**incomplete** 8:17 65:24 101:5,13 107:4
**inconsistent** 129:18
**incorrect** 108:17
**independent** 93:3,20 117:23
**index** 96:19 193:10,19
**indicative** 160:19
**individual** 5:22 47:3 121:10 190:24 191:8
**information** 40:15 55:21 69:24 70:2 101:5,11,13 107:5 122:25 144:13
**informed** 77:18 77:21 110:18
**initial** 54:6
**initially** 140:13
**initiate** 64:3,5
**injured** 56:12
**injuries** 51:11 51:14,19 58:9 135:23 159:5
**injury** 57:25 162:4 172:12 172:13,17 174:21
**inmate** 22:5,11 24:25 25:3 39:21,24 43:3 43:22,24 44:16 51:19,25 52:8 52:12,18 53:9 53:17,25 54:3 54:4,23 55:2 57:7,21,24 59:16 60:11,20 61:12 62:10 63:16 66:18 67:12,17 68:7 68:9,14,19 72:18 73:4,8 73:19,24 74:14 74:21 75:4,11 80:16,20 83:10 83:22 84:17,23 85:5 92:21 93:7 103:16 104:13 107:6 108:20,24 109:11,12,13 109:14,15 119:10 127:12 131:10 132:2 132:11,14,22 133:22 134:9 139:13 141:15 148:7,12 149:19 163:7 167:20 168:4 175:22 178:2 185:17,19,23
**inmate's** 51:11 51:14,16 52:11 58:9 75:6 80:25 82:11 114:23 115:15 116:12 117:2

119:7 149:5
**inmate-on-in...** 46:20
**inmates** 37:4 53:8 54:10 56:25 57:9,12 64:2 67:2,23 68:17 83:14 104:5 112:17 116:4 121:13 127:18,23 133:16 134:6 134:16,18 164:21 168:16 186:4,6 191:11
**inserted** 118:13 148:9
**inside** 38:25 47:18 87:21
**instance** 68:13 135:18
**instill** 63:24
**instincts** 48:24
**instructions** 122:5
**intelligence** 46:21 47:16
**interaction** 172:7
**interested** 194:18
**interim** 23:3,9 23:14
**internal** 5:23 31:8,21,23 32:7 33:11,20 33:24 46:15,18 47:7,9,22 52:13,16 58:23 59:2,14 78:8 84:12 86:9 95:5 99:9 101:5 107:5 113:14 157:14 157:17,22 175:24 177:7 189:15
**interrogation** 41:4
**interrogations** 34:10
**interview** 35:2 52:12 54:7 55:8,17 56:24 57:13,14,21 58:5 61:12,19 62:6,13,22 69:12,21,25 71:10 101:6,7 104:12 107:6 108:23 117:9 117:11,17 124:19 125:22 126:8,17 129:9 129:15 132:21 136:4,14,22 137:9,11,15,17 137:20,24 138:5,13,16,20 138:24 139:4 139:11,24 163:4,23 164:14 171:11
**interviewed** 11:9 55:10 98:4,8 103:16 104:8 107:15 107:17 108:21 117:12 119:16 123:2 125:25 129:2 131:12 132:16 133:4 135:5 137:5 154:7,10 158:6 158:7 173:12 173:13 188:6
**interviewing** 41:3 55:11 79:5 124:2,7 132:14 135:14 136:3
**interviews** 34:10 54:9 65:7 108:2 112:16 121:25 122:2 139:21
**investigate** 37:18 38:5 44:4,7,23 45:18,22 54:17 76:6 82:6 84:11,16,25 85:4 87:9 100:23 120:12 123:9 126:21
**investigated** 39:24 75:19 76:2 80:20 82:7 83:2,6,23 85:21 91:11 92:4,12,25 105:13,19,23 106:23 108:9 140:22 169:22 184:18
**investigating** 65:2 92:15
**investigation** 6:18 10:20 11:4 13:7 28:7 29:24 34:14 36:24 37:3 39:6 41:8 43:2 44:16 46:2 47:16 50:5,9 50:17 51:22 52:4 57:20 59:23 62:19 63:10,18 64:4 64:6 65:12,13 65:22,24,25 66:3,9 71:6,9 71:11 72:3 78:17 79:2 89:17,20,24 90:10,15 91:15 98:10 102:5,8 102:11,25 103:5,9,13 105:17 107:12 121:22 122:7 122:15 140:5 141:21 142:20 142:22 143:25 152:21 154:17 164:8 165:6 166:9 167:10 172:11 189:22 193:24
**investigations** 5:22 33:14 42:14 45:7 46:2,19,22,24 47:2,21 60:10 63:15 95:14,16 189:17
**investigative** 5:21 31:8 33:12 46:17
**investigator** 5:7 11:19 14:10 16:5 19:13,18 19:20,23 20:9 28:4 31:25 32:4,10 33:6 39:6,11,23 40:7,19 41:2 43:14,20 44:22 45:5,22 46:14 47:21 62:24 63:11 73:22 75:24 76:5 80:19 84:12 100:20 111:23 112:6,24 120:17 129:9 141:2 145:11
**investigators** 45:16 112:12 114:7
**involve** 80:24 118:25
**involved** 114:16 119:9 121:21 125:8,10,13
**involves** 120:7
**involving** 131:13 132:23
**issue** 12:21 52:14,15,17 53:2 60:18 165:13,19
**issued** 94:23
**issues** 80:17 96:17 163:7 164:15
**items** 4:23 23:7

**J**

**J** 97:14 152:14
**jail** 11:13,14,16 34:21 37:24 47:18 59:16,18 60:7 86:7 87:15,21 90:6 110:3 185:10 185:20 193:16
**James** 1:9 86:4 86:23 155:12
**JANE** 1:9
**January** 98:3
**Jeffery** 6:16 90:11 91:12 110:9 154:19
**Jeffrey** 1:4 115:20 116:22 117:24 119:14 119:17 120:21 126:8,21 127:19 130:2 132:23 133:5 134:14,19 152:25 161:25 173:15 175:13 176:10 184:20 184:24
**Jerome** 99:24
**job** 11:17 16:4 40:10 64:15 88:21 112:5 120:17
**jobs** 18:24
**Jogging** 35:18
**JOHN** 1:9,9 2:7
**Johnson** 1:4 6:16,20 25:3 78:23 79:5 110:9 115:20 118:15 119:14 119:17 120:21

126:8 127:19
129:18 130:2
131:14 132:24
133:6 134:14
134:19 135:22
138:10 139:6
140:2,13 142:3
148:7 149:19
152:25 154:19
162:11,20
163:7,13,25
165:12 169:16
170:22,24
172:7 173:15
175:14 181:5
182:4 184:21
186:3 188:6
189:24 190:8
**Johnson's** 90:11
91:13 116:22
117:24 126:22
129:6 160:12
161:25 162:16
165:25 176:10
184:24 187:11
**join** 32:21
**Joseph** 111:9
**Jr** 1:4 6:16
**July** 20:4,5
**June** 1:14 42:22
42:24 194:21
**justice** 16:15
41:11 42:17

**K**

**K-R-E-U-T-Z**
111:7
**keep** 7:4,8
126:18 138:19
141:3,10,20
**kick** 109:13
159:23
**kicked** 118:9
146:20 159:4
**kids** 88:13,15
89:6
**kind** 32:15 46:4
82:12 89:14
**King** 18:20
**kit** 83:14 122:21
149:18
**know** 7:14,20,22
8:18 9:3 10:22
12:18,20 15:7
20:10 22:17
25:6 38:15
45:10 48:9,13
53:7 58:24
59:4 60:6 67:7
67:16 76:22
79:9,10,15,20
80:9 83:13,16
84:10 85:7,14
85:15,23,25
86:3,6 87:11
87:14 88:15,19
88:22 89:5,11
89:12,14,21
90:2,5,23 91:6
91:10 92:13,19
96:21 97:3,11
97:14,20,21,23
98:7,9,20
99:23 100:3,13
103:19 105:7
110:15 111:8
115:4 120:10
126:7 128:12
128:13,14
130:20 134:12
138:15 139:17
143:3 147:24
153:24 155:2
157:3,5,8
158:4 159:21
164:24 167:20
168:14 176:4
176:12,20
183:4 186:12
186:20 187:14
189:16,19,24
190:5,10
**knowledge**
98:19 114:22
116:10
**known** 88:20
**knows** 98:6
**Kreutz** 111:5
114:11 117:7
117:10,19
121:24 148:25
184:4
**Krueger** 183:18
184:5
**Kullen** 18:20

**L**

**L** 3:2
**lack** 96:6
**Lastly** 6:3
**LAURA** 194:6
194:23
**law** 1:20 19:2
117:8,10
**lawsuit** 13:13
**laying** 118:11
**layout** 60:6
**lead** 100:20
**leads** 178:11
179:25
**learn** 71:8 167:2
181:4 182:2
**learned** 27:20
29:21 42:12
71:24 72:17,21
73:2,6 82:9
**leave** 98:15,16
122:9 128:4
**leaving** 18:10
**left** 42:9,10
68:18 69:6,8
150:25 158:14
159:8 160:4,8
160:11 161:25
172:25 174:9
174:14 175:6
178:17 183:20
**legal** 74:25 75:8
77:24 184:6
**less-than-five-...**
137:16
**Let's** 20:11
114:9
**letting** 76:22
**levels** 56:18 62:2
**library** 117:9,11
149:2
**lied** 73:23
**lieutenant** 42:3
56:14 63:9
64:18 110:17
110:21 111:4,5
111:10,18
114:11 117:7
117:10,19
121:23 148:25
**life** 90:24 91:7
**line** 36:19 44:12
151:5
**lineup** 150:15,17
151:4 170:15
170:16
**LIORA** 2:11
**list** 121:20
**listed** 5:23
**little** 20:24
34:20 47:2
137:13
**live** 88:18
**lives** 88:19 89:12
**LLP** 2:4
**lobby** 121:15
180:2,3,12,19
**located** 86:11
180:11 182:13
185:3
**location** 184:7
185:5 187:22
**lock** 118:5 121:6
121:7,8,9,11
126:20 127:3
127:15 171:2
178:15 180:2
180:16 181:2
**locked** 143:11
143:15 179:15
179:16
**log** 67:21
**logbook** 168:23
168:25 169:4,9
191:8
**long** 17:22 18:5
20:22 22:14,23
37:9 39:15
42:5 56:7,20
66:17 77:3
88:20 116:6
126:7 135:15
136:5 137:10
138:15
**longer** 20:25
**look** 38:19 42:20
95:17 97:22
98:13 100:12
101:3 144:15
147:3 151:11
153:4 159:24
177:14 180:14
182:24 183:3
184:23
**looked** 122:16
169:10
**looking** 6:4
150:11 158:8
160:10 161:19
177:21,24
178:7,9 179:12
179:13 182:9
183:11 186:2
**looks** 173:10
178:9,18
186:22
**Loss** 98:14
**lost** 36:8,12
**lot** 67:6 87:20
**loud** 148:6
**lower** 162:13,16

**M**

**M** 2:11 97:18
**mad** 163:13,25
164:5
**main** 4:23
**majority** 43:23
67:8,10
**makeup** 113:25
**Manhattan** 34:2
**manner** 7:7
**manufacturing**
73:7

**March** 17:21 19:11
**marked** 142:13 176:14 179:20 192:13
**marriage** 194:16
**married** 89:10
**material** 38:23 143:16
**materials** 22:2 22:13 23:8 38:8 193:21
**matter** 194:19
**matters** 88:9
**McCaffrey** 1:8 5:10 6:21 15:2 78:23 79:6 90:3,19 91:3,7 91:9,12,16 92:2,12,16,24 93:11,17 98:19 101:4 105:16 106:24 108:3 108:11 109:7 109:21 110:10 114:12 123:2 128:16 129:2 131:9,13 132:9 133:8 134:16 134:18 135:5 137:6,8,16,21 137:25 150:2 152:18 153:5 153:19,23 154:8 162:25 169:17,21 171:12 172:6 184:18
**McCaffrey's** 131:25 139:19
**Meadow** 4:11 15:22
**mean** 37:24 48:2 60:2,6 62:9 65:6 82:12 85:13 94:18 97:8 112:20,24 115:13 124:16 129:3 130:25 141:7 146:20 148:15 150:6 152:6 153:16 156:2 183:13 184:8 185:7 186:9
**meaning** 50:22 50:23
**means** 97:10 115:12 148:16 152:7 185:9 186:18
**medical** 46:22 52:18 53:14,19 53:20,20,21,24 54:21 55:6,7 57:25 61:17,19 107:24 109:10 119:19,21 120:2,2,4 122:10,14,18 122:19 123:12 126:5 128:4 129:19 147:10 149:8 173:20 174:20
**meet** 76:15 77:13
**meeting** 76:20 76:22 77:11
**member** 43:16 46:19 53:13 63:25 64:6 94:19 100:8,10 123:22
**members** 11:10 43:6,7 52:11 55:8,12 112:17 124:17
**memories** 35:19 70:10 136:11
**memory** 35:18 70:13,23 78:16
**memos** 23:4,9 23:14
**mention** 190:3
**mentioned** 15:4 29:20 31:19 47:4 53:13 54:21 102:21 106:9,19 123:18 124:21 127:21 128:22 129:25 166:15 179:5 187:12
**met** 77:2 79:23
**methods** 57:17 61:9
**Mets** 88:12
**Michelle** 146:2
**middle** 57:11 166:5,19 167:5 182:14 186:14
**midnight** 150:23 187:9
**midnights** 124:25
**military** 16:24
**mind** 32:23 141:3,10,20
**Mineola** 2:10
**Minerverni** 152:9
**minimum** 23:10 28:23
**Miniverni** 154:14 155:16
**minor** 172:13
**minute** 37:12
**minutes** 65:9 77:4,5 126:10 126:12,14,15 126:16 137:12 138:18 168:18 179:6 189:7
**misconduct** 43:25 93:16
**missed** 154:23
**moments** 176:20
**money** 12:16
**month** 18:4 56:22 135:9,10
**months** 20:23 56:23 135:11 135:12 136:14 136:22 137:15 138:9,24 139:3
**mop** 61:2
**morning** 54:16 186:23
**motion** 3:12
**move** 3:8,10
**moved** 187:15
**multiple** 67:20
**multitude** 164:21

**N**

**N** 2:2 3:2 84:24 193:2
**name** 4:7 6:13 27:16 78:11 79:14 85:11,11 85:16,19 111:6 111:8,19 145:25 146:8 151:23 153:10 184:24 187:11 187:24 188:3
**named** 4:17 5:18 12:25 188:11
**narration** 55:13
**narrative** 155:21 156:2 156:19 162:23 166:12,24 167:13
**Nassau** 1:7,7,7 1:10 2:9 10:12 10:14 11:15,16 14:12,15 17:6 17:9,11,13,20 18:6,14,17,25 19:8 23:19 41:18 44:18 66:18 74:4 79:22 85:10 95:20,22 113:11 120:5 123:6 142:15 149:10 176:5 182:22
**nature** 10:3 11:21 34:12 92:19 95:18 158:17,25
**NC656** 94:3
**NCPD** 149:4,18
**NCSD** 95:19,19
**near** 34:4 88:18 127:18 144:7 190:19
**necessarily** 160:24
**necessary** 28:23 126:25 127:2
**neck** 161:21
**need** 9:2 40:16 40:21 62:5,24 63:21 65:8
**needed** 32:5 110:18 139:24
**neighbor** 88:17
**never** 44:15 47:15 85:9 105:4 146:14 146:24 154:10 164:22 171:18 172:2,6 185:21
**new** 1:2,23 2:5 2:10 4:4,12 15:23 33:10,17 112:5 121:2 185:20 189:25 194:7
**Nicholas** 79:11 79:15
**night** 173:18 186:23 187:3
**Non-Party** 1:18
**normal** 129:8 131:2
**notarized** 104:16
**Notary** 1:22 3:15,16 4:3 192:22 194:6
**notation** 191:7
**note** 20:7 95:11
**noted** 192:11
**notes** 126:18

137:20 138:20
**notice** 94:16
144:23 161:19
181:8 193:12
**notified** 60:19
77:24 149:4,13
**notify** 83:18
123:13
**November** 98:11
105:14 131:6
**number** 7:8
16:23 63:19,20
67:7 78:14
82:16 83:25
84:9 92:13
95:9,11 114:7
116:14 148:8
148:11,13
150:11 177:19
182:7,10,18,22
185:15,17,18
185:20,21,23
185:24
**numbers** 121:12
176:15
**NYPD** 37:7,16
48:20

**O**

**O** 3:2 4:2
**O-C-C-H-I-N-O**
79:14
**oath** 8:8,11,12
**object** 3:7,10
**Objection** 22:20
24:14 25:15
26:9 28:11
31:2 39:7
44:19 52:5
59:24 66:10
67:3,18 68:24
69:5,16 70:19
70:24 71:13
73:14 74:6,10
74:24 75:7
98:5 109:16
115:9 124:9
130:23 132:3
135:16 136:7
136:16,24
139:7 141:4
159:19 160:21
161:8 162:7
171:8,20 173:2
175:8,15
188:16
**obligated** 123:13
**obligation**
190:25
**observe** 160:4
160:10
**observed** 109:13
160:17 191:8
**obtain** 35:9,13
68:6,20 69:3
70:8,16 72:2
119:18 168:24
**obtained** 104:4
107:19 109:2
117:12 119:17
119:18 129:20
149:2,3,3,23
150:2 151:8
**obtaining** 36:20
**obviously** 84:16
161:15
**OC** 25:24
**Occhino** 79:11
79:15,18
**occupied** 133:16
**occur** 39:13,18
39:19 80:17
81:8,17,20
**occurred** 41:7
51:7 58:12,16
83:11 92:17
98:10 131:17
135:8 147:24
153:2 154:20
169:25 172:12
173:7,16 181:6
**occurrence**
120:8 144:8
**occurs** 39:16,17
**October** 19:16
110:7 112:3
113:19 114:13
147:19,25
152:22 169:5
173:13,17,22
173:25 186:21
187:5 190:20
**odd** 115:8,12,13
130:22
**offers** 33:18
**office** 2:9 14:15
14:18 74:16
75:13 86:11
87:21 98:4
109:9 113:12
116:7 143:14
144:4 180:15
**office's** 30:24
**officer** 1:8,8,9
6:21 13:17,21
14:22 15:2
19:24 20:2,14
20:18 21:11,18
21:21,25 23:11
23:15 24:13,21
29:14,18 31:11
32:8 33:4
47:13,17 55:18
56:11 62:3
65:4 69:13
70:17 71:5
72:17,21 73:2
73:7,10,12,18
73:23 74:13,20
75:3,9,10 76:7
78:23,24 80:10
80:21,24 82:10
83:23 84:24
85:7 86:3
87:12 94:25
95:4 99:8,15
106:5 108:3,10
109:13 110:10
112:24 114:4,5
114:22 116:11
117:2 118:7,12
118:19,24
122:22 123:2,2
124:2,8 128:15
128:18,19,22
128:23 130:3
131:10 132:11
133:7 135:15
136:3,15,23
138:6,13,16,21
138:25 139:4
139:12,19
141:17 145:16
145:23 146:14
151:20 155:8
155:12,16
162:24 163:4,6
163:8,12
164:14,19
165:17 166:4
166:18 167:16
168:15 169:17
171:5 175:23
179:6 180:24
190:23
**officer's** 70:13
70:22
**officers** 5:10
21:2 23:18
31:13 56:5
62:7,14 70:4
75:20 86:15
108:6 117:25
124:22 128:20
129:10,15
142:3 150:18
152:20 154:5
170:19 171:13
**officers'** 180:4
**okay** 5:13 6:23
7:23 8:5,6,24
8:25 9:5,6
25:20 65:22
71:22 72:12
100:16 105:10
142:14 144:17
155:22 159:10
176:22,23
183:6
**Okeno** 176:9
**old** 16:6 18:13
18:21
**on-the-job** 44:9
47:20,24 48:7
49:2,6,10,14
49:17,21 50:3
50:19,25 51:5
51:9,17 191:21
**once** 14:2 32:8
32:20 33:4
69:25 122:24
**ones** 82:7 104:9
140:21 181:24
**online** 41:13
**open** 57:8
121:11,13
133:2 141:3,10
141:20 153:10
**Operating** 45:9
45:15 97:9
**order** 32:3 62:6
99:14 113:2
**ordered** 147:14
**orders** 23:3,3,8
23:9,13,14
**ordinary** 24:8
115:17 116:24
**organizations**
19:5
**original** 3:17,21
**ouch** 109:15
**outcome** 10:22
12:18,24 15:7
194:19
**outline** 42:18
**outside** 13:3
39:10 40:24
59:2 78:20
80:6 88:4,10
91:25 143:14
168:10 178:14
178:19 189:14
**outward** 178:10
**overtime** 153:5
153:6,7,8,20

**P**

**P** 2:2,2 3:2 4:2
**p.m** 42:7 192:11
**package** 56:2,2

56:3 61:23,25 62:6 123:16,19 124:4 125:6
**packages** 5:20
**page** 94:7,9 143:22 144:16 144:22 150:6 156:18 186:14 193:6,11,20
**pages** 150:8
**Palaromo** 105:18
**pants** 118:13,18
**paperwork** 132:19
**part** 3:5 12:23 59:22 77:8 79:2 95:17 108:19 134:23 152:21 154:16 165:24
**partial** 118:14 118:20
**participated** 121:21
**particular** 42:16 46:15 104:25 143:21 153:18
**parties** 3:4 194:17
**partner** 93:12 100:25
**parts** 12:21 98:24
**party** 12:22
**passing** 90:22
**Patrick** 1:8 6:21 15:2 90:3 91:11 92:2 150:2
**patrol** 168:23,24 169:4 181:12
**PD** 34:20 37:5 37:22 41:5,6
**penalized** 64:7,8
**penalty** 94:21 95:3,6 99:14
**people** 35:2 48:22 62:22 79:9 82:8 107:15,17,20 113:15,24 138:3
**percent** 14:4 34:3 48:14 82:4 83:19 134:3 167:24 186:18
**Perfect** 6:7
**performed** 122:20 148:15 148:17
**permissible** 139:15,16
**permitted** 139:11
**person** 39:20,22 40:4 41:15 64:19,20 77:2 100:5
**personal** 40:12 90:24 91:7 102:16
**personally** 82:6 83:2 85:25 108:23 117:14 125:22
**personnel** 5:18 94:16 193:12
**pertinent** 127:6
**phone** 76:24 77:20 139:13 168:13
**phonetic** 14:23 99:6 105:18
**photo** 158:12 159:25 160:15
**photograph** 59:19 60:17
**photographic** 172:20
**photographing** 58:22
**photographs** 51:6,10 52:17 58:7,8,11 61:20 83:9 107:22 117:12 117:15 119:17 129:19 149:3 161:24 162:15 173:5 191:23 193:15
**photos** 4:19 6:3 59:6,11,16 61:5,6 109:11 157:23,24 173:9,11,25 174:4,5 176:24
**physical** 29:23 30:6 50:4,16 51:18 57:25 58:17 83:7 159:14 160:19 171:16 174:18
**physically** 73:19 73:24 74:14,21 75:4,11
**pick** 87:3
**picture** 177:22 179:24
**pictures** 5:12 127:3 176:17 177:3
**pieces** 33:15
**Pierce** 1:17 4:9 5:1,7 6:1,14,15 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 93:23 94:1,6 95:1 96:1,21 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1,21 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1,11 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1,5,17 193:1,5 194:1
**pinpoint** 164:20 164:22 165:9
**PINTO** 194:6,23
**place** 1:22 11:11 37:14 41:17 61:18 65:10 81:18 92:10 105:14 140:10 176:3 189:10
**places** 5:6 81:18
**plaintiff** 1:5,19 2:4 6:16 13:9 127:8 167:3
**Plaintiff's** 94:2 104:19 131:3 142:13 176:14 179:19 181:17 182:15,18,21 192:12 193:11
**platoon** 124:11 150:19 153:14 153:17,18,21
**platoons** 124:23 153:17
**Plaza** 33:23
**plea** 10:25
**please** 4:8,10 6:12 7:7,8,13 7:21 8:17 9:3,4 15:20 16:11 100:13 105:7 121:20 148:6 149:21,24

176:19
**PO** 149:23
**pod** 57:10
**point** 9:3 27:18 40:3 62:15 189:11
**police** 33:10,14 33:18,23 41:18 79:22 123:6 149:10 176:6
**policies** 21:14 23:5,17,22 29:10 30:24 45:3 74:4,16 75:13
**policy** 25:16,23 83:18 84:10 109:9
**portions** 96:20
**position** 20:9 131:25 171:25
**possession** 11:8 102:14,16
**possible** 26:23 27:2 34:17 35:14 36:5,23 49:3,8,12 50:13,17 67:14 69:14,22 70:9 70:18 71:6 134:17 140:16 142:7 161:16 161:17 162:4 162:10 171:5 174:17 175:10 188:14,17,20
**possibly** 96:18 147:22
**post** 32:14 153:10 154:22
**posting** 32:13
**potential** 35:5 35:10,14 39:12 49:22 50:8,12 56:25 57:3,7 58:5 66:16 67:12 68:7,14 71:9,25 127:12 129:10 132:21 132:22 155:8 155:12,16
**potentially** 165:13
**Povaromo** 14:22
**practice** 1:20 144:3
**practices** 21:10 21:24 29:14 73:13
**preparation** 78:5
**prepare** 24:3,7 102:7 142:25 156:5
**prepared** 147:7 156:7
**preparing** 156:10
**present** 77:10 117:20 124:18 137:6 138:12 184:19
**preserve** 60:25
**pretty** 31:17 56:10 65:7 88:8 89:4 119:9 120:19 125:18 178:6 180:15 181:24
**prevalent** 116:20
**previous** 18:18 19:17 118:22
**previously** 53:19
**primary** 62:23
**print** 93:8 186:17
**printed** 183:15 183:19
**prior** 12:12 17:8 18:17,24 19:22 47:12 58:6 67:2 76:16 77:14 89:20 115:25 116:19 139:20 173:3
**prisoner** 30:23
**prisoners** 30:16 30:20
**probably** 14:5 26:6 54:22 103:23 137:12
**problem** 192:9
**problems** 163:13
**procedure** 45:9 45:16 167:24 175:21,24
**procedures** 21:9 21:24 23:5,17 23:23 29:10,15 30:25 45:4 73:13 74:5,16 75:14 97:9 109:10
**proceeding** 13:20 15:5,8 15:10,15 107:8
**proceedings** 7:11 15:12
**process** 53:16
**produced** 10:5
**production** 38:13,22 46:8 96:11 102:11 169:4,13
**professional** 24:21
**profiling** 37:23 37:25
**promoted** 91:18 106:12,15 111:25 113:2
**promotion** 91:18
**pronounced** 79:18
**proper** 21:9,17 21:23
**properly** 30:6
**protocol** 127:14 168:7
**protocols** 127:21 128:10 133:19 133:21 134:9 167:17,22 178:3
**provide** 67:17 68:15,23
**provided** 3:5,19 31:12 101:4 107:4 193:21
**psychology** 28:14
**Public** 1:22 3:15 3:16 4:4 192:22 194:6
**pull** 131:4 151:5
**pulled** 118:12,18
**pulling** 104:19
**punch** 161:2 162:5
**punched** 118:7,9 159:4 172:24 174:13
**punishment** 74:23
**purpose** 24:2,6
**pursuant** 1:19
**put** 27:15 32:14 118:13 130:4 144:12 153:10
**puts** 143:8
**putting** 114:23

**Q**

**quarantine** 128:3,8 134:13
**quarantined** 163:14 164:2,6 166:20
**question** 3:7,10 7:13,15,18,21 8:3,4 9:4 27:2 49:11,22 72:24 86:19 115:16 135:25 136:20 141:11 173:3 188:25
**questioned** 103:8,12 107:10,14 118:6
**questioning** 55:24
**questions** 6:18 7:5 8:2 9:12 37:15 191:15
**quickly** 54:9 55:17

**R**

**R** 2:2 4:2,2,2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1

112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1 189:1
190:1 191:1
192:1 193:1
194:1
**race** 12:5
**racial** 12:2
37:19,23,25
39:10 83:21
84:19,22
169:18 170:8
170:25 171:19
171:23
**rank** 19:12,15
19:17,22,25
111:10
**rape** 83:14
122:21 149:18
**reach** 77:24
**reached** 103:13
174:23
**reaction** 110:25
**read** 64:12
100:13 105:7
108:19 148:4,6
149:15,21,24
162:18
**reading** 85:19
98:23,23
**realize** 8:15
**really** 40:5 41:6
76:21 87:22
125:2,4 178:4
186:11
**reason** 9:14
124:6 132:20
175:11 191:23
**reasonable**
144:9
**reasons** 18:9
**recall** 12:12 22:3
22:14 25:23
26:24 27:4,10
28:16,20 29:25
30:8 34:8 37:9
38:6 41:7
45:18 48:10,18
85:22 90:13,16
90:17,18 92:15
93:4,9,21
94:10,11 98:7
98:12 101:2,16
101:17,18
103:6,7,10,11
103:14,16,25
104:4,7,9
108:25 110:7
110:12 113:20
116:18 117:22
120:20,24
121:24 123:15
123:17 127:8
132:13,15
133:6,12,14,15
135:4,6 137:9
137:10 138:14
139:25 147:2
162:11,14
163:10,11,15
164:13,17,23
165:5 166:3,6
166:17,22
167:15,18
169:2,15 173:8
176:7,8 184:17
188:5,9,13,21
189:2,5
**receive** 16:16
19:25 21:5
22:8 26:16
31:6 37:17
38:4,8 40:25
44:6 51:17
94:21 191:21
**received** 4:18
5:17,19 27:14
31:7,19 47:19
48:6 113:5
117:5 122:24
135:24 140:11
140:14 142:2
148:24 190:16
190:19
**receives** 43:16
**recess** 37:14
65:10 92:10
140:10 189:10
**recognize** 99:3
157:24 176:24
181:18 183:7
188:3
**recollection**
25:18 26:6
28:13,17,22
29:2 93:4,20
100:18 105:12
106:20 117:23
**recommend**
95:6
**recommended**
41:23 42:2,3
**recommends**
95:3
**record** 4:7,15
96:18 98:21
140:7,9 144:5
169:13 175:18
175:20 194:13
**recorded** 54:5,8
61:14 104:8
117:17 144:8
**recording** 79:5
181:14
**recordings**
78:21,22,25
79:4
**recordkeeping**
95:10
**records** 5:9,17
5:24 53:14,22
53:24 54:22,23
55:6 58:2
61:17,20
107:24 119:19
120:3,4 122:11
122:14,18,19
126:5 147:10
149:8 174:20
190:11
**recovery** 10:21
**rectum** 80:25
82:11 114:23
115:15 116:12
117:3 118:14
118:20,25
119:7 130:5
148:9
**redness** 161:20
161:22
**refer** 53:5
**referred** 180:7
**refresh** 78:16
100:17 105:11
106:20
**refused** 68:14
**regarding** 4:19
5:9 6:19 23:4
45:4 69:13
70:17 72:22
107:6,11 110:8
139:12 169:18
191:22
**regards** 176:9
**regular** 143:19
144:3
**regulations**
94:20 95:23
96:9,12 193:23
**related** 37:22
43:2 80:16
194:15
**relating** 37:3
**relation** 182:13
**release** 52:19
53:20 117:13
119:18,25
149:7
**released** 67:2
**relevance** 97:24
**relevant** 96:20
163:25 164:3,8
164:12 165:6
166:9 167:9
**relied** 48:21
156:24
**rely** 48:19
**relying** 44:11
**remember** 14:20
22:19,23,25
26:19,20 27:8
38:24 39:2,3
39:14 41:4
80:14 85:18
93:6 119:4
121:4 163:5
164:18 165:17
168:2,5
**rendered** 125:14
**repeat** 13:18
68:3 132:6
161:11
**repeatedly**
118:8

**rephrase** 7:14
**report** 31:17 56:8 62:17 63:2,12 64:9 64:12 73:3 75:12 76:7 102:8,12 106:24 109:8 123:20,23 146:18 156:3,4 156:7,10,13 190:17,19 191:2,5,7 193:24
**reported** 57:24 176:4
**reporter** 4:6 7:10
**reports** 56:6,9,9 77:8 85:19 122:17 185:11
**represent** 6:15
**representative** 99:20 124:18 137:8
**representatives** 1:10 139:20
**representing** 77:25
**request** 6:5 55:7 57:25 126:4
**requested** 4:16 125:17 151:7
**REQUESTS** 193:19
**require** 63:11 104:13
**required** 20:13 41:20 56:5 103:4 123:23
**reserve** 4:25
**reserved** 3:9,13
**respect** 6:18 30:17 91:12 103:13,15 122:15 125:25 136:4 137:20 139:5 140:5 146:23 189:21
**respective** 3:4
**respond** 24:11 59:18
**responded** 11:7 148:25
**responses** 7:4
**responsibilities** 43:21 45:5 112:5
**responsible** 58:21 143:6 189:13,20
**restraining** 22:11
**result** 141:20,24 141:24 146:15 146:19 190:12
**resume** 32:15
**retire** 111:14
**retired** 14:24 111:13 183:25
**retrieval** 46:21
**retrieve** 58:16
**return** 3:17
**review** 8:21,22 51:2 53:21,23 54:23 62:14 64:13 78:4,19 155:23 176:16 176:20 189:7
**reviewed** 78:6 78:15 107:24 108:10 109:12 122:19 142:17 145:15 156:19 156:20 157:4,6 161:24
**right** 3:7 4:25 28:4 29:22 37:4 40:19 42:8 44:4 47:13 52:20 54:24 57:17 60:12 61:9 63:3 67:14 69:4 70:5 76:11 84:13 85:5 86:9 89:18,24 94:8 95:8 101:24 102:23 105:17 106:16,21 109:3 111:23 114:13 118:20 119:14 122:11 124:4 126:11 131:6 134:6,23 142:18 147:8 147:11,14 152:10 153:13 154:5,8 158:9 161:5 165:12 165:14,16,25 168:9 171:16 172:17 173:22 177:19 178:22 183:11,16 186:4 187:6,19 187:22
**rights** 3:5,19 75:6
**Robert** 1:4,17 4:9 6:14,16 25:3 90:11 91:12 110:9 115:20 116:22 117:23 119:14 119:16 120:21 126:8,21 127:19 129:25 131:13 132:23 133:5 134:14 134:19 138:10 139:6 140:2,13 142:3 148:7 152:25 154:18 161:24 162:11 162:20 165:12 165:25 169:15 170:21,24 172:7 173:15 175:13 176:10 181:5 182:4 184:20,24 186:3 187:11 188:6 189:24 190:8 192:17 193:5
**Rockland** 41:5
**role** 112:4
**roster** 154:24
**route** 119:20
**rule** 3:19 7:3 96:2,22 97:2
**rules** 1:20 3:6 6:25 9:8 94:20 95:23 96:8,11 193:23
**runs** 42:14

**S**

**S** 2:2 3:2,2
**S-T-U-S-S-E-Y** 80:10
**safeguard** 30:6
**satellite** 82:2
**Saturday** 42:23
**Saturdays** 42:7
**saw** 91:17 106:9 110:2 134:18 158:20
**saying** 40:2 45:14,25 81:11 114:24 125:4 129:5 166:4,18 167:18 173:24 188:13
**says** 45:20 94:7 95:9,18,25 98:14 99:19 101:4 135:22 145:15 146:4 147:18 148:3 148:14 150:5 150:24 152:3,4 152:5 153:4,14 157:6 183:10 183:12,18 184:7 185:5
**SBI** 45:25 95:13 145:10,15 146:4,12
**SBI-004-10** 95:9
**scene** 58:15,22 59:5,5 83:10
**scenes** 42:15,15
**scheduling** 124:11
**schematic** 181:21 193:16
**Scieta** 99:6 101:22,23
**scroll** 155:18
**search** 5:7,8 6:2 128:17
**searched** 5:6
**second** 90:9 92:9 94:9 100:11 111:21 129:21 144:16 184:11
**section** 11:13 97:18 100:6,11 153:5
**secure** 27:20 49:15 51:2
**securing** 49:18 50:12,16 191:22
**security** 40:3,6 40:18 47:17 154:22 155:2,4 170:11
**see** 55:8 86:14 87:2,16 90:7 90:12 93:23 98:25 99:20 104:24 122:16 122:20 145:7 147:19 148:3 148:21 150:4 150:12 151:10 151:22 152:3,9 153:13 155:25 159:2,25 160:6 161:22 177:17 178:17 179:11 179:22 180:18 180:20,22 182:10 184:23 186:13 187:24 189:7

**seen** 61:5 86:23 87:19,20 88:23 90:8 96:15 104:21 105:4 109:23 110:3 181:22,23
**send** 5:11 63:5 83:16 125:19
**sent** 53:19,20
**separate** 12:21
**September** 19:21
**sergeant** 15:3 56:13 64:18 99:6 106:14,18 149:4,9,17
**Sergent** 101:22
**SERVANTS** 1:9
**service** 16:25 43:6,7 113:3
**Services** 17:17 41:12 42:17
**set** 23:9 55:25 65:7 194:10,20
**setting** 57:10 112:16
**Seventeen** 18:23
**severe** 159:5
**severity** 54:19
**sex** 79:21
**sexual** 38:5 80:17,21 85:4 114:17 123:9 123:13 140:12 175:22 176:5
**sexually** 110:23 176:11
**shake** 7:5
**share** 132:8
**sheet** 150:16,17 170:10,11,15 170:16
**sheriff** 45:3,6,25 75:13 99:25
**sheriff's** 1:8 14:15,18 17:6 17:9 18:2,12 19:9,10 20:12 20:14,19 21:14 23:4,19,23 29:10 30:24 44:18 45:15 46:8,23,25 74:4,16 85:10 95:15,20,22 109:9 113:12 116:7 120:6 143:19 144:4 175:24 189:13 193:22
**shift** 153:7,8 184:13,16 185:13
**shoe** 93:8
**short** 16:21 45:25
**shorter** 20:25
**show** 25:24
**showed** 48:22 77:7 131:3
**shower** 168:12 178:12,12 179:18
**showing** 142:12 176:13 179:19 181:17 182:15 182:20
**sick** 152:4,5,7
**side** 58:23 59:3 62:3 158:14 159:8 160:4,8 160:11 161:25 172:25 174:9 175:7 178:17
**sign** 41:20,23 52:18 64:13 99:13,16 104:13,17,18 117:13 145:20 146:10 157:12
**sign-off** 55:16 64:25 146:12
**signature** 99:2,3 99:21 101:20 145:10,13,17 146:3
**signatures** 145:7
**signed** 55:14 99:10 100:3 157:7,8
**significance** 150:25 186:15
**Significant** 60:14
**signing** 100:6
**similar** 32:15 85:11,12,13 119:2,13 131:20 181:23
**similarity** 132:8
**simultaneously** 124:13
**sir** 6:12 16:4
**sit** 147:23 161:23
**sitting** 32:25 108:13 165:16
**situation** 26:12 54:11 139:10 146:13
**situations** 24:4
**six** 56:23
**slight** 160:14
**slurs** 170:25 171:23
**smoking** 118:3 164:15,20 165:10,14,19 166:18,21 190:6,13,16,21 190:24 191:9 191:11
**somebody** 62:21 62:25 99:17 115:14 118:2 128:8 190:15
**someone's** 118:25
**somewhat** 105:15 106:21 131:20 158:17
**soon** 35:14 36:4 36:23 50:13,17 56:10 67:14 69:14,22 70:9 70:18
**SOP** 45:7,8,10 45:19,20,23 46:9 193:22
**SOPCD** 97:8,11
**sorry** 13:18 17:23,25 57:2 58:6 65:9 68:3 132:6 154:23 177:10
**sound** 85:17
**sounded** 85:16
**Sounds** 126:11
**speak** 27:2 49:11 53:24 54:2,4,22,25 61:3 88:6 90:14 91:16 109:21 110:18 127:17 139:18 192:7
**speaking** 82:7 176:8
**Special** 95:13 123:5 149:11
**specific** 37:3 43:2,5 78:11 103:25 116:3 120:6 122:7 123:16 133:10 139:25 189:18
**specifically** 47:7 112:13 120:11 121:4
**specifications** 13:16,20
**specifics** 34:8 93:9 101:19
**Speculation** 162:8 188:18
**spell** 111:19 146:6
**spelling** 79:13
**spoke** 11:20 80:13 84:13 89:23 90:19,20 97:6 119:21 122:19 174:2
**spoken** 87:23
**staff** 10:5 11:9 43:16,25 55:8 55:11 63:25 64:6 92:22 94:19 110:23 112:17 121:25 122:2 123:22 124:17 150:15 150:17 151:16
**staff-on-staff** 43:23 44:17
**Staib** 1:9 86:4 86:23 152:14 154:10 155:12
**stairwells** 180:5
**stamp** 5:15 144:15 155:20 174:3 179:21
**stamped** 94:3,8 142:15 182:22
**stand** 17:15
**standard** 29:18 45:9,15 97:9
**standards** 21:20 23:10
**start** 17:19 184:15
**started** 4:14 6:9 18:14 88:21 131:2
**state** 1:23 4:4,7 4:10 6:12 15:20 194:7
**stated** 117:25 128:21 130:2 132:9
**statement** 4:15 35:13 50:12 67:17 68:7,15 68:20,23 70:16 73:11 75:17 108:11 109:7 109:14 129:6 163:16
**statements** 34:11,11 35:9

36:20 51:16 66:15 67:14,24 69:4 70:8 104:5 107:19 108:14 109:2 109:12 169:18 169:22,25 171:7
**states** 1:2 45:11 108:20 155:25 172:9
**stating** 149:19
**station** 180:4
**stationed** 180:24
**step** 25:25 122:25
**steps** 25:25 26:7 52:2 103:5,8 107:11 122:15
**stick** 115:14
**sticking** 117:2 118:24
**STIPULATED** 3:3,23
**stomach** 118:12 118:16
**stop** 37:25 52:20
**stopped** 166:21
**stored** 143:4,10 143:11
**storing** 143:6
**story** 119:2
**Street** 2:5,10 34:2,3
**streets** 34:22
**Strictly** 33:20 47:17
**strike** 3:8,11 158:22 159:12 159:15 160:20 160:24 161:5,7 161:13,15 174:18
**strikes** 162:13
**stuck** 80:24 82:10 116:11 118:19 119:6
**stuff** 37:23

60:23,24 87:5 112:18 147:13
**Stussey** 1:9 80:10 85:7
**subject** 15:14,17 62:6,9 105:17 139:12
**subjects** 49:23
**submit** 55:7,14 63:12 64:9,16 64:22
**submits** 56:13 56:14 64:19
**submitted** 55:15 56:12 119:24 119:25 150:3
**subpoena** 1:21 15:25
**Subscribed** 192:20
**Subsection** 97:14
**substance** 163:22
**substantiate** 174:21
**substantiated** 60:11 83:3 94:25 106:2 172:20
**successfully** 33:4
**suffered** 162:12
**sum** 163:21
**summaries** 162:22
**summarized** 163:17 164:25 166:11
**summary** 162:19 163:17 166:24
**Sunday** 42:24
**Sundays** 42:7
**superior** 63:6 64:10,10,14,16 111:12,17
**superiors**

156:17 157:3
**supervise** 112:10,11
**supervisor** 12:5 55:14 63:13 183:22
**supervisor's** 99:2 101:20
**supervisors** 11:23
**supervisory** 112:9,14
**supposed** 157:12
**sure** 14:4 16:22 18:3 28:2 34:3 37:8,13 38:20 42:21 60:9 82:3,4 83:19 87:25 134:3 167:25 186:11 186:18 188:20 189:9
**surrounded** 186:3
**surveillance** 51:3 130:13,14 130:15 191:22 192:2
**sustain** 93:10 175:12
**sustained** 63:23 93:7,14,16 140:6,22 162:5 170:4 171:23
**SVU** 83:18 122:20 123:4,8 149:4,18
**swelling** 159:3 160:4,6,11,15 160:19 162:3
**switch** 110:5
**sworn** 3:14 4:3 192:20 194:10
**syndrome** 17:18

**T**

**T** 3:2,2 4:2

**table** 96:19
**tables** 181:9
**tactics** 22:11
**take** 5:3 8:13 9:2 9:4,5 11:11 25:25 32:11 33:15 37:11 38:19 41:17 43:22,23 44:22 46:10 51:6,10 52:2,11,17 55:5 56:8,21 56:22,23 58:7 58:8,11 59:10 61:5 83:9 92:7 96:13 102:19 122:14 127:3 134:18 137:19 158:2 162:15 168:12 176:19 182:24 183:3
**taken** 1:18 8:8 133:7 146:24 172:21 173:6 173:11 174:6
**takes** 56:2 61:18
**talk** 20:8,11 27:12 34:13 36:19 77:13 88:24 91:23 163:3 169:14
**talked** 19:7 66:14 156:17
**talking** 11:14 34:6 39:11 51:21,22
**target** 14:23 92:23 93:13
**task** 148:16
**taught** 21:9,14 21:17,20,23 24:11,17,20 25:8 26:22 27:5 28:6,9,14 28:18,22 29:2 29:8,23 30:2,5 30:15,19 37:7 48:10,11

**teach** 35:4,8 47:25 49:3,7 49:11,15,18,22 50:4,7,11,15 51:2,6,10
**teacher's** 17:14
**technically** 87:21
**techniques** 22:9 26:3 33:13
**tell** 7:16,21 8:8 40:5 57:15 78:2 188:7,15
**telling** 139:22
**ten** 14:6 34:6,7 82:19,21,22,23 84:2,3,8 103:22 104:2 113:22,24 116:10,13,17 118:22 119:5 126:12,14,15 126:16 132:18 186:6
**term** 115:12
**test** 32:11 113:3
**testified** 4:5 12:11 13:4,15 13:19,22,25 15:4,11 47:19 70:7 107:8 116:16 162:3 174:16 183:23 191:20
**testify** 9:15 14:8 102:22 103:4
**testimony** 1:20 3:8,11 14:2 116:21 160:3 160:16 194:9 194:13
**thank** 192:5,10
**thing** 53:2 55:20 55:22 57:19,23 58:4 61:16,21
**things** 26:3 32:24 34:11 36:8 38:2

39:21 45:21 59:17 61:11 84:15 85:3 87:4 88:14 108:8 140:23 146:22
**think** 5:14 6:8 9:25 33:25 59:20 60:5 69:20 81:14 82:15 87:7,18 94:14 98:2,22 119:10 120:14 126:13 134:3 135:7,13 136:10,13,21 140:18 153:9 162:3 164:7,11 166:20 167:8 169:8 171:4 173:4 175:4 188:14
**thinking** 53:4
**third** 7:12 116:24
**Thomas** 1:8 6:22 87:12 90:12 99:6 101:22 149:23 162:24 163:4 163:18 165:2 166:13
**thorough** 65:17 66:4,8 71:20 72:8
**thought** 118:2,3
**threaten** 30:20
**threatening** 30:23
**three** 5:18 42:6 42:10 49:25 50:2 60:22 80:3,12 92:14 92:14 114:25 115:18 135:12
**three-month** 135:14
**tier** 40:22 57:14 118:2,4 121:14 128:2,4,8,24 129:4,7 133:3 133:15 134:13 134:17 164:16 164:20 165:14 165:20 166:5 166:19 167:3,6 168:12,16 177:4,25 178:4 178:5,13,14 179:14 182:5 183:10 184:10 184:12 186:4 187:16 190:7 190:14,20,25 191:12
**tiers** 33:2 121:9 181:21
**time** 1:22 9:23 10:2 19:21 22:15 31:10 37:9 39:15 41:6 54:13 56:2 60:19,20 61:19 63:14 99:9 100:2 104:6 105:16 106:4,13 110:18 113:18 114:8,20 115:6 115:19 116:20 116:22 120:20 127:13,23,25 128:3 133:10 133:12,13,18 134:11 135:15 136:5 138:8 144:7,9 145:18 145:24 146:17 152:23 154:18 157:10,18,20 168:4 170:20 174:3 177:9,12 183:16 184:20 185:18,20 186:9,13,18 187:17,19 190:7,20 191:13 192:7 192:11
**timeline** 63:17
**times** 9:21 13:24 32:18 69:6 79:23 80:3,12 80:14,18 87:18 92:11 119:10 159:3 180:24
**title** 11:17 16:4 32:5 64:15,20 111:10,22
**today** 8:8,12 9:16 40:10,22 63:9 76:16 108:13 116:15 147:23 161:23 192:8
**today's** 7:11
**told** 5:5 100:9 110:20 111:2 120:11 122:22 131:9,16 163:12 164:19 165:5,18,18,22 167:16 188:22 189:3
**tolerated** 29:3
**top** 95:8 150:24 153:13 183:11 183:20
**tour** 150:19,20 150:21,21 185:12,14 186:23,24 187:3,10
**train** 34:16 35:12,21 37:2 44:12
**trained** 22:4,18 25:11 26:25 30:9,12 34:9 39:5,12
**training** 21:6 22:7,16,24 24:2,6 26:17 26:19,21 27:9 31:6,7,9,12,15 31:16,20 32:9 33:5,8,9,19 34:5 37:7,10 37:16,17,21 38:3,4,7 39:4 40:25 41:2 42:5,25 43:17 44:7,10,15 47:20,24 48:7 48:16,19,20 49:2,6,10,14 49:17,21 50:3 50:19,20,25 51:5,9,18 67:22 68:5 73:21 74:17,19 75:2,23 76:4 83:20 158:19 160:17 191:21 193:21
**trainings** 22:13 43:10,13
**transaction** 144:8
**transcribed** 104:12
**transcript** 7:11 8:22,24 194:12
**trauma** 160:7
**treat** 30:16
**triage** 112:15,20
**trial** 3:13 8:13 10:24 12:14 13:5 66:23 102:22
**true** 23:11,12 48:25 65:23 73:13 140:15 140:18 194:12
**truth** 8:8
**truthfully** 9:15
**try** 7:14 57:6
**trying** 32:24
**turn** 121:12
**Twenty** 18:16
**Twice** 9:22 80:3
**two** 7:8 18:7 42:9,11 60:22 76:19 80:12 87:8 92:14 97:23 111:15 112:12 119:10 131:20 135:11 135:12 136:14 136:22 137:14 138:9,24 139:3 181:8 186:20
**two-** 135:13
**two-month** 136:2,10 137:24
**two-week** 33:9 33:18 34:5 38:7 39:4 40:24 44:14 48:20 193:21
**type** 11:25 22:7 159:14 172:6 185:17 191:4
**types** 13:25 22:10 45:21
**typical** 51:25 63:10 123:25
**typically** 53:23 54:10 56:7,20 56:24 61:16 62:20 64:21 66:17 67:23 68:23 77:21 114:3

U

**U** 3:2
**uh-huh** 7:6 89:7
**umbrella** 46:23
**unable** 172:11
**unbecoming** 96:25
**underlying** 98:10
**undersheriff** 114:5 157:7,10 157:11,14,16
**undersheriffs** 157:20

**understand** 5:16 7:12 8:7,10 9:10 39:16,17 72:24 115:10 115:11
**understanding** 25:19 123:12
**understood** 7:17
**unexpected** 24:18
**Unfair** 71:18
**Unfortunately** 136:18
**Uniform** 3:6
**union** 65:5,6 100:8,10 124:12,14,18 125:3,5 137:8 139:20
**unit** 31:8,21,24 32:7,14,17,19 32:22 46:15,16 46:22,22 47:22 48:22 52:9 53:3,6 59:5,6,8 59:13,14,16 77:24 78:9 79:22 81:20,21 81:22 84:13 86:8,9 95:5 113:14,16 122:20 123:4,5 123:8 143:8 149:12 184:6 189:12,15,16
**UNITED** 1:2
**units** 46:18 47:3 58:25
**unnecessary** 29:5 106:25
**unsubstantiated** 171:15,18
**unusual** 74:22 120:8
**use** 22:5,17,24 25:22 26:2,8 28:10,23 29:8 31:17 33:16 43:18,24 55:25 56:3,4 61:4,21 61:23,25 62:11 72:23 73:3 75:25 76:8 84:16 101:18 106:24 114:16 119:9 123:16 123:18,19,22 123:24 124:3 125:6 131:10 131:25 132:10 142:8
**User** 183:18
**usually** 54:5,12 55:19 58:13 60:19 77:23 179:15 180:23

**V**

**vacation** 98:16
**various** 81:18 170:14,19,25
**verbal** 7:5,7 26:3
**version** 69:13 70:17 71:5 117:24 134:23 165:25
**Victims** 123:5 149:11
**video** 51:2 130:13,14,15 191:23 192:2
**view** 146:25 165:11 177:22
**views** 4:21
**Vilatoro** 152:16 154:12 155:8
**violate** 23:22
**violates** 94:19
**violation** 29:9 29:13,17 30:23 73:11 74:3 75:5,13 93:22 95:18 109:9
**visited** 177:12
**voice** 7:9
**volunteer** 19:4

**W**

**wait** 124:3
**waited** 120:3 122:18 139:3
**waiting** 4:18 122:10,13 136:14,22
**waived** 3:22
**waiver** 3:12,19
**walk** 178:5,25 179:9
**walking** 87:4
**want** 4:14 6:24 7:22 12:3 20:4 20:9 30:7 32:21 65:12 66:4 71:4 72:14 96:17 110:6 119:8 121:13 144:15 153:11 159:7 159:24 163:3
**wasn't** 92:23
**way** 40:11 77:23 140:24 186:17 194:18
**ways** 67:20
**we'll** 5:3,25 6:5 129:21
**we're** 4:18 5:6 11:14 20:8 60:3 98:23 110:5 114:6 124:13
**We've** 116:3
**weapons** 31:16
**week** 20:5
**weekend** 43:9
**weekends** 41:16 42:6
**weeks** 76:19
**went** 31:7 33:24 77:7 87:3 117:10 118:4 119:23 121:15 128:23,24 129:3 151:8 173:20
**West** 2:10
**Westchester** 41:5
**whatnot** 27:15
**WHEREOF** 194:20
**whichever** 77:25
**window** 180:21
**windows** 180:19
**witness** 1:18 3:14,25 5:2 8:13 10:16,19 11:23 14:9 15:3 25:16,17 35:14 38:14,20 66:15 68:7,14 93:13 121:18 131:9 132:10 155:8,13,16 182:20 188:7 188:11 189:3 192:9 193:3 194:9,14,20
**witnessed** 75:10
**witnesses** 26:23 27:2 34:17 35:6,10 36:20 36:23 49:4,8 49:12,23 50:8 50:13 55:9 57:3,4,7,13,14 58:5 66:16 67:12 68:9 70:9 71:9 103:17 108:21 108:24 127:12 127:16 128:18 132:14,22 133:4
**Woods** 187:25 188:12 189:3
**word** 84:24 96:6
**word-for-word** 163:22
**words** 26:8,14 63:18 87:8 166:6
**work** 17:12 18:5 40:6,18 52:25 77:17 80:7 82:9 86:8,9,13 88:4,10 92:2 124:23,24 138:3 141:8 150:22 153:12 153:24
**worked** 18:20 18:22 39:20,23 40:2 47:15 85:23
**working** 14:14 17:9,19 18:14 18:17 86:7,24 87:15 90:6 124:13 152:22 153:20 154:17 170:20 171:5
**works** 79:21 85:10
**wouldn't** 38:14 66:4 71:22 76:21 91:4 116:13
**write** 56:6,8 94:13 123:23
**writing** 31:18 128:11
**written** 21:25 22:12 23:8 38:8,23 45:3 56:10 85:20 104:5 193:21
**wrong** 57:15 73:25 141:24
**wrote** 144:20 146:17

**X**

**X** 1:3,12 193:2

**Y**

**Yankees** 88:12
**year** 12:4 14:5 31:18 63:22

64:3 67:2
88:22 95:12
111:15
**yearly** 31:14
43:13,15,17
**years** 14:6 18:7
66:21,22 81:10
81:12 90:8,20
111:15 115:24
116:4,8,9
**yell** 109:15
**yelled** 170:25
**yesterday** 5:12
**York** 1:2,23 2:5
2:10 4:4,12
15:23 33:10,17
189:25 194:7

**Z**

**Zero** 76:9
**Zoom** 1:13

**0**

**04-02-04SEC3**
97:12
**0600** 184:15
**07** 19:21

**1**

**1** 33:23 93:24
94:2 193:12
**1-7** 192:13
**1-9** 1:9
**10** 17:21 19:11
**10/11/21** 148:10
**10/12/21** 148:24
**10/13/21** 149:17
**10:40** 1:15
**100** 4:11 15:22
98:23,25
**1007** 182:19
**102** 193:24
**1050** 5:15
**10th** 42:24
**11** 16:21 98:11
105:14 131:6
147:19
**11504** 2:10
**11554** 4:12
15:23
**11735** 2:5
**11th** 42:24
**12** 97:2 147:25
152:5,22 169:5
186:21 187:5
190:20
**12-page** 104:20
**12/15/21** 149:22
**12/17/21** 149:25
**12:00** 124:24
150:22 187:3
**12th** 173:13,17
173:22
**13** 96:2,22
**13th** 173:25
174:3,6
**15** 98:3 168:18
179:6
**1600** 184:16
**191** 193:8
**193** 193:12,13
193:14,15,16
193:17
**1997** 18:3
**1998** 16:18

**2**

**2** 96:2 104:20
131:4 193:13
**2.2** 96:22
**2:35** 192:11
**20** 77:4,5 84:4,6
84:7,8 103:24
**2000** 17:21
19:11 20:5
**2006** 40:20
47:11,12
**2007** 9:25
**2009** 92:17
98:11 105:14
131:6
**2010** 12:4 95:12
98:3
**2019** 81:16
82:23 115:25
116:15
**2021** 81:9 110:7
113:19 114:13
147:19,25
152:23 169:5
186:21 187:5
190:20
**2021001706**
148:8
**2022** 19:16
112:3
**2023** 1:14 81:9
192:21 194:21
**20th** 42:22
**21st** 42:22
**221** 3:5
**23** 116:8,9
**24** 112:3
**24th** 19:16
**25th** 194:21

**3**

**3** 142:13 193:14
**3-4022** 149:4
**3.9** 97:2
**3/30/23** 183:12
**3:00** 54:15
**30** 132:14
**30(b)(6)** 25:17
**31** 1:19
**3116** 3:19
**35** 108:20,23
**353** 182:23
**355** 183:11
184:10 186:2
186:19
**356** 187:4
**358** 187:21
**360** 182:23
**366** 142:16
144:22 157:6
**367** 144:16
145:8
**368** 147:3,16
**369** 150:11
**38** 193:21
**3rd** 20:4 42:23

**4**

**4** 153:18,21
176:14
**4,5** 193:15
**4:00** 124:24,25
150:22,22
153:19 187:2
**46** 193:22
**477** 155:20,23
155:25
**480** 170:5
172:10
**481** 155:20
**482** 157:23
158:8
**484** 159:24
**490** 160:10
**491** 142:16
155:23 161:19
**4th** 42:23

**5**

**5** 153:18,21
179:20
**500** 98:14,22
**52** 57:9

**6**

**6** 1:14 153:14,18
153:18 181:17
182:18 193:7
193:16
**6:00** 184:15
**657** 94:8
**658** 94:3
**659** 179:21,22
181:9
**661** 181:2
**671** 179:21

**7**

**7** 182:16,21
193:17
**7:00** 42:6,7
**705** 176:15
**711** 177:17
**713** 178:7
**717** 179:11
**718** 179:17
**721** 176:15
**77** 2:5

**8**

**8** 152:5
**8:00** 124:25
150:22,23
153:19

**9**

**9** 167:4,5 177:19
182:7
**96** 193:23

# *ERRATA SHEET*

I, ______________________________, would like to make the following changes to my record:

| PAGE | LINE | CHANGE | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Signed_________________________ Date__________________________

**HILL REPORTING SERVICE, INC.**